**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

|  |  |
|---|---|
| RySheena Moore, Cadeidga Coleman, Janishia Fleming, Sheliah Ayanwale, and HOPE Fair Housing Center, | Case No. 24-cv-12912 |
| Plaintiffs, | Hon. April M. Perry |
| v. |  |
| Mac Property Management, LLC, d/b/a Mac Properties, |  |
| Defendant. |  |

**MEMORANDUM IN SUPPORT OF DEFENDANT MAC PROPERTIES' MOTION
TO DISMISS PLAINTIFFS' COMPLAINT AND TO STRIKE CLASS ALLEGATIONS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 4

    A.    Mac and the Hyde Park Housing Market ................................................. 4

    B.    The Federal Housing Choice Voucher Program ..................................... 4

    C.    Plaintiffs' Alleged Interactions with Mac .............................................. 6

    D.    The Alleged HOPE Investigation and Experiences of Unknown Parties ............... 9

    E.    Class Allegations ..................................................................................... 9

LEGAL STANDARD ...................................................................................................... 10

ARGUMENT .................................................................................................................... 11

    I.    PLAINTIFFS' CLAIM FOR SOI DISCRIMINATION MUST BE DISMISSED ............ 11

        A.    Plaintiffs Fail to Plausibly Allege That Mac Denied Them Apartments or Treated Them Differently Because of Their HCVP Subsidies. ................ 11

        B.    HCVP Subsidies Are Not "Income" Under the IHRA. ...................... 16

        C.    Mandating Participation in HCVP Is Unconstitutional. .................... 18

    II.    PLAINTIFFS HAVE FAILED TO PLEAD DISPARATE IMPACT RACIAL DISCRIMINATION UNDER THE FHA OR IHRA. .......................... 24

        A.    The Seventh Circuit Does Not Recognize FHA Disparate Impact Racial Discrimination Related to Participation in the HCVP Program ................ 24

        B.    The Complaint Fails to Establish a Prima Facie Case of Disparate Impact under both the FHA and the IHRA ................................ 25

    III.    THE COURT SHOULD DISMISS PLAINTIFFS' ICFA CLAIM. .................... 30

        A.    The IHRA Preempts Plaintiffs' ICFA Claim. ............................... 30

        B.    Plaintiffs Fail to Allege Mac Properties Engaged in "Unfair Practices." ................ 31

    IV.    THE COURT SHOULD STRIKE THE CLASS ALLEGATIONS ...................... 33

    V.    HOPE LACKS ARTICLE III STANDING. ............................................. 35

CONCLUSION ................................................................................................................ 40

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
659 F.3d 13 (D.C. Cir. 2011).................................................................................. 40

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................ 10

*Atl. Hous. Partners L.L.L.P. v. Brevard Cnty.*,
2024 WL 4235770 (M.D. Fla. Sept. 19, 2024)..................................................... 26

*Aux Sable Liquid Prods. v. Murphy*,
526 F.3d 1028 (7th Cir. 2008) ............................................................................... 22

*Baker v. City of Portsmouth*,
2015 WL 5822659 (S.D. Ohio Oct. 1, 2015)......................................................... 20

*Barclay v. Bio-Med. Applications of Ill., Inc.*,
2019 WL 1200330 (N.D. Ill. Mar. 14, 2019) .................................................... 30-31

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................ 10

*Benson v. Fannie May Confections Brands, Inc.*,
944 F.3d 639 (7th Cir. 2019) ................................................................................. 32

*Bieniek v. Cent. States, Se. & Sw. Areas Health & Welfare & Pension Funds*,
2023 WL 4473018 (N.D. Ill. July 11, 2023)........................................................... 11

*Bourbeau v. Jonathan Woodner Co.*,
549 F. Supp. 2d 78 (D.D.C. 2008) ......................................................................... 17

*Boyce v. DePaul*,
2024 WL 1603683 (D. Or. Apr. 11, 2024) ....................................................... 14-15

*Breen v. Chao*,
253 F. Supp. 3d 244 (D.D.C. 2017) ....................................................................... 26

*Briscoe v. Health Care Serv. Corp.*,
337 F.R.D. 158 (N.D. Ill. 2020) ............................................................................. 34

*Brower v. Village of Bolingbrook*,
735 F Supp 768 (N.D. Ill. 1990)............................................................................. 22

*Cal. Fed. Sav. & Loan Assoc. v. Guerra*,
479 U.S. 272 (1987) ................................................................................................ 22

*Camara v. Mun. Ct. of City & Cnty. of San Francisco*,
    387 U.S. 523 (1967) ............................................................................. 18

*City of Joliet v. New West, L.P.*,
    825 F.3d 827 (7th Cir. 2016) ........................................................27, 29

*City of Los Angeles v. Patel*,
    576 U.S. 409 (2015) ......................................................................19, 21

*Common Cause Indiana v. Lawson*,
    937 F.3d 944 (7th Cir. 2019) .............................................................. 38

*Connectors Realty Grp. Corp. v. State Farm Fire & Cas. Co.*,
    2021 WL 1143513 (N.D. Ill. Mar. 25, 2021) ...................................11, 33

*Crawford v. Marion Cnty. Election Bd.*,
    472 F.3d 949 (7th Cir. 2007) .............................................................. 38

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ......................................................................22, 24

*De La Fuente v. Stokely–Van Camp, Inc.*,
    713 F.2d 225 (7th Cir. 1983) .............................................................. 35

*Democratic Party of Wis. v. Vos*,
    966 F.3d 581 (7th Cir. 2020) .............................................................. 38

*Doe v. Columbia Coll. Chicago*,
    933 F.3d 849 (7th Cir. 2019) ...........................................................4, 10

*Eidson v. Pierce*,
    745 F.2d 453 (7th Cir. 1984) ...........................................................14, 23

*Fair Hous. Ctr. Of Metro. Detroit v. Singh Senior Living, LLC*,
    124 F.4th 990 (6th Cir. 2025) ............................................................. 39

*FDA v. All. For Hippocratic Med.*,
    602 U.S. 367 (2024) ............................................................... *passim*

*Forest Park II v. Hadley*,
    336 F.3d 724 (8th Cir. 2003) .............................................................. 24

*Geraci v. Union Square Condo. Ass'n*,
    2017 WL 372303 (N.D. Ill. Jan. 26, 2017) .......................................... 12

*Godinez v. Sullivan-Lackey*,
    352 Ill. App. 3d 87 (2004) ................................................................. 18

*In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*,
  2024 WL 4333709 (N.D. Ill. Sept. 27, 2024) .......................................................... 35

*Halpern 2012, LLC v. City of Center Line*,
  404 F. Supp. 3d 1121 (E.D. MI 2019) .................................................................... 21

*Hamilton v. Svatik*,
  779 F.2d. 383 (7th Cir. 1985) ................................................................................ 12

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ........................................................................................ 36-39

*Hawkins v. Chicago Comm'n on Hum. Rels.*,
  171 N.E.3d 21 (Ill. App. 2020) .............................................................................. 29

*Hill v. Grp. Three Housing Dev. Corp.*,
  799 F.2d 385 (8th Cir. 1986) ................................................................................. 23

*Hill v. Wells Fargo Bank, N.A.*,
  946 F. Supp. 2d 817 (N.D. Ill. 2013) ..................................................................... 11

*Inclusive Communities Project, Inc. v. Heartland Cmty. Ass'n, Inc.*,
  824 F. App'x 210 (5th Cir. 2020) ..................................................................... 14-15

*Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*,
  920 F.3d 890 (5th Cir. 2019) .................................................................25-26, 28-29

*Johnson v. Levy*,
  812 F. Supp. 2d 167 (E.D.N.Y. 2011) ...............................................................14, 16

*Jones, et al. v. City of Kansas City, Mo.*,
  Case No. 4:24-cv-00649-RK, Dkt. 28 (Slip Op.) (W.D. Mo. Feb. 11, 2025) .......................... 19-21

*Kaplan v. Pavalon & Gifford*,
  12 F.3d 87 (7th Cir. 1993) .................................................................................... 18

*Knapp v. Eagle Prop. Mgmt. Corp.*,
  54 F.3d 1272 (7th Cir. 1995) ........................................................................ *passim*

*Kubilius v. Barilla Am., Inc.*,
  2019 WL 2861886 (N.D. Ill. July 2, 2019) .............................................................. 11

*LaRiviere v. Bd. of Trustees of S. Illinois Univ.*,
  2015 IL App (5th) 140443-U ................................................................................ 31

*Legal Aid Chicago v. Hunter Properties, Inc.*,
  2024 WL 4346615 (N.D. Ill. Sept. 30, 2024) ..................................................... 38-40

*Loop Spine & Sports Ctr., Ltd. v. Am. Coll. Of Med. Quality, Inc.*,
   2023 WL 3585835 (N.D. Ill. May 22, 2023).................................................................... 32

*Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*,
   924 F.3d 375 (7th Cir. 2019) ........................................................................................ 18

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ....................................................................................................... 36

*McCauley v. City of Chicago*,
   671 F.3d 611 (7th Cir. 2011) ................................................................................... 10, 15

*Mich. Canners & Freezers Ass'n v. Agric. Mktg. & Bargaining Bd.*,
   467 U.S. 461 (1984) ....................................................................................................... 22

*McFields v. Dart*,
   982 F.3d 511, 518 (7th Cir. 2020) ................................................................................ 35

*Minch v. City of Chicago*,
   486 F.3d 294 (7th Cir. 2007) .......................................................................................... 5

*Mother Zion Tenant Ass'n v. Donovan*,
   865 N.Y.S.2d 64 (2008) ................................................................................................. 23

*Murdock-Alexander v. Tempsnow Emp.*,
   2016 WL 6833961 (N.D. Ill. Nov. 21, 2016) ............................................................... 11

*Nasir v. U.S. Dep't of State*,
   2024 WL 4206279 (N.D. Ill. Sept. 17, 2024) ............................................................... 10

*Nesbitt v. Draper & Kramer, Inc.*,
   2008 WL 4542942 (N.D. Ill. May 23, 2008)............................................................ 12-13

*Nischan v. Stratosphere Quality, LLC*,
   865 F.3d 922 (7th Cir. 2017) ........................................................................................ 30

*Our Country Home Enterprises, Inc. v. Comm'r of Internal Revenue*,
   855 F.3d 773 (7th Cir. 2017) ........................................................................................ 23

*Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*,
   840 F.3d 879 (7th Cir. 2016) ........................................................................................ 18

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
   636 F.3d 1150 (9th Cir. 2011) ...................................................................................... 31

*People by James v. Common West, LLC ("Common West II")*,
   224 N.Y.S.3d 364 (N.Y. Sup. Ct. Dec. 11, 2024) .................................................... 19-21

*People by James v. Common West, LLC* ("*Common West I*"),
    80 Misc. 3d 447 (N.Y. Sup. Ct. 2023) .............................................................. 20-21

*Phillips v. Sheriff of Cook Cty.*,
    828 F.3d 541 (7th Cir. 2016) ............................................................................ 34

*Richards v. U.S. Steel*,
    869 F.3d 557 (7th Cir. 2017) ............................................................................ 30

*Robinson v. Toyota Motor Credit Corp.*,
    201 Ill. 2d 403 (2002) ..................................................................................... 32

*Salute v. Stratford Greens Garden Apts.*,
    136 F.3d. 293 (2d Cir. 1998) ................................................................... *passim*

*Schneckloth v. Bustamante*,
    412 U.S. 218 (1973) ........................................................................................ 18

*See v. Seattle*,
    387 U.S. 541, 545 (1967) ................................................................................. 18

*Siegel v. Shell Oil Co.*,
    612 F.3d 932 (7th Cir. 2010) ........................................................................... 32

*Simer v. Rios*,
    661 F.2d 655 (7th Cir. 1981) ........................................................................... 35

*Sims, et al. v. Mac Prop. Mgmt., LLC, et al.*,
    Case No. 2023CH00516 (Ill. Cir. Ct., Cook Cnty. Jan. 18, 2023) ...................... 4

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ......................................................................................... 40

*Steele v. GE Money Bank*,
    2009 WL 393860 (N.D. Ill. Feb. 17, 2009) .................................................... 15

*Stevens v. Hollywood Towers & Condo. Ass'n*,
    836 F. Supp. 2d 800 (N.D. Ill. 2011) ............................................................. 29

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) ........................................................................... 34

*Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*,
    17 F.4th 950 (9th Cir. 2021) ........................................................................... 28

*TBS Grp., LLC v. City of Zion, Illinois*,
    2017 WL 5129008 (N.D. Ill. Nov. 6, 2017) ........................................... 5, 12, 28

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
  576 U.S. 519 (2015) ............................................................... *passim*

*U.S. ex rel. Prewitt, et al. v. Mac Prop. Mgmt. LLC, et al.*,
  Case No. 21-CV-02195 (N.D. Ill. April 23, 2021) ....................................... 4

*U.S. v. Johnson*,
  47 F.4th 535 (7th Cir. 2022) ........................................................ 16

*Valley Forge Christ. Coll. v. Am. United for Sep. of Church and State, Inc.*,
  454 U.S. 464 (1982) ................................................................ 36

*Vanlaningham v. Campbell Soup Co.*,
  492 F. Supp. 3d 803 (S.D. Ill. 2020) ................................................ 32

*Vanzant v. Hill's Pet Nutrition, Inc.*,
  934 F.3d 730 (7th Cir. 2019) ..................................................... 31-32

*Wigginton v. Bank of Am. Corp.*,
  2013 WL 4854373 (N.D. Ill. Sept. 11, 2013) ...................................... 12-13

**Statutes, Rules & Regulations**

24 C.F.R. § 100 ..................................................................... 26

24 C.F.R. § 982 ............................................................... *passim*

775 ILCS 5/1-103 ................................................................... 16

775 ILCS 5/3-102 ............................................................... 11, 30

775 ILCS 5/8-111 ................................................................... 30

775 ILCS 5/10-102 ........................................................... 15, 18-19

42 U.S.C. § 1437f .................................................................. 23

42 U.S.C. § 3604 ................................................................... 24

Fed. R. Civ. P. 12 ........................................................... *passim*

Fed. R. Civ. P. 23 .......................................................... 9, 11, 33-34

Pub. L. No. 101-625, 104 Stat. 4079, § 225 ......................................... 23

**Other Authorities**

BLACK'S LAW DICTIONARY (12th ed. 2024) .............................................. 16

H.R. Rep. 100-122 ....................................................................................................... 23

HUD, Guidance on Application of the Fair Housing Act to the Screening of
    Applicants for Rental Housing (April 29, 2024) ................................................. 13-14

IRS Rev. Rul. 76-229, 1976-2 C.B. 16 ...................................................................... 17

MERRIAM-WEBSTER'S ONLINE DICTIONARY ........................................................... 16-17

S. REP. 105-21 ............................................................................................................. 23

U.S. CONST., amend. IV ....................................................................................... *passim*

U.S. CONST., amend. XIV ........................................................................................... 18

U.S. CONST., art. VI, cl. 2 ................................................................................. 2, 18, 22

Defendant Mac Property Management, LLC d/b/a Mac Properties ("Mac") submits this Memorandum in Support of its Motion to Dismiss the Complaint and to Strike the Class Allegations filed by Plaintiffs RySheena Moore, Cadeidga Coleman, Janishia Fleming, Sheliah Ayanwale, and H.O.P.E., Inc., d/b/a HOPE Fair Housing Center ("HOPE").

## INTRODUCTION

Mac is an equal opportunity property management company that manages residential apartment buildings, including in Chicago's Hyde Park neighborhood. As part of its business, Mac regularly rents apartments to "Section 8" federal Housing Choice Voucher Program ("HCVP") beneficiaries. Regardless of prospective tenants' source of payment, Mac consistently applies lawful, objective criteria when evaluating proposed tenants' rental applications.

Plaintiffs are four Black women[1] who allegedly sought to rent apartments in Mac-managed buildings in Hyde Park, specifically Regents Park and the 5252 Apartments ("Regents" and "5252"). Mac allegedly "steered" Plaintiffs away from and/or denied them access to apartments in those buildings because they are HCVP beneficiaries. HOPE is a nonprofit advocacy organization with a purported mission of eliminating housing discrimination. HOPE claims it investigated Mac's leasing practices by deploying "testers" who pretended to be HCVP beneficiaries seeking to rent apartments, primarily at Regents.

Plaintiffs allege Mac discriminated against them because they are (or pretended to be) HCVP beneficiaries. Plaintiffs claim this conduct violates the Illinois Human Rights Act ("IHRA") prohibition against "source of income" (or, "SOI") discrimination. Plaintiffs bring additional claims under the IHRA and the federal Fair Housing Act ("FHA") for racial

---

[1] The Complaint describes Plaintiffs' and other individuals' race using the terms "Black" and "White." Mac adopts that same convention.

discrimination, asserting Mac's alleged SOI discrimination disparately impacts Black renters. Finally, Plaintiffs also allege claims under the Illinois Consumer Fraud Act ("ICFA") based on Mac's alleged violations of the IHRA. Plaintiffs purport to bring all of these claims on behalf of a class of HCVP beneficiaries who sought to rent from Mac.

None of Plaintiffs' claims are viable. To start, Plaintiffs' SOI discrimination claim (Count I) suffers from a myriad of alternative and overlapping failings requiring dismissal. First, Plaintiffs never actually allege a viable claim of discrimination because, despite filing a 52-page, 200-plus paragraph Complaint, Plaintiffs do not allege their HCVP subsidies were sufficient to rent the units they desired. Time and again, Plaintiffs allege Mac had "available" units posted online at prices "within" their "budgets." However, Plaintiffs never quantify those budgets or allege they were sufficient to cover the total rent costs of the subject units, which include both the posted rent and *additional monthly fees and expenses*. Second, and alternatively, Plaintiffs' IHRA SOI discrimination claim must be dismissed because a HCVP subsidy is not "income." If the Court finds the IHRA's SOI provision encompasses HCVP subsidies as "income," as Plaintiffs insist, Count I must still be dismissed because the state statute underlying their claim is unconstitutional. Federal law establishes that participation in the HCVP is voluntary. In Plaintiffs' view, the State of Illinois is constitutionally empowered to ignore that Congressional intent and mandate landlords' participation in the HCVP in violation of both the Fourth Amendment's prohibition against warrantless searches and the Supremacy Clause.

Next, the Court must dismiss Plaintiffs' disparate impact racial discrimination claims (Counts II & III), again for multiple, independent reasons. As the Seventh Circuit has long held, because participation in the HCVP is voluntary and non-participating owners are free to reject HCVP applicants, plaintiffs cannot maintain a suit under the FHA for disparate impact racial

discrimination based on the HCVP. Alternatively, the Court must dismiss Plaintiffs' FHA claim because it fails to satisfy the pleading standard required to allege a disparate impact housing discrimination claim. Plaintiffs broadly allege that Mac's supposed SOI discrimination harms Black tenants because a majority of Chicago's HCVP beneficiaries are Black. The Complaint, however, is devoid of any allegations concerning the racial makeup of Regents, 5252, or any other building. The Supreme Court has explicitly held that Plaintiffs must plead facts and/or statistical evidence that demonstrate a causal connection between a challenged policy and the alleged racial disparity caused by that policy to maintain a disparate impact racial discrimination claim under the FHA. The Complaint fails to meet that standard.

Plaintiffs' ICFA claim (Count IV) fails because it is preempted. The IHRA expressly bars alternative state-law claims that are inextricably linked to a civil rights violation governed by the statute. Yet, Plaintiffs purport to bring their state consumer fraud claim based entirely on Mac's purported violation of the IHRA's SOI antidiscrimination provision, which Plaintiffs try to repackage as a "public policy" violation and other purportedly actionable conduct under the ICFA tied to IHRA-created legal duties. The IHRA preempts it.

The Court should also dismiss the Individual Plaintiffs' class action claims. Plaintiffs purport to represent a putative class of HCVP beneficiaries who sought to rent from Mac *anywhere in Chicago since 2021* (which is two years before the state of Illinois adopted its SOI discrimination prohibition). The Complaint fails to allege the minimal, necessary facts to support this proposed class. The entirety of Plaintiffs' substantive allegations concern just two buildings—Regents and 5252—and allege discriminatory acts that all occurred in the last two years. Those limited allegations are insufficient to support a class of HCVP beneficiaries who sought to rent from Mac anywhere in Chicago over the last four years.

3

*Finally*, the Court should dismiss HOPE for lack of Article III standing. HOPE has not alleged a sufficient injury to invoke this Court's jurisdiction.

## FACTUAL BACKGROUND [2]

### A. Mac and the Hyde Park Housing Market

Mac manages residential property buildings, including in Chicago's Hyde Park neighborhood. Compl. ¶¶ 17, 20, 31, 34-35. Hyde Park is racially and economically diverse, with a "competitive rental housing market with rapidly rising housing costs" that Plaintiffs claim "increasingly displace[s] lower-income and Black residents." *Id.* ¶¶ 29-30. Mac allegedly controls more than half of Hyde Park's available rental units. *Id.* ¶¶ 32-33. Mac participates in the HCVP and rents to its beneficiaries. *See id.* ¶ 47.

### B. The Federal Housing Choice Voucher Program

The HCVP provides low-income families with subsidies to rent housing in the private market with the assistance of federal funds. U.S. Department of Housing and Urban Development ("HUD") guidelines empower local public housing agencies ("PHAs") like the Chicago Housing Authority ("CHA") to administer the HCVP, subject to federal oversight. 24 C.F.R. § 982.1. HUD's regulations require authorized PHAs to adopt a written "administrative

---

[2] As required for a Rule 12(b)(6) motion, the Court must accept all *well-pleaded* factual allegations as true. *See Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019). That said, Plaintiffs incorrectly allege Mac "owns and manages" the buildings that are the subject of Plaintiffs' allegations. Compl. ¶¶ 17, 32-33. As Plaintiffs' counsel knows or should be aware, Mac *is a property management company*. In at least two other cases filed on behalf of other clients, Plaintiffs' counsel sued Mac *and* the owners of the buildings it manages on their behalf. *See, e.g., U.S. ex rel. Prewitt, et al. v. Mac Prop. Mgmt. LLC, et al.*, Case No. 21-CV-02195, Dkt. 1, ¶ 1 (N.D. Ill. Apr. 23, 2021) (False Claims Act suit against Mac as the "property manager" and "5512 S. Hyde Park, LLC," as the building owner); *Sims, et al. v. Mac Prop. Mgmt., LLC, et al.*, Case No. 2023CH00516, Dkt. 1, ¶¶ 9-15 (Ill. Cir. Ct., Cook Cnty. Jan. 18, 2023) (alleging claims against Mac as the property manager of the Algonquin Apartments, and "Indian Village LLC," "Cedar Algonquin LLC," and "Pointe Algonquin, LLC," as defendant-owners of the Algonquin Apartments).

plan" detailing the local program policies, which must comply with HUD requirements. 24 C.F.R. § 982.54.

The CHA's Administrative Plan[3] provides that a voucher applicant's total income cannot exceed 80% of the area's median income. CHA Admin. Plan (attached as "Ex. A"), § 18-III.B. If CHA approves an HCVP beneficiary for a housing subsidy, CHA then calculates both that prospective tenant's contribution, *i.e.*, the total tenant payment ("TTP"), and CHA's contribution, which is the HCVP subsidy. Ex. A, §§ 6.I.A to 6.II.C; *see also* 24 C.F.R. §§ 982.301(b)(2), 982.505(b). HUD and CHA require HCVP beneficiaries to search for and find qualified apartments on their own, and the apartments cannot exceed HUD payment standards. *See* Ex. A §§ 5-II.B, 16-I.A-16-II.B; 24 C.F.R. § 982.302(a), § 982.503(b). CHA grants exceptions above the HUD payment guidelines in limited circumstances, including for "Mobility Areas." *See* Compl. ¶¶ 24, 27. Plaintiffs allege that while the CHA caps monthly rent "budgets" for the Hyde Park Mobility Area's housing, some of Mac's high-rise buildings have rental units priced below this cap. *Id.* ¶¶ 24, 124.

Once a HCVP beneficiary locates a desired apartment and CHA confirms it meets HUD and CHA requirements, the beneficiary must provide a Request for Tenancy Approval ("RTA") to the potential landlord, which sometimes is referred to as "moving papers." Ex. A § 9-I.B; 24 C.F.R. § 982.302(b)-(c). HCVP beneficiaries are not permitted to rent apartments until CHA approves their completed and executed RTA. *Id.*

The CHA's administration of the HCVP requires participating landlords to consent to an initial inspection of "the contract unit and premises at such times as the [CHA] determines

---

[3] The Court may take judicial notice of the CHA's Administrative Plan. *See Minch v. City of Chicago*, 486 F.3d 294, 300 n. 3 (7th Cir. 2007) (trial court could consider of parties' contract); *TBS Grp., LLC v. City of Zion, Illinois*, 2017 WL 5129008, at *1 (N.D. Ill. Nov. 6, 2017) (similar).

necessary," and additionally allow the CHA, HUD, and the Comptroller General of the United States "full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant," including "any computers, equipment or facilities containing such records." *See* Ex. A § 8-II; Housing Assistance Payments ("HAP") Contract, HUD Form No. 52641 (2023), Part B §§ 3(e), 11 (attached as "Ex. B"); 24 C.F.R. § 982.158(c).[4]

If a unit passes this mandatory inspection, the CHA will only approve a proposed lease if the rent price for the unit is "reasonable." Ex. A § 8-III. If it is, and if CHA otherwise approves the RTA, the property owner enters into a lease with the beneficiary and a separate contract with the CHA called a Housing Assistance Payment or "HAP" contract. *See* Ex. B. That agreement must conform with HUD's requirements. Ex. A §§ 9-I.F-9.I.H, 17-V.A; 24 C.F.R. § 982.451. A. The HAP Contract requires landlords to consent to further inspections of the apartment and the building in which it is located, Ex. B, Part B, § 3(e), and gives the CHA and federal agencies "access to the property owner's accounts and other records of the owner that are relevant to the HAP contract," Ex. B, Part B § 11, including "any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere," Ex. B, Part B, § 6(d); *see also* 24 C.F.R. §§ 982.405-406(g), 982.158.[5]

**C.    Plaintiffs' Alleged Interactions with Mac**

*RySheena Moore.* According to the Complaint, RySheena Moore is a Black woman who "has a two-bedroom Voucher" and allegedly contacted Mac about a two-bedroom apartment at Regents. Compl. ¶¶ 12, 92. In February 2023, Moore allegedly sent screenshots to a Mac leasing

---

[4] The Court may take judicial notice of HUD's form HAP Contract. *See supra*, 5 n. 3.

[5] Both the federal regulations and HAP contract define "premises" to include "[t]he building or complex in which the contract unit is located, including common areas and grounds." Ex. B, Part C, § 17; 24 C.F.R. § 982.4.

agent of two Regents listings (one for $2,000; the other, $1,975), which Plaintiffs claim were within Moore's "budget." *Id.* ¶ 95. The Complaint does not provide any information regarding Moore's "budget." *Id.* ¶ 95. The agent with whom Moore spoke allegedly emailed her listings for other properties in Hyde Park. Compl. ¶ 96. Moore allegedly then traveled to Regents where she met with a different agent, who asked to see Moore's "moving papers," which she did not have. *Id.* ¶ 97. The leasing agent then allegedly "refused to show Ms. Moore the building or available apartments and refused to rent to Ms. Moore." *Id.* Moore allegedly made an additional inquiry in March 2023, but, she says, Mac "refused" to rent her a Regents apartment. *Id.* ¶ 99.

**Cadeidga Coleman.** The Complaint alleges that Cadeidga Coleman is a Black woman who wanted to move from Minnesota to Hyde Park using her "two-bedroom Voucher." Compl. ¶ 13. Coleman allegedly contacted Mac in December 2022 "about renting a two-bedroom apartment at [Regents]" after seeing "available two-bedroom apartments advertised at [Regents] that were within her Voucher budget." *Id.* ¶ 105. The Complaint provides no information regarding Coleman's "budget" or the listing prices of the referenced apartments. *Id.* Plaintiffs allege a Mac leasing agent "refused to show or rent her any of the available [Regents] apartments" after Moore disclosed her voucher. *Id.* ¶ 106. Instead, the agent allegedly suggested other, alternative apartments. *Id.* The Complaint alleges the agent told Coleman that Mac "required her to have 'work income' of 2.5 times the full monthly rent, in addition to her Voucher." *Id.* ¶ 108. Coleman allegedly contacted the agent again in January 2023, who purportedly stated that because Mac "required 'work income,'" it "would not rent an apartment to a Voucher holder even if CHA paid the entire rent." *Id.* ¶ 110.

**Janishia Fleming.** The Complaint alleges that Janishia Fleming is a Black woman who contacted Mac about apartments at Regents in July 2023. Compl. ¶ 115. Mac allegedly "initially

'pre-approved' her application," but later advised Fleming that she "could not tour or rent at [Regents], even though the rent prices were within her budget." *Id.* ¶ 115. Again, the Complaint does not quantify Fleming's "budget" or allege that the listed rents included all costs of the apartment. The agent allegedly told Fleming she could only rent apartments "at least $300 per month under her Voucher budget" because of "hidden utility and maintenance fees at [Regents]" and allegedly "refused to process her full application." *Id.* ¶ 116. Fleming allegedly contacted Mac again in August 2023 using a different email address and without disclosing her voucher. *Id.* ¶ 117. The responding agent "offered to show her available apartments at [Regents]" before learning of her voucher status and "den[ying] her a tour." *Id.*

**Sheliah Ayanwale**. The Complaint alleges that Sheliah Ayanwale is a Black woman and HCVP beneficiary with a "two-bedroom" voucher who wanted to move to Chicago from Texas, "transfer[ing]" her voucher. Compl. ¶¶ 15, 122. Ayanwale allegedly contacted Mac around April 2023 to confirm the rent for units at 5252—$2,505 for a studio and $2,700 for a one-bedroom. *Id.* ¶ 124. Ayanwale claims she then confirmed that CHA's monthly area voucher budget was "about $2,700 for an apartment with up to two bedrooms." *Id.* ¶ 125. The Complaint does not plead any information regarding Ayanwale's alleged budget. Ayanwale claims that when she sought to apply for a one-bedroom or studio apartment at 5252, Mac's leasing agent "evaded [her] request for an application, [and] discouraged her from applying to the building with a Voucher." *Id.* ¶ 126. Ayanwale allegedly later spoke with yet another agent who responded similarly, telling Ayanwale that "she could only rent an apartment at least $100 per month below her Voucher budget maximum of $2,700." *Id.* ¶ 128. Ayanwale claims the agent would not allow her to apply for a studio. *Id.* She claims she ultimately completed an application for 5252, but, after confirming she was a HCVP beneficiary, the Mac agent refused her application, stating "no

apartments were available" at 5252, and instead offered to show Ayanwale other, alternative units. *Id.* ¶¶ 130-131.

### D. The Alleged HOPE Investigation and Experiences of Unknown Parties

HOPE is a private, non-profit corporation, with a claimed mission of eliminating housing discrimination and creating greater housing opportunities. Compl. ¶ 16. The Complaint contends that Mac's alleged "policy and practice" of SOI discrimination interferes with HOPE's programs and services. *Id.* ¶ 144. HOPE purportedly implemented a fair housing investigation of Mac that included the use of so-called "testers," who allegedly contacted Mac and requested to rent apartments at Regents with vouchers. *Id.* ¶ 10.

The Complaint also references other, unnamed individuals who allegedly sought to rent Mac apartments in Hyde Park, largely before the IHRA was amended in 2023 to preclude SOI discrimination, and who were purportedly denied and/or steered away from Regents, 5252 and other unidentified Mac-managed high-rise properties. Compl. ¶¶ 59-66. The Complaint alleges these individuals were told, among other things, that "special rules apply to Voucher holders," *id.* ¶ 61, that beneficiaries still had to comply with Mac's "work income" requirements, *id.* ¶¶ 62-64, and that there were no available apartments at Regents, *id.* ¶¶ 64-65. Plaintiffs claim Mac's leasing agents steered these other prospective HCVP beneficiaries away from high-rises like Regents and 5252 toward low-rise, walk-up buildings with fewer amenities and further from the lake. Compl. ¶ 76. The Complaint does not identify these individuals, specify their budgets, the units they requested to tour, or any details about their supposed HCVP benefits. *See, e.g.*, *id.* ¶¶ 59, 63, 68.

### E. Class Allegations

The Individual Plaintiffs purport to allege claims on behalf of themselves and a class of similarly situated individuals under Rules 23(b)(3)(2) and (c)(4). Compl. ¶ 150. The Complaint

describes this putative class as HCVP beneficiaries who "sought to rent an apartment" from Mac anywhere in Chicago "on or after December 17, 2021." *Id.* ¶ 149. The Complaint alleges this putative class is so numerous that joinder is impracticable because more than 3,000 HCVP beneficiaries move annually in Chicago, Hyde Park is a desired location, and Mac controls approximately 5,000 apartments there. *Id.* ¶ 151. Plaintiffs further allege their claims are typical of all HCVP recipients who sought to rent from Mac. *Id.* ¶ 153. Finally, they allege there are "common questions of law and fact" for the class concerning whether Mac's alleged practices violate the FHA, IHRA and ICFA. *Id.* ¶¶ 152(a)-(m).

## LEGAL STANDARD

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* When deciding a Rule 12(b) motion, the Court "accept[s] all well-pleaded facts as true and draw[s] all reasonable inferences in favor of the plaintiff." *Doe*, 933 F.3d at 854. Even still, "legal conclusions and conclusory allegations" are "not entitled to this presumption of truth," and courts must disregard them when evaluating a motion to dismiss. *See, e.g.*, *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (instructing trial courts to "disregard[]" "legal conclusions" because they "contribute nothing" to a Rule 12(b) "plausibility analysis").

Rule 12(b)(1) provides that a matter may be dismissed for "lack of jurisdiction," including, for example, where a litigant does not have standing. *Nasir v. U.S. Dep't of State*, 2024 WL 4206279, at *2 (N.D. Ill. Sept. 17, 2024) (plaintiffs must offer competent proof of standing to avoid dismissal pursuant to Rule 12(b)(1)); Fed. R. Civ. P. 12(b)(1).

10

A Court may dismiss putative class action allegations from a complaint under Rule 12(f) if a complaint does not plausibly allege Rule 23 prerequisites. *Connectors Realty Grp. Corp. v. State Farm Fire & Cas. Co.*, 2021 WL 1143513, at *2 (N.D. Ill. Mar. 25, 2021) ("Courts in this District … evaluate motions to strike class allegations under Rule 23[.]") (citation omitted). Consistent with the Court's duty to determine the appropriateness of class treatment "[a]t an early practicable time," Fed. R. Civ. P. 23(1)(A), courts may exercise their discretion and strike class allegations where the legal theories advanced by the putative class representative are "improper as a matter of law." *Bieniek v. Cent. States, Se. & Sw. Areas Health & Welfare & Pension Funds*, 2023 WL 4473018, at *5 (N.D. Ill. July 11, 2023); *see also Murdock-Alexander v. Tempsnow Emp.*, 2016 WL 6833961, at *3 (N.D. Ill. Nov. 21, 2016) ("The interplay of Rules 12(f), 23(c)(1)(A), and 23(d)(1)(D) empowers the Court to dismiss or strike class allegations at the pleading stage."). A court therefore has discretion to strike class allegations where the putative class representatives fail to allege "a legal requirement for class certification." *Kubilius v. Barilla Am., Inc.*, 2019 WL 2861886, at *2 (N.D. Ill. July 2, 2019); *see, e.g.*, *Hill v. Wells Fargo Bank, N.A.*, 946 F. Supp. 2d 817, 829-833 (N.D. Ill. 2013) (granting motion to strike class allegations at the pleading stage).

## ARGUMENT

### I. PLAINTIFFS' CLAIM FOR SOI DISCRIMINATION MUST BE DISMISSED.

#### A. Plaintiffs Fail to Plausibly Allege That Mac Denied Them Apartments or Treated Them Differently Because of Their HCVP Subsidies.

The Court should dismiss Plaintiffs' IHRA housing discrimination claim because Plaintiffs do not allege basic, necessary facts to state a claim for disparate treatment. *See* 775 ILCS 5/3-102. For this claim, a plaintiff must allege "1) that she is [a member of a protected class]; 2) that defendants were aware of [it]; 3) that she was ready and able to accept

defendant's offer to rent; and 4) that defendant refused to deal with her." *Nesbitt v. Draper & Kramer, Inc.*, 2008 WL 4542942, at *2 (N.D. Ill. May 23, 2008) (citing *Hamilton v. Svatik*, 779 F.2d 383, 387 (7th Cir. 1985)).[6] Here, Plaintiffs fail to assert non-conclusory facts to support their assertion that Mac discriminated against them *because of* their HCVP subsidies.

The viability of Plaintiffs' claim depends on whether their HCVP subsidies and approved TTP were sufficient to rent apartments at Regents and 5252.[7] But instead of plausibly alleging they were "ready and able to" to rent from Mac at those buildings, *Nesbitt*, 2008 WL 4542942, at *2, Plaintiffs plead around this prerequisite, repeatedly asserting that the online apartment listings they saw were "within" their "Voucher budgets."[8] Regardless of the frequency with which they repeat this conclusory allegation, it does not establish the necessary elements of their claim. *See Wigginton v. Bank of Am. Corp.*, 2013 WL 4854373, at *3 (N.D. Ill. Sept. 11, 2013), *aff'd*, 770 F.3d 521 (7th Cir. 2014) (plaintiff must allege facts showing discrimination because of a protected trait rather than other, non-protected characteristics).

Plaintiffs must allege plausible, non-conclusory *facts* from which the Court may fairly infer that Mac discriminated against them *because of* their income source. *TBS Group, LLC* 2017 WL 5129008, *9 ("And, most importantly, the key (and sole) allegation is not even factual, but merely a conclusion. That type of pleading does not unlock the doors of discovery….") (cleaned

---

[6] *Geraci v. Union Square Condo. Ass'n*, 2017 WL 372303, at *8 (N.D. Ill. Jan. 26, 2017) ("Illinois courts look to federal law" when addressing IHRA housing discrimination claims).

[7] Pursuant to HCVP rules, a program beneficiary may not pay more than her approved TTP to rent an apartment. *See, e.g.*, Ex. B, Part C § 4(a) ("The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.").

[8] *See* Compl. ¶ 95 ("Moore sent the leasing agent screenshots of two [Regents] apartment listings that were within her Voucher budget[.]"); ¶ 105 ("Coleman saw available two-bedroom apartments advertised at [Regents] that were within her Voucher budget."); ¶ 115 ("Mac Properties … told [Ms. Fleming] that she could not tour or rent at [Regents], even though the rent prices were within her budget."); ¶ 123 ("Ayanwale was excited to find a few apartments at 5252 Apartments that advertised rental prices within her Voucher budget."); *see also id.* ¶¶ 9, 10, 36, 61, 65-67, 70-71, 73-75, 99, 106, 111, 125, 128, 134-35.

up). Vague allegations regarding the scope of Plaintiffs' voucher budgets do not suffice. Plaintiffs do not allege, for instance, (i) the amounts of Plaintiffs' supposed budgets, (ii) how their budgets were calculated, (iii) whether they complied with CHA rules limiting tenant payment to the TTP, or (iv) that the units would be approved by the CHA. The Complaint also fails to allege that the listed rents Plaintiffs saw online included utilities and building services fees, which is significant because CHA considers these additional costs as part of the total rent when evaluating whether an HCVP beneficiary's desired apartment is "reasonable" *See* Ex. A § 8-III.C (CHA considers the "[a]menities, services and utilities" as part of its "Rent Reasonableness" evaluation). Without plausibly establishing that their "budgets" otherwise qualified them to rent the units at Regents or 5252, Plaintiffs have not alleged they "met [Mac's] objective requirements for the lease," and their claim must be dismissed. *See Wigginton*, 2013 WL 4854373, at *4 (dismissing FHA claim where plaintiffs "failed to plausibly allege that they were otherwise qualified for the mortgage they were seeking"); *Nesbitt*, 2008 WL 4542942, at *2. HOPE's discriminatory treatment claim fails for the same reason. Whether relying on the Individual Plaintiffs' allegations, the vague and conclusory "examples" of unknown third parties who allegedly sought to rent in Mac managed buildings before Illinois adopted the IHRA's SOI discrimination prohibition, or the purported experiences of its "testers," HOPE pleads no individual facts to establish a claim of disparate treatment based on prospective renters' source of income. *See* Compl. ¶¶ 58-76.

Further, the Complaint never reconciles Plaintiffs' allegations with the law, which authorizes landlords to request, receive, and consider applicants' financial abilities when evaluating rental applications—whether applicants are HCVP beneficiaries or otherwise.[9] *See,*

---

[9] HUD, Guidance on Application of the Fair Housing Act to the Screening of Applicants for Rental

*e.g.*, *Eidson v. Pierce*, 745 F.2d 453, 461 (7th Cir. 1984) (landlords are "free to accept applications only from those persons he or she expects to be responsible tenants, and the Section 8 program does not constrain the owner's judgment on that question"). Without well-pleaded allegations establishing their qualifications to rent at Regents or 5252, the Court must dismiss Plaintiffs' disparate treatment claim. *See, e.g.*, *Boyce v. DePaul*, 2024 WL 1603683, at *3 (D. Or. Apr. 11, 2024); *Johnson v. Levy*, 812 F. Supp. 2d 167, 181 (E.D.N.Y. 2011) (dismissing discrimination claim under FHA because plaintiff failed to allege she "met [landlord's] objective requirements for the lease").[10]

Plaintiffs' discriminatory treatment claim also should be dismissed because Plaintiffs do not allege that Mac engaged in discriminatory treatment by "alter[ing]" any "terms, conditions, or privileges" for HCVP beneficiaries relative to non-HCVP beneficiaries. Although the Complaint alleges that "Mac Properties often waives income requirements and other rules for rental applications for non-Voucher renters, including University of Chicago students," while "strictly appl[ying]" such requirements to HCVP beneficiaries, that assertion is too vague and conclusory to state a claim. Compl. ¶ 90. This assertion suggests (but does not actually allege) that college students with access to student loans, scholarships, third-party payors, and other unique sources of capital to guaranty payment are somehow "similarly situated" to Plaintiffs (who are responsible for paying their TTP). The Complaint, however, offers no facts to support that suggestion. *See Inclusive Communities Project, Inc. v. Heartland Cmty. Ass'n, Inc.*, 824 F.

---

Housing (April 29, 2024), https://www.hud.gov/sites/dfiles/FHEO/documents/FHEO_Guidance_on_Screening_of_Applicants_for_Rental_Housing.pdf (*last visited* Feb. 5, 2025) (landlords may lawfully "assess[] an applicant's ability to afford the rent.").

[10] The Complaint also separately acknowledges Plaintiff Moore did not have her "moving papers" when she inquired about apartments in Regents. Compl. ¶ 97. But the law allows Mac to require prospective tenants to provide such paperwork before processing a rental application. *See also Eidson*, 745 F.2d at 460-61. This allegation there does nothing to support a claim for actional discrimination under the IHRA.

App'x 210, 220 (5th Cir. 2020) (dismissing complaint because plaintiff failed to allege that housing remained available to a "similarly situated" group.); *Boyce*, 2024 WL 1603683, at *3.

Nor does the Complaint plausibly allege Mac refused to "negotiate" with HCVP beneficiaries. In fact, Plaintiffs never allege they submitted offers to rent at Regents or 5252. Rather, consistent with their shotgun pleading approach, Plaintiffs assert that a "former employee" (apparently from Mac) said at some point, to someone that "Mac Properties can—and does—negotiate the advertised or requested rent for market renters, but not for Voucher holders." Compl. ¶ 90. This vague and anonymized allegation does not save their claim from dismissal. Similarly, the one, time-barred, conclusory allegation regarding an unnamed individual who sought to rent at 5252 in March 2022 but who was allegedly told (by someone) that Mac has "special rules that apply only to voucher holders," Compl. ¶ 61, does not satisfy federal pleading standards. *See McCauley*, 671 F.3d at 616.[11]

Nor can Plaintiffs sustain their claim through bald assertions that Mac falsely represented that apartments were unavailable to tour. The Complaint concedes that Mac agents offered and provided multiple tours at multiple apartments in Hyde Park, negating any claim on this basis.[12] Finally, Plaintiffs' conclusory allegations suggesting Mac agents "lied" about the availability of rental units is an inference without facts to support it. *See* Compl. ¶ 95 ("Mac Properties lied to [Moore] and falsely represented that no apartments were available when in fact, multiple apartments were available."); *Steele v. GE Money Bank*, 2009 WL 393860, at *2 (N.D. Ill. Feb. 17, 2009) ("[T]he court is [not] bound by the plaintiff's legal characterization of the facts[.]"). At

---

[11] The IHRA statute of limitations is two years. *See* 775 ILCS 5/10-102 (A)(1).

[12] *See, e.g.*, Compl. ¶¶ 96, 98 (Plaintiff Moore claims Mac offered to show her a range of apartments in Hyde Park); *id.* ¶ 106 (Plaintiff Coleman alleges that Mac suggested four other apartments in Hyde Park she could tour); *id.* ¶¶ 116, 117 (Plaintiff Fleming claims Mac showed her other buildings in Hyde Park); *id.* ¶ 131 (Plaintiff Ayanwale alleges that Mac offered a range of apartments for her consideration).

bottom, Plaintiffs' SOI claim hinges on their allegation that Mac "steered" Voucher holders away from a vaguely defined set of apartments to an equally undefined but allegedly inferior set of apartments. Ultimately, however, the Complaint fails to allege any facts to suggest that Plaintiffs were able to rent apartments at Regents or 5252, or that Mac's agents did anything other than assist prospective tenants, including the Plaintiffs, in identifying rental units their HCVP subsidies otherwise "qualified" them to rent. *See Johnson*, 812 F. Supp. 2d at 181 ("Where a plaintiff alleges they were otherwise qualified because they met the landlord's objective criteria, to survive a motion to dismiss the plaintiff must plead more than the conclusory assertion that they met the stated requirements[.]") (cleaned up).

### B.     HCVP Subsidies Are Not "Income" Under the IHRA.

Alternatively, Plaintiffs' SOI discrimination claim must be dismissed because HCVP vouchers are not "income" under the state statute. The IHRA defines "source of income" as "the lawful manner by which an individual supports himself or herself and his or her dependents." 775 ILCS 5/1-103(O-5). However, the statute does not define what constitutes "support." Courts look to the plain and ordinary meaning of undefined statutory terms. *See U.S. v. Johnson*, 47 F.4th 535, 543 (7th Cir. 2022). *Black's Law Dictionary* defines the verb "support" as, inter alia, "sustenance or maintenance" BLACK'S LAW DICTIONARY (12th ed. 2024). Merriam-Webster's Online Dictionary defines "support" in relevant part as, "to pay the costs of." *See* MERRIAM-WEBSTER'S ONLINE DICTIONARY; www.merriam-webster.com/dictionary/support (*last visited* Feb. 7, 2025). As written, the IHRA's definition excludes vouchers as a source of income because beneficiaries do not "pay" their HCVP subsidies to their landlords. Beneficiaries do not even receive the subsidies themselves. Instead, the CHA sends HCVP payments directly to property owners on beneficiaries' behalf as required under the HAP contracts. *See* 24 C.F.R. § 982.305; Ex. A § 17-V.A; Ex. B; *Knapp v. Eagle Prop. Mgmt. Corp.*, 54 F.3d 1272, 1282 (7th

Cir. 1995) (holding vouchers were not income because "unlike other forms of support, the local housing authority makes payments directly to the owner pursuant to a contract between those parties, rather than to the voucher holder").

Similarly, an HCVP subsidy does not fit with any reasonable definition of "income." Merriam-Webster defines "income" as "a gain or recurrent benefit usually measured in money that derives from capital or labor." *See* MERRIAM-WEBSTER'S ONLINE DICTIONARY https://www.merriam-webster.com/dictionary/income (*last visited* Feb. 4, 2025.) Beneficiaries do not "derive" their HCVP subsidies from capital or labor, and vouchers themselves are not transferable and do not have value outside of the HAP contractual relationship. And, tellingly, HCVP beneficiaries are not required to report their voucher benefits as income on their Illinois income taxes. *See* IRS Rev. Rul. 76-229, 1976-2 C.B. 16. A HCVP subsidy is just that—a subsidy.

The Seventh Circuit already answered the question of whether an HCVP subsidy is "income" in *Knapp v. Eagle Property Management*, a case in which a plaintiff brought an SOI discrimination claim under the Wisconsin Open Housing Act. 54 F.3d at 1282. That statute defined "income" as "lawful compensation or lawful renumeration in exchange for goods or services provided" and expressly identified "vouchers" as within the statute's definition. *See id.* Notwithstanding, the Seventh Circuit held that HCVP subsidies were *not* "income" under the statute, reasoning that "section 8 vouchers are more analogous to subsidies than income," and thus could not be the basis for an SOI discrimination claim. *Id.*; *compare Bourbeau v. Jonathan Woodner Co.*, 549 F. Supp. 2d 78 (D.D.C. 2008) (finding that D.C. Human Rights Act, which expressly defines SOI to include "federal payments," includes HCVP subsidies).[13]

---

[13] Illinois state court decisions construing "source of income" in other contexts do not change this

### C.    Mandating Participation in HCVP Is Unconstitutional.

Plaintiffs' contention that the IHRA's SOI provision requires property owners to accept HCVP subsidies creates multiple constitutional problems. In particular, that interpretation would require Illinois property owners to participate in the HCVP or face significant penalties, including "actual and punitive damages." *See* 775 LCS 5/10-102. If Plaintiffs' reading is correct, the IHRA would compel landlords to participate in the HCVP, contravening Congressional intent that the program be voluntary and most significantly, forcing landlords to submit to the HCVP's warrantless inspection rubric in violation of the Fourth Amendment and Supremacy Clause.

### 1.    The Fourth Amendment

The Fourth Amendment protects persons against "unreasonable searches and seizures," and states "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation…." U.S. CONST. AMEND. IV; *Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 380 n.1 (7th Cir. 2019) (Fourteenth Amendment incorporates Fourth Amendment into state law). These protections "appl[y] to commercial property," *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 840 F.3d 879, 893 (7th Cir. 2016), and to administrative searches, *see Camara v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 528-29 (1967) (administrative search protocols lacking warrant procedural safeguards violate the Fourth Amendment).[14] And while owners may consent to warrantless searches, such consent is not valid unless given freely and voluntarily. *Schneckloth v. Bustamante*, 412 U.S. 218, 227 (1973).

---

analysis. In *Godinez v. Sullivan-Lackey*, an Illinois appellate court held that the Chicago Municipal Code's "source of income" definition encompassed HCVP subsidies. *Godinez*, 352 Ill. App. 3d 87, 93 (2004) (declining to follow *Knapp*). *Godinez*, however, does not control this Court's analysis, including because it addressed the definition under the municipal code—not the IHRA. *See also, e.g.*, *Kaplan v. Pavalon & Gifford*, 12 F.3d 87, 89 (7th Cir. 1993) ("Intermediate appellate court cases are useful but not binding evidence of what the Illinois Supreme Court would do in a similar case.").

[14] *See also, e.g.*, *See v. Seattle*, 387 U.S. 541, 545 (1967) ("[A]dministrative entry, without consent, …

Plaintiffs' reading of the IHRA compels landlords to accept HCVP subsidies or face substantial penalties, thereby vitiating the voluntary consent framework of the HCVP. *See* Compl. ¶ 169 (seeking relief under 775 ILCS 10-102, which provides actual and punitive damages and other monetary and injunctive relief). The threat of penalties under the IHRA unconstitutionally coerce landlords to consent to warrantless searches of their property and business records, including through a pre-rental initial inspection regime and forced acceptance of the advance consent provisions in a mandatory HAP contract. *See People by James v. Common West, LLC*, 224 N.Y.S.3d 364 (N.Y. Sup. Ct. Dec. 11, 2024) ("*Common West II*") (finding New York state SOI antidiscrimination statute unconstitutional under the Fourth Amendment); *Jones v. City of Kansas City*, 4:24-cv-00649-RK (W.D. Mo. Feb. 11, 2025), at 7-13 (granting preliminary injunction enjoining enforcement of SOI antidiscrimination ordinance as violative of the Fourth Amendment).[15] Landlords thus have two choices under the Plaintiffs' reading of the IHRA SOI provision: either consent under coercion to participate in the HCVP with its extensive rubric of warrantless inspections of premises and records, or risk the penalties state officials or private plaintiffs may seek through actions like the one alleged here.

---

may only be compelled through prosecution or physical force within the framework of a warrant procedure."); *City of L.A. v. Patel*, 576 U.S. 409, 419-20 (2015) ("[T]he Court has repeatedly held that searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable") (cleaned up).

[15] As noted *supra*, the HCVP mandates an initial, mandatory move-in inspection, periodic inspections, quality control inspections, and inspections in response to any complaints. *See* Ex. A § 8-II.A; 24 C.F.R. § 982.405(a)-(d). Moreover, owners (like those for whom Mac provides services) are required to execute HAP contracts, which include the aforementioned advance consent to warrantless inspections of "the contract unit and premises at such times as the PHA determines necessary," and authorize the PHA, HUD, and the U.S. Comptroller General "full and free" *and warrantless* "access to the contract unit and the premises." Ex. B, Part B §§ 11(a)-(c); 24 C.F.R. §982.4(b); *see also* Ex. A § 17-V.A.; 24 C.F.R. § 982.405. And that is not all—HAP contracts require property owners to provide their business "accounts and other records that are relevant to the HAP contract" *on demand*, including access to "any computers, equipment or facilities containing such records." *See* Ex. B, Part B §§ 11(a)-(c). 24 C.F.R. § 982.451(a)(1).

A New York state trial court recently addressed this question of forced HCVP participation in a case raising the issue as a matter "of first impression." In *People by James v. Common West, LLC*, 80 Misc. 3d 447 (N.Y. Sup. Ct. 2023) ("*Common West I*"), the court held that New York's SOI antidiscrimination statute violated property owners' Fourth Amendment rights because the statute required landlords to participate in the HCVP, including its warrantless search provisions and the advance consent provisions of the HAP contract. As the court explained: "[A] landlord cannot accept a Section 8 housing voucher as payment for rent without agreeing to participate in Section 8, which, in turn, requires that the landlord authorize warrantless searches of the rental property and the landlord's records." *Common West I*, 80 Misc. 3d at 450. The court concluded such forced participation violated the Fourth Amendment.

> [A] law may not coerce property owners into consenting to warrantless inspections in derogation of their constitutional rights by conditioning their ability to rent real property on providing such consent, which is precisely the effect of the source of income antidiscrimination statute. Thus, by requiring landlords to accept Section 8 vouchers, the source of income antidiscrimination statute necessarily compels landlords to consent to warrantless searches … in violation of the Fourth Amendment.

*Id.* at 451; *see also Jones*, 4:24-cv-00649-RK, at 7-13 (similar). Following the court's decision, the New York Housing Agency that administers the state's HCVP attempted to cure the law's constitutional defects by adding purported notice requirements to the program's inspection provisions. Yet, in a subsequent decision, the court found that the modified policy was still unconstitutional: "The fact remains that a landlord who is forced by the statute to participate in the Section 8 program would be compelled by the provisions of federal law to execute a HAP contract providing advance consent for nonconsensual searches." *Common West II*, 224 N.Y.S.3d 364, 372 (N.Y. Sup. Ct. Dec. 11, 2024). The court held that this compulsory waiver of consent "render[ed] the statute facially unconstitutional." *Id.*; *Jones*, 4:24-cv-00649-RK, at 7-13; *Baker v. City of Portsmouth*, 2015 WL 5822659 (S.D. Ohio Oct. 1, 2015) (municipal code

requiring rental inspections was facially unconstitutional); *Halpern 2012, LLC v. City of Center Line*, 404 F. Supp. 3d 1109, 1121 (E.D. MI 2019) (same).

On February 11, 2025, the U.S. District Court for the Western District of Missouri reached a similar conclusion and issued a preliminary injunction, enjoining enforcement of a Kansas City Ordinance that prohibits landlords from refusing to rent to tenants based on their reliance on HCVP subsidies. *Jones*, 4:24-cv-00649-RK, at 1-2. The court held the "effect of the Ordinance is likely to mandate landlord participation in the Section 8 program" and with it, the inspections inherent in that program. *Id.* at 6. The *Jones* court further held the plaintiffs had established that the Ordinance likely violated the Fourth Amendment because: (1) "landlords have a reasonable expectation of privacy in their business records," (2) "the Ordinance requires their participation as landlords in the Section 8 program," and (3) "their consent to the warrantless searches under the Section 8 HAP contract is coerced, making such consent invalid." *Id.* at 13.

The constitutional issues in *Common West I*, *Common West II* and *Jones* are identical to those presented here. Plaintiffs' interpretation of the IHRA's SOI antidiscrimination provision compels landlords to accept vouchers, thereby requiring their participation in the HCVP and their mandatory waiver of Fourth Amendment rights through execution of the CHA's HAP contract. *See Common West I*, 80 Misc. 3d at 451; *Common West II*, 224 N.Y.S.3d at 372; *Jones*, 4:24-cv-00649-RK, at 7-13. Statutorily coercing property owners to consent to warrantless searches is unconstitutional on its face. Count I should be dismissed.[16]

---

[16] The Supreme Court has held that facial challenges to statutes authorizing warrantless searches are appropriate. *See Patel*, 576 U.S. at 418. According to the Court, a statute is facially unconstitutional if it is "unconstitutional in all of its applications" for those for whom the statute affects, *i.e.*, "the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* Accordingly, participation in the HCVP does not preclude Mac from presenting this facial challenge because "when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant." *Id.*

## 2. The Supremacy Clause

The Constitution's Supremacy Clause declares that federal law is "the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST., art. VI, cl. 2. The HCVP, which is part of the FHA, preempts the IHRA SOI provision (as Plaintiffs present it) because it conflicts with "the accomplishment and execution of the full purposes and objectives of Congress." *See Cal. Fed. Sav. & Loan Assoc. v. Guerra*, 479 U.S. 272, 281 (1987).[17]

When evaluating potential conflict preemption, courts review the relevant federal statutory scheme as a whole to identify its goals and to evaluate the state law's impact on those goals. *See, e.g.*, *Mich. Canners & Freezers Ass'n v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 471 (1984); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). If the state law imposes a "sufficient obstacle" to the federal law's "purposes and intended effects," the state law is preempted. *Crosby*, 530 U.S. at 373. "[T]he crucial inquiry is whether … [a] congressional objective is frustrated." *Aux Sable Liquid Prods.*, 526 F.3d at 1034 (cleaned up).

In mandating participation in the HCVP, the IHRA fundamentally frustrates the FHA's statutory objectives. *See, e.g.*, *Salute v. Stratford Greens Garden Apts.*, 136 F.3d. 293, 300 (2d Cir. 1998) (The voluntariness of the HCVP "reflects a congressional intent that the burdens of

---

Of course, the IHRA's SOI provision would also be unconstitutional "as applied" to Mac. Plaintiffs allege that Mac does not accept HCVP benefits at 5252. Compl. ¶¶ 165-66. Accordingly, Mac allegedly has not consented to warrantless searches at that building or of its books and records, and forced acceptance of HCVP beneficiaries would thus necessarily require Mac's (and the building owner's) consent to warrantless searches. Finally, Mac has standing to raise this constitutional challenge as the management company that faces punitive damages liability under the IHRA. *See Brower v. Village of Bolingbrook*, 735 F. Supp. 768, 772 (N.D. Ill. 1990) (property management company had standing to challenge municipality's rental inspection ordinance under Fourth Amendment).

[17] The Supreme Court recognizes three forms of Supremacy Clause preemption: (1) express preemption; (2) field preemption; and (3) conflict preemption, in which a state statute conflicts with federal law. *See Aux Sable Liquid Prods. v. Murphy*, 526 F.3d 1028, 1033 (7th Cir. 2008) (citation omitted).

[HCVP] participation are substantial enough that participation should not be forced …"). The FHA's text itself shows that Congress intended the HCVP to remain voluntary. *See, e.g.*, 42 U.S.C. §§ 1437f(b)(1), (d)(1)(A), (o)(6)(B) (providing that property owners "may" enter into HAP contracts with a PHA, and that the selection and evaluation of prospective beneficiary-tenants is "the function of the owner"); *Our Country Home Enterprises, Inc. v. Comm'r of Internal Revenue*, 855 F.3d 773, 791 (7th Cir. 2017) ("[W]hen interpreting a statute, we must begin with its text and assume that the ordinary meaning of that language accurately expresses the legislative purpose.") (cleaned up). Federal courts have concluded that by granting exclusive responsibility of tenant selection to landlords, the FHA "encourage[s] the participation of the private sector in providing low-income housing by leaving management decisions (which includes the selection of residents) to the private owner." *Hill v. Grp. Three Housing Dev. Corp.*, 799 F.2d 385, 388 (8th Cir. 1986); *see also Eidson*, 745 F.2d at 458 (an owner retains authority to determine applicant eligibility and ultimate tenant selection).

This reading of the FHA's text is support by its legislative history. The HCVP previously included a "take one, take all" rule that required landlords to accept applications from all beneficiaries once landlords enrolled in the program. *See* S. REP. 105-21, 36; H.R. Rep. 100-122(I). Congress repealed this provision, as it "discourage[d] participation by private sector landlords," which led to reductions in the "supply of affordable housing." S. REP. 105-21, 36.[18]

Despite Congress' view that compulsory participation frustrates rather than furthers the FHA's purposes, Plaintiffs' reading of the IHRA compels such participation, thereby creating a constitutional conflict. *Mother Zion Tenant Ass'n v. Donovan*, 865 N.Y.S.2d 64, 67 (2008)

---

[18] Similarly, Congress repealed the law's "endless lease" provision, which restricted landlords' ability to stop accepting HCVP beneficiaries or to terminate leases. *See* Pub. L. No. 101-625, 104 Stat. 4079, § 225.

(finding conflict preemption between the FHA and NYC ordinance requiring landlords to provide notice before HCVP withdrawal); *Knapp*, 54 F.3d at 1282 ("[I]t seems questionable ... to allow a state to make a voluntary federal program mandatory."); *Salute*, 136 F.3d at 298 (reading FHA to compel landlords to accept HCVP beneficiaries would be an "absurd result").

The IHRA's goals are immaterial to this analysis. Conflict preemption does not depend on whether the challenged state law shares the same or similar goals as its federal counterpart. *See, e.g.*, *Forest Park II v. Hadley*, 336 F.3d 724, 733 (8th Cir. 2003) ("[I]t is not enough to say that the ultimate goal of both federal and state law is the same. A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach that goal.") (cleaned up). "The fact of a common end hardly neutralizes conflicting means," because, even if "some [people] might be able to comply," the state law still may be "at odds with achievement of the federal decision about the right degree of pressure to employ." *Crosby*, 530 U.S. at 379-80.

Congress determined that voluntary HCVP participation facilitates the FHA's goals of fair, nondiscriminatory, and integrated housing, and these objectives supersede state laws with similar intentions. The FHA's text and legislative history reflect a careful balance between its stated goals and drawing market participants into the HCVP—the exact opposite of the forced marriage between private actors and government that Plaintiffs' reading would impose.

## II. PLAINTIFFS HAVE FAILED TO PLEAD DISPARATE IMPACT RACIAL DISCRIMINATION UNDER THE FHA OR IHRA.

### A. The Seventh Circuit Does Not Recognize FHA Disparate Impact Racial Discrimination Related to Participation in the HCVP Program.

Seventh Circuit precedent does not allow FHA disparate impact claims based on the alleged discriminatory treatment of HCVP beneficiaries. The FHA prohibits a defendant from refusing to rent "a dwelling to any person because of [their] race…." 42 U.S.C. § 3604(a). While claims that otherwise neutral policies have prohibitive disparate impacts on protected classes are

cognizable under the FHA, *see Texas Dep't of Hous. & Cmty. Affs. V. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015) ("*ICP*"), such claims are not available in all situations. In *Knapp*, for instance, a district court excluded a plaintiff's proffered expert testimony regarding the purportedly discriminatory effect of an apartment owner's refusal to accept her HCVP subsidy, which the Seventh Circuit affirmed, holding in the process that while the FHA supported disparate impact claims, the "analysis is not appropriate in certain contexts." *Knapp*, 54 F.3d at 1280. The Court held that because apartment owners can choose not to participate in the HCVP, they cannot be held liable under the FHA under a disparate impact theory. *Id.* ("[N]on-participation constitutes a legitimate reason for their refusal to accept Section 8 tenants ... [W]e therefore cannot hold them liable for ... discrimination under the disparate impact theory."). The Court's holding applied to both participating and non-participating owners, too. *Id.* ("The actions of both non-participating and participating owners have the same impact on minorities and to hold only the latter liable for racial discrimination for that conduct would deter them from joining or remaining involved in the program.").[19] Thus, controlling precedent does not allow Plaintiffs' disparate impact theory to proceed.

### B. The Complaint Fails to Establish a Prima Facie Case of Disparate Impact under both the FHA and the IHRA.

If Plaintiffs' disparate impact claim based on Mac's purported refusal to rent to HCVP beneficiaries was legally viable (it is not), their claim still would fail because the Complaint does not plausibly allege a prima facie discrimination claim. The Supreme Court instructs that "prompt resolution" of disparate impact claims is "important," and courts must scrutinize

---

[19] The Second Circuit adopted the reasoning of *Knapp* a few years later in *Salute*, holding that plaintiffs could not bring a disparate impact racial discrimination claim under the FHA based on an owner's refusal to rent apartments to HCVP beneficiaries. *Salute*, 136 F.3d at 302; *see also Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890 (5th Cir. 2019) (citing *Knapp* and *Salute* with approval)..

pleadings to ensure plaintiffs "allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection" between a challenged policy and an alleged racial disparity. *ICP*, 576 U.S. at 542-43; *ICP v. Lincoln Prop. Co.*, 920 F.3d 890, 904 (5th Cir. 2019). Where a statistical disparity is the foundation of a disparate impact claim—like it is here—Plaintiffs *must* plead a "robust causality" between (i) the alleged statistical disparity and (ii) the alleged policy that *causes* the alleged disparity. *ICP*, 576 U.S. at 542. A complaint that fails to plausibly plead this "robust causality" should be dismissed. *Id.*[20]

Plaintiffs' allegations fail this requirement. Their core allegation is that Mac denied HCVP beneficiaries the opportunity to rent apartments in "newly-built or renovated, high-rise amenity buildings near Lake Michigan," Compl. ¶ 1, and instead, "steer[ed] Voucher holders to older, lower quality buildings with fewer amenities," *id.* ¶ 47. While the Complaint alleges Mac had such policies across a portfolio of buildings, *the only two buildings identified in Plaintiffs' substantive allegations are Regents and 5252.*[21] According to Plaintiffs, by denying voucher holders access to those buildings—which are less than one third-of-a-mile apart—Mac denies

---

[20] The Complaint must allege policies or practices that "actually or predictably result in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing because of race." 24 C.F.R. § 100.500(a). Plaintiffs' allegations must therefore support the assertion that Mac's policies disproportionately affect a protected class by making housing options "significantly more restrictive" for members of that class. *Atl. Hous. Partners L.L.L.P. v. Brevard Cnty.*, 2024 WL 4235770 at *5 (M.D. Fla. Sept. 19, 2024); *see also Breen v. Chao*, 253 F. Supp. 3d 244, 265 (D.D.C. 2017).

[21] While the Complaint notes that Mac manages "[n]ewly-built, high-rise, amenity buildings near the lake such as 5252 Apartments, Solstice on the Park, and City Hyde Park," and "renovated, high-rise, amenity buildings, which are also mostly near the lake and include Regents Park Apartments, Del Prado, East Park Tower, Windermere House, Blackwood Apartments, and the Sutherland," the Complaint only identifies Regents and 5252 in its substantive allegations. *Compare* Compl. ¶¶ 35a-b., *with id., generally.* And while the Complaint must be read in the light most favorable to Plaintiffs, that does not include assuming that Mac steered prospective tenants away from buildings for which there are *no factual allegations to support that accusation* other than Mac's alleged management of real estate generally. That is especially so because Plaintiffs allegedly investigated Mac's policies and practices by sending so-called testers to pretend that they wanted to rent from Mac, and yet, according to the Complaint, the testers only sought apartments at Regents and 5252. *See id.* ¶¶ 67-76.

Black renters "effective and equal access to the rental market in Hyde Park" and "residential housing in Chicago." Compl. ¶¶ 187, 189.

The Complaint therefore does not allege the "robust causality" connecting Mac's purported conduct to an alleged disparate impact. It also fails to allege any logical connection, let alone a plausible one, tying Mac's alleged conduct at Regents and 5252 to a discriminatory impact on Black renters across all of Chicago. The Complaint offers no explanation whatsoever to support what are, at bottom, *non-sequitur* pleading allegations.

Rather, Plaintiffs' racial discrimination claims ultimately hinge on a single statistical figure: namely, that approximately 89% of Chicago's voucher recipients are Black. Plaintiffs do not tie that fact to any alleged conduct of Mac or explain how that fact, when combined with Mac's alleged conduct at Regents and 5252, allegedly *caused* the segregative effect they allege—*i.e.*, the inability of the Black individuals (i) to rent in Hyde Park or (ii) find homes in Chicago. That failure necessitates dismissal. *See ICP*, 576 U.S. at 543.

"[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *ICP*, 576 U.S. at 542; *see also City of Joliet v. New West, L.P.*, 825 F.3d 827, 829-30 (7th Cir. 2016) (finding that 95% of a condemned complex's residents were Black did not establish disparate impact racial discrimination: "Disparate-impact analysis looks at the effects of policies."). Plaintiffs' Complaint fails to clear this hurdle, as well. The Complaint does not allege Mac's conduct contributed to the racial imbalance in Chicago's HCVP beneficiaries. The percentages of Chicago's HCVP beneficiaries also are irrelevant to Plaintiffs' claim that Mac has limited the Black community's access to Hyde Park. *See* Compl. ¶¶ 175, 186. While the Complaint references Hyde Park's racial demographics, it does not allege the percentages of Black renters

or HCVP beneficiaries who reside there. To assess the plausibility of a statistically-based disparate-impact claim, however, Plaintiffs need to point to "correct comparative populations." *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improv. Dist.*, 17 F.4th 950, 960 (9th Cir. 2021). The Complaint does not do so. No allegations causally connect Mac's alleged conduct to a statistical incongruence in Hyde Park or Chicago, and, ultimately, none of the Plaintiffs' allegations show that Mac's conduct "diminished the amount of rental opportunities for … Black prospective tenants" in any location. *Lincoln Prop. Co.*, 920 F.3d at 907.[22]

The Complaint does not allege, as it must, the racial make-up of Regents or 5252, let alone racial disparities associated with those buildings. *Sw. Fair Hous. Council, Inc.*, 17 F.4th at 960. Again, disparate impact claims based on statistics must provide details comparing the group unaffected by the policy to those who allegedly are. *ICP*, 576 U.S. at 542. An isolated, untethered allegation that 89% of Chicago's HCVP beneficiaries are Black cannot support a disparate impact claim standing alone. Under Plaintiffs' theory, if a law school at a Historically Black College or University ("HBCU") decided to limit the percentage of its incoming 1L class from its undergraduate school, the law school would be immediately susceptible to a claim for disparate impact racial discrimination (under Title IX). Applying Plaintiffs' logic, because the HBCU's undergraduate population is overwhelmingly Black, any policy that limited the admission of its undergraduate population to the law school would necessarily create actionable racial discrimination, regardless of the racial demographics of the law school. That cannot be the law. *TBS Group, LLC*, 2017 WL 5129008, at *9 (rejecting claim relying on statistics of minority

---

[22] Although Plaintiffs reference the decline in Hyde Park's Black population from 2000 to 2022, the Complaint makes no effort to connect this statistic to Mac's practices or policies. Compl. ¶ 30, generally.

population because otherwise, "*every* [municipal] ordinance that addresses only rental property would be grounds for a disparate impact claim"); *see also City of Joliet*, 825 F.3d at 829-30.

The Fifth Circuit rejected a disparate impact claim relying on the same type of failed statistical arguments advanced here. In *Inclusive Communities Project v. Lincoln Property Co.*, a fair housing nonprofit, "ICP," sued a property manager for its alleged "no vouchers" policy. 920 F.3d 890, 896 (5th Cir. 2019). ICP argued this policy purportedly forced voucher holders to rent units in high poverty, "racially concentrated" areas, which disproportionately affected Black people since 87% of the voucher recipients in Dallas were Black. *Id.* at 897. ICP further alleged that some of Lincoln's apartment complexes had no Black tenants at all. *Id*. In affirming the dismissal of the lawsuit, the Court reasoned that the complaint lacked any allegation that Lincoln's voucher policy *caused* 87% of Dallas's voucher households to be Black, rendering ICP's assertion that Lincoln's policies contributed to the high percentage of Black voucher holders in particular neighborhoods, as opposed to other possible socioeconomic factors, "entirely speculative." *Id*. at 906-07.

Finally, Plaintiffs have alleged racial discrimination under both the FHA (Count III) and IHRA (Count II) based on the same disparate impact theory. "Illinois courts have looked to the [FHA] in interpreting the Illinois Human Rights Act," *Stevens v. Hollywood Towers & Condo. Ass'n*, 836 F. Supp. 2d 800, 807-08 (N.D. Ill. 2011), including relying on federal precedents, *Hawkins v. Chicago Comm'n on Hum. Rels.*, 171 N.E.3d 21, 27 (Ill. App. 2020) (citing *ICP* in resolving disparate impact claim brought under Chicago Housing Ordinance). Accordingly, because Plaintiffs' FHA claim fails, their IHRA claim arising under the same disparate impact theory also fails.

### III.     THE COURT SHOULD DISMISS PLAINTIFFS' ICFA CLAIM.

#### A.     The IHRA Preempts Plaintiffs' ICFA Claim.

The Court should dismiss the Individual Plaintiffs' ICFA claim (Count IV) because the IHRA preempts it. For their claim, Plaintiffs first "restate and reallege" the Complaint's allegations. Compl. ¶ 193. They then allege that Mac's conduct violates the "public policy" underlying the IHRA, thus constituting an ICFA violation. *Id.* ¶ 195.

The IHRA's preemption provision bars Plaintiffs' claim. The IHRA provides that "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 Ill. Comp. Stat. 5/8-111(D). Courts routinely apply this language to dismiss parallel state law claims that are "inextricably linked to [an IHRA] civil rights violation," meaning claims based on "*legal duties* created by the [IHRA]." *See Richards v. U.S. Steel*, 869 F.3d 557, 564 (7th Cir. 2017).

The preemption analysis here is simple. Plaintiffs expressly base their ICFA claim on Mac's alleged "source of income" discrimination. *See* Compl. ¶ 198 ("Mac Properties' policies and practices discriminating against Voucher holders offend public policy because they violate … *Illinois state law*[.]") (emphasis added). But "source of income" discrimination is a breach of a "legal duty" or "civil right" created by the IHRA. *See* 775 ILCS 5/3-102. Plaintiffs' alleged ICFA claim thus necessarily arises from "the subject of an alleged civil rights violation," *see* 775 ILCS Ill. Comp. Stat. 5/8-111(D), and is preempted. *See Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 934 (7th Cir. 2017) (IHRA is the "exclusive remedy for civil rights violations" created by the IHRA); *Barclay v. Bio-Med. Applications of Ill., Inc.*, 2019 WL 1200330, at *2

(N.D. Ill. Mar. 14, 2019) ("[I]f the IHRA furnishes the legal duty that a defendant allegedly breached, then the IHRA preempts a state-law claim seeking recovery for it.").[23]

Plaintiffs cannot save their preempted ICFA claim by trying to connect it to "public policy" associated with other, local ordinances purported to prohibit SOI discrimination. [24] While certain municipalities and counties have adopted provisions prohibiting such discrimination, none of Plaintiffs' alleged actional discriminatory conduct against the Individual Plaintiffs occurred prior to enactment of the IHRA's SOI antidiscrimination provision. *See, e.g.*, Compl. ¶ 92 (Moore), *id.* ¶¶ 105-108 (Coleman), *id.* ¶ 115 (Fleming), *id.* ¶ 124 (Ayanwale).

Plaintiffs also cannot sustain a "public policy" ICFA claim by vaguely pointing at "federal government[] efforts to provide safe, affordable, and sanitary housing choice and to promote economic and racial integration." *See* Compl. ¶ 199. Plaintiffs do not explain these "efforts" or allege anything to suggest Mac's conduct hindered them. Nor could they. Congress has specifically held that the HCVP is voluntary program. *Salute*, 136 F.3d at 300; *Knapp*, 54 F.3d at 1282; *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1161 (9th Cir. 2011) ("If Congress had intended that owners must continue to execute HAP contracts despite opting out of Section 8, it could easily have said so.").

### B. Plaintiffs Fail to Allege Mac Properties Engaged in "Unfair Practices."

If Plaintiffs' ICFA claim is not preempted by the IHRA—and it is—Plaintiffs still fail to allege a claim for unfair practices. To sustain such a claim, Plaintiffs must allege Mac intentionally "committed a[n] unfair act, that the act occurred in the course of trade or commerce, and that it caused actual damages." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d

---

[23] *See also LaRiviere v. Bd. of Trustees of S. Illinois Univ.*, 2015 IL App (5th) 140443-U, ¶ 24 (IHRA barred parallel Illinois Whistleblower Act statutory claim).

[24] *See, e.g.*, Compl. ¶¶ 25, 53, 87, 198 (referencing Chicago and Cook County SOI ordinances).

730, 736 (7th Cir. 2019). To allege a practice is unfair under ICFA, Plaintiffs must show it: (i) "offends public policy;" (ii) "is immoral, unethical, oppressive, or unscrupulous;" and (iii) "causes substantial injury to consumers." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 647 (7th Cir. 2019) (quoting *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002)). "A practice may be unfair 'because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.'" *Id.*; *Loop Spine & Sports Ctr., Ltd. v. Am. Coll. of Med. Quality, Inc.*, 2023 WL 3585835, at *3 (N.D. Ill. May 22, 2023). Because the Complaint does not allege an "unfair practice" beyond Plaintiffs' preempted "public policy" theory, the Court should (again) reject this claim.

To start, the Complaint does not allege facts to support the claim that Mac's conduct was "immoral, unethical, oppressive, or unscrupulous" which would require allegations suggesting that Mac left consumers with no meaningful choice or that it imposed unreasonable burdens on them. *See Loop Spine & Sports Ctr., Ltd.*, 2023 WL 3585835, at *3; *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 962 (Ill. 2002). The Complaint also does not allege a "substantial injury"—*i.e.*, an injury that is: (1) "substantial;" (2) "not … outweighed by any countervailing benefits;" and (3) is not an injury that consumers could have not reasonably avoided. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010). Plaintiffs' alleged injuries were not "substantial;" they ultimately rented apartments Compl. ¶¶ 104, 114, 121, 137; *see Siegel*, 612 F.3d at 937 (because consumers could purchase gasoline from other stations, they did not suffer a substantial injury).

Nor have Plaintiffs plausibly alleged "actual damages" proximately caused by an ICFA violation. *See Vanlaningham v. Campbell Soup Co.*, 492 F. Supp. 3d 803, 809 (S.D. Ill. 2020). While Plaintiffs assert several forms of monetary damages, they do not allege they incurred those

damages *as a result of* Mac's alleged conduct. For example, Plaintiffs Coleman and Fleming allege they paid application and move-in fees at other apartments. *See* Compl. ¶¶ 113, 120. But Plaintiffs would have incurred those types of expenses regardless of where they moved. Fleming further asserts she lost an opportunity to receive a mobility stipend, but that claim relies on the false premise that Regents and/or 5252 had the only apartments available to rent in Hyde Park. As for travel costs, again, Plaintiffs would have incurred those expenses regardless of Mac's alleged refusal to rent *specific* apartments at Regents or 5252.

## IV. THE COURT SHOULD STRIKE THE CLASS ALLEGATIONS.

"Courts in this District … evaluate motions to strike class allegations under Rule 23[.]" *See Connectors Realty Grp. Corp.*, 2021 WL 1143513, at *2-3 (granting motion to strike class definition). Under Rule 23(a), Plaintiffs must establish that joinder is impracticable, their claims present common questions of law and fact and are typical of the class, and that Plaintiffs may adequately represent the class. At a minimum, Plaintiffs have not plausibly established their claims raise common questions or are typical of the proposed class members' claims, and the Court should therefore grant the motion to strike.

*First*, Plaintiffs assert a proposed class of HCVP holders who sought to rent apartments from Mac *anywhere in Chicago from 2021 to the present*, seeking classwide injunctive relief under Rules 23(b)(2) and (c)(4). Compl. ¶¶ 149-50. The class definition is overbroad on its face because the Illinois legislature did not create the legal duty to be free from SOI discrimination until January 1, 2023. *See* Compl. ¶ 2; *see Connectors Realty Group Corp.*, 2021 WL 1143513, at *3 (granting motion to strike class allegations at pleading stage where plaintiffs' allegations "would capture individuals who have not suffered" the "harms" underlying plaintiffs' claims). Plaintiffs' proposed class would include HCVP beneficiaries across the country for at least two

years in which they suffered no redressable harm alleged by Plaintiffs. This alone should preclude a class proceeding.[25]

*Second*, Plaintiffs' individual claims do not raise plausibly common questions of law or fact. *See* Rule 23(a)(2). "What matters to class certification," is whether "a classwide proceeding" would "generate common answers apt to drive the resolution of the litigation." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). This analysis "requires a precise understanding of the nature of plaintiffs' claims." *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 552 (7th Cir. 2016). Here, Plaintiffs' substantive, non-bare assertions target exactly two buildings managed by Mac at which they sought rental housing—Regents and 5252. None of their individual alleged experiences would plausibly generate common answers to the scattershot alleged "common" fact and legal issues they assert, *e.g.*: "[w]hether Mac Properties *systematically* refuses to engage in real estate transactions with Voucher holders by steering Voucher holders to older, lower quality buildings with fewer amenities," or "[w]hether Mac Properties' *policies and practices* for Voucher holders violate State law prohibitions against source of income discrimination." Compl. ¶ 152(b), (h). None of their asserted questions are tied to Regents or 5252, yet those are the near exclusive focus of Plaintiffs' claims. *Compare supra*, at 27 n. 21 (listing but never alleging facts regarding various other Mac-managed buildings). *See Briscoe v. Health Care Serv. Corp.*, 337 F.R.D. 158, 163 (N.D. Ill. 2020) (class was not certifiable where plaintiffs did not adequately establish defendants' alleged policies were common among members of the class).

---

[25] Plaintiffs may argue their FHA claim (Count III) does not depend on the IHRA SOI provision and targets only Mac's alleged "policies." But as discussed *supra*, at Section II, the Seventh Circuit does not recognize disparate impact claims premised on HCVP participation, so the claim is not viable regardless. Their ICFA claim, moreover, is predicated on the exact civil rights the IHRA SOI provision creates, and therefore cannot save their class allegations from a Rule 12(f) challenge.

For these same reasons, none of Plaintiffs' claims are typical of proposed class members' claims, either. The proposed class is defined by subjective criteria—*i.e.*, those who "[s]ought to rent"—which courts do not allow. *See Simer v. Rios*, 661 F.2d 655, 660 (7th Cir. 1981) (a class defined by each individual's "state of mind" raises too many individualized issues to support common treatment). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*, 2024 WL 4333709, at *4 (N.D. Ill. Sept. 27, 2024) (citing *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). This means the Individual Plaintiffs must allege that their claims "have the same essential characteristics as the claims of the class at large." *Id.* (cleaned up). Yet, it is clear that the Individual Plaintiffs do not share the same essential characteristics of the proposed class—the substantial majority of class members necessarily would not have sought to rent at Regents or 5252 based on Plaintiffs' own allegations concerning Mac's total inventory of managed buildings. *See* Compl. ¶ 17 (alleging Mac "manages approximately 100 residential buildings and over 5,000 apartments" *in Hyde Park* alone). Plaintiffs assert, in contrast, that Mac steered them away from just two of the 100-plus residential buildings managed by Mac in a single neighborhood. These allegations are too thin to proceed to discovery on a classwide basis. The Court should grant the motion to strike. *McFields v. Dart*, 982 F.3d 511, 518 (7th Cir. 2020).

## V.    HOPE LACKS ARTICLE III STANDING.

Finally, the Court should dismiss Plaintiff HOPE because it has failed to allege an injury in fact, a prerequisite to Article III standing.[26] It is axiomatic that mere "intensity of [a] litigant's

---

[26] To establish standing, a plaintiff has to establish: (1) an injury in fact; (2) fairly traceable to the

interest" does not confer standing, and an organization cannot manufacture its own standing to sue merely because it strongly opposes a defendant's conduct or policies. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 370 (2024) (quoting *Valley Forge Christ. Coll. v. Am. United for Sep. of Church and State, Inc.*, 454 U.S. 464, 486 (1982)). Rather, a plaintiff's injury must be "concrete and particularized," affecting "the plaintiff in a personal and individual way." *Lujan*, 504 U.S. 555, 560, n.1 (1992). This injury requirement screens out would-be plaintiffs who simply wish to litigate because of a moral, ethical or ideological objection to a defendant's conduct. *All. for Hippocratic Med.*, 602 U.S. at 396.

Despite repeated conclusory assertions to the contrary, the Complaint fails to allege facts that would establish that HOPE has suffered an injury. Plaintiffs broadly allege Mac injured HOPE by impairing its "mission and activities," and because HOPE was required to divert staff and organizational resources from its "activities and programs" to investigate and build a case against Mac. Compl. ¶¶ 16, 138-139, 142, 145. None of these supposed "injuries" are sufficient to establish standing. In *Alliance for Hippocratic Medicine*, the Supreme Court held that an organization's conclusory assertion that a defendant's conduct has impaired its "ability to provide services and achieve [its] organizational mission[]" does not demonstrate Article III standing. *Id.* at 394. Thus, an organization like HOPE cannot establish standing by alleging "a setback to [its] abstract social interests," or the "intensity of [its] opposition to the defendant's conduct." *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n.19 (1982)). Moreover, "an organization that has not suffered a concrete injury cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's

---

defendant's action; that (3) is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).

action." *Id.* HOPE's diversion of resources to oppose Mac's alleged conduct is thus insufficient to confer standing.

Also, in *Alliance for Hippocratic Medicine*, the Supreme Court rejected the association plaintiffs' reliance on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), where the Court previously had held an issue-advocacy housing organization could establish standing if it demonstrated that the defendant's conduct had negatively impacted that organization's operations. The *Havens* Court had framed the question of organizational injury as whether the defendant had "perceptively impaired" the plaintiff organizations' ability to provide services. *Id.* at 379. The Court found that the plaintiff-organization had sufficiently alleged that the defendant's conduct had "perceptibly impaired [the nonprofit's] ability to provide counseling and referral services for low- and moderate-income homeseekers." *Id.* In rejecting *Havens* as a basis to establish organizational standing in *Alliance for Hippocratic Medicine*, the Court noted "*Havens* was an unusual case" and that the Court "has been careful not to extend the *Havens* holding beyond its context." *All. for Hippocratic Med.*, 602 U.S. at 396.

Plaintiffs' Complaint fails to allege a similar, "perceptible" impact above the cabined *Havens* standard. Plaintiffs do not allege a direct connection between HOPE and Mac beyond Hope's pre-litigation investigation and Hope's purported need to conduct additional training in Chicago because of Mac's alleged policies. Compl. ¶¶ 145-46. HOPE vaguely claims the cost and resource diversion of its investigation "interfere[d] with its program and services," thus delaying some other programing, and required it to "revise" materials and conduct additional SOI trainings. *Id.* ¶¶ 144, 146-47. These are the kind of vague, indirect allegations of resource impairment that *Alliance for Hippocratic Medicine* holds insufficient to establish standing.

HOPE's standing allegations are similar to those recently rejected in *Legal Aid Chicago v. Hunter Properties*, 2024 WL 4346615 (N.D. Ill. Sept. 30, 2024), an FHA case brought after the Supreme Court's *Alliance for Hippocratic Medicine* decision. In *Hunter Properties*, an organizational plaintiff that provides free legal services to low-income individuals sued a property management company based on its alleged "no prior evictions" policy. *Id.* at *1. The organization alleged it was injured by that policy because it had to spend resources combatting the policy's impact on its client community. The organization further claimed it had to divert limited resources to countermand the defendant's policy by providing "training and education to tenants" as well as "investigating and bringing th[eir] case." *Hunter Properties*, 2024 WL 4346615, *6. Finally, it alleged it would have devoted more resources to its core mission but for the defendant's allegedly discriminatory policies. *Id.*

After canvassing Seventh Circuit decisions interpreting *Havens*' standing principles, the *Hunter Properties* court held that a plaintiff organization could not meet the *Havens* organizational injury standard unless the defendant's conduct directly impacted the organization's function, adding additional work to its core mission, or created new, disruptive burdens to that mission:

> The upshot of the Seventh Circuit case law is that an organization suffers a concrete injury if it devotes resources to combatting a discrete regulation or policy, at the expense of its other work. But the impact must be real and measurable – it must be "perceptible." And an organization cannot allege an injury in fact based on "baseline" or "ordinary program costs" of the work that it is already doing.

*Hunter Properties*, 2024 WL 4346615, *6-9 (citations omitted) (analyzing *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007); *Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019); *Democratic Party of Wis. v. Vos*, 966 F.3d 581 (7th Cir. 2020)).

38

The *Hunter Properties* court found that the plaintiff organization did not have standing because it had failed to allege it had interacted with the defendant other than through its pre-lawsuit "investigative" activities, which were "baseline" or "ordinary program costs" of the plaintiff's ongoing activities. *Id.* at *6-7. At most, the plaintiff had alleged that it incurred costs and deployed resources to develop a lawsuit against a property owner whose policies the organization opposed. *See id.* ("Legal Aid Chicago's primary alleged injury is the need to divert resources from its other activities in order to fight evictions and eviction-related housing denials."). The court therefore held that the plaintiff did not sufficiently allege that defendant caused it to incur any costs beyond those it would necessarily incur because of its ongoing activities relating to its core mission. *See id.* at *10. That is insufficient to confer standing. *Id.* ("An organization's raison d'être is not simultaneously an injury that establishes Article III standing."). Finally, in evaluating the impact of the *Alliance for Hippocratic Medicine*, the court viewed the Supreme Court's decision as "pour[ing] some cement around bedrock principles"—specifically, that organizations do not establish standing simply because "the defendant's conduct may have impaired its ability to provide services or fulfill an organizational mission." *Id.* at *10; *see also, e.g.*, *Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 992 (6th Cir. 2025) ("*Alliance* thus clarified that the expenditure of resources in opposition to a defendant's actions, standing alone, is insufficient to establish standing under *Havens*. It is not enough to broadly gesture toward 'a drain on an organization's resources' and call it a day, as some of our pre-*Alliance* cases have done.") (citations omitted).

Here, the Complaint spills paragraphs of ink attempting to plausibly allege that Mac's purported SOI steering caused some injury to HOPE. Ultimately, those allegations fall into two categories: (1) HOPE spent resources "design[ing] and implement[ing] a fair housing

investigation of Mac Properties' leasing practices;" and (2) HOPE had to "conduc[t] additional outreach, education and training activities" in response to Mac's practices. Compl. ¶¶ 145-46. But, as in *Hunter Properties*, HOPE's supposed costs are insufficient to support standing. The costs of investigating a claim for litigation do not suffice for standing purposes. *Hunter Properties*, 2024 WL 4346615, *12 ("The Supreme Court has squarely rejected the notion that the cost of bringing a lawsuit is an injury that can support standing.") (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)). Standing "must rest on something more than the lawsuit itself." *Hunter Properties*, 2024 WL 4346615, *13. Moreover, "an organization's diversion of resources to litigation or to an investigation in anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing." *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). Yet, HOPE pleads those supposed costs as its standing anchor. Like in *Alliance for Hippocratic Medicine*, HOPE cannot "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 370. Finally, HOPE's assertion that it was forced to engage in public advocacy and education to counteract Mac's alleged conduct is nothing more than engagement in its core mission duties. It is not an injury to support invoking this Court's jurisdiction.

## CONCLUSION

For the reasons set forth above, the Court should dismiss Plaintiffs' Complaint.

Dated: February 13, 2025                        Respectfully submitted,

                                                /s/ Joel M. Hammerman
                                                Joel M. Hammerman
                                                Joshua P. Mahoney
                                                Tiffany Kamara Nwosu
                                                Naomi Duru
                                                FAEGRE DRINKER BIDDLE & REATH LLP
                                                320 S. Canal Street, Suite 3300
                                                Chicago, IL 60606
                                                Telephone: (312) 569-1000
                                                Fax: (312) 569-3000
                                                Email: joel.hammerman@faegredrinker.com
                                                Email: josh.mahoney@faegredrinker.com
                                                Email: kamara.nwosu@faegredrinker.com
                                                Email: naomi.duru@faegredrinker.com

                                                *Counsel for Mac Property Management, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 19, 2025, I caused a copy of the foregoing document to be filed electronically with the Court's CM/ECF system and thereby served electronically upon all ECF-registered counsel of record.


*<u>/s/ Joel M. Hammerman</u>*