# EXHIBIT A

Chicago Housing Authority

# Housing Choice Voucher Program
# Administrative Plan

Approved by CHA Board of Commissioners on July 16, 2024
Effective August 1, 2024



Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Contents

Chapter 1 – Overview of the Program and Plan ..................................................................................1-1

    Part I: CHA and the HCV Program ......................................................................................................1-1

        1-I.A. Introduction....................................................................................................................1-1

        1-I.B. The CHA's Mission .........................................................................................................1-1

        1-I.C. Organization and Structure of the CHA .......................................................................1-1

        1-I.D. The CHA's Commitment to Ethics and Service ...........................................................1-1

        1-I.E. HCV Partnerships ...........................................................................................................1-2

    Part II: The HCV Program Administrative Plan..................................................................................1-3

        1-II.A. Overview and Purpose of the Plan .............................................................................1-3

        1-II.B. Mandatory vs. Optional Policy ...................................................................................1-3

        1-II.C. Updating and Revising the Plan ..................................................................................1-3

        1-II.D. Applicable Procedures.................................................................................................1-3

Chapter 2 – Fair Housing and Equal Opportunity .............................................................................2-1

    Part I: Nondiscrimination ...................................................................................................................2-1

        2-I.A. Overview.........................................................................................................................2-1

        2-I.B Providing Information to Families and Owners.............................................................2-1

        2-I.C. Discrimination Complaints............................................................................................2-1

        2-I.D. Access for Persons with Limited English Proficiency...................................................2-1

        2-I.E. Affirmative Marketing ..................................................................................................2-1

    Part II: Policies Related to Persons with Disabilities ........................................................................2-2

        2-II.A. Definition of Disability .................................................................................................2-2

        2-II.B. Overview........................................................................................................................2-2

        2-II.C. Request for a Reasonable Accommodation ................................................................2-3

        2-II.D. Approval/Denial of a Requested Accommodation......................................................2-3

        2-II.E. Termination of Assistance ............................................................................................2-4

    Part III: Violence Against Women Act ...............................................................................................2-4

        2-III.A. Protections for Victims ...............................................................................................2-4

        2-III.B. VAWA Documentation ...............................................................................................2-4

        2-III.C. Notice of VAWA ...........................................................................................................2-5

        2-III.D. Confidentiality.............................................................................................................2-5

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan

2-III.E. VAWA Emergency Transfers ..................................................................2-5

Chapter 3 – Eligibility ..............................................................................................3-1

Introduction ......................................................................................................3-1

Part I: Definition of Family ................................................................................3-1

3-I.A. Family and Household .............................................................................3-1

3-I.B. Family Break-Up ....................................................................................3-2

Part II: Basic Eligibility Criteria .......................................................................3-3

3-II.A. Income Eligibility and Targeting ...........................................................3-3

3-II.B. Citizenship or Eligible Immigration Status .............................................3-3

3-II.C. Social Security Numbers ......................................................................3-4

3-II.D. Eligibility for Demonstration Programs .................................................3-4

Part III: Denial of Assistance ............................................................................3-4

3-III.A. Overview .............................................................................................3-4

3-III.B. Mandatory Denial of Assistance .........................................................3-4

3-III.C. Other Permitted Reasons for Denial of Assistance...............................3-5

3-III.D. Screening ..........................................................................................3-6

3-III.E. Criteria for Deciding to Deny Assistance .............................................3-6

3-III.F. Eligibility for Emergency Housing Voucher Recipients .........................3-6

Chapter 4 – Applicant, Waiting List and Tenant Selection....................................4-1

Introduction ......................................................................................................4-1

Part I: The Application Process .........................................................................4-1

4-I.A. Applying for Assistance and Placement on the Waiting List ..................4-1

Part II: Managing the Waiting List....................................................................4-1

4-II.A. Organization of the Waiting List...........................................................4-1

4-II.B. Opening and Closing the Waiting List...................................................4-2

4-II.C. Reporting Changes in Family Circumstances........................................4-2

4-II.D. Updating the Waiting List.....................................................................4-2

Part III: Selection for HCV Assistance ..............................................................4-3

4-III.A. Overview .............................................................................................4-3

4-III.B. Selection and HCV Funding Sources ...................................................4-3

4-III.C. Selection Method ................................................................................4-4

4-III.D. Notification of Selection .....................................................................4-6

4-III.E. The Eligibility Interview.......................................................................4-6

Chapter 5 – Briefings and Voucher Issuance .......................................................5-1

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan

Introduction .............................................................................................................................5-1

Part I: Briefings ........................................................................................................................5-1

  5-I.A. Overview ......................................................................................................................5-1

  5-I.B. Briefing .........................................................................................................................5-1

Part II: Voucher Issuance ........................................................................................................5-1

  5-II.A. Determining Family Unit (Voucher) Size ....................................................................5-1

  5-II.B. Voucher Issuance .......................................................................................................5-1

  5-II.C. Voucher Term and Extensions ...................................................................................5-2

Chapter 6 – Income and Subsidy Determinations ..................................................................6-1

Part I: Calculating Income .......................................................................................................6-1

  6-I.A. Annual Income ............................................................................................................6-1

  6-1.B. Adjusted Income .........................................................................................................6-1

Part II: Calculating Family Share and CHA Subsidy ...............................................................6-1

  6-II.A. Total Tenant Payment .................................................................................................6-1

  6-II.B. Financial Hardships Affecting Minimum Rent ............................................................6-2

  6-II.C. Applying Payment Standards .....................................................................................6-3

Chapter 7 – Verification ...........................................................................................................7-1

Part I: General Verification Requirements ...............................................................................7-1

  7-I.A. Introduction .................................................................................................................7-1

  7-I.B. Family Consent to Release of Information ..................................................................7-1

  7-I.C. Verification Hierarchy ..................................................................................................7-1

Chapter 8 – CHA Inspection Standards and Rent Reasonableness Determinations..............8-1

Introduction .............................................................................................................................8-1

Part I: Physical Standards .......................................................................................................8-1

  8-I.A. General HUD Requirements ........................................................................................8-1

  8-I.B. Additional Local Requirements ...................................................................................8-1

  8-I.C. Life-Threatening Conditions .......................................................................................8-2

  8-I.D. Owner and Family Responsibilities ............................................................................8-3

  8-I.E. Special Requirements for Children with Elevated Blood Lead Levels...........................8-3

  8-I.F. City of Chicago Building Code .....................................................................................8-4

Part II: The Inspection Process ...............................................................................................8-4

  8-II.A. Overview ....................................................................................................................8-4

  8-II.B. Inspection Results and Re-inspections .....................................................................8-5

  8-II.C. Enforcing Owner Compliance ....................................................................................8-6

Part III: Rent Reasonableness .................................................................................................8-6

    8-III.A. Overview ......................................................................................................8-6

    8-III.B. When Rent Reasonableness Determinations Are Required ..........................8-6

    8-III.C. Establishing Comparability ...........................................................................8-7

Chapter 9 – Leasing .................................................................................................................9-1

    Introduction ............................................................................................................9-1

    9-I.A. Information Provided to the Owner ...............................................................9-1

    9-I.B. Requesting Tenancy Approval .......................................................................9-1

    9-I.C. Ineligible Units .............................................................................................9-1

    9-I.D. Rent Burden ..................................................................................................9-1

    9-I.E. Duplicative Assistance ..................................................................................9-2

    9-I.F. Lease .............................................................................................................9-2

    9-I.G. Tenancy Addendum ......................................................................................9-2

    9-I.H. HAP Contract Execution ................................................................................9-3

    9-I.I. Changes in Lease or Rent ...............................................................................9-3

    9-I.J. Service Fee Dollars for Emergency Housing Vouchers ...................................9-3

Chapter 10 – Moving with Continued Assistance and Portability ...........................................10-4

    Introduction ..........................................................................................................10-4

    10-I.A. Allowable Moves ........................................................................................10-4

    10-I.B. Restrictions on Moves ................................................................................10-4

    10-I.C. Portability ...................................................................................................10-5

Chapter 11 – Re-examinations ...............................................................................................11-7

    Introduction ..........................................................................................................11-7

    Part I: Regular Re-examinations ............................................................................11-7

        11-I.A. Scheduling Regular Re-examinations ......................................................11-7

        11-I.B. Conducting Regular Re-examinations ......................................................11-7

    Part II: Interim Re-examinations ...........................................................................11-8

        11-II.A. Overview ................................................................................................11-8

        11-II.B. Changes in Family and Household Composition ......................................11-8

        11-II.C. Changes Affecting Income or Expenses ..................................................11-8

        11-II.D. Effective Dates .......................................................................................11-9

        11-II.E. Notification of New Family Share and HAP Amount ...............................11-9

Chapter 12 – Terminations ....................................................................................................12-1

    Part I: Grounds for Termination of Assistance .......................................................12-1

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan

12-I.A. Overview ...................................................................................................................... 12-1

12-I.B. Family No Longer Requires Assistance ........................................................................ 12-1

12-I.C. Family Chooses to Terminate Assistance ..................................................................... 12-1

12-I.D. Family Obligations ....................................................................................................... 12-1

12-I.E. Family Self Sufficiency ................................................................................................ 12-5

12-I.F. HAP Payments to Owners ............................................................................................. 12-5

12-I.G. Insufficient Funding ..................................................................................................... 12-5

Part II: Approach to Termination of Assistance ....................................................................... 12-6

12-II.A. Method of Termination ............................................................................................... 12-6

12-II.B. Alternatives to Termination of Assistance .................................................................. 12-6

12-II.C. Consideration of Circumstances .................................................................................. 12-6

12-II.D. Termination Process ..................................................................................................... 12-6

12-II.E. How Termination of Assistance Affects the HAP Contract and Lease ......................... 12-6

12-II.F. Termination of Tenancy by the Owner ......................................................................... 12-6

Chapter 13 – Owners ................................................................................................................. 13-1

Introduction .............................................................................................................................. 13-1

Part I: Owners in the HCV Program ......................................................................................... 13-1

13-I.A. Owner Recruitment ...................................................................................................... 13-1

13-I.B. Initial Eligibility ........................................................................................................... 13-1

13-I.C. Conflict of Interest ........................................................................................................ 13-3

13-I.D. Owner Responsibilities ................................................................................................. 13-3

Part II. HAP Contracts ............................................................................................................... 13-4

13-II.A. Termination of HAP Payments .................................................................................... 13-4

13-II.B. Breach of HAP Contract .............................................................................................. 13-4

Chapter 14 – Program Integrity ................................................................................................. 14-1

Introduction .............................................................................................................................. 14-1

Part I: Preventing and Detecting Program Abuse ...................................................................... 14-1

14-I.A. Preventing Errors and Program Abuse .......................................................................... 14-1

14-I.B. Detecting Errors and Program Abuse ............................................................................ 14-1

Part II: Corrective Measures and Penalties ............................................................................... 14-1

14-II.A. Subsidy Under- or Over-Payments .............................................................................. 14-1

14-II.B. Family-Caused Errors and Program Abuse .................................................................. 14-2

14-II.C. Owner-Caused Error or Program Abuse ....................................................................... 14-2

14-II.D. CHA-Caused Errors or Program Abuse ........................................................................ 14-3

14-II.E. Criminal Prosecution ...................................................................................................14-3

14-II.F. Civil Prosecution/Recovery .........................................................................................14-3

Chapter 15 – Special Housing Types ..............................................................................................15-1

Introduction ............................................................................................................................15-1

Part I: Single Room Occupancy .............................................................................................15-1

Part II: Congregate Housing ..................................................................................................15-1

Part III: Group Home .............................................................................................................15-1

Part IV: Shared Housing ........................................................................................................15-2

Part V: Cooperative Housing .................................................................................................15-2

Part VI: Homeownership ........................................................................................................15-2

15-VI.A. Overview ...................................................................................................................15-2

15-VI.B. Family Eligibility .......................................................................................................15-3

15-VI.C. Selection of Families .................................................................................................15-3

15-VI.D. Eligibile Units ............................................................................................................15-4

15-VI.E. Additional CHA Requirements for Search and Purchase .........................................15-4

15-VI.F. Homeownership Counseling ......................................................................................15-6

15-VI.G. Contract of Sale and CHA Disapproval of Seller .....................................................15-6

15-VI.H. Financing ..................................................................................................................15-6

15-VI.I. Continued Assistance Requirements; Family Obligations .........................................15-6

15-VI.J. Maximum Term of Homeowner Assistance ...............................................................15-7

15-VI.K. Homeownership Assistance Payments and Homeownership Expenses ...................15-7

15-VI.L. Moving with Continued Assistance and Portability ...................................................15-8

15-VI.M. Denial or Termination of Assistance .........................................................................15-9

Chapter 16 – Program Administration .............................................................................................16-1

Introduction ............................................................................................................................16-1

Part I: Administrative Fee Reserve ........................................................................................16-1

Part II: Setting Program Standards and Schedules ...............................................................16-1

16-II.A. Overview .....................................................................................................................16-1

16-II.B. Payment Standards ....................................................................................................16-1

16-II.C. Utility Allowances .......................................................................................................16-2

Part III: Informal Reviews and Hearings ...............................................................................16-3

16-III.A. Informal Reviews  [24 CFR 982.554]........................................................................16-3

16-III.B. Informal Hearings for Participants ............................................................................16-4

16-III.C. Hearing and Appeal Provisions for Non-Citizens .....................................................16-9

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan

Part IV: Reporting for Children with Elevated Blood Lead Levels ........................................................16-9

Part V: Communication to Participants ...........................................................................................16-10

Chapter 17 – Project-Based Voucher Program ...................................................................................17-1

Introduction ..........................................................................................................................................17-1

Part I: General Requirements ...............................................................................................................17-1

17-I.A. Overview.....................................................................................................................................17-1

17-I.B. Tenant-Based vs. PBV Assistance ............................................................................................17-1

PART II: PBV Owner Proposals ............................................................................................................17-1

17-II.A. Overview.....................................................................................................................................17-1

17-II.B. Owner Proposal Selection Process .........................................................................................17-1

17-II.C. Housing Type ............................................................................................................................17-2

17-II.B. Prohibition of Assistance for Certain Units ...........................................................................17-2

17-II.D. Subsidy Layering and Environmental Reviews ....................................................................17-3

17-II.E. Cap on Number of PBV Units in Each Property ....................................................................17-3

17-II.F. Site Selection Standards ..........................................................................................................17-3

Part III: Dwelling Units .........................................................................................................................17-4

17-III.A. CHA Inspection Standards .....................................................................................................17-4

17-III.B. Housing Accessibility for Persons with Disabilities ..........................................................17-5

17-III.C. Inspecting Units ......................................................................................................................17-5

PART IV: Substantial Rehabilitation and New Construction ............................................................17-6

17-IV.A. Agreement to Enter into HAP Contract.................................................................................17-6

17-IV.B. Conduct of Development Work .............................................................................................17-6

17-IV.C. Completion of Housing...........................................................................................................17-6

PART V: Housing Assistance Payments Contract (HAP) ...................................................................17-7

17-V.A. Overview ...................................................................................................................................17-7

17-V.B. Amendments to the HAP Contract.........................................................................................17-7

17-V.C. HAP Effective, Anniversary and Expiration Dates ...............................................................17-8

17-V.D. Owner Responsibilities Under the HAP Contract.................................................................17-8

17-V.E. CHA Monitoring of PBV Properties ........................................................................................17-8

Part VI: Selection of PBV Program Participants ................................................................................17-8

17-VI.A. Overview ..................................................................................................................................17-8

17-VI.B. Organization of the Waiting List............................................................................................17-8

17-VI.C. Selection from the Waiting List .............................................................................................17-9

17-VI.D. Offer of PBV Assistance.........................................................................................................17-10

17-VI.E. Owner Selection of Tenants ....................................................................................................17-10

17-VI.F. Screening Policies for Rental Assistance Demonstration (RAD) Properties ...........................17-11

Part VII: Occupancy ...............................................................................................................................17-11

17-VII.A. Overview ...............................................................................................................................17-11

17-VII.B. Moves and Transfers ............................................................................................................17-12

17-VII.C. Participation in Special Programs by PBV Residents ...........................................................17-13

17-VII.D. Encouraging Smoke-Free Properties ...................................................................................17-13

Part VIII: Determining Rent to Owner ..................................................................................................17-13

17-VIII.A. Overview .............................................................................................................................17-13

17-VIII.B. Rent Limits ..........................................................................................................................17-13

17-VIII.C. Reasonable Rent .................................................................................................................17-14

17-VIII.D. Effect of Other Subsidy and Rent Control ..........................................................................17-14

Part IX: Payments to Owner ..................................................................................................................17-14

17-IX.A. Housing Assistance Payments ...............................................................................................17-14

17-IX.B. Rent Payments during Initial Occupancy Period ...................................................................17-14

17-IX.C. Vacancy .................................................................................................................................17-15

17-IX.C. Tenant Rent to Owner ..........................................................................................................17-15

Part X: Regional Housing Initiative ........................................................................................................17-15

17-X.A. Introduction ...........................................................................................................................17-15

17-X.B Chicago RHI Commitment ......................................................................................................17-15

Chapter 18 – Policies for Rental Assistance Demonstration Properties ................................................18-1

Introduction ..........................................................................................................................................18-1

Part I: General Requirements ................................................................................................................18-1

18-I.A Overview ...................................................................................................................................18-1

18-I.B. RAD Project-Based Vouchers Vs. Traditional Project-based Voucher Assistance ...................18-1

Part II: Contract and Administrative Terms ...........................................................................................18-1

18-II.A. Overview .................................................................................................................................18-1

18-II.B. HAP Contract Terms and Property Ownership ........................................................................18-1

18-II.C. Voucher Limitations ...............................................................................................................18-2

18-II.D. Transfers of Assistance and Temporary Assistance ...............................................................18-2

Part III: Applicant and WaitList Provisions ............................................................................................18-2

18-III.A. Overview ...............................................................................................................................18-2

18-III.B. Qualifying for Admission Eligibility .......................................................................................18-2

18-III.C. Processing Applications for Admission ..................................................................................18-3

18-III.D. Establishing and Maintaining the Waitlist.................................................................18-4

18-III.E. The Preference System for Admissions ...................................................................18-4

18-III.F. Screening Applicants for Suitability .......................................................................18-10

18-III.G. Admissions Screening Criteria...............................................................................18-12

18-III.H. Screening Applicants with Mitigating Circumstances ...........................................18-15

18-III.I. Determination of Qualification for Admission.........................................................18-15

18-III.J. Occupancy Guidelines: HUD Occupancy Standards ...............................................18-16

**Number of Persons Per Unit Standard**.............................................................................18-16

18-III.K. Tenant Selection and Assignment Plan ..................................................................18-17

18-III.L. Administering Waitlists ..........................................................................................18-18

18-III.M. Site-based Wait lists for Family Properties ...........................................................18-19

18-III.N. Site-based Waitlists for Senior Designated Housing Properties ............................18-20

18-III.O. Transfer Waitlist (for CHA properties) ..................................................................18-20

18-III.P. Making Unit Offers .................................................................................................18-20

18-III.Q. Mixed-Income Developments Unit Offers .............................................................18-20

18-III.R. Accessible Units .....................................................................................................18-21

18-III.S. Leasing Policies .......................................................................................................18-21

Part IV: Resident Provisions and Rights ...............................................................................18-22

18-IV.A. Overview ................................................................................................................18-22

18-IV.B. Leasing Policies: Changes in Household Composition.............................................18-22

18-IV.C. Visitors ...................................................................................................................18-23

18-IV.D. Live-In Aides ..........................................................................................................18-24

18-IV.E. Units Occupied by CHA Residents as Employees ...................................................18-25

18-IV.F. Property Rules .........................................................................................................18-25

18-IV.G. Community Space Policy.........................................................................................18-27

18-V.H. Cannabis Policy ......................................................................................................18-30

18-VI.I. Medical Marijuana Policy .......................................................................................18-30

18-IV.G. Lease Renewal........................................................................................................18-30

18-IV.H. Transfer Policy........................................................................................................18-30

18-IV.I. Transfer Categories .................................................................................................18-31

18-IV.J. Processing Transfers................................................................................................18-34

18-IV.K. Residents in Good Standing....................................................................................18-35

18-IV.L. Cost of Transfers ....................................................................................................18-36

18-IV.M. Security Deposits...................................................................................................18-36

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan

18-IV.N. Split Family Transfers ........................................................................................18-36

18-IV.O. Temporary Relocation and Right to Return to a RAD PBV property....................18-37

Part V: Rent and Income Provisions- ..............................................................................18-37

18-V.A. Re-examination of Income and Family Circumstances ......................................  18-37

18-V.B. Eligibility for Continued Occupancy .................................................................  18-38

18-V.C. Re-examinations .................................................................................................18-39

18-V.D. Action Following Re-examination ......................................................................  18-40

18-V.E. Unit Maintenance and Inspections .....................................................................18-41

18-V.F. Effective Date of Rent Adjustments ...................................................................18-41

18-V.G. Remaining Family Members ..............................................................................18-42

18-V.H. Community Service and Ecconmic Independence Requirement ..........................18-43

18-IV.I. Other Resident Opportunities ............................................................................18-46

18-V.J. Over Income Residents .......................................................................................  18-46

18-V.K. Interim Adjustments for Rent & Family Composition ........................................18-46

18-V.L. Adjusting Rent between Regularly Scheduled Re-examinations (Interim Increase / Reduction in Rent) ..........................................................................................................................18-47

18-V.M. Effective Date of Rent Adjustments ..................................................................18-47

18-V.N. Interim Changes in Household Composition .......................................................18-49

18-V.O. CHA Work Requirement Policy ..........................................................................18-49

18-V.P. Utilities .............................................................................................................18-51

18-V.Q. Reasonable Accommodations ............................................................................18-52

18-V.R. Flat Rents..........................................................................................................  18-52

18-V.S. Determining Income and Rent                                                                    18-53

18-V.T. Resident Organizations......................................................................................18-59

18-V.U. Pet & Assistance Animal Policy .........................................................................18-59

18-V.V. Lease Termination .............................................................................................18-65

Glossary..........................................................................................................................1

Acronyms Used in Subsidized Housing ...........................................................................1

Glossary of Terms ..........................................................................................................3

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 1 – Overview of the Program and Plan

## Part I: CHA and the HCV Program

### 1-I.A. Introduction

The Chicago Housing Authority (CHA) was created to operate housing programs within the city of Chicago for low-income families. The CHA administers the Housing Choice Voucher (HCV) program which allows low income families to rent quality housing in the private market via federal funds provided by the U.S. Department of Housing and Urban Development (HUD). The CHA and its contractors must comply with all applicable state, local, and federal laws, and establish procedures and policies, like this Administrative Plan, to ensure these requirements are met.

The CHA participates in HUD's Moving to Work (MTW) demonstration program, which provides the CHA with the flexibility to meet Chicago's specific needs. The CHA's initial MTW Demonstration Agreement was signed by the CHA and HUD on February 6, 2000 and authorized the implementation of the original Plan for Transformation. The MTW program enables the CHA to create innovative policies that promote self-sufficiency, reduce program cost, and increase options for participants in the program.

The CHA has already implemented changes in its HCV program to achieve these objectives and will continue to explore possible improvements to the program in the future. Current HUD-approved MTW activities are noted throughout this Plan. More information on implemented and proposed MTW activities can be found in the CHA's MTW Annual Plans and Reports on the CHA website.

### 1-I.B. The CHA's Mission

The CHA's mission is to leverage the power of affordable, decent, safe, and stable housing to help communities thrive and low-income families increase their potential for long-term economic success and a sustained high quality of life.

### 1-I.C. Organization and Structure of the CHA

The CHA is governed by a 10-member Board of Commissioners, appointed by the mayor of Chicago. All commissioners must be residents of Chicago, and at least three commissioners must be CHA residents. The Board is responsible for preserving and expanding the CHA's resources and assuring the agency's continued viability. The principal staff member of the CHA is the Chief Executive Officer who is hired and appointed by the Board. Formal actions of the CHA are taken through written resolutions which are voted on, adopted by the Board and entered into official CHA records.

### 1-I.D. The CHA's Commitment to Ethics and Service

As a public service agency, the CHA is committed to providing excellent service to all stakeholders, including HCV participants renting with a voucher and landlords/owners. The CHA will make every effort to keep participants and owners informed of all current and future HCV rules and regulations.

The CHA will maintain proper standards of ethical conduct in the administration of the HCV Program by adhering to the CHA's Ethics Policy. A copy of this policy can be found on the CHA's website. This document is provided to all employees of the CHA and its contractors to ensure the highest standard of ethical conduct is maintained.



Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan

## 1-I.E. HCV Partnerships

Administration of the HCV program includes the participation of four different parties: HUD, the CHA, the property owner and the HCV participant. In order for the program to succeed all four groups have important roles to play. The chart below demonstrates these relationships.



HUD's Responsibilities

- Develop regulations and other guidance to administer the HCV program;
- Allocate HCV program funds to the CHA for operations and rent subsidies; and
- Monitor the CHA's compliance with HUD's HCV program requirements.

1-2

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



CHA's Responsibilities

- Accurately maintain the waiting list and issue vouchers to qualified selected applicants;
- Make Housing Assistance Payments (HAP) to the owner in a timely manner;
- Ensure that owners and families comply with all program rules;
- Comply with all applicable state, local and federal regulations; and
- Establish local policies.

Owner Responsibilities

- Screen families who apply for tenancy to determine if they meet owner requirements;
- Comply with all applicable HCV rules and regulations; and
- Maintain the housing unit in accordance with CHA inspection standards and lease requirements.

Family's Responsibilities

- Provide the CHA with complete and accurate information needed to administer the program;
- Attend all appointments scheduled by the CHA;
- Maintain unit in accordance with CHA inspection standards, lease terms, and allow CHA to inspect units after reasonable notice; and
- Comply with all applicable CHA/HCV rules and regulations.

## Part II: The HCV Program Administrative Plan

### 1-II.A. Overview and Purpose of the Plan

The purpose of the Administrative Plan is to establish policies for administering the HCV program in a manner consistent with HUD requirements and local goals. All issues related to the HCV program not addressed in this document are governed by federal regulations. The CHA is responsible for complying with all future changes in HCV regulations. The CHA's Administrative Plan is applicable to the operation of HCV, Project Based Voucher (PBV), and Rental Assistance Demonstration (RAD) programs as well as additional special programs discussed in Chapter 15- Special Housing Types.

### 1-II.B. Mandatory vs. Optional Policy

HUD requires all public housing authorities (PHAs) to develop policies and procedures that are consistent with federal mandatory policies. In addition, HUD requires all PHAs make clear any optional policies the PHA has adopted and provides guidance that the CHA may decide to implement. The CHA's Administrative Plan is the foundation of the mandatory policies as well as additional policies and procedures that work best for local conditions in the City of Chicago.

### 1-II.C. Updating and Revising the Plan

The CHA will revise this Administrative Plan as needed. Substantive changes to the Plan require public hearings and approval of the CHA's Board of Commissioners. Technical and clarification changes do not need Board approval.

### 1-II.D. Applicable Procedures

For more specific processes in regards to policies stated in the Plan please see the CHA's HCV Procedure Guide.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 2 – Fair Housing and Equal Opportunity

## Part I: Nondiscrimination

### 2-I.A. Overview

Federal laws require public housing authorities (PHAs) to treat all applicants and participants equally, providing the same quality of service, regardless of family characteristics and background. These laws prohibit discrimination against certain protected classes.

The CHA will comply fully with all federal, state and local nondiscrimination laws, and with rules and regulations governing fair housing and equal opportunity in housing and employment. The CHA will not discriminate on the basis of race, color, sex, religion, familial status, age, disability, national origin, marital status, sexual orientation, gender identity, order of protection status, housing status, military discharge status, source of income or other protected classes under state and local laws.

### 2-I.B Providing Information to Families and Owners

PHAs must take steps to ensure that families and owners are fully aware of all applicable civil rights laws. As part of the briefing process, the CHA will provide information to HCV applicant families about civil rights requirements and the opportunity to rent in a broad range of neighborhoods [24 CFR 982.301 (10) & (15)]. In addition, the Housing Assistance Payment (HAP) contract entered into between CHA and owners prohibits discrimination against any person on the basis of race, color, religion, sex, national origin, age, familial status or disability in connection with the contract.

### 2-I.C. Discrimination Complaints

Applicants or participants who believe that they have been illegally discriminated against may notify the CHA either orally or in writing. If the complaint is against CHA staff or contractor, the CHA will attempt to resolve the complaint internally. If the complaint is against a non-CHA staff/vendor such as a landlord or realtor, the CHA will inform the applicant or participant of their right to file a complaint and provide contact information for HUD, the Illinois Department of Human Rights and the Chicago Commission on Human Relations.

### 2-I.D. Access for Persons with Limited English Proficiency

Regulations under Title VI of the Civil Rights Act and Section 188 of the Workforce Investment Act require the CHA to provide language assistance to Limited English Proficiency (LEP) persons. CHA will follow the policies and procedures in its Language Access Plan to ensure that LEP persons will have equal access to CHA programs.

### 2-I.E. Affirmative Marketing

The CHA will conduct affirmative marketing of its housing to ensure that all families are given an equal opportunity to access CHA housing programs. All marketing efforts will include outreach to those least likely to apply for CHA housing programs.

All fair housing posters will be prominently displayed so as to be readily apparent at any CHA place of business where a unit is offered or where business is conducted in relation to residential units, such as customer service centers and the CHA main office.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



## Part II: Policies Related to Persons with Disabilities

### 2-II.A. Definition of Disability

The CHA utilizes two different definitions of disability: there is a HUD definition that is used for income rent calculations and eligibility determinations as well as a broader Americans with Disabilities Act (ADA)/Fair Housing Act (FHA)/Section 504 definition that is used for reasonable accommodation purposes.

1) HUD Definition of Disability: The person meets the Social Security Administration definition of a person with disabilities as defined in 42 U.S.C. 423 or the person has a physical, mental, or emotional impairment that:
   a) Is expected to be of long-continued and indefinite duration;
   b) Substantially impedes their ability to live independently; and
   c) Is of such a nature that the ability to live independently could be improved by more suitable living conditions.
   d) Has a developmental disability as defined in 42 U.S.C. 6001

2) ADA/FHA Definition/504 of Disability (24 CFR Parts 8.3 and 100.201): In order to be considered disabled under this provision, the person must:
   a) Have a physical, mental or emotional impairment that substantially limits one or more of the person's major life activities;
   b) Have a record of such an impairment; or
   c) Be regarded as having such an impairment.

### 2-II.B. Overview

The CHA does not discriminate against persons with disabilities. In order to ensure that equal treatment is afforded to those with disabilities, the CHA provides equal access to its programs and services. It also provides the opportunity for applicants and participants to request reasonable accommodations at any time, from application through termination, to those with qualified disabilities. A reasonable accommodation is a modification or change the CHA can make to its policies or procedures that will assist an otherwise qualified applicant or participant with a disability to take full advantage of and use CHA programs, including those that are operated by other agencies in CHA-owned public space. [24 CFR 8.20]

Although applicants and participants with disabilities may request an accommodation at any time, the CHA shall ask all applicants and participants in writing if they would like to request an accommodation on the intake application, re-examination documents and notices of adverse action by the CHA.

The types of reasonable accommodations the CHA can provide include changes, exceptions or adjustments to a rule, policy, practice or service. Examples include, but are not limited to:

• Permitting applications and re-examinations to be completed by mail;
• Providing alternative formats for persons with visual or hearing impairments, such as large print documents and sign language interpretation;
• Approving the need for a live-in aide;
• Approving an extra bedroom for medical equipment/supplies or to allow a family member with a disability to have their own room.
• Extending the time necessary to acquire documents;
• Allow a higher payment standards if the CHA determines this is necessary to enable a person with disabilities to obtain a suitable housing unit;

Effective August 1, 2024



- Providing time (voucher) extensions for locating a unit when necessary because of lack of availability of accessible units or special challenges of the family in seeking a unit; and
- Permitting an authorized designee or advocate to participate in the application or certification process and any other meetings with CHA staff.

Federal regulations stipulate that requests for accommodations are reasonable unless they pose an "undue financial or administrative burden" to the CHA or will result in a "fundamental alteration" in the nature of the housing program.

HUD issued memoranda entitled "Medical Use of Marijuana in Public Housing" (September 24, 1999) and "Medical Marijuana Use in Public Housing and Housing Choice Voucher Programs" (February 10, 2011) that mandated that all public housing authorities in states where medical marijuana is legalized adopt a policy prohibiting the use and possession of medical marijuana in public housing programs. As such, the CHA cannot permit the use of medical marijuana as a reasonable accommodation.

## 2-II.C. Request for a Reasonable Accommodation

The family must explain the type of accommodation necessary for the person with the disability to fully access the CHA's programs and services. The requesting family must explain the relationship between the requested accommodation and the disability. A "nexus" or relationship between the requested accommodation and the individual's disability must be established in order for the CHA to approve the accommodation.

The Reasonable Accommodation Request forms are available at CHA offices as well as on the CHA's website at http://www.thecha.org/. If the individual with a disability is unable to submit their request in writing, the CHA will assist the individual in putting their request in written form. Participants should contact the CHA and their owner or property manager about their reasonable accommodation needs.

## 2-II.D. Approval/Denial of a Requested Accommodation

In order to provide reasonable accommodations to qualified participants with disabilities, the CHA must verify that the person making the request (or the person on whose behalf the request is being made) meets the definition of a person with a disability and the individual requires the requested accommodation because of a disability. If the disability is obvious and the nexus is clear, the CHA will not seek third party verification. When verifying a disability, the CHA will follow the verification policies in Chapter 7- Verification.

Decisions to approve or deny requests for reasonable accommodations will be made on a case-by-case basis. Factors taken into account include the cost of the requested accommodation, the financial resources of the CHA at the time of the request, the benefits that the accommodation would provide to the family, and the availability of alternative accommodations that would effectively meet the family's disability-related needs. The CHA will approve a request for an accommodation if the following three conditions are met:

- The request was made by or on behalf of a person with a disability;
- There is a disability-related need for the accommodation; and
- The requested accommodation is reasonable, meaning it would not impose an undue financial and administrative burden on the CHA, or fundamentally alter the nature of the CHA's HCV operations (including the obligation to comply with HUD requirements and regulations).

At the CHA's discretion, before making a determination on a reasonable accommodation request, the CHA may discuss and negotiate with the family, request more information from the family or require the family to sign a consent form allowing the CHA to further inquire about the need for the requested accommodation with the family's preferred knowledgeable professional. Where it is unclear whether there is a disability-related need

2-3

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



for the accommodation, the CHA will notify the family as to what additional information is needed, will allow a reasonable timeframe for submission of information, and will make a timely decision on the matter based on the information provided. A decision on the reasonable accommodation request will be made within 30 calendar days of receipt by the HCV's Fair Housing department. If the applicant or participant disagrees with the determination, the applicant may request an informal review or the participant may request a grievance hearing.

## 2-II.E. Termination of Assistance

A CHA decision to deny or terminate the assistance of a family that includes a person with disabilities is subject to consideration of reasonable accommodation [24 CFR 982.552(2)(iv)].

When applicants with disabilities are denied assistance, the notice of denial will inform them of the CHA's informal review process and their right to request a hearing. In addition, the notice will inform applicants with disabilities of their right to request reasonable accommodations to participate in the informal review process.

When a participant family's assistance is terminated, the notice of termination will inform them of the CHA's informal hearing process and their right to request a hearing and reasonable accommodation.

## Part III: Violence Against Women Act

The Violence Against Women Act (VAWA) is a federal law that protects victims (regardless of gender or age) of domestic violence, dating violence, sexual assault or stalking who apply for or live in private housing with a voucher. The law covers the head of household and household members. In Illinois, victims of domestic violence are also covered by the Safe Homes Act [765 ILCS 750].

## 2-III.A. Protections for Victims

The CHA provides the following protections for victims who are HCV applicants or participants:

1. The CHA may not deny admission to the HCV program if a victim of domestic violence, dating violence, sexual assault or stalking can show that the reason for the denial is connected to domestic violence, dating violence, sexual assault or stalking.
2. The CHA may not terminate a participant because he/she is a victim or threatened victim of domestic violence, dating violence, sexual assault or stalking.
3. If a domestic violence victim leaves the unit because of domestic violence, dating violence, sexual assault or stalking, the CHA will not consider him or her in violation of the lease or HCV program requirements.
4. The CHA can 'separate' the family by terminating the abuser from the HCV program while protecting the victim and other household members. The abuser will NOT be issued a separate voucher.
5. The CHA may provide an emergency termination of the HAP contract and issue the participant expedited moving papers.

Limitations of VAWA Protections

1. The CHA has the authority to terminate any participant, including the victim, if it can demonstrate a threat to other tenants or to staff.
2. The CHA can terminate a participant for any violation of the program or the lease that was not based on domestic violence, dating violence, sexual assault or stalking.

## 2-III.B. VAWA Documentation

The CHA accepts the following documentation as verification of domestic violence, dating violence, sexual assault or stalking.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



1. An active Order of Protection (emergency, interim or plenary);
2. A police report;
3. A letter from a professional with knowledge of the abuse, signed under penalty of perjury, from whom the victim has sought assistance;
4. A record from an administrative agency; or
5. A completed HUD form 5382 - Certification of Domestic Violence, Dating Violence, Sexual Assault, or Stalking an Alternate Documentation

In cases where a family has fled due to domestic violence and is asking for portability or if coming to the CHA offices would endanger their health and safety, the CHA will accept a verbal statement from the victim in place of written documentation. The CHA will document the name, date, and statement of the participant or applicant at that time in the confidential database.

## 2-III.C. Notice of VAWA

The CHA will provide a VAWA notice HUD 5380 Notice of Occupancy Rights under VAWA to applicants and participants:

1. At the time an applicant is denied residency;
2. At the time the individual is admitted; and
3. With any notification of eviction or termination of assistance.

The HUD notice must be available in multiple languages and be consistent with HUD guidance concerning language access for individuals with limited English proficiency.

## 2-III.D. Confidentiality

All domestic violence, dating violence, sexual assault or stalking documentation and information will be kept confidential by the CHA. As such, the CHA will not:

1. Enter domestic violence information into any shared database; or
2. Disclose domestic violence information to anyone outside CHA, unless:
   a. The victim makes a request in writing;
   b. The information is required for an eviction or termination proceeding, or
   c. Otherwise required by law.

## 2-III.E. VAWA Emergency Transfers

Participants who are victims of domestic violence, dating violence, sexual assault, or stalking may request an emergency transfer in accordance with Housing Choice Voucher (HCV) Emergency Transfer Plan for Victims of Domestic Violence, Dating Violence, Sexual Assault, or Stalking. CHA will respond to transfer a participant who is granted an emergency transfer request, subject to availability and unit safety.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 3 – Eligibility

## Introduction

The CHA is responsible for ensuring that every individual and family admitted to the HCV program meets all program eligibility requirements, including any individual approved to join the family after admission.

To be eligible for the HCV program:

- The applicant family must:
    - Qualify as a family as defined by HUD and CHA;
    - Have income at or below HUD-specified income limits;
    - Meet citizenship or eligible immigration requirements;
    - Provide social security number information for family members as required; and
    - Consent to the CHA's collection and use of family information by signing consent forms.
- The CHA must determine that the current or past behavior of household members does not include activities prohibited by HUD or the CHA.

## Part I: Definition of Family

### 3-I.A. Family and Household
[24 CFR 982.201(C) and 5.403]

The terms *family* and *household* have different meanings in the HCV program.

#### Family
The CHA's definition of a family includes, but is not limited to, the following, regardless of actual or perceived sexual orientation, gender identity or marital status:

- A family with a child or children;
- Two or more elderly or disabled persons living together;
- One or more elderly or disabled persons living with one or more live-in aides;
- A single person, who may be an elderly person, a displaced person, a disabled person or any other single person; or
- Two or more individuals who are not related by blood, marriage, adoption, or other operation of law but who either can demonstrate that they have lived together previously or certify that each individual's income and other resources will be available to meet the needs of the family.

The addition of new family or household members are limited to the following circumstances:

- Birth of a child by a current family member;
- Adoption of a child by a current family member;
- Court-awarded custody of a child to a current family member;
- Legal guardianship of a minor granted to a current family member;
- As result of marriage by a current family member;
- As result of a civil union created under any state law by a current family member;
- As a result of a registered domestic partnership under any state law by a current family member;
- When a current family member is declaring themselves to be in a relationship with another person;

3-1

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



- As a result of a reasonable accommodation for a current disabled family member;
- As a result of a returning family member from active military service;
- As a result of a returning and now disabled family member;
- As a result of a returning child;
- As a result of returning or placement of a parent to an existing minor in the family;
- As a result of returning or placement of elderly or disabled parents or grandparents to be cared by current family members; or
- As a result of returning or placement of a foster child(ren) or foster adult (s) if their presence would not result in a violation of CHA inspection space standards according to 24 CFR 982.401.

All additional family members must pass applicant screening.

## Household

*Household* is a broader term that includes additional people who, with the CHA's permission, live in an assisted unit, such as live-in aides, foster children and foster adults.

## Head of Household

*Head of Household* is an adult family member or an emancipated minor who has the legal capacity to enter into a lease and is considered the head for purposes of determining income eligibility and rent.

## Spouse and Co-Head

*Spouse* means the marriage partner of the head of household. A co-head of household ("*co-head*") is an individual in the household who is equally responsible with the head of household for ensuring that the family fulfills all of its responsibilities under the program, but who is not a spouse. A family can have only one co-head and can not have both a spouse and co-head.

## Remaining Members of a Tenant Family

The CHA's definition of family includes the *remaining member of a tenant family,* which is a family member of an assisted family who remains in the unit when head of household dies or leaves the unit. Continued occupancy by remaining family members is allowed only if one or more family members on the lease living in the household can pass applicant screening, is age 18 years or over or an emancipated minor under Illinois law, and has the legal capacity to enter into a lease. Household members such as live-in aides, foster children, and foster adults do not qualify as remaining members of a family to assume the voucher. An individual can only be a remaining member of the tenant family if they are on the voucher prior to the Head of Household dying or leaving the unit.

If dependents are the only "remaining members of a tenant family" and there is no family member able to assume the responsibilities of the head of household, the CHA will take into account various factors when determining who receives continued assistance including the interest of the minor children, issues related to VAWA, other factors covered under 24 CFR 982.315, and factors considered by the CHA in its discretion on a case-by-case basis. CHA may allow another adult to join the family as head of household; for example, a newly designated legal guardian of children who are "remaining members."

## 3-I.B. Family Break-Up

[24 CFR 982.315]

When a family on the waiting list breaks up into two otherwise eligible families, only one of the new families may retain the original application date. Other former family members may apply for assistance (with a new

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



application date) if the waiting list is open. Exceptions to this policy will be reviewed on a case by case basis and determinations made at the discretion of the CHA.

The CHA has discretion to determine which members of an assisted family continue to receive assistance if the family breaks up. The CHA will consider factors set forth in 24 CFR 982.315, as well as other factors on a case-by-case basis including those set forth in Section 3-I.A. Remaining Members of a Tenant Family. In the event a court in a divorce or separation decree specifically addresses the continued receipt of a housing subsidy between members of the assisted family, the CHA will follow the court's determination. Such court determination does not waive the requirement that the assisted family members must continue to meet CHA and HCV program screening requirements and eligibility criteria.

## Part II: Basic Eligibility Criteria

### 3-II.A. Income Eligibility and Targeting

Income & Asset Limits

HUD is required by law to set income limits that determine the eligibility of applicants for the HCV program. The income limits are published annually and are based on HUD estimates of median family income and family size in a particular area.

HUD requires CHA to deny assistance based on the following asset limitations:

- Applicants whose assets are in excess of $100,000.
- Applicants who own real property suitable for occupancy (CHA will allow this to be self certified)

Using Income Limits for Eligibility
[24 CFR 982.201]

Income limits are used for eligibility only at admission. Eligibility is established by comparing a family's annual income with HUD's published income limits. To be income-eligible, a family's total income must not exceed HUD's low-income limit, or 80 percent of Area Median Income (AMI). Families are also eligible if:

- The low-income family is "continuously assisted" under the 1937 Housing Act. The CHA will consider a family to be continuously assisted if the family was leasing a unit under any 1937 Housing Act program at the time they were issued a voucher by the CHA.
- A family is a low-or moderate-income family that is displaced as a result of the prepayment of a FHA insured mortgage of a multi-family property or voluntary termination of a mortgage insurance contract on eligible low-income housing as defined in 24 CFR 248.101.

According to CHA's MTW Agreement,* at least 75 percent of the families admitted to the CHA's program during the fiscal year must have incomes that are below the very low-income limit (50 percent of AMI).

### 3-II.B. Citizenship or Eligible Immigration Status
[24 CFR 5, Subpart E]

Housing assistance is only available to individuals who are U.S. citizens, U.S. nationals (herein referred to as citizens and nationals) or noncitizens who have eligible immigration status. The CHA will not provide assistance to a family before verifying eligibility of all family members.

All applicant families must submit evidence of their citizenship status, and they will be notified of this requirement when they apply. Family members who claim U.S. citizenship or national status will not be required to provide additional documentation unless the CHA receives information indicating that an individual's declaration may not be accurate. No declaration is required for live-in aides, foster children, or

Effective August 1, 2024



foster adults. A family is eligible for assistance as long as at least one member is a citizen, national or eligible noncitizen. Families that include eligible and ineligible individuals are considered mixed families. Such families will be given notice that their assistance will be prorated and that they may request a hearing if they contest this determination. Prorated assistance is determined based on the number of family members that are eligible.

If the CHA determines that an applicant family does not include any citizens, nationals or eligible noncitizens, following the verification process, the family will be notified in writing of the determination.

### 3-II.C. Social Security Numbers
[24 CFR 5.216 and 5.218]

The applicant and all members of the applicant's household must disclose the complete and accurate social security number (SSN) assigned to each household member. Families that add children to the household during the eligibility process must provide SSNs for children under the age of 6 years within 90 days of lease-up. When a participant requests to add a new household member who is under the age of six and has not been assigned a SSN, the participant must provide the SSN assigned to each new child and the required documentation within 90 calendar days of the child being added to the household.

These requirements do not apply to non-citizens who do not contend eligible immigration status.

### 3-II.D. Eligibility for Demonstration Programs
Demonstration programs and initiatives may have different eligibility criteria for applicants compared to CHA's standard criteria. A list and description of such demonstration programs and initiatives titled "The CHA Demonstration Program and Special Initiatives Overview" can be found on the CHA website. As necessary, the CHA will obtain any required approvals, including MTW approval,* prior to implementing new or amended demonstration programs and initiatives.

For demonstration programs and special initiatives, applicants who meet the individual program criteria are selected from the existing HCV waiting list. If there are no applicants eligible for a specific program/initiative on the waiting list, then applicants may be generated by referral from various community organizations or other government agencies. Referred applicants who meet program requirements are provided a voucher in accordance with the demonstration program for which they qualify

## Part III: Denial of Assistance
### 3-III.A. Overview
A family that does not meet the eligibility criteria discussed in Parts I and II must be denied assistance.

In addition, HUD requires the CHA to deny assistance based on certain types of current or past behaviors of family members and permits the CHA to deny assistance based on other behaviors.

There are exceptions to the eligibility requirements below for families using Veterans Affairs Supportive Housing (VASH) vouchers; see 77 FR 17088.

### 3-III.B. Mandatory Denial of Assistance
[24 CFR 982.553(a)]

HUD requires the CHA to deny assistance in several cases. Accordingly, CHA will deny assistance if:

---

* For more information on the CHA's MTW agreement and activities, see the Plans, Reports and Policies page on the CHA's website.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



- Any member of the household has been evicted from federally assisted housing in the last three years for drug-related criminal activity. The CHA may admit an eligible family who was evicted from federally assisted housing within the past three years for drug-related criminal activity if the CHA is able to verify that the household member who engaged in the criminal activity has completed a supervised drug rehabilitation program approved by the CHA, or the circumstances leading to the eviction no longer exist.
- The CHA determines that any household member is currently engaged in the use of illegal drugs, including the distribution, possession, sale or use in violation of the Controlled Substances Act (21 USC 801, et seq., 841). ). Each household member will be informed that the use or possession of medical marijuana is considered a violation of the Controlled Substances Act and may be grounds for denial of admission in or termination from any CHA-supported housing program.
- The CHA has reasonable cause to believe that any household member's current use or pattern of use of illegal drugs or alcohol may threaten the health, safety or right to peaceful enjoyment of the premises by other residents.
- Any household member has ever been convicted of drug-related criminal activity for the production or manufacture of methamphetamine in any location.
- An applicant or household member has ever been convicted of a crime that requires them to be registered as a lifetime sex offender under a state sex offender registration program.

## 3-III.C. Other Permitted Reasons for Denial of Assistance

In addition to the mandatory denials stated above, the CHA will also deny assistance for the following reasons.

### Criminal Activity

[24 CFR 982.553]

If any household member is currently engaged in or has engaged in any of the following criminal activities within the past 180 calendar days, the family will be denied assistance.

- Drug-related criminal activity, which includes possession or use of a drug as defined in Section 802 of the Controlled Substances Act ([21 USC 802](#)) [24 CFR 5.100].
- Violent criminal activity;
- Other criminal activity that may threaten the health, safety or right to peaceful enjoyment of the premises by other residents or persons residing in the immediate vicinity;
- Other criminal activity that may threaten the health or safety of property owners and management staff, and persons performing contract administration functions or other responsibilities on behalf of the CHA (including a CHA employee or a CHA contractor, subcontractor or agent);
- Any abuse of alcohol or pattern of abuse of alcohol by any household member that may threaten the health, safety or right to peaceful enjoyment of the premises by other residents;
- Illegal possession or use of a firearm or aggravated assault weapon in violation of federal, state or local laws; and
- Arson

The CHA **will not** deny assistance solely upon the basis of an applicant's arrest record. *See* PIH notice 2015-19.

### Previous Behavior

[24 CFR 982.552(c)]

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



The CHA will deny assistance to an applicant family if:

- The family does not provide complete or accurate information that the CHA or HUD determines necessary in administering the program.
- Any family member has been evicted from federally assisted housing in the last three years.
- Any public housing authority (PHA) has previously terminated assistance for any family member under any federal assisted housing program within the last three years. This policy excludes voluntary terminations.
- Any family member has committed fraud, bribery or any other corrupt or criminal act in connection with any federal housing program.
- The family owes rent or other amounts to any PHA in connection with the HCV Program (including the Project-Based Voucher [PBV] Program, Rental Assistance Demonstration [RAD]), Certificate, Moderate Rehabilitation or public housing programs). The family may be eligible for assistance if they repay the full amount of the debt prior to being selected from the waiting list.
- The family has not reimbursed any PHA for amounts the PHA paid to an owner under a Housing Assistance Payment (HAP) contract for rent, damages to the unit or other amounts owed by the family under the lease, unless the family repays the full amount of the debt prior to being selected from the waiting list.
- The family has breached the terms of a repayment agreement entered into with the CHA, unless the family repays the full amount of the debt covered in the repayment agreement prior to being selected from the waiting list.
- A family member has engaged in or threatened violent or abusive behavior toward CHA personnel (including a CHA employee or a CHA contractor, subcontractor or agent).

The CHA **will not** deny assistance because the family previously failed to meet its obligations under the Family Self-Sufficiency (FSS) program.

### 3-III.D. Screening

The CHA will perform a background check for every adult household member age 18 years and older for admission to the HCV program. The CHA will obtain criminal background records and review them for eligibility purposes. The CHA will not conduct additional screening to determine an applicant's suitability for tenancy.

### 3-III.E. Criteria for Deciding to Deny Assistance

Consideration of Circumstances
[24 CFR 982.552(c)(2)]

In determining whether or not to deny assistance, the CHA may consider the following factors prior to making its decision:

- The seriousness of the case, especially with respect to how it would affect other residents;
- The effects that denial of assistance may have on other members of the family who were not involved in the action or failure;
- The extent of participation or culpability of individual family members, including whether the culpable family member is a minor or a person with disabilities, or a victim of domestic violence, sexual violence, dating violence, sexual assault or stalking;
- The length of time since the violation occurred;
- The family's recent history and the likelihood of favorable conduct in the future; and

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



- In the case of drug or alcohol abuse, whether the culpable household member is participating in or has successfully completed a supervised drug or alcohol rehabilitation program or has otherwise been rehabilitated successfully.

CHA will conduct an individualized assessment or otherwise take mitigating circumstances into consideration related to their criminal records during the eligibility process.

## 3-III.F. Eligibility for Emergency Housing Voucher/Stability Voucher Recipients

The eligibility criteria for Emergency Housing Voucher applicants will be identical to non-EHV applicants, except for the following differences. CHA may not deny based on the following reasons:

- Any member of the family has been evicted from federally assisted housing or if the PHA has ever terminated assistance under the program for any member of the family.
- The family currently owes rent or other amounts to the PHA or to another PHA in connection with Section 8 or public housing assistance under the 1937 Act.
- The family has not reimbursed any PHA for amounts paid to an owner under a HAP contract for rent, damages to the unit, or other amounts owed by the family under the lease.
- The family breached an agreement with the PHA to pay amounts owed to a PHA, or amounts paid to an owner by a PHA.
- The family would otherwise be prohibited admission under alcohol abuse standards established by the PHA in accordance with §982.553(a)(3).
- The PHA determines that any household member is currently engaged in or has engaged in during a reasonable time before the admission, drug-related criminal activity.

For Stability Vouchers, CHA will not deny admission for the permissive prohibitions outlined in PIH Notice 2022-24.

### Notification of Denial

If the CHA determines that a family is not eligible for the program for any reason, the family will be notified promptly. The notice will describe the reasons for which assistance has been denied and contain information regarding the process for the family informal review.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 4 – Applicant, Waiting List and Tenant Selection

## Introduction

In order to give all families an equal opportunity to apply for and receive housing assistance, the CHA places families that apply for assistance on a waiting list using a lottery. When HCV assistance becomes available, the CHA selects families from the waiting list in accordance with HUD requirements and CHA policies.

The CHA maintains a single waiting list for the tenant-based HCV program. For policies specific to the waiting list for the Project-Based HCV program, see Chapter 17- Project-Based Voucher Program.

## Part I: The Application Process

### 4-I.A. Applying for Assistance and Placement on the Waiting List

A family that wishes to receive HCV assistance must apply for admission to the program. The CHA initially requires families to provide only the information needed to determine the family's placement on the waiting list. After the family is selected from the waiting list they are required to provide all information necessary to establish family eligibility and level of assistance.

Except for HUD special admissions, targeted funding, project-based assistance and certain preference categories, the **CHA will only accept applications when the waiting list is open**. Families will be placed on the CHA's waiting list using a lottery. Once each application has been randomly assigned a number, the applications will be placed on the waiting list in order of the assigned numbers and according to CHA preference(s) described below in 4-III.C- Selection Method. No applicant has a right or entitlement to be listed on the waiting list, or to any particular position on the waiting list.

## Part II: Managing the Waiting List

### 4-II.A. Organization of the Waiting List
[24 CFR 982.204 and 205]

The CHA organizes the HCV waiting list to accurately identify and select families for assistance in the proper order.

The waiting list contains the following information for each applicant listed:

- Applicant name;
- Family unit size;
- Assigned lottery number, if applicable;
- Date and time of application, if applicable;
- Qualification for any local preference; and
- Racial or ethnic designation of the head of household.

The CHA also maintains a tenant-based HCV transfer list for eligible participants in the project-based voucher (PBV) program. The CHA will provide assistance to participants who are on the HCV transfer list before assisting families on the general tenant-based program waiting list.

A family's decision to apply, receive or refuse other housing assistance will not affect the family's standing on the HCV waiting list. The CHA will not merge the HCV waiting list with the waiting list for any other program the CHA operates.

4-1

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



### 4-II.B. Opening and Closing the Waiting List
[24 CFR 982.206]

#### Closing the Waiting List
HUD permits the CHA to close the waiting list if it has an adequate pool of families to use its available HCV assistance. The CHA may elect to continue to accept applications from certain categories of families that meet particular preferences or funding criteria. The CHA closes the waiting list when it is anticipated that there are sufficient waiting list applicants who can be served within a time frame determined by the CHA.

#### Re-opening the Waiting List
Prior to re-opening the waiting list, the CHA will publish a notice in local newspapers of general circulation, minority media, electronic and social media, as well as other suitable media outlets. The notice will comply with HUD fair housing requirements and will state where and when to apply, along with any limitations on who may apply.

The CHA will announce the reopening of the waiting list at least 10 calendar days prior to the date applications are accepted. If the list opening is only applicable to certain categories of families this information is contained in the notice.

### 4-II.C. Reporting Changes in Family Circumstances
The family must inform the CHA in writing within a reasonable time of changes in their contact information, including current residence, mailing address and phone number. All applicants have the responsibility to maintain the accuracy of their personal information provided on their application. Failure to do so may cause the CHA to remove the family from the waiting list if the family does not respond to notices such as those for selection and updating the waiting list.

### 4-II.D. Updating the Waiting List
[24 CFR 982.204]

#### Cleaning the Waiting List
The waiting list will be cleaned or "purged" as necessary to ensure that all applicants and applicant information is current and timely. Nonresponsive applicants will be removed from the waiting list.

#### Removal from the Waiting List
If an applicant family is on the waiting list and the CHA determines that the family is not eligible for assistance, the family will be removed from the waiting list. A written notice will be sent to the family's address of record. The notice will state the reasons the family was removed from the waiting list and inform the family how to request an informal review regarding the CHA's decision.

If a family is removed from the waiting list for failure to respond, the CHA may reinstate the family if determines the lack of response was due to a CHA error and/or due to circumstances beyond the family's control (provided the waiting list the appplicant initially applied to is still open).

Once an applicant family receives a voucher, that family will be removed from the waiting list. Any family currently receiving assistance in the HCV Program is removed from the waiting list.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



## Part III: Selection for HCV Assistance

### 4-III.A. Overview

As vouchers become available, families on the waiting list will be selected for assistance in accordance with the policies described in this part. The CHA will maintain a clear record of information required to verify that the family is selected from the waiting list according to the CHA's selection policies [24 CFR 982.204(b) and 982.207(e)].

### 4-III.B. Selection and HCV Funding Sources

#### Regular HCV Funding

The CHA may use regular HCV funding to assist any eligible family on the waiting list. Families are selected from the waiting list according to the policies provided in Section 4-III.C-Selection Method.

#### Special Admissions

[24 CFR 982.203]

HUD may award funding for specifically named families living in specified types of units. In these cases, the CHA may admit families not on the waiting list or may admit families without considering their position on the waiting list. The CHA will maintain records showing that such families were admitted with special program funding.

The CHA may add or move a family to the top of the waiting list to meet Special Admissions requirements for the following cases:

- Families covered under the CHA Leaseholder Housing Choice and Relocation Rights Contract (RRC) whose right of return or return preference to final replacement housing has not been satisfied and who were relocated as a result of rehabilitation, demolition or disposition activities as described in the RRC; and
- Families that are displaced due to rehabilitation (for ADA purposes) of the public housing unit in which they are living.

#### Families Affected by Other Subsidies Ending

The CHA will provide tenant-based vouchers to eligible families residing in units assisted under the Section 8 Moderate Rehabilitation program at the time that the Housing Assistance Payment (HAP) contract expires but is not renewed. In these cases, the CHA may add or move the family to the top of the waiting list to meet Special Admissions requirements.

The CHA may also add or move to the top of the waiting list a family that is affected by an owner's decision to end an existing subsidy by refusing to renew the lease for a unit assisted by a project-based voucher without good cause, by opting out of a project-based Section 8 contract, or by prepaying or making the final payment on a HUD-insured mortgage.

#### Targeted Funding

[24 CFR 982.204(e)]

HUD may award the CHA funding for a specified category of families on the waiting list. The CHA must use this funding only to assist the families within the specified category. The order in which such families are assisted is determined according to the policies provided in Section 4-III.C.

The CHA administers the following types of targeted funding:

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



- HUD-Veterans Affairs Supportive Housing (HUD-VASH) Program. These vouchers are not subject to selection from the waiting list, they are based on referrals to the CHA by the Veterans Affairs Medical Center.

- Family Unification Program. Families eligible for participation are selected from the HCV program waiting list, or referred by Department of Children and Family Services (DCFS), and must be approved as eligible by CHA.

- Mainstream vouchers for persons with disabilities. The CHA will make vouchers with a one-year term available only to non-elderly families with a disabled person; these families are selected from the waiting list. The CHA will make vouchers with a five-year term available to elderly families and non-elderly families with a disabled person; these families are selected from the waiting list.

- Non-elderly disabled vouchers. The CHA will make these vouchers available to non-elderly disabled families (families that do not meet the definition of an elderly family, whose head, spouse or sole member is a person with disabilities). The CHA will select non-elderly disabled families from the HCV program waiting list.

- Section 811 Mainstream vouchers (awarded 2018). The CHA will make these vouchers available to non-elderly disabled households (defined as a household composed of one or more non-elderly persons with disabilities, which may include additional household members who are not non-elderly persons with disabilities; a household where the sole member is an emancipated minor is not an eligible household). Eligible households can be referred to the CHA by partner agencies and added to the HCV waiting list. The CHA will provide a waiting list preference for these vouchers to non-elderly persons with disabilities who are transitioning out of institutional or other segregated settings, at serious risk of institutionalization, homeless, or at risk of becoming homeless. Other programs designated under any new HUD-awarded special programs funding.

- Fostering Youth to Indepedence (FYI). The CHA will make these vouchers available to youth at least 18 years and not more than 24 years of age who left foster care, or will leave foster care within 90 days, and are homeless or are at risk of becoming homeless at age 16 or older.

In the event of a funding shortfall, these special purpose vouchers will be issued first when the CHA begins issuing vouchers again after the shortfall.

## 4-III.C. Selection Method

### Order of Selection

When selecting families from the waiting list the CHA is required to use targeted funding to assist only those families who meet the specified criteria. The CHA is not permitted to skip down the waiting list to a family that it can afford to subsidize when there are not sufficient funds to subsidize the family at the top of the waiting list [24 CFR 982.204(d) and (e)]. The CHA does not permit applicants to give their place on the waiting list to another applicant. The CHA may limit the number of applicants who may qualify for any local preference.

CHA will select families in order of preference as follows [24 CFR 982.207]:

(1) Families that meet the criteria under targeted funding;
(2) Special/emergency circumstances, such as:
    a. Families that meet the eligibility criteria for and are participating in a CHA demonstration program or special initiative;
    b. Family Unification Program (FUP) and Foster Youth to Independence (FYI) participants whose subsidy is expiring;
    c. Families that are victims of a federally declared national disaster affecting the city of Chicago;

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



    d.  Families that are an active participant in a Witness Protection Program or State Victim Assistance Program;

    e.  Families living in a CHA administered housing unit which must be rehabilitated to meet ADA/504 requirements and for whom alternate CHA administered housing units are not available;

    f.  Over-housed or under-housed families living in a Section 8 Moderate Rehabilitation project administered by the CHA for whom no appropriate size unit is available in the same project that is already under a HAP contract; or

    g.  Public Housing residents covered under the Violence Against Women Act (VAWA) and for whom the CHA has determined that it does not have a suitable unit in its portfolio to which the household can be relocated.

(3) Families or individuals that meet HUD's definition of homelessness under the HEARTH Act and are referred by the City of Chicago or Chicago's Continuum of Care through the Coordinated Entry System. This will be limited to an annual number each year with those on the CHA waiting list prioritized first.

(4) Families or individuals that meet HUD's definition of homelessness under the HEARTH Act, that are victims or survivors of Gender Based Violence and are referred by the City of Chicago or Chicago's Continuum of Care through the Coordinated Entry System. This will be limited to an annual number each year with those on the CHA waiting list prioritized first.

(5) Working Families:

    a.  Families where head, spouse, or co-head is employed; or

    b.  An applicant shall be given the benefit of the working preference when the head and co-head spouse are age 62 or older and/or a person with disabilities; and

(6) Veterans, Active or Inactive Military Personnel and Immediate Family Members of both.


CHA will cap RAD transfer vouchers to 75 percent of its turnover vouchers.

Families that qualify for the above preferences will be selected within each preference by their assigned lottery number. If it is determined that the family does not qualify for the preference, the family will be returned to their original placement on the waiting list.

Families that qualify for any of the above preferences will be selected from the waiting list and will be provided assistance before families that do not qualify for any preferences. Families that do not qualify for any preferences will be selected in numerical order based on their assigned lottery number. Families that qualify for a specified category of program funding (targeted funding or special CHA demonstrations) may be selected from the waiting list ahead of higher placed families that do not qualify for the targeted or demonstration funding. However, within any targeted or demonstration funding category, applicants will be selected in numerical order based on the lottery number that was assigned to each application, at the time the applicants were placed on the waiting list.

If there are no applicants eligible for a specific program/initiative on the waiting list, then applicants may be generated by referral from various community organizations or other government agencies. Referred applicants who meet program requirements are added to the waiting list and are provided a local preference in accordance with the demonstration program.

Income Targeting Requirement
[24 CFR 982.201(b)(2)]

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



Under the Moving to Work program, HUD requires that very low-income families (Defined by HUD as annual incomes at or below 50 percent of the area median income) make up at least 75 percent of families admitted to the HCV program annually.

Very low-income families will be selected ahead of other eligible families on an as-needed basis to ensure income-targeting requirements are met.

## 4-III.D. Notification of Selection

When the family has been selected from the waiting list the CHA will notify them. The notice will inform the family of the following:

- Date, time and location of the scheduled application interview, including any procedures for rescheduling the interview;
- All persons required to attend the interview;
- Documents that the family must bring to the interview to document the legal identity of household members, including information about what constitutes acceptable documentation; and
- Other documents and information that should be brought to the interview.

Any required documents or information that is missing or that the family was unable to provide at the time of the interview must be provided to the CHA within the timeframe requested. Extensions may be granted upon request by the family. If the documents and information are not provided within the required time frame (plus any extensions granted by the CHA), the family will be sent a notice of denial (see Chapter 3- Eligibility).

If a notification letter is returned to the CHA with no forwarding address, the family will be removed from the waiting list.

## 4-III.E. The Eligibility Interview
The CHA requires families selected from the waiting list to participate in an eligibility interview. All adult family members must attend the interview. Eligibility is determined according to the policies in Chapter 3- Eligibility.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 5 – Briefings and Voucher Issuance

## Introduction

When a family is determined eligible for the HCV program the CHA will ensure that the family understands their obligations and how the program operates.

## Part I: Briefings

### 5-I.A. Overview

HUD requires that the CHA conduct mandatory briefings for applicant families. The briefing provides a broad description of owner and family responsibilities, explains the CHA's procedures and includes instructions on how to lease a unit.

### 5-I.B. Briefing

[24 CFR 982.301]

HUD requires that the CHA give the family an oral briefing and provide the family with a briefing packet containing written information about the program. Briefings provide information about how the HCV program works, including family and owner responsibilities, where the family can lease a unit and the advantages of moving outside areas of high poverty concentration. The applicant will receive their voucher at the conclusion of the briefing.

Applicants who do not attend two scheduled appointments for voucher pick-up without CHA approval will be denied assistance. Participants who are subject to a required move and fail to attend two scheduled appointments will be terminated from the program.

## Part II: Voucher Issuance

### 5-II.A. Determining Family Unit (Voucher) Size

[24 CFR 982.402]

The CHA will assign one bedroom for the head of household and spouse or co-head and an additional bedroom for each two persons within the household. The CHA does not classify a live-in-aide and his/her family members as family members. Live-In Aides (LIA) who are family members but move into the unit as a live-in aide are prohibited from changing this status and gaining rights to the voucher. A live-in aide will not be required to share a bedroom with another family member of the household, but the live-in-aide's family members are restricted to one bedroom.

The voucher size determines the subsidy the family receives. However, it does not dictate the size of unit the family must lease or determine who within a household will share a bedroom/sleeping room.

### 5-II.B. Voucher Issuance

[24 CFR 982.302]

The voucher is the family's authorization to search for housing. It specifies the unit size for which the family qualifies and includes both the date of voucher issuance and date of expiration. It is the evidence that the CHA has determined the family eligible for the program. However, the CHA does not have any liability to any party by the issuance of the voucher, and the voucher does not give the family any right to participate in the CHA's HCV program.



Prior to issuing any vouchers, the CHA will determine whether it has sufficient funding. If the CHA determines there is insufficient funding after a voucher has been issued, the voucher may be rescinded and the family placed back on the waiting list in their original position.

## 5-II.C. Voucher Term and Extensions

### Voucher Term
[24 CFR 982.303]

The initial voucher term will be 120 calendar days. The family must submit a Request for Tenancy Approval (RTA) within the 120-calendar day period unless the CHA grants an extension. All requests for voucher extensions must be in writing.

In the case of public housing families that are considered temporary relocatees under the Relocation Rights Contract, the initial term of the voucher will be 180 days. Families who receive an initial voucher term of more than 120 days will receive only the standard 120-day voucher term for subsequent moves.

### Extensions of Voucher Term
[24 CFR 982.303(b)]

The CHA will approve an extension in one or more increments not to exceed 60 calendar days upon written request from the family if it is necessary as a reasonable accommodation for a person with disabilities or due to reasons beyond the family's control, as determined by the CHA.

Any request for an additional extension must be made in writing and submitted to the CHA prior to the expiration date of the voucher and must include the reason(s) an additional extension is necessary. The CHA may require the family to provide documentation to support the request.

Public housing families that are considered temporary relocatees under the CHA Leaseholder Housing Choice and Relocation Rights Contract may have their initial voucher term extended for up to an additional six months but the total voucher term may not exceed one year. Subsequent moves after initial leasing shall comply with the extension of voucher term policy.

Upon submission of an RTA, the remaining search time provided on the voucher will freeze. The time will not resume unless the unit is not approved and the CHA sends notice of the denial. An applicant or participant may request an extension prior to the expiration of the voucher.

### Expiration of Voucher Term
If the voucher term or extension expires before the family has submitted an RTA, the family is no longer eligible to search for housing. When the CHA reopens the waiting list, the family may reapply for assistance.

For participants approved to move to a new unit within the CHA's jurisdiction, if a family does not locate a new unit within the term of the voucher and any extensions, the family may remain in its current unit with continued voucher assistance if the owner agrees and the CHA approves. However, if the family has already moved out of the unit, the family will lose its assistance.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 6 – Income and Subsidy Determinations

[24 CFR Part 5, Subpart F]

## Part I: Calculating Income

### 6-I.A. Annual Income

The CHA uses the family's income to determine eligibility for assistance and is used to calculate the family's payment and the CHA's subsidy.

Annual income refers to all income that a family receives during the 12-month period following admission to the program or a regular re-examination effective date. Income from all family members must be counted unless it is specifically excluded by federal regulations or the CHA's MTW Plan policies.* Excluded income is not counted in determining the family's share of the rent. For a complete list of income that is included in and excluded from annual income, see 24 CFR 5.609.

CHA will determine annual income based on actual income received over the previous 12 months.

### 6-1.B. Adjusted Income

Adjusted income is annual income minus deductions. A household could receive deductions for the following reasons:

- Elderly person(s) in the household;
- Dependent(s) in the household;
- Unreimbursed medical expenses;
- Unreimbursed childcare expenses (as long as they allow a member of the family to be employed, look for employment or attend school); CHA will consider a hardship exemption for the loss of childcare deduction in conjunction with the loss of employment. The financial hardship exemption for childcare exemptions may be extended beyond 90 days on a case by case basis as determined by CHA
- Unreimbursed attendant care and auxiliary apparatus expenses necessary to enble a family member to be employed;
- Full-time students in the household (other than the Head, Co-Head and Spouse); and
- Disabled individuals(s) in the household.

## Part II: Calculating Family Share and CHA Subsidy

### 6-II.A. Total Tenant Payment

[24 CFR 5.628]

Total Tenant Payment (TTP) is the estimated monthly rent portion for the participant. It is the highest of the following amounts:

- 30 percent of the family's monthly adjusted income;
- 10 percent of the family's monthly gross income; and
- A minimum rent of $75 as allowed by CHA's MTW Plan.*

---

* For more information on the CHA's MTW agreement and activities, see the Plans, Reports and Policies page on the CHA's website.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



The amount that a family pays for rent and utilities (the family share) will never be less than the family's TTP but may be greater depending on the rent charged for the unit the family selects.

## 6-II.B. Financial Hardships Affecting Minimum Rent
[24 CFR 5.630(b)]

### Overview

If a family is unable to pay the minimum rent of $75 due to financial hardship, the CHA may grant a hardship exemption. Financial hardship includes the following situations:

- The family has lost eligibility or is awaiting an eligibility determination for a federal, state or local assistance program. In order to qualify for an exemption, this loss must prevent the family from paying the minimum rent. The hardship period will end as of the first of the month following the family receiving assistance.
- The family would be evicted because it is unable to pay the minimum rent.
- The family income has decreased due to changed family circumstances, including loss of employment.
- A death in the family has created a financial hardship.

### Implementation of Hardship Exemption

*Determination of Hardship*

When a family requests a financial hardship exemption, the CHA will suspend the minimum rent requirement beginning the first of the month following the family's request if it is determined there is a financial hardship.

To qualify for a hardship exemption, a family must submit a request for a hardship exemption in writing. The request must explain the nature of the hardship and how the hardship has affected the family's ability to pay the minimum rent. If the CHA determines there is no financial hardship, the minimum rent is reinstated, and the family is required to repay the amounts suspended.

When the minimum rent is suspended, the family share reverts back to the highest of the remaining components of the calculated TTP.

*Temporary/Long Term Hardship*

The CHA defines temporary hardship as a hardship expected to last 90 calendar days or less. Long-term hardship is defined as a hardship expected to last more than 90 calendar days.

If the CHA determines that a qualifying financial hardship is temporary, the minimum rent will be suspended for the 90-day period beginning the first of the month following the date of the family's request for a hardship exemption. At the end of the 90-day period the family must resume payment of the minimum rent and repay the CHA the amounts suspended. CHA will offer a reasonable repayment agreement on terms and conditions established by the CHA. However, the CHA may determine that circumstances have changed and the hardship is now a long-term hardship.

If the CHA determines that the financial hardship is long-term the family is exempt from the minimum rent for as long as the hardship continues. The exemption will apply from the first of the month following the family's request until the end of the hardship. Families qualifying for long-term hardships are not required to repay minimum rent. The hardship period ends either when the family's TTP is greater than the minimum rent or new sources of income are received that equal to the loss of income which caused the hardship exemption.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



6-II.C. Applying Payment Standards

The CHA's schedule of payment standards is used to calculate the Housing Assistance Payment (HAP) for HCV families. The payment standard is the highest amount of subsidy the CHA will provide for each household. See Section 16-II.B: Payment Standards for information on setting and applying payment standards.

6-3

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 7 – Verification

[24 CFR 982.551 and 24 CFR 5.230]

## Part I: General Verification Requirements

### 7-I.A. Introduction

The CHA must verify all information it uses to establish the family's eligibility and level of assistance. The CHA is required to get the family's consent to collect this information and must not pass on the cost to the family.

The CHA will follow the verification guidance provided by HUD and will change verification policies, rules and procedures as needed to accommodate persons with disabilities. All information obtained through the verification process will be handled in accordance with the CHA's records management policies.

### 7-I.B. Family Consent to Release of Information

The family must supply any information that the CHA or HUD determines is necessary for the administration of the program and must consent to CHA verification of that information. All adult applicants and participants will be required to sign form HUD-9886, Authorization for Release of Information, and all other applicable forms. If any family member who is required to sign a consent form fails to do so, the CHA will deny admission to applicants and terminate assistance of participants. The family will be eligible to request an informal review (applicants) or informal hearing (participants) based on the decided action.

### 7-I.C. Verification Hierarchy

The CHA will use the methods authorized by HUD to verify family information. The verification methods are listed below in order of preference. In general, the CHA will use the most reliable form of verification that is available and document the reasons when the CHA uses a lesser form of verification. The CHA will consider lower-priority forms of verification only if higher-priority forms are insufficient. In order of priority, the forms of verification that the CHA will use are:

- Up-front Income Verification (UIV) using HUD's Enterprise Income Verification (EIV) system;
- UIV using a non-HUD system;
- Review of Documents;
- Third-party Written Verification;
- Third Party Oral Verification; and
- Self-Certification.

#### Up-Front Income Verification

Up-front income verification (UIV) refers to the CHA's use of the verification tools available from independent sources that maintain computerized information about income and benefits. UIV will be used as needed to the extent that these systems are available to the CHA, including HUD's Enterprise Income Verification (EIV) system as the first priority and other systems as the second priority, such as information from the Department of Human Services, information on Child Support and other non-governmental sources such as the Work Number.

#### Review of Documents

The CHA will use documents provided by the family as verification and when necessary, to help clarify information provided by third parties.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



### Third-Party Written and Oral Verification

The CHA may mail, fax, e-mail or hand deliver third-party written verification requests and will accept third-party responses using any of these methods. When necessary, the CHA will make at least two unsuccessful attempts to obtain third-party verification before using another form of verification.

### Self-Certification

When information cannot be verified by a third party or by a review of documents, family members will be required to submit self-certifications attesting to the accuracy of the information they have provided to the CHA. CHA will accept self-certification of net family assets equal to or less than $50,000 at admission.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 8 – CHA Inspection Standards and Rent Reasonableness Determinations

[24 CFR 982 Subpart I and 24 CFR 982.507]

## Introduction

HUD requires that all units occupied by families receiving HCV assistance meet quality standards and permits the CHA to establish additional requirements. CHA inspections are required before the Housing Assistance Payment (HAP) contract is signed and biennially.

HUD also requires the CHA to determine that units rented by families assisted under the HCV program have rents that are reasonable compared to other market rate units in the area.

## Part I: Physical Standards

### 8-I.A. General HUD Requirements

HUD's performance and acceptability standards for HCV-assisted housing are provided in 24 CFR 982.401. These standards cover the following areas:

- Sanitary facilities;
- Food preparation and refuse disposal;
- Space and security;
- Thermal environment;
- Illumination and electricity;
- Structure and materials;
- Interior air quality;
- Water supply;
- Lead-based paint;
- Access;
- Site and neighborhood;
- Sanitary condition; and
- Smoke detectors.

### 8-I.B. Additional Local Requirements

[24 CFR 982.401(a)(4)]

The CHA may impose additional quality standards. The additional standards must not adversely affect the health and safety of participant families or severely restrict housing choice. HUD approval is required only if more stringent standards are imposed. Approval is not required if the CHA additions are clarifications.

#### Thermal Environment

The CHA has developed the following requirements concerning the thermal environment:

- The heating system must be capable of maintaining a minimum interior temperature of 68 degrees Fahrenheit in all interior rooms used for living, complying with the City of Chicago Heating Ordinance.
- If the heating systems of a building with four or more dwelling units has passed CHA inspections within the preceding 12 months then the boiler room or other common heating systems may be considered CHA inspection standardcompliant without further inspection.

8-1



- The CHA will inspect the heating plant for an HCV assisted unit when the participant has forwarded a complaint about insufficient heat, regardless of whether the heating system was previously inspected and approved by the CHA.

## Clarifications of HUD Requirements

The CHA has adopted the following specific requirements that elaborate on HUD standards:

- Windows and doors are required to be weather-tight.
- The following minimum standard must be met for bedroom classification:
  - Every bedroom must contain at least 70 square feet of floor space; and
  - Three-quarters (75 percent) of the bedroom must have a floor-to-ceiling height of seven feet or more.
- In concurrence with the 2008 Chicago Building Code Requirement, carbon monoxide detectors must be located within 15 feet of a fossil fuel burning system and within 15 feet of any area used for sleeping purposes.
- At least one smoke detector must be installed on every level that contains a habitable room or a heating plant and within 15 feet of any area used for sleeping purposes.
- Locks operated with skeleton keys are prohibited on any dwelling unit or building entrance or exit door.
- All dwelling unit entrance and exit doors must have a single cylinder deadbolt (a deadbolt that does not require a key to be operated from the interior of the unit).

## 8-I.C. Life-Threatening Conditions

[24 CFR 982.404(a)(3) and (b)(2)]

The CHA will define life-threatening conditions and notify the owner or the family (whichever is responsible) of the corrections required. The responsible party must correct life-threatening conditions within 24 hours of the notification date.

The following are considered life-threatening deficiencies:

- Any property determined uninhabitable by a city agency, including uninhabitable units due to fire, flood or other natural disasters;
- Any condition that jeopardizes the security of the unit (e.g., missing or broken locks on exterior doors);
- Major plumbing leaks, waterlogged ceiling or floor in imminent danger of falling;
- Natural or LP gas leaks or fuel oil leaks;
- Any electrical problem or condition that could cause shock or fire;
- A heating system that cannot maintain a minimum of 55 degrees, complying with the City of Chicago Heating Ordinance. (as noted above, a heating system that is not capable of maintaining a minimum interior temperature of 68 degrees Fahrenheit is considered a non-life-threatening deficiency);
- Utilities not in service;
- Conditions that present the imminent likelihood of injury;
- Unmovable obstacles that prevent safe entrance or exit from the unit;
- Absence of a functioning toilet in the unit;
- Backed up sewer system in the unit;
- Lack of at least one working smoke detector on each level of the unit;
- Lack of a working carbon monoxide detector in an area with fossil fuel burning system and on each level used for sleeping; and

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



- Fuel burning water heater or heating, ventilation, or cooling system with missing, damaged, improper, or misaligned chimney or venting. Chimney exhibiting signs of structural failure.
- Chimney, flue, or firebox with an incomplete or damaged connection to a fireplace or wood-burning appliance as it may not safely contain fire and convey smoke and combustion gases to the exterior.
- Combustible materials stored near a heat source, water heater or boiler.
- Detached or missing transition duct on gas dryer.
- Exhaust ventilation system with restricted airflow.
- Missing, damaged or improperly installed guardrails.

If an owner fails to correct life-threatening conditions as required by the CHA, the HAP will be abated and the HAP contract will be terminated.

If a family fails to correct a family-caused life-threatening condition the CHA may terminate the family's assistance.

## 8-I.D. Owner and Family Responsibilities
[24 CFR 982.404]

### Family Responsibilities
The family is responsible for correcting the following CHA inspection standard deficiencies:

- Tenant-paid utilities not in service;
- Failure to provide or maintain family-supplied appliances; and
- Damage to the unit or premises caused by a household member or guest beyond normal wear and tear. The CHA defines "normal wear and tear" as items which the owner could not assess against the tenant's security deposit under state law or court practice.

### Owner Responsibilities
The owner is responsible for all CHA inspection standard violations not listed as a family responsibility above, even if the violation is caused by the family's living habits.

## 8-I.E. Special Requirements for Children with Elevated Blood Lead Levels
[24 CFR 35.1225]

If the CHA is notified by a public health department or medical health care provider or verifies information from another source that a child of less than six years of age has an elevated blood lead level, an environmental investigation of the dwelling unit must be completed by the public health department or the CHA. The investigation must be completed in accordance with program requirements and be provided immediately to the owner of the dwelling unit and the participant. In cases where the public health department has already completed an evaluation the information must also be provided to the owner.

Within 30 days of receiving the results of the investigation the owner is required to complete the reduction of identified lead-based paint hazards in accordance with the lead-based paint regulations [24 CFR 35.1325 and 35.1330]. If the "hazard reduction" is not completed as required, the dwelling unit is in violation of CHA inspection standards and the rent will be abated. Failure to correct will result in HAP contract termination. Extensions will only be granted for exterior deficiencies if needed due to weather related issues.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



### 8-I.F. City of Chicago Building Code

If the City of Chicago notifies the CHA that a property leased under the HCV program does not meet local building code, it will be treated as failing CHA inspections. In such cases, the CHA will notify the owner to make the repairs.  Owner failure to make the repairs will cause the termination of the HAP contract.

## Part II: The Inspection Process

### 8-II.A. Overview

[24 CFR 982.405]

Types of Inspections

The CHA conducts the following types of inspections:

*Initial Inspections.*

- The CHA conducts initial inspections in response to a request from the family to approve a unit for participation in the HCV program.

*Regular Inspections.*

- HUD requires the CHA to inspect each unit under lease at least biennially (every other year) to confirm that the unit still meets inspection standards.
- CHA conducts an inspection for compliance with CHA inspection standards biennially before the end of the calendar month in which the initial or last biennial inspection was completed to confirm that the unit still meets CHA inspections standards.
- CHA reserves the right to place units on a regular inspection schedule, if deemed appropriate.

*Special/Complaint Inspections.*

- If at any time the family or owner notifies CHA the unit does not meet CHA inspection standards, CHA will conduct an inspection if CHA determines that an inspection is warranted.
- CHA may also conduct a Special Inspection based on written info from third parties, such as neighbors, public officials or health care officials.
- All requests for complaint inspections shall be scheduled without regard for whether or not the complaint pertains to an item of an emergency nature.
- CHA will use various forms of communication to inform participants and owners of their ability to request a complaint inspection and that retaliation by the participant or owner in any form is prohibited.

*Quality Control Inspections.*

- HUD requires that a sample of units be re-inspected by a supervisor or other qualified individual to ensure that CHA inspection standards are being enforced correctly and uniformly by all inspectors.

In cases where an HCV family is receiving assistance in a CHA-owned unit, the CHA will obtain the services of an independent entity to perform inspections.

The CHA may rely on alternative inspection results for inspections for units that are also subject to inspections under the HOME or Low-Income Housing Tax Credit (LIHTC) programs

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



## Notice and Scheduling

The CHA will give both the family and the owner reasonable notice (not less than 48 hours) of all inspections, except in the case of a life-threatening emergency. In the case of a life-threatening emergency the CHA will give as much notice as possible, given the nature of the emergency.

The CHA will schedule an initial inspection within 15 calendar days after the following conditions are met:

- The CHA receives the completed Request for Tenancy Approval (RTA);
- Owner verification screening is complete; and
- The owner notifies the CHA the property is available and ready for inspection.

For regular inspections, the family may reschedule one time but no more than seven days after the originally scheduled inspection.

## Owner and Family Inspection Attendance

When a family occupies the unit at the time of inspection an adult must be present for the inspection. The presence of the owner or the owner's representative is required during the regular inspection and/or during an owner-requested special inspection. At initial inspection of a vacant unit the CHA will inspect the unit in the presence of the owner or owner's representative. The presence of a family representative is permitted, but not required.

## 8-II.B. Inspection Results and Re-inspections

### Initial Inspection

After the initial CHA inspection, the CHA will notify the owner in writing of any deficiencies identified during an inspection within seven calendar days. When the deficiencies are corrected, the owner must contact CHA to schedule a re-inspection. Only the owner can request a re-inspection. If the owner does not schedule a re-inspection within the required time frame, the CHA will end the inspection process and issue new moving papers to the tenant.

### Regular Inspections

For units under HAP contract, the CHA will notify the owner and the family in writing of the results of all inspections. When an inspection identifies a CHA inspection failure, the CHA determines whether the failure is a life-threatening condition and if the family or owner is responsible.

When life-threatening conditions are identified, the CHA will immediately notify both parties. The notice will specify who is responsible for correcting the violation and the corrective actions. When failures that are not life-threatening are identified, the CHA will send the owner and the family a written notification of the inspection results within seven calendar days. The written notice will specify who is responsible for correcting the violation and the time frame within which the failure must be corrected.

The notice of inspection results will inform the owner that if life-threatening conditions are not corrected within 24 hours and non-life-threatening conditions are not corrected within the specified time frame the owner's HAP will be abated. Likewise, in the case of family caused deficiencies the notice will inform the family that if corrections are not made within the specified time frame the family's assistance will be terminated.

For conditions that are life-threatening the CHA cannot grant extensions to the 24-hour corrective action period. However, for non-life-threatening items the CHA may grant an extension. The request for an extension must be made in writing, and the length of the extension will be determined on a case by case basis.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



Re-inspections

The CHA will re-inspect the unit to ensure that any inspection deficiencies are corrected. For non-life-threatening inspection deficiencies, the CHA may accept written certification from the owner and the participant in lieu of performing a re-inspection as proof that the required repairs have been made. CHA reserves the right to conduct an inspection. The CHA will schedule the first re-inspection.

Where inspection deficiencies are the owner's responsibility, the CHA will charge the owner a non-refundable $75 fee for conducting a second re-inspection and for each subsequent re-inspection. For subsequent re-inspections, it is the responsibility of the owner to schedule the inspection.

For participant fail items the CHA will send an Intent to Terminate (ITT) notice to the family if the unit does not pass the regular re-inspection.

## 8-II.C. Enforcing Owner Compliance

If the CHA determines that a unit fails to meet CHA inspection standards and the owner has failed to make the necessary repairs within the time period specified by the CHA, payments to the owner will abate (stop).

The effective date of an abatement is the first of the month following the failed re-inspection. [24 CFR 985.3(f)]. The CHA will make no retroactive payments to the owner for the period of time the rent was abated. Owner rents are not abated as a result of CHA inspection failures that are the family's responsibility.

The maximum length of time that a HAP may be abated is 60 calendar days. If the owner does not make the corrections by the end of the abatement period the CHA will terminate the HAP contract and the participant will be required to move.

If an owner has a history or practice of non-compliance with their obligations, the CHA may impose consequences, up to and including terminating the owner's participation in the program.

## Part III: Rent Reasonableness
[24 CFR 982.507 and Notice PIH 2011-46]

### 8-III.A. Overview

The CHA cannot approve a HAP contract until it has determined that the rent for the unit is reasonable. The purpose of the rent reasonableness test is to ensure that the CHA pays a fair rent for each unit rented under the HCV program. HUD regulations define a reasonable rent as one that does not exceed the rent charged for comparable market-rate units in the same area. When an HCV family is receiving assistance in a CHA-owned unit, an independent entity is required to determine rent reasonableness and assist the family to negotiate the contract rent if the family requests [24 CFR 982.352(b)].

### 8-III.B. When Rent Reasonableness Determinations Are Required

Owner-Initiated Rent Determinations

The CHA must make a rent reasonableness determination at initial occupancy and whenever the owner requests a rent adjustment. After the initial occupancy period, the owner may request a rent adjustment in accordance with the owner's lease once in a 365-day period.

All rent adjustments will become effective on the later of the following dates: the first of the month that begins 60 or more calendar days after the CHA receives the owner's request or on the date specified by the owner.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



### CHA and HUD-Initiated Rent Reasonableness Determinations

HUD requires the CHA to conduct a rent reasonableness if there is a 10 percent decrease in the Fair Market Rent that goes into effect at least 60 days before the contract anniversary date. The CHA will also conduct a rent reasonableness if it is determined that initially it was done incorrectly or the information provided by the owner was incorrect.

## 8-III.C. Establishing Comparability

### Factors to Consider

The CHA will take into consideration the following when determining rent comparability:

- Location and age;
- Unit size including the number of rooms and square footage of units;
- Structure type;
- Quality of the unit including quality of the original construction, maintenance and improvements made; and
- Amenities, services and utilities included in the rent.

Comparable units must represent unrestricted market rents. Therefore, units that receive some form of federal, state or local assistance that imposes rent restrictions cannot be considered comparable units.

### Rents Charged for Other Units on the Premises

Units for which an owner has decided to charge rents that are below what other tenants are charged and what the market might actually bear are not "assisted" units for the purposes of rent reasonableness determinations. Per HUD guidance, these units must be taken into consideration as unassisted comparable units on the premises.

Units assisted by Low-Income Housing Tax Credits (LIHTC) or assistance under HUD's HOME Program are not required to determine rent reasonableness if the rent does not exceed the rent for other LIHTC- or HOME-assisted units in the project that are not occupied by families with tenant-based assistance. If the rent requested exceeds rent for non-voucher families then a rent reasonableness determination is required. [24 CFR 982.507(c)(2)]

In the case of a family moving into a multifamily property the CHA will only consider units leased within the past year in determining comparable market rate units.

By accepting the CHA payment each month, the owner certifies that the rent is not more than the rent charged for other comparable market rate units on the premises. If asked to do so, the owner must give the CHA information regarding rents charged for other units on the premises.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 9 – Leasing

## Introduction

This chapter covers additional policies related to the requirements of the CHA, the participant and the owner in order for the family to move into a unit and the CHA to execute a Housing Assistance Payment (HAP) contract with the owner.

## 9-I.A. Information Provided to the Owner
[24 CFR 982.307(b)(1)]

The CHA will not screen applicants or participants for family behavior or suitability for tenancy on behalf of the owner. The determination on whether an assisted family meets the tenancy requirements for leasing is the owner's responsibility. The CHA will provide the owner with the family's current and prior address as shown in CHA records and the name and address of the owner/property manager at the family's current and prior address if known.

## 9-I.B. Requesting Tenancy Approval

After the voucher is issued the family must locate an eligible unit and submit the Request for Tenancy Approval (RTA), signed by both the family and the owner. The family may not submit more than one RTA at a time.

## 9-I.C. Ineligible Units
[24 CFR 982.352(a)]

The CHA will not assist a unit under the voucher program if the unit falls in the following categories:

- A public housing unit or Indian housing unit;
- A unit receiving project-based assistance under Section 8 of the 1937 Act (42 U.S.C. 1437f);
- Nursing homes, board and care homes;
- Facilities providing continual psychiatric, medical or nursing services;
- College or other school dormitories;
- Units on the grounds of penal, reformatory, medical, mental and similar public or private institutions; and
- A unit occupied by its owner or by a person with any interest in the unit.

The CHA may limit the amount of subsidy provided to a single property in the CHA's mixed-income properties so the number of subsidized units does not exceed 40 percent of the total number of units. This rule only applies to the CHA's mixed-income developments that include public housing and properties under a CHA project-based voucher contract. Senior and supportive housing developments are exempt from this provision.

## 9-I.D. Rent Burden
[24 CFR 982.508]

When a family is initially leasing a unit and the gross rent of the unit exceeds the applicable payment standard for the family, the dwelling unit rent must be at a level where the family's share of rent does not exceed 40 percent of the family's adjusted monthly income.  Chapter 6- Income and Subsidy Determinations provides more detail on how family income is calculated.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



### 9-I.E. Duplicative Assistance
[24 CFR 982.352(c)]

A family may not receive the benefit of HCV tenant-based assistance while receiving the benefit of any of the following forms of other housing subsidy, for the same unit or for a different unit:

- Public or Indian housing assistance;
- Other Section 8 assistance (including other tenant-based assistance);
- Assistance under former Section 23 of the United States Housing Act of 1937 (before amendment by the Housing and Community Development Act of 1974);
- Section 101 rent supplements;
- Section 236 rental assistance payments;
- Tenant-based assistance under the HOME Program;
- Rental assistance payments under Section 521 of the Housing Act of 1949 (a program of the Rural Development Administration);
- Any local or State rent subsidy;
- Section 202 supportive housing for the elderly;
- Section 811 supportive housing for persons with disabilities;
- Section 202 projects for non-elderly persons with disabilities (Section 162 assistance); or
- Any other duplicative federal, state or local housing subsidy, as determined by HUD. For this purpose, 'housing subsidy' does not include the housing component of a welfare payment, a social security payment received by the family, or a rent reduction because of a tax credit.

### 9-I.F. Lease

The family and the owner must execute and enter into a written lease for the assisted unit and the owner is required to submit a copy to the CHA. The CHA will not accept an initial lease term of less than one year.

The CHA prohibits side payments for additional rent, or for items, appliances or services customarily provided to unassisted families as part of the dwelling lease for those families [24 CFR 982.510(c)]. The CHA permits owners and families to execute separate, non-lease agreements for services, appliances (other than range and refrigerator) and other items that are not included in the lease. Owners may collect a security deposit provided it is not in excess of private market practices and is in accordance with the Chicago Residential Landlord and Tenant- Ordinance.

The CHA is not a party to the lease, but will review it for compliance with all applicable CHA requirements. Property owners may enter into a lease with a participant for a term that is longer than one year, but not to exceed two years only if the property owner uses the same lease terms for voucher holders and market rate tenants. The property owner may not change any of the terms of the two-year lease, including the contract rent amount and utility responsibility at any time during the full length of the lease term. The CHA will not review the lease for compliance with state or local law.

### 9-I.G. Tenancy Addendum
[24 CFR 982.308]

All provisions in the HUD-required Tenancy Addendum must be added word-for-word to the owner's standard lease form. The Tenancy Addendum includes the tenancy requirements for the program and the composition of the household as approved by the CHA. As a part of the lease, the tenant has the right to enforce the Tenancy Addendum against the owner and the terms of the Tenancy Addendum prevail over any other provisions of the lease.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



### 9-I.H. HAP Contract Execution
[24 CFR 982.305]

If the CHA has determined the unit to be eligible, the owner and the CHA will execute the HAP contract. Under the HAP contract, the CHA agrees to make housing assistance payments to the owner on behalf of a specific family occupying a specific unit and obliges the owner to comply with all HCV program requirements.

For participants who meet the specified criteria for demonstration programs, the CHA will allow the voucher holder to move into the unit prior to passing the CHA inspection, as long as there are no life-threatening defenciencies.

### 9-I.I. Changes in Lease or Rent
[24 CFR 982.308]

When the owner is changing the amount of rent, the owner must notify the CHA of any proposed changes at least 60 days before any changes go into effect. No rent increase will be approved by the CHA unless it meets the rent reasonableness standards [24 CFR 982.507]. However, during the initial term of the lease, the owner may not raise the rent.

### 9-I.J. Service/ Special Fee Dollars for Emergency Housing Vouchers/Stability Vouchers
CHA will work with the referring agency and the applicant to identify the most appropriate use of the available service dollars. The funds will be used for one or more of the following uses.
- Housing Search Assistance
  - Security Deposit
  - Utility Deposit
  - Rental Application
  - Holding Fee Uses
- Owner Related Uses
  - Owner Recruitment and Outreach
  - Owner Incentive and/or Retention Payments
- Moving Expenses (EHV Only)
- Tenant-Readiness Services (EHV Only)
- Essential Household Items (EHV Only)
- Renter's Insurance

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 10 – Moving with Continued Assistance and Portability

## Introduction

Freedom of choice is a hallmark of the HCV program. In general, HUD regulations impose few restrictions on where families may live or move with HCV assistance.

## 10-I.A. Allowable Moves

[24 CFR 982.354]

Generally, the family can move with continued assistance if:

- The family terminates the lease and provides notice to the owner in accordance with the lease;
- The family and the owner mutually agree to terminate the lease;
- The owner has given the family a notice to vacate, has started an action to evict the family, or has obtained a court judgment or other process allowing the owner to evict the family;
- The CHA has terminated the assisted lease for the family's unit for the owner's breach; or
- The CHA determines that the family's current unit does not meet the CHA inspection space standards because of an increase in family size or a change in family composition. A new voucher will be issued to the family and they must try to find an acceptable unit as soon as possible.

Families will not be denied permission to move due to an Intent to Terminate (ITT) being issued. However, a family's continued participation in the HCV Program is subject to the final outcome of any termination notice issued regardless of the timing of the termination notice. Any further processing or granting of participant requests, including but not limited to a request for moving papers, shall not void, restrict or waive the CHA's right to end the family's participation based on any violations whether known or unknown at the time of the request. In general, the moving process follows the policies on briefings and voucher issuance in Chapter 5-Briefings and Voucher Issuance.

## 10-I.B. Restrictions on Moves

### Insufficient Funding

The CHA will deny a family permission to move on grounds that the CHA does not have sufficient funding for continued assistance. Notification of this policy will be provided in writing to the family at the time the move is denied. This policy applies to moves within the CHA's jurisdiction as well as portability.

If the CHA denies a move because it does not have sufficient funding, the CHA will promptly notify the family in writing (assuming the family is still a participant in the CHA HCV program). The move will be approved once there is sufficient funding to support the family's move. A family's request to move will remain open for consideration for 30 days.

### Restrictions on Elective Moves

[24 CFR 982.354 (c)]

A family may only be issued moving papers to make an elective move once in any 12-month period. In the case of a move, the policies on voucher extensions in Section 5-II.C Voucher Terms and Extensions of this plan will apply.

### Zero HAP Families Who Wish to Move

Effective August 1, 2024



A participant who is not receiving any subsidy, but whose HAP contract is still in force, may request a voucher to move to a different unit. The PHA must issue a voucher to move unless it has grounds to deny assistance under the program regulations. However, if the PHA determines no subsidy would be paid at the new unit, the PHA may refuse to enter into a HAP contract on behalf of the family.

## Notification
[24 CFR 982.354(d)(2)]

If a family wishes to move to a new unit, the family must notify the CHA and the owner before moving out of the old unit or terminating the lease on notice to the owner. If the family wishes to move to a unit outside the CHA's jurisdiction under portability, the notice to the CHA must specify the area where the family wishes to move. The notices must be in writing.

## 10-I.C. Portability
Within the limitations of the regulations and this plan, a participant family or an applicant family that has been issued a voucher may use tenant-based voucher assistance to lease a unit anywhere in the United States provided that the unit is located within the jurisdiction of a public housing authority (PHA) administering a tenant-based voucher program [24 CFR 982.353(b)]. Portability is the process by which a family obtains a voucher from one PHA and uses it to lease a unit in the jurisdiction of another PHA.

### Families Moving from the CHA's Jurisdiction to Another PHA's Jurisdiction
Both participant and applicant families that have been issued vouchers may qualify to lease a unit outside the CHA's jurisdiction under portability.

The CHA requires a formal briefing for a participant family wishing to move outside the CHA's jurisdiction under portability. The CHA will provide the family with the same oral and written explanation of portability it provides to applicant families selected for admission to the program.

### Families Moving from Another PHA's Jurisdiction to the CHA's Jurisdiction
The CHA will require families moving into its jurisdiction under portability to attend a briefing.

In determining income eligibility, the CHA will rely upon the income information provided by the initial PHA and will not conduct a new re-examination of income and composition. However, if the family has been selected from the waiting list and ported to the CHA's jurisdiction without ever being a participant on the program, then the CHA will conduct its own income eligibility determination.

For any family moving into its jurisdiction under portability, the CHA will conduct a criminal background check for each family member age 18 and older and will conduct the criminal background screening under the applicant screening procedures of the CHA.

Families relocating to the CHA's jurisdiction under portability who are participants in the Family Self-Sufficiency (FSS) program should refer to the CHA's FSS Action Plan.

### Voucher Extensions and Expiration
The CHA will not approve extensions to a voucher issued to an applicant or participant family porting out of the CHA's jurisdiction except under the following circumstances:

- The initial term of the voucher will expire before the portable family will be issued a voucher by the receiving PHA;
- The family returns to the CHA's jurisdiction and search for a unit there; or
- The family searches for a unit in a third PHA's jurisdiction.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



In such cases, the policies on voucher extensions in Section 5-II.C Voucher Terms and Extensions of this plan will apply.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 11 – Re-examinations

## Introduction

In accordance with its MTW Plan,* the CHA conducts biennial (every other year) re-examinations for participant families. For families with fixed incomes where all members are elderly and/or disabled, the CHA conducts re-examinations triennially (every three years). Families participating in the Homeownership Program (see Chapter 15- Special Housing Types) have annual re-examinations. Interim re-examinations are also needed in certain situations. Re-examinations include gathering and verifying current information about family composition, income and expenses.

## Part I: Regular Re-examinations
[24 CFR 982.516]

### 11-I.A. Scheduling Regular Re-examinations

To complete the regular re-examination the family may be required to attend an in-person interview. If required to attend, each family member age 18 and older in the household must be present. If a family does not attend the scheduled interview they will be rescheduled for another date. If the participant does not attend the second interview the CHA will send an Intent to Terminate (ITT) in accordance with the termination policies in Chapter 12-Terminations.

### 11-I.B. Conducting Regular Re-examinations

Families will be asked to provide all required information within a certain time frame. The CHA will perform criminal background checks for every household member who is 18 years and older, including live-in aides.

If the family does not provide the required documents or information within the required time frame they will be sent an ITT.

If adding a new family member to the unit causes overcrowding according to CHA inspection standards, the CHA must issue the family a new voucher. If an acceptable unit is available for rental by the family the CHA will terminate the Housing Assistance Payment (HAP) contract in the family's current unit in accordance with its terms [24 CFR 982.403].

In general, an *increase* in the family share of the rent that results from a regular re-examination will take effect on the family's anniversary date, and the family will be notified at least 30 calendar days in advance. If less than 30 calendar days remain before the scheduled effective date, the increase will take effect on the first of the month following the end of the 30 calendar day notice period.

If a family moves to a new unit within 90 to 120 calendar days of the regular re-examination, the change will take effect on the effective date of the new lease and HAP contract. If the CHA schedules a regular re-examination for completion before the family's anniversary date (for administrative purposes), the effective date will be determined by the CHA, but will always allow for the 30 calendar day notice period.

If the family causes a delay in processing the regular re-examination, *increases* in the family share of the rent will be applied retroactively, to the scheduled effective date of the regular re-examination.

In general, a *decrease* in the family share of the rent that results from a regular re-examination will take effect on the family's anniversary date. If a family moves to a new unit, the decrease will take effect on the effective

---

* For more information on the CHA's MTW agreement and activities, see the Plans, Reports and Policies page on the CHA's website.



date of the new lease and HAP contract. If the family causes a delay in processing the re-examination, *decreases* in the family share of the rent will be applied from the first day of the month following its completion.

## Part II: Interim Re-examinations
[24 CFR 982.516]

### 11-II.A. Overview

Family circumstances may change throughout the period between regular re-examinations. HUD and CHA policies dictate what kinds of information about changes in family circumstances must be reported.

### 11-II.B. Changes in Family and Household Composition

The CHA will conduct interim re-examinations to account for any approved changes in household composition that occur between regular re-examinations.

The addition of a family member through birth, adoption or court-awarded custody does not require CHA approval, but the family is required to promptly notify the CHA of the addition. For any other addition listed in Section 3-I.A Family and Household, a family must request in writing CHA approval to add a new family member or other household member (live-in aide or foster child) [24 CFR 982.551(h)]. Families must also obtain the owner's approval to add a new family or household member.

When any new family member is added, the CHA must conduct a re-examination to determine any new income or deductions associated with the additional family member. The CHA will make appropriate adjustments to tenant and HAP portion [24 CFR 982.516(e)].

If a household/family member ceases to reside in the unit, the family must inform the CHA within 30 days. Even if the family fails to do so, the CHA will consider all persons listed on the Housing Choice Voucher as approved to reside in the unit with assistance by the CHA as a household/family member.

### 11-II.C. Changes Affecting Income or Expenses

The CHA can schedule re-examinations because the CHA has reason to believe a family's income or expenses may have changed, or because the family reports a change. When a family reports a change, the CHA may take different actions depending on whether the family reported the change voluntarily or because it was required by the CHA.

#### CHA-Initiated Interim Re-examinations

The CHA will check Enterprise Income Verification (EIV) data every six months for all zero income households, and if any income is being received conduct an interim re-examination. CHA reserves the right to not process an interim re-examination.

The CHA may conduct an interim re-examination at any time in order to correct an error in a previous re-examination, investigate a tenant fraud complaint, or to address a multiple subsidy report.

#### Family-Initiated Interim Re-examinations

For households with zero income (before any income exclusions), heads of household are required to report all increases in income within 30 calendar days of the date of the change. The CHA will process an interim re-examination based on the income reported for these families.

Households with income are not required to report increases in income in between regular re-examinations. However, if a family reports an income increase, CHA may, at its sole discretion, conduct an interim re-examination based on the increased income.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



Families may report decreases in income or increases in expenses at any time and the CHA will conduct an interim re-examination if appropriate.

If a family reports a decrease in income from the loss of welfare benefits due to fraud or non-compliance with a welfare agency requirement to participate in an economic independence program, the family's share of the rent will not be reduced [24 CFR 5.615].

## 11-II.D. Effective Dates

If the family share of the rent is to increase, the effective date is on the first of the month following 30 calendar days of the date on the notice.

If a family fails to report a change within the required time frames or fails to provide all required information within the time frames, the increase is applied retroactively.

If the family share of the rent is to decrease, it is effective on the first day of the month following the date the documentation was received. In cases where the change cannot be verified until after the date the change would have become effective, the change will be made retroactively.

## 11-II.E. Notification of New Family Share and HAP Amount

The CHA will notify the owner and family in writing of any changes in the amount of the HAP payment. The notice will include the amount and effective date of the new HAP payment, the amount and effective date of the new tenant rent to owner, and the reason for the change in the amount of the HAP payment.

The family will be given an opportunity to discuss the CHA's determination of their annual or adjusted income and the use of such income to compute the housing assistance payment. If necessary, the family may request an informal hearing.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 12 – Terminations

HUD regulations specify the reasons for which the CHA can terminate a family's assistance and the ways in which such terminations must take place.

## Part I: Grounds for Termination of Assistance

### 12-I.A. Overview

HUD requires the CHA to terminate assistance for certain offenses and when the family no longer requires assistance. CHA is also permitted to terminate assistance for other actions family members take or fail to take. In addition, a family may decide to stop receiving HCV assistance at any time by notifying the CHA.

### 12-I.B. Family No Longer Requires Assistance

[24 CFR 982.455]

The family's assistance will automatically end when HCV assistance by CHA drops to zero and remains there for 180 consecutive calendar days. It is the family's responsibility to report any changes in circumstances that would cause the HCV assistance to rise above zero before the expiration of the 180 day period.

### 12-I.C. Family Chooses to Terminate Assistance

If a family chooses to stop receiving assistance, they must make a request to terminate assistance in writing. The head of household, spouse, or co-head must sign the request before terminating the family's assistance, the CHA will follow the notice requirements in Section 12-II.D- Family Obligations.

### 12-I.D. Family Obligations

[24 CFR 982.551; 24 CFR 982.552; 24 CFR 982.553]

When the family's unit is approved and the Housing Assistance Payment (HAP) contract is executed, the family must follow the rules listed below in order to continue participating in the housing choice voucher program.

The CHA may terminate a family's assistance if the family has failed to comply with any family obligations under the program listed below, even if not required to do so by HUD.

**Any information the family supplies must be true and complete.**

**The family must:**

1. **Supply any information the CHA or HUD determines to be necessary including evidence of citizenship or eligible immigration status.** The CHA is required by HUD to terminate a family's assistance if they do not meet this obligation. See 24 CFR 982.552(b)(4) and 24 CFR 5.514(c).

2. **Supply any information the CHA or HUD determine to be necessary for use in administering the program, including conducting a regularly scheduled re-examination or interim re-examination of family income and composition.** See 24 CFR 982.551(b)(1)-(2).

3. **Disclose and verify social security numbers.** The CHA is required by HUD to terminate a family's assistance if they do not meet this obligation. See 24 CFR 5.218(c).

4. **Sign and submit consent forms for obtaining information.** The CHA is required by HUD to terminate a family's assistance if they do not meet this obligation. See 24 CFR 982.552(b)(3). See Chapter 7-Verification for further discussion of consent requirements.

12-1

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



5.  **Supply any information requested by the CHA to verify that the family is living in the unit or information related to family absence from the unit.**

6.  **Notify the CHA in writing within 30 days when the family is away from the unit for an extended period of time in accordance with CHA policies.** Regardless of any notice of absence, if the entire household is absent beyond 90 consecutive days, CHA will consider the unit to be abandoned and will proceed to terminate the family's participation and the HAP to the owner even if the family continues to pay rent and/or utilities.

7.  **Notify the CHA and the owner in writing at least 30 days before moving out of the unit or terminating the lease.**

8.  **Use the assisted unit for residence only by the family that is listed on the HAP contract and the lease. The unit must be the family's only residence.**

9.  **Notify the CHA in writing within 30 days of the birth, adoption or court-awarded custody of a child.**

10. **Request CHA's written approval to add any other family member as an occupant of the unit.**

11. **Notify the CHA in writing within 30 days if any family member no longer lives in the unit.**

12. **Give the CHA a copy of any owner eviction notice within 30 days of the date the notice is received.**

13. **Attend informational briefings and required appointments including but not limited to those scheduled to discuss violations of family obligations and allegations of criminal activity in the family's unit, building or neighborhood.**

14. **Request and obtain CHA approval before adding a live-in aide or foster child/adult to the household.**

15. **Report all changes in annual income within 30 days if the family has zero income prior to the change.**

16. **Maintain the assisted unit in accordance with CHA inspection standards or any other new inspection standards** The participant is responsible for keeping the unit in compliance with CHA inspection standards, including maintaining appliances, paying utility bills and ensuring continuous utility service for any appliances and utilities that the owner is not required to provide under the lease and HAP contract. The participant *is not* responsible for owner-related CHA inspection fail items.

17. **Allow the CHA and/or owner to inspect the dwelling unit at reasonable times and after reasonable notice, and allow the owner/landlord access to the unit to make repairs.** See 24 CFR 981.551(d).

18. **Continue to meet ongoing eligibility requirements in the case of students.** If a student enrolled at an institution of higher education is under the age of 24, is not a veteran, is not married, does not have dependent children and is not residing with his/her parents in an HCV assisted household, the CHA will terminate the student's assistance if, at the time of re-examination, either the student's income or the income of the student's parents (if applicable) exceeds the applicable income limit. The CHA is required by HUD to terminate a family's assistance if they do not meet this obligation. See 24 CFR 982.552(b)(5).

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



19. **Follow the CHA's policy regarding guests.** A *guest* is defined as a person temporarily staying in the unit with the consent of the head of household or other adult member. See 24 CFR 5.100. A guest may visit a family in an assisted unit for a total of 30 calendar days in a calendar year; however, each visit cannot exceed 14 consecutive calendar days. A visit is defined as an overnight stay. Participants may request a time extension to this visitor timeframe. Persons that exceed the time as a guest will be considered an unauthorized occupant and the family will be subject to program termination. Verification of an unauthorized occupancy can be established through the following:

(1) Government issued ID's or reports;
(2) Utility Bills for the assisted unit;
(3) Property sign-in logs; and/or
(4) Other documentation or investigations.

**The family (including each family member) must not:**

1. **Own or have any interest in the unit (other than in a cooperative or in the case of a voucher holder participating in the homeownership program).**

2. **Be evicted due to serious violation of the lease.** The CHA is required by HUD to terminate a family's assistance if they do not meet this obligation. See 24 CFR 982.552(b)(2). CHA considers a family evicted if the landlord files an eviction action and the court enters an order of possession, even if: 1) a money judgment is not entered concurrently with the order of possession, or 2) the family moves out of the subsidized unit before the order of possession is entered or physically enforced. CHA may consider a family to be evicted if the order of possession is an agreed order. The CHA will not consider a family to be evicted, however, if the order of possession is entered concurrently with a written settlement agreement pursuant to which the family repays all unpaid back rent and rent when due while they remain in possession of the subsidized unit.

3. **Commit any serious or repeated violation of the lease, even if the violation does not lead to eviction.** Serious or repeated lease violations will include, but not be limited to, nonpayment of rent, disturbance of neighbors, destruction of property, living or housekeeping habits that cause damage to the unit or premises, and criminal activity.

4. **Commit fraud, bribery, or any other corrupt or criminal act in connection with any federal housing program.**

5. **Engage in, or allow guests to engage in, drug-related criminal activity.** See 24 CFR 982.553(b) and 24 CFR 5.100.
   a. *Drug-related criminal activity* is defined by HUD as the illegal manufacture, sale, distribution, or use of a drug, or the possession of a drug with intent to manufacture, sell, distribute, or use the drug [24 CFR 5.100]. *Drug* means a controlled substance as defined in Section 802 of the Controlled Substances Act [21 USC 802] or any other illegal drug.
   b. The CHA may terminate assistance for a family if:
      i. Any household member or guest, including those who are 17 years of age, is currently engaged in drug-related criminal activity, or has engaged in drug-related criminal activity within the past three years.
      ii. Any illegal drug use or pattern of illegal drug use by a household member or guests, including those who are 17 years of age, interferes with the health, safety or right to peaceful enjoyment of the premises by other residents.

12-3



   c.  The CHA may terminate assistance for drug-related criminal activity by a household member if the CHA determines that the household member has engaged in the activity within the last three years.

6. **Engage in, or allow guests to engage in, violent criminal activity.** See 24 CFR 982.553(b) and 24 CFR 5.100.

   a.  *Violent criminal activity* is defined by HUD as any criminal activity that has as one of its elements the use, attempted use, or threatened use of physical force substantial enough to cause, or be reasonably likely to cause, serious bodily injury or property damage [24 CFR 5.100].

   b.  The CHA may terminate assistance for criminal activity by a household member or guest if the CHA determines that the household member has engaged in the activity within the last three years.

7. **Engage in, or allow guests to engage in, other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises.** *Immediate vicinity* means within a one mile radius of the premises. See 24 CFR 5.100.

8. **Engage in, or allow guests to engage in, behavior that disturbs or threatens the health, safety or right to peaceful enjoyment of the other residents and persons residing in the immediate vicinity of the premises. This includes behavior related to the abuse of alcohol.** *Immediate vicinity* means within a one mile radius of the premises. See 24 CFR 5.100.

9. **Sublease or let the unit, assign the lease or transfer the unit. This includes receiving payment to cover rent or utility cost by a person living in the unit who is not listed as a family member.**

10. **Receive Housing Choice Voucher program housing assistance while receiving another housing subsidy for the same unit or a different unit under any other federal, state or local housing assistance program.** See 24 CFR 982.551(n).

11. **Damage the unit or premises (other than damage from ordinary wear and tear) or permit any guest to damage the unit or premises.** See 24 CFR 5.100.

12. **Fail to attend two consecutive, scheduled re-examination appointments without CHA approval.**

13. **Receive Housing Choice Voucher program housing assistance while residing in a unit owned by a spouse, domestic partner, parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the CHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.**

14. **Threaten or engage in, or allow guests to threaten or engage in, abusive or violent behavior or criminal activity toward CHA personnel or its representatives.** See 24 CFR 982.552(c)(1)(ix) and 24 CFR 5.100. CHA personnel include CHA employees or CHA contractors, subcontractors or agents. *Abusive or violent behavior towards CHA personnel or agents and contractors* includes verbal as well as physical abuse or violence. Use of racial epithets, or other language, written or oral, that is customarily used to intimidate may be considered abusive or violent behavior. *Threatening* refers to oral or written threats or physical gestures that communicate intent to abuse or commit violence.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



15. **Possess or use a firearm or aggravated assault weapon in violation of federal, state or local criminal or civil laws.** This obligation applies to any household member and/or their guests while on the property or within the immediate vicinity of the property. See 24 CFR 5.100.

16. **Be subject to a lifetime requirement to register as a sex offender in any state or territory of the United States.**

17. **Have committed or be convicted of child molestation.**

18. **Have committed or be convicted of a drug-related crime for the manufacture or production of methamphetamine on the premises of federally assisted housing.** The CHA is required by HUD to terminate a family's assistance if they do not meet this obligation. See 24 CFR 982.553(b)(1)(ii).

19. **Have committed or be convicted of arson.**

20. **Have had any public housing authority (PHA) previously terminate assistance under any federally assisted housing program within the last three years.** See 24 CFR 982.552(c)(1)(iii). This policy excludes voluntary terminations.

21. **Currently owe rent or other amounts to any PHA in connection with the HCV (including PBV and RAD), Moderate Rehabilitation or public housing programs, unless the family currently has a repayment agreement and is complying with its terms.** See 24 CFR 982.552(c)(1)(v). This includes, but is not limited to:
    a. Failure to reimburse a PHA for amounts the PHA paid to an owner for amounts owed by the family under the lease.
    b. Breaching the terms of a repayment agreement entered into with the CHA. See 24 CFR 982.552(c)(1)(vii). See Chapter 14-Program Integrity for further discussion on repayment agreements.

## 12-I.E. Family Self Sufficiency

The CHA will **not** end a family's assistance because of the family's failure to meet its obligations under the Family Self-Sufficiency program.

## 12-I.F. HAP Payments to Owners

Failure of the CHA to make a HAP payment to the owner is not a violation of the lease between the participant and the owner.

## 12-I.G. Insufficient Funding

[24 CFR 982.454]

If the CHA determines there is a shortage of funding, prior to terminating any HAP contracts, the CHA will determine if any other actions can be taken to reduce program costs. If after implementing all reasonable cost cutting measures there is not enough funding available to provide continued assistance for current participants, the CHA will terminate HAP contracts as a last resort. HAP contracts for special purpose vouchers as described in Section 4-III.B Selection and HCV Funding Sources will be terminated last.

Before terminating any HAP contracts, the CHA will inform the local HUD field office and terminate the minimum number needed in order to reduce HAP costs to a level within the CHA's annual budget authority.

If the CHA must terminate HAP contracts due to insufficient funding, the CHA will make public its plan for terminating assistance.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



## Part II: Approach to Termination of Assistance

### 12-II.A. Method of Termination

HUD permits the CHA to terminate assistance by:

- Refusing to enter into a HAP contract or approve a lease;
- Terminating housing assistance payments under an outstanding HAP contract; or
- Refusing to process or provide assistance under portability procedures.

### 12-II.B. Alternatives to Termination of Assistance

Except where otherwise required by HUD, the CHA may consider alternatives to terminating assistance such as requiring that any household member who took part in or was responsible for an offense no longer resides in the unit [24 CFR 982.552(c)(2)(ii)]. Upon consideration of such alternatives and factors, the CHA may, on a case-by-case basis, choose not to terminate assistance**.**

### 12-II.C. Consideration of Circumstances
[24 CFR 982.552(c)(2)(i)], [24 CFR 982.555(e)(6)]

The CHA may consider all relevant circumstances when deciding to terminate assistance. For all discretionary termination decisions, however, the CHA will consider relevant circumstances, provided those circumstances are factually supported by a preponderance of the evidence as determined by the informal hearing officer in the hearing decision. The hearing officer will further consider any claimed or documented disability as a mitigating factor against termination.

See 24 CFR 982.552(b) and (c) for mandatory versus discretionary terminations.

### 12-II.D. Termination Process

If a family's assistance is to be voluntarily ended, the CHA issues the family a Final Termination Notice indicating that the termination is per the family's request. If a family's assistance is to be ended involuntarily, the CHA must give the family and the owner a written Intent to Terminate (ITT) notice that specifies the reasons for which assistance has been terminated and the family's right to an informal hearing.

If a criminal record is the basis of the termination, the CHA will provide a copy of the record to the family. A copy of the criminal record also must be provided to the subject of the record at the listed address. [24 CFR 982.553(d)]

After the CHA issues the ITT, the family has a right to request an informal hearing. If a family does not request an informal hearing within the required time period, the CHA will issue a notice of termination. If a family does request an informal hearing, the result of the hearing will determine whether a notice of termination is issued. If a notice of termination is issued, it will indicate the effective date of the termination.

### 12-II.E. How Termination of Assistance Affects the HAP Contract and Lease

When the family's assistance is terminated, the lease and HAP contract terminate automatically.

### 12-II.F. Termination of Tenancy by the Owner
[24 CFR 982.310]

Termination of an assisted tenancy is a matter between the owner and the family; the CHA is not directly involved. However, as discussed above, violations of the lease can lead to termination from the HCV program.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 13 – Owners

## Introduction

Owners play a central role in the HCV program by supplying decent, safe and sanitary housing for participating families. Owners have many responsibilities under the program, including screening and leasing to families, maintaining the dwelling unit, enforcing the lease and complying with various contractual obligations.

## Part I: Owners in the HCV Program

### 13-I.A. Owner Recruitment

The CHA strives to reach owners with units outside areas of high poverty or minority concentration. To accomplish this the CHA will:

- Conduct periodic seminars, meetings and other outreach efforts with current and prospective owners to explain and provide HCV program updates;
- Issue regular owners' newsletters;
- Join associations of owners/managers of rental property;
- Staff speakers' bureau by advertising the ability of guest speakers for meetings of local community groups;
- Maintain the CHA Inspection Guidebook; and
- Administer a program in accordance with MTW activities* to recognize and reward outstanding property owners and/or property managers who demonstrate exceptional program participation.

The CHA may undertake additional services on an as-needed basis and as resources permit.

### 13-I.B. Initial Eligibility

[24 CFR 982.306]

Before executing a HAP contract and processing housing assistance payments, the CHA must determine that the owner of the assisted unit is eligible to participate in the HCV program. Therefore, upon receiving a Request for Tenancy Approval (RTA) or prior to a change of ownership and/or management the CHA will screen owners/property managers (if not screened within the last 90 days). CHA will not approve an assisted tenancy if:

- The CHA has been informed (by HUD or otherwise) that the owner is debarred, suspended or subject to a limited denial of participation under 2 CFR part 2424.
- HUD has directed the CHA not to approve a tenancy request because:
  - The federal government has instituted an administrative or judicial action against the owner for violation of the Fair Housing Act or other federal equal opportunity requirements, and such action is pending; or
  - A court or administrative agency has determined that the owner violated the Fair Housing Act or other federal equal opportunity requirements.

---

* For more information on the CHA's MTW agreement and activities, see the Plans, Reports and Policies page on the CHA's website.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



- The owner is the parent, spouse, domestic partner, child, grandparent, grandchild, sister or brother of any member of the family; unless CHA determines that approving the unit would provide reasonable accommodation for a family member who is a person with disabilities.
    - This restriction against CHA approval of a unit only applies at the time a family initially receives tenant-based assistance for occupancy of a unit, but does not apply to CHA's approval of a new tenancy with continued tenant-based assistance in the same unit.
    - Current contracts on behalf of owners and families who are related may continue. However, any new leases or contracts for these families may not be approved, except if they are a result of the merger to the HCV program.
- The owner has committed fraud, bribery or any other corrupt or criminal act in connection with any federal housing program.
- The owner has engaged in any of the following in the last three years:
    - Drug-related criminal activity;
    - Violent criminal activity; or
    - Illegal possession and/or use of a firearm or aggravated assault.
- The owner has been convicted of arson or a crime that requires them to be registered under a state sex offender registration program, including the ten-year State Sex Offender Registration Act.

The CHA may choose not to approve an assisted tenancy if:

- The owner has violated obligations under a HAP contract under Section 8 of the 1937 Act (42 U.S.C. 1437f).
- The owner has a history or practice of non-compliance with CHA inspection standards for units leased under the tenant or project-based programs or any other federal housing program.
- The owner has a history or practice of failing to terminate tenancy of tenants assisted under Section 8 or any other federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:
    - Threatens the right to peaceful enjoyment of the premises by other residents;
    - Threatens the health or safety of other residents, employees of CHA, or owner employees or other persons engaged in management of the housing;
    - Threatens the health or safety of persons residing in the immediate vicinity of the premises, or threatens their right to peaceful enjoyment of their residences; or
    - Takes part in drug-related criminal activity or violent criminal activity.
- The owner has a history or practice of renting units that fail to meet state or local housing codes;
- The owner has not paid state or local real estate taxes, fines or assessments, has outstanding debt(s) to the CHA and/or another public housing authority or has foreclosure activity;
- The owner has engaged in violent behavior toward CHA's personnel (including a CHA employee, CHA contractor, subcontractor or agent); or
- The owner fails to prove legal ownership of unit.

If the CHA disapproves an owner, it will not terminate the HAP contract for families that are already living in the owner's properties unless the owner has violated the HAP contract for such units. When applicable, owners may request a review of the CHA's decision to deny a RTA and/or terminate a HAP contract.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



### 13-I.C. Conflict of Interest
[24 CFR 982.161]

Neither CHA nor any of its contractors or subcontractors may enter into any contract or arrangement in connection with tenant-based programs in which any of the following classes of persons has any direct or indirect interest during their tenure or for one year thereafter:

- Any present or former member or officer of CHA (except a participant commissioner);
- Any employee of CHA, or any contractor, subcontractor or agent of CHA, who creates policy or who influences decisions with respect to the programs;
- Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the programs; or
- Any member of the Congress of the United States.

Any member of the classes described in this section must disclose their interest or prospective interest to CHA and HUD.

The HUD field office may waive the conflict of interest prohibition under this sections for good cause.

### 13-I.D. Owner Responsibilities
[24 CFR 982.452]

Under the HAP contract and other applicable laws, the owner is responsible for:

- Performing all the owner's obligations under the HAP contract and the lease, including furnishing all required information to the CHA.
- Performing all management and rental functions for the assisted unit, including selecting a voucher-holder to lease the unit and deciding if the family is suitable for tenancy of the unit.
- Complying with Violence Against Women Act (VAWA) Reauthorization Act of 2013 when screening and terminating tenants.
- Maintaining the unit in accordance with CHA inspection standards, including performance of ordinary and extraordinary maintenance. The owner is not responsible for a breach of the CHA inspection standards that is not caused by the owner, and for which the family is responsible, as provided in 24 CFR 982.404(b). However, the CHA may terminate assistance to a family because of a CHA inspection standards breach caused by the family.
- Collecting from the family:
  - Any security deposit;
  - The tenant contribution; and
  - Any charges for unit damage by the family.
- Enforcing tenant obligations under the lease.
- Paying for utilities and services (unless paid by the family under the lease).
- Complying with the Illinois Safe Homes Act (765 ILCS 750 et seq.).
- Notifying the CHA of any changes to their bank accounts for the purposes of direct deposit. If owners fail to notify the CHA, they will be subject to fees and/or penalties for non-compliance.

The CHA encourages owners and property managers to complete a briefing session.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



## Part II. HAP Contracts

### 13-II.A. Termination of HAP Payments
[24 CFR 982.311(b)]

CHA must continue making housing assistance payments to the owner in accordance with the HAP contract as long as the tenant continues to occupy the unit and the HAP contract is not violated. HAP payments terminate when the contract terminates or when the tenancy is terminated in accordance with the lease.

If the owner is in compliance with the HAP contract and has initiated eviction proceedings against the family and the family continues to reside in the unit, the CHA must continue to make housing assistance payments to the owner until the owner has obtained a court judgment or other process allowing the owner to evict the tenant. To continue to make housing assistance payments, the CHA will require that:

- The owner informs the CHA when the owner has initiated eviction proceedings against the family and the family continues to reside in the unit; and
- The owner informs the CHA when the owner has obtained a court judgment or other process allowing the owner to evict the tenant, and provide the CHA with a copy of such judgment or determination.

Once the owner has obtained a court judgment or other process allowing the owner to evict the tenant, the CHA will terminate the HAP contract and initiate termination proceedings if it has not already done so in accordance with the policies in Chapter 12-Terminations.

### 13-II.B. Breach of HAP Contract
[24 CFR 982.453]

Any of the following actions by the owner constitutes a breach of the HAP contract:

- If the owner violates any obligations under the HAP contract including failure to maintain the unit in accordance with CHA inspection standards;
- If the owner has violated any obligation under any other HAP contract under Section 8 of the 1937 Housing Act [42 USC 1437f];
- If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any federal housing program;
- For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable program, or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan;
- If the owner has engaged in drug-related criminal activity;
- If the owner has committed any violent criminal activity; or
- If the CHA is informed (by HUD or otherwise) and/or discovers that the owner no longer meets initial eligibility or owner responsibilities requirements.

### CHA Remedies
[24 CFR 982.404]

If the owner fails to maintain the dwelling unit in accordance with CHA inspection standards, the CHA must take prompt and vigorous action to enforce the owner obligations.

If the CHA determines that a breach of the HAP contract has occurred it may exercise any of its rights and remedies under the HAP contract.

The CHA's rights and remedies against the owner under the HAP contract include:

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



- A mandatory meeting with the CHA;
- Recovery of any HAP overpayment;
- Suspension of housing assistance payments;
- Abatement or reduction of the housing assistance payment, and
- Termination of payment or HAP contract.

The CHA may also obtain additional relief by judicial order or action.

The CHA must notify the owner of its determination and provide in writing the reasons. The notice may require the owner to take corrective action by an established deadline. The CHA must provide the owner with written notice of any reduction in housing assistance payments or the termination of the HAP contract.

In all cases, the HAP contract terminates at the end of the calendar month following the date which the CHA gives written notice. It does not entitle the owner to any housing assistance payment after this period and must return any HAP received after this period.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 14 – Program Integrity

## Introduction

The CHA is committed to ensuring that subsidy funds made available are spent in accordance with HUD requirements and the CHA's ethics policy.

## Part I: Preventing and Detecting Program Abuse

### 14-I.A. Preventing Errors and Program Abuse

The term error refers to an unintentional mistake or omission. Program abuse or fraud refers to a single act or pattern of actions that represents a false statement, omission or concealment of a substantial fact made with the intent to deceive or mislead.

To ensure that the CHA's HCV program is effectively administered and according to the highest ethical and legal standards, the CHA employs a variety of techniques to ensure that both errors and intentional program abuse are rare. The CHA provides each employee with the necessary training on program rules and regulations.

### 14-I.B. Detecting Errors and Program Abuse

Under its MTW agreement,* the CHA is not required to participate in the quality control activities under the Section 8 Management Assessment Program (SEMAP). However, the CHA monitors program actions through its internal quality assurance program. The CHA also uses results reported in any independent audit or HUD monitoring reports to identify potential program abuses and to assess the effectiveness of the CHA's error detection and abuse prevention efforts.

## Part II: Corrective Measures and Penalties

### 14-II.A. Subsidy Under- or Over-Payments

A subsidy under-payment or over-payment includes an incorrect HAP to the owner, incorrect family share established for the family and an incorrect utility reimbursement to a family. Whether the incorrect subsidy determination is an overpayment or underpayment of subsidy, the CHA must promptly correct the HAP, family share and any utility reimbursement prospectively.

Whether the family or owner is required to reimburse the CHA or the CHA is required to make retroactive subsidy payments to the owner or family depends upon which party is responsible for the incorrect subsidy payment and whether the action taken was an error or program abuse. The CHA will make this determination and issue the results of the determination in writing.

When an action or inaction of an owner or participant results in the overpayment of housing assistance, the CHA holds the appropriate party liable to return any overpayments to the CHA. The CHA will enter into repayment agreements in accordance with the policies discussed in the sections below to recover overpayments. When an owner or participant refuses to repay monies owed, the CHA will utilize other available collection alternatives including, but not limited to, collection agencies, small claims court or civil law suit.

---

\* For more information on the CHA's MTW agreement and activities, see the Plans, Reports and Policies page on the CHA's website.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



### 14-II.B. Family-Caused Errors and Program Abuse

When a family abuses the program, the CHA may, at its discretion:

- Require repayment of the excess subsidy;
- Require removal of the culpable family member; or
- Terminate assistance or pursue other appropriate remedies

The CHA may, but is not required to, offer the family a repayment agreement. If the family refuses to repay the debt or enter into a repayment agreement, or breaches a repayment agreement, the CHA will terminate the assistance upon notification and pursue other modes of collection.

The CHA will not reimburse the family for any underpayment of assistance when the underpayment is caused by the family.

If any member of the household has a repayment agreement with the CHA and the member is removed from the family composition, the debt will be transferred to the succeeding head of household and co-head or spouse.

### Repayment Agreement

The term *repayment agreement* refers to a formal document signed by a tenant and provided to the CHA in which a tenant acknowledges a debt in a specific amount and agrees to repay the amount due at specific time periods.

By entering a repayment agreement with the participant, and in the event the participant breaches the payment agreement, the CHA does not waive its right to pursue a termination for the underlying cause which gave rise to the outstanding debt.

The CHA may enter into repayment agreements for amounts not to exceed $5,000. For amounts greater the CHA will pursue other modes of collection, including referral to the Inspector General.

### Down Payment Requirement

Upon execution of a repayment agreement, the family must pay either the balance owed to the CHA or a down payment of $500.

For families repaying rent owed due to a temporary hardship exemption, there is no minimum down payment. The CHA does not have any other hardship exemption. The family must comply with the Repayment Agreement Guidelines despite any change in circumstances beyond the family's control.

### No Offer of Repayment Agreement

The CHA will not enter into a repayment agreement if there is already a repayment agreement in place with the family.

The CHA will only enter into one repayment agreement with a family during the family's tenure on the program. Subsequent events will be automatic grounds for termination.

### 14-II.C. Owner-Caused Error or Program Abuse

In all cases of overpayment of subsidy caused by the owner, the excess amount received must be re-paid to the CHA. The CHA may recover overpaid amounts by withholding HAP due for subsequent months. If the debt is large, the CHA may allow the owner to pay in installments over a period of time.

If the owner refuses to repay the debt or does not repay the debt, the CHA will abate the debt from future payments made to the owner through participation in the program. If the amount owed by the owner is not



repaid, or the owner leaves the program, the CHA will pursue other modes of collection, including referral to the Inspector General, litigation and debt collection agencies. If the owner seeks to be discharged from the debt through a bankruptcy filing, and if the debt is due to fraud against the program, the CHA will object to the discharge of the debt.

## 14-II.D. CHA-Caused Errors or Program Abuse

CHA-caused incorrect subsidy determinations include failing to correctly apply HCV rules regarding family composition, income, assets, and expenses, assigning an incorrect voucher size to a family and errors in calculation.

Neither a family nor an owner is required to repay an overpayment of subsidy if the error or program abuse is caused by CHA staff or managing agents.

The CHA must reimburse a family for any underpayment of subsidy, regardless of whether the underpayment was the result of staff-caused error or staff or owner program abuse.

## 14-II.E. Criminal Prosecution

If the CHA determines that program abuse by an owner, family, or CHA staff or managing agents has occurred and the amount of overpaid subsidy meets or exceeds the threshold for prosecution under local or state law, the CHA will refer the matter to the HUD Offices of the Inspector General or other appropriate entity.

## 14-II.F. Civil Prosecution/Recovery

The CHA may, at its discretion and in accordance with federal law, recover funds fraudulently obtained by families or owners, and keep a portion of the recovered funds. The CHA may receive these funds through civil litigation, court order, or repayment agreement. [24 CFR 982.163].

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 15 – Special Housing Types

## Introduction

The CHA permits families to utilize the following special housing types:

- Single Room Occupancy housing;
- Congregate housing;
- Group homes;
- Shared housing;
- Cooperative housing; and
- Homeownership.

The CHA will not allow families that own a manufactured housing unit to lease home spaces or pads since such housing is prohibited by City law.

Except as modified by this chapter, the general requirements of the HCV program apply to special housing types.

## Part I: Single Room Occupancy
[24 CFR 982.602-605]

A single room occupancy (SRO) unit provides living and sleeping space for the exclusive use of the occupant but requires the occupant to share sanitary and/or food preparation facilities with others. More than one person may not occupy an SRO unit. The CHA does not permit the use of single room occupancy housing in its program except as a reasonable accommodation to a person with disabilities.

## Part II: Congregate Housing
[24 CFR 982.606-609]

Congregate housing is intended for use by elderly persons or persons with disabilities. A congregate housing facility contains a shared central kitchen and dining area and a private living area for the individual household that includes at least a living room, bedroom and bathroom. Food service for residents must be provided.

If approved by the CHA, a family member or live-in aide may reside with the elderly person or person with disabilities. The CHA must approve a live-in aide if needed as a reasonable accommodation so that the program is readily accessible to and usable by persons with disabilities.

When providing HCV assistance in congregate housing, a separate lease and Housing Assistance Payment (HAP) contract are executed for each assisted family.

## Part III: Group Home
[24 CFR 982.610-614]

A group home is a state-licensed facility intended for occupancy by elderly persons and/or persons with disabilities. Except for live-in aides, all persons living in a group home, whether assisted or not, must be elderly persons or persons with disabilities. Persons living in a group home must not require continuous medical or nursing care.

A group home consists of bedrooms for residents, which can be shared by no more than two people, and a living room, kitchen, dining area, bathroom and other appropriate social, recreational or community space that



may be shared with other residents. No more than 12 persons may reside in a group home including assisted and unassisted residents and any live-in aides.

If approved by the CHA, a live-in aide may live in the group home with a person with disabilities. The CHA must approve a live-in aide if needed as a reasonable accommodation so that the program is readily accessible to and usable by persons with disabilities.

When providing HCV assistance in a group home, a separate lease and HAP contract is executed for each assisted family.

## Part IV: Shared Housing
[24 CFR 982.615-618]

Shared housing is a single housing unit occupied by an assisted family and another resident or residents. The shared unit consists of both common space for use by the occupants of the unit and separate private space for each assisted family.

An assisted family may share a unit with other persons assisted under the HCV program or with other unassisted persons. The owner of a shared housing unit may reside in the unit, but housing assistance may not be paid on behalf of the owner. The resident owner may not be related by blood or marriage to the assisted family.

If approved by the CHA, a live-in aide may reside with the family to care for a person with disabilities. The CHA must approve a live-in aide if needed as a reasonable accommodation so that the program is readily accessible to and usable by persons with disabilities.

When providing HCV assistance in shared housing, a separate lease and HAP contract are executed for each assisted family.

## Part V: Cooperative Housing
[24 CFR 982.619]

This part applies to rental assistance for a cooperative member residing in cooperative housing. It does not apply to assistance for a cooperative member who has purchased membership under the HCV homeownership option, or to rental assistance for a family that leases a cooperative housing unit from a cooperative member.

A cooperative is a form of ownership (nonprofit corporation or association) in which the residents purchase memberships in the ownership entity. Rather than being charged "rent" a cooperative member is charged a "carrying charge."

When providing HCV assistance in cooperative housing, the HAP contract is used.

## Part VI: Homeownership
[24 CFR 982.625-643]

### 15-VI.A. Overview
[24 CFR 982.625]

The homeownership option is used to assist a family residing in a home purchased and owned by one or more members of the family. A family assisted under this option may be newly admitted or an existing participant in the HCV program. Under the homeownership option, known as Choose to Own (CTO), the CHA will offer monthly homeownership assistance payments to qualified families.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



## 15-VI.B. Family Eligibility

[24 CFR 982.627]

The family must meet all of the family eligibility requirements listed below before the commencement of homeownership assistance:

- The family has had no family violations of HUD's CHA inspection standards within the past year.
- The family does not owe money to CHA.
- The family has not committed any serious or repeated violations of a CHA-assisted lease.
- The family must have been admitted to the HCV program.
- The family must qualify as a first-time homeowner or may be a cooperative member.
- In accordance with the CHA's MTW activities,* for non-elderly, non-disabled families the family must have a gross annual income equal to 50 percent of the area median income (AMI) based on family size. The CHA will count self-employment in a business when determining whether the family meets the employment requirement.
- For elderly or disabled families, the minimum income requirement is equal to the current Supplemental Security Income (SSI) monthly payment for an individual living alone, multiplied by 12. For these families, welfare assistance payments for adult family members who will own the home will be included in determining whether the family meets the minimum income requirement. It will not be included for other families.
- Non-elderly, non-disabled families must demonstrate that one or more adult members of the family who will own the home at commencement of homeownership assistance is currently employed on a full-time basis (not less than an average of 30 hours per week) and has been continuously so employed during the year before commencement of homeownership assistance for the family. The CHA may grant an exemption from the employment requirement if the CHA determines that it is needed as a reasonable accommodation.
- The family has not defaulted on a mortgage securing debt to purchase a home under the homeownership option.
- Except for cooperative members who have acquired cooperative membership shares prior to commencement of homeownership assistance, no family member has a present ownership interest in a residence at the commencement of homeownership assistance for the purchase of any home.
- Except for cooperative members who have acquired cooperative membership shares prior to the commencement of homeownership assistance, the family has entered a contract of sale in accordance with 24 CFR 982.631(c).

## 15-VI.C. Selection of Families

In accordance with the CHA's MTW activities,* the CHA will offer a selection preference for participation in the tenant-based homeownership program to any family under a CHA public housing lease who is fully compliant with the public housing program and provided the voucher is utilized for home mortgage assistance only.

---

* For more information on the CHA's MTW agreement and activities, see the Plans, Reports and Policies page on the CHA's website.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



## 15-VI.D. Eligibile Units

[24 CFR 982.628]

In order for a unit to be eligible, the CHA must determine that the unit satisfies all of the following requirements:

- The unit must meet HUD's "eligible housing" requirements, including that the unit may not be any of the following:
  - A public housing or Indian housing unit;
  - A unit receiving Section 8 project-based assistance;
  - A nursing home, board and care home or facility providing continual psychiatric, medical or nursing services;
  - A college or other school dormitory; or
  - On the grounds of penal, reformatory, medical, mental or similar public or private institutions.
- The unit must be under construction or already exist at the time the family enters into the contract of sale.
- The unit must be a one-unit property or a single dwelling unit in a cooperative or condominium.
- The unit must have been inspected by the CHA and must meet CHA inspection standards (see Chapter 8-CHA Inspection Standards and Rent Reasonableness Determinations).
- The unit must have been inspected by an independent inspector, designated by the family, whose report must be submitted to the CHA for review. This inspector must be a member of the American Society of Home Inspectors (ASHI) or other recognized professional society, or a licensed engineer. The inspector may not be a CHA employee. The CHA may disapprove a unit for assistance based on information in the independent inspector's report, even if the unit was found to comply with CHA inspection standards.
- For a unit where the family will not own fee title to the real property (such as a manufactured home), the home must have a permanent foundation and the family must have the right to occupy the site for at least 40 years.
- For CHA-owned units all of the following conditions must be satisfied:
  - The CHA informs the family, both orally and in writing, that the family has the right to purchase any eligible unit and a CHA-owned unit is freely selected by the family without CHA pressure or steering;
  - The unit is not ineligible housing; and
  - The CHA obtains the services of an independent agency to inspect the unit for compliance with CHA inspection standards, review the independent inspection report, review the contract of sale, determine the reasonableness of the sales price and any CHA provided financing. All of these actions must be completed in accordance with program requirements.

The CHA must not approve the unit if the CHA has been informed that the seller is debarred, suspended, or subject to a limited denial of participation.

## 15-VI.E. Additional CHA Requirements for Search and Purchase

[24 CFR 982.629]

It is the family's responsibility to find a home that meets the criteria for homeownership assistance. The family will be allowed 180 days to identify a unit and submit a sales contract for review. The family will be given an

15-4

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



additional 180 days to close on the home. The CHA may grant extensions to either of these periods for good cause. The length of the extension(s) will be determined on a case-by-case basis.

15-5

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



### 15-VI.F. Homeownership Counseling
[24 CFR 982.630]

Before commencement of homeownership assistance for a family, the family must attend and satisfactorily complete the CHA's pre-assistance homeownership and housing counseling. The family must also attend and complete post-purchase ongoing homeownership counseling.

### 15-VI.G. Contract of Sale and CHA Disapproval of Seller
[24 CFR 982.631 (c) – (d)]

Contract of Sale

Before commencement of monthly homeownership assistance payments or receipt of a down payment assistance grant, a member or members of the family must enter into a contract of sale with the seller of the unit to be acquired by the family. The family must give the CHA a copy of the contract of sale.

Disapproval of a Seller

In its administrative discretion, the CHA may deny approval of a seller for the same reasons it may disapprove an owner under the regular HCV program; see 24 CFR 982.306(c).

### 15-VI.H. Financing
[24 CFR 982.632]

As a check against predatory lending, the CHA will review the financing of each purchase transaction, including estimated closing costs. The CHA will review the loans for certain features, such as balloon payments, adjustable rate mortgages and unusually high interest rates, all of which are prohibited. The CHA also will not approve "seller financing" or "owner-held" mortgages. Beyond these basic criteria, the CHA will rely on the lenders to determine that the loan will be affordable to program participants.

The mortgage the family applies for must require a minimum down payment of at least three percent of the sale price with one percent of the down payment coming from the purchaser's personal funds. The CHA will not require that the family have any more than the minimum of one percent of their own money in the transaction. However, in cases where a lender is requiring a larger amount, the family will be held to the underwriting guidelines set by their lending institution.

The CHA will approve a family's request to utilize its Family Self-Sufficiency (FSS) escrow account for down payment and/or closing costs when purchasing a unit under the HCV homeownership option.

### 15-VI.I. Continued Assistance Requirements; Family Obligations
[24 CFR 982.633]

Homeownership assistance may only be paid while the family is residing in the home. If the family moves out of the home, the CHA may not continue homeownership assistance after the month when the family moves out. The family or lender is not required to refund to the CHA the homeownership assistance for the month when the family moves out.

Before commencement of homeownership assistance, the family must execute a statement in which the family agrees to comply with all family obligations under the homeownership option.

Except for the following specified obligations, the family must comply with all obligations listed in 24 CFR 982.551. The family is not required to:

- Comply with CHA inspection standards;

15-6

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



- Allow CHA inspections;
- Comply with any lease;
- Provide the CHA with any owner eviction notice; or
- Refrain from owning or maintaining any interest in the unit.

The family must comply with the following obligations:

- The family must comply with the terms of the mortgage securing debt incurred to purchase the home, or any refinancing of such debt.
- The family may not convey or transfer ownership of the home, except for purposes of financing, refinancing or pending settlement of the estate of a deceased family member. Use and occupancy of the home are subject to 24 CFR 982.551 (h) and (i).
- The family must supply information to the CHA or HUD as specified in 24 CFR 982.551(b). The family must further supply any information required by the CHA or HUD concerning mortgage financing or refinancing, sale or transfer of any interest in the home, or homeownership expenses. If there are any changes to the mortgage payment amount (increase or decrease), the family must notify the CHA within 14 days of the date of the notice from the mortgage lender.
- The family must notify the CHA before moving out of the home.
- The family must notify the CHA if the family defaults on the mortgage used to purchase the home.
- No family member may have any ownership interest in any other residential property.

For families who have reached the 10-year anniversary of their closing, their equity in the home will be considered an asset for the purposes of income calculations. However, in accordance with the CHA's MTW Plan, assets are disregarded after initial eligibility and are not included in the calculation of the participant's portion.

## 15-VI.J. Maximum Term of Homeowner Assistance
[24 CFR 982.634]

The limits on the length of time a family will receive homeownership assistance are as follows:

- 15 years, if the initial mortgage incurred to finance purchase of the home has a term of 20 years or longer;
- 30 years for elderly or disabled families; or
- 10 years in all other cases.

In the case of an elderly family, the exception only applies if the family qualifies as an elderly family at the start of homeownership assistance. In the case of a disabled family, the exception applies if at any time during receipt of homeownership assistance the family qualifies as a disabled family.

## 15-VI.K. Homeownership Assistance Payments and Homeownership Expenses
[24 CFR 982.635]

The monthly homeownership assistance payment is the lower of the voucher payment standard minus the total tenant payment, or the monthly homeownership expenses minus the total tenant payment.

In determining the amount of the homeownership assistance payment, the CHA will use the same payment standard schedule, payment standard amounts and subsidy standards as those described elsewhere in this plan for the HCV program.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



The CHA's HAP will be paid directly to the family. It is the family's responsibility to make the entire payment to the lender. The CHA may pay the HAP directly to the lender if this process is preferred by the lender and this arrangement is agreed upon by the participant. If the assistance payment exceeds the amount due to the lender, the CHA must pay the excess directly to the family.

The CHA will not grant relief, under any circumstances, from the requirement to automatically terminate homeownership assistance 180 calendar days after the CHA makes the last HAP on behalf of the family.

The CHA will allow the following homeownership expenses:

- Monthly homeownership payment, including principal and interest on initial mortgage debt, taxes and insurance, and any mortgage insurance premium, if applicable;
- The CHA utility allowance for the unit, based on the current HCV utility allowance schedule;
- A combined monthly allowance for maintenance expenses and costs of major repair and replacement calculated as one percent of the purchase price of the unit divided evenly throughout the 12 months of the year; or $75 monthly, whichever is greater.
- If applicable, the monthly amount of co-op or condominium association operation and maintenance assessments; and
- Monthly principal and interest on debt for major home repair, replacements or improvements, if applicable.

The CHA will allow the following expenses for a cooperative member:

- The cooperative charge under the occupancy agreement including payment for real estate taxes and public assessments;
- Principal and interest on initial debt to purchase cooperative membership;
- Home insurance;
- The CHA allowance for maintenance expenses;
- The CHA allowance for costs of major repairs and replacements;
- The CHA utility allowance for the home;
- Principal and interest on debt incurred to finance major repairs, replacements or improvements for the home; and
- Cooperative operating charges or maintenance fees assessed by the cooperative homeowner association.

## 15-VI.L. Moving with Continued Assistance and Portability
[24 CFR 982.636, 982.637, 982.353(b) and (c)]

For families participating in the homeownership option, requests to move will be approved and/or denied in accordance with CHA policies in Chapter 10. The CHA will require additional counseling of any families who move with continued assistance.

The CHA must deny the family permission to move to a new unit with continued voucher rental assistance if:

- The CHA lacks funding to provide continued assistance; or
- The family defaulted on an FHA-insured mortgage;  or
- The family fails to demonstrate that the family has conveyed, or will convey, title to the home, as required by HUD, to HUD or HUD's designee; and the family has moved, or will move, from the home within the period established or approved by HUD.

15-8

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



A family may exercise portability if the receiving public housing authority (PHA) is administering a voucher homeownership program and accepting new homeownership families.

The family must attend the briefing and counseling sessions required by the receiving PHA. The receiving PHA will determine whether the financing for, and the physical condition of the unit, are acceptable. The receiving PHA must promptly notify the initial PHA if the family has purchased an eligible unit under the program, or if the family is unable to purchase a home within the maximum time established by the PHA.

## 15-VI.M. Denial or Termination of Assistance
[24 CFR 982.638]

The CHA will deny or terminate a family's homeownership assistance if the family violates any of the homeowner obligations listed in Section 15-VI.I, as well as for any of the reasons listed in Section 2 of form HUD-52649, Statement of Homeowner Obligations Housing Choice Homeownership Voucher Program.

In making its decision to terminate homeownership assistance, the CHA will follow the policies in Chapter 12-Terminations.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 16 – Program Administration

## Introduction

This chapter discusses administrative policies and practices that are relevant to the activities covered in this plan.

## Part I: Administrative Fee Reserve

[24 CFR 982.155]

An administrative fee reserve allows the program to pay program administrative expenses in excess of administrative fees paid by HUD. The use of administrative fee reserves is authorized by the Chief Executive Officer or his or her designee and is restricted to activities related to rental assistance under the HCV program.

Expenditures from the administrative fee reserve will be made in accordance with all applicable federal requirements. Expenditures will not exceed $100,000 per occurrence without the prior approval of the CHA's Board of Commissioners.

## Part II: Setting Program Standards and Schedules

### 16-II.A. Overview

Although many of the program's requirements are established by HUD, flexibility is required to allow the CHA to adapt the program to local conditions. The schedules and standards discussed here include:

- *Payment Standards*, which dictate the maximum subsidy a family can receive; and
- *Utility Allowances*, which specify how a family's payment should be adjusted to account for tenant-paid utilities.

### 16-II.B. Payment Standards

[24 CFR 982.503]

The payment standard sets the maximum subsidy payment a family can receive from the CHA each month [24 CFR 982.505(a)]. Payment standards are set for each unit size and are based on fair market rents (FMR) published annually by HUD. The FMR is set at the 50th percentile of rents within the Chicago metropolitan area.

Except in cases governed by the CHA's MTW activities,* CHA's payment standards are the same across the entire service area and are within HUD's "basic range": between 90 and 110 percent of the published FMR.

### Updating Payment Standards

When HUD updates its FMRs, the CHA must update its payment standards if they are no longer within the range stated above [24 CFR 982.503(b)]. HUD may require the CHA to make further adjustments if it determines that rent burdens for assisted families are unacceptably high [24 CFR 982.503(g)].

The CHA will review the appropriateness of the payment standards on an annual basis. In addition to ensuring the payment standards are always within 90 to 110 percent of FMR, the following factors are also taken into account when determining whether an adjustment should be made to the payment standard schedule.

- Funding availability: The CHA will review the budget to determine the impact projected subsidy adjustments will have funding available for the program and the number of families served. The CHA

---

* For more information on the CHA's MTW agreement and activities, see the Plans, Reports and Policies page on the CHA's website.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



will compare the number of families who could be served under revised payment standard amounts with the number assisted under current payment standard amounts.

- Rent burden of participating families: When 40 percent or more of families for any given unit size are paying more than 30 percent of adjusted monthly income, the CHA will consider increasing the payment standard. In evaluating rent burdens, the CHA will not include families renting a larger unit than the family unit size listed on the voucher.
- Quality of units selected: The CHA will review the quality of units selected by participants when making the determination of the percent of income families are paying for housing, to ensure that payment standard increases are only made when needed to reach the mid-range of the market.
- Changes in rent to owner: The CHA may review a sample of the units to determine how often owners are increasing or decreasing rents and the average percent of increases/decreases by bedroom size.

## Applying Payment Standards
[24 CFR 982.505 (b) - (d)]

The payment standard for a family is based on the lower of unit size or the number of bedrooms the family qualifies for due to the family composition.

When the CHA revises its payment standards during the term of the HAP contract it will apply the new payment standards in accordance with HUD regulations. Families under a HAP contract at the time of a decrease in the payment standard will continue to use the higher payment standard as long as they continue to receive voucher assistance in that unit. If the payment standard is increased during the term of the HAP contract, the higher will be used to calculate the HAP beginning on the effective date of the family's first regular re-examination.

Families requiring or requesting interim re-examinations will not have their HAP payments calculated using the higher payment standard until their next regular re-examination. However, under its MTW Program, elderly/disabled households will have their HAP payments calculated using the most up to date payment standard as well as those participants who have had a rent increase processed.

Regardless of any increase or decrease in the payment standard, if the family unit size increases or decreases during the HAP contract term, the new family unit size must be used to determine the payment standard for the family beginning at the family's first regular re-examination following the change in family unit size.

## Exception Payment Standards
[24 CFR 982.503(c)]

Under its MTW program,* the CHA has established payment standards that are higher than the basic range. Approval of exception payment standards is determined on a case-by-case basis.

## 16-II.C. Utility Allowances
[24 CFR 982.517]

An established utility allowance schedule is used in determining family share and subsidy. The CHA will maintain a utility allowance schedule for all tenant-paid utilities, the cost of tenant-supplied refrigerators and stoves, and other tenant-paid housing services such as trash collection. The CHA utility allowance schedule does not include an allowance for air-conditioning. The CHA may approve a higher utility allowance as a reasonable accommodation with supporting documentation and approval.

---

* For more information on the CHA's MTW agreement and activities, see the Plans, Reports and Policies page on the CHA's website.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



The utility allowance schedule must be determined based on the typical cost of utilities and services paid by energy-conservative households that occupy housing of similar size and type in the same locality. In developing the schedule, the CHA must use normal patterns of consumption for the community as a whole, and current utility rates.

The CHA must review its schedule of utility allowances each year and must revise its allowance for a utility category if there has been a change of 10 percent or more in the utility rate since the last time the utility allowance schedule was revised.

## Part III: Informal Reviews and Hearings

### 16-III.A. Informal Reviews

[24 CFR 982.554]

Program applicants who are denied assistance may request an informal review of that decision. Informal reviews are intended to provide a "minimum hearing requirement" and need not be as complex as the informal hearing requirements.

#### Decisions Subject to Informal Review

Denial of assistance may include any or all of the following [24 CFR 982.552(a)(2)-(c); 24 CFR 982.553]:

- Denying listing on the CHA waiting list;
- Denying or withdrawing a voucher;
- Refusing to enter into a HAP contract or approve a lease;
- Refusing to process or provide assistance under portability procedures;
- Denial of assistance based on unfavorable history involving criminal activity that disturbs the health and safety and peaceful enjoyment of the premises (see Section 3-III.C Other Permitted Reasons for Denials of Assistance); and
- Denial of assistance based on information, investigation, background checks, and/or arrests or convictions of an unfavorable history that may be the result of domestic violence, sexual violence, dating violence, sexual assault or stalking (see Section 2-III Violence Against Women Act).

CHA will not offer informal reviews for the following reasons [24 CFR 982.554(c)]:

- Discretionary administrative determinations by the CHA;
- General policy issues or class grievances;
- Failure to be selected for a spot on the waiting list;
- Removing (or "purging") applicants from the waiting list for failure to respond to CHA communication;
- A determination of the family unit size under the CHA subsidy standards;
- A determination not to grant approval of the tenancy;
- A determination that the unit is not in compliance with the CHA inspection standards; or
- A determination that the unit is not in compliance with the CHA inspection standards due to family size or composition.

#### Scheduling and Holding an Informal Review

A request for an informal review must be made in writing to the CHA by the close of the business day no later than 15 business days from the date of the CHA's denial of assistance.

Except as provided in Section 2-III Violence Against Women Act, the CHA will schedule and send written notice of the informal review within a reasonable time of the family's request and will hold the review within a reasonable time from the date of the family's request.

16-3

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



At the discretion of the CHA, mitigating factors may be considered for the admission of the applicant family.

## Informal Review Procedures
[24 CFR 982.554(b)]

The family at their own expense may be represented by a lawyer or other representative at the informal review. Legal representation is not allowed during any of the following events: new admission eligibility appointments, regular re-examination appointments or interim re-examinations requested by the family.

The informal review must be conducted by a person other than the one who made or approved the decision under review, or a subordinate of that person.

The applicant must be given a copy of any record, including background checks, if the denial is based on criminal activity. The applicant must be provided an opportunity to present written or oral objections to the decision of the CHA.

## Informal Review Decision
[24 CFR 982.554(b)-(3)]

In rendering a decision, the CHA will evaluate all relevant facts related to the denial.

The CHA will notify the applicant of the final decision, including a statement explaining the reason(s) for the decision. Generally, the notice will be mailed within 30 calendar days of the informal review. If the decision to deny is overturned as a result of the informal review, processing for admission will resume.

If the family does not appear at the scheduled time, and was unable to reschedule the informal review in advance due to the nature of the conflict, the family must contact the CHA by telephone or in writing within 24 hours of the scheduled informal review date, excluding weekends and holidays. The CHA will reschedule the informal review only if the family can show good cause for the failure to appear. The family must provide all requested documentation of good cause in writing within 10 days. If the family misses the rescheduled informal review, the family's assistance will be denied.

## 16-III.B. Informal Hearings for Participants
[24 CFR 982.555]

The CHA must offer an informal hearing for certain determinations relating to a participant family. A participant is defined as a family that has been admitted to the CHA's HCV program and is currently assisted in the program. The purpose of the informal hearing is to consider whether the CHA's decisions related to the family's circumstances are in accordance with the law, HUD regulations and CHA policies.

### Decisions Subject to Informal Hearing
Circumstances for which the CHA will give a participant family an opportunity for an informal hearing are as follows:

- A determination of the family's annual or adjusted income, and the use of such income to compute the HAP;
- A determination of the appropriate utility allowance (if any) for tenant-paid utilities from the utility allowance schedule;
- A determination of the family unit size;
- A determination to terminate assistance for a participant family because of the family's actions or failure to act, including but not limited to criminal activity;



- A determination to terminate assistance because the participant has been absent from the assisted unit for longer than the maximum period permitted under CHA policy and HUD rules;
- A determination to terminate a family's Family Self Sufficiency (FSS) contract, withhold supportive services, or propose forfeiture of the family's escrow account; and
- A determination based on information, investigation, background checks and/or arrests or convictions to terminate assistance based on an unfavorable history.

Circumstances for which the CHA will not give a participant family an opportunity for an informal hearing are as follows:

- Discretionary administrative determinations by the CHA;
- General policy issues or class grievances;
- Establishment of the schedule of utility allowances for families in the program;
- A determination not to approve an extension of a voucher term;
- A determination not to approve a unit or tenancy;
- A determination that a unit selected by the applicant is not in compliance with CHA inspection standards;
- A determination that the unit is not in accordance with CHA inspection standards because of family size; and
- A determination to exercise or not to exercise any right or remedy against an owner under a HAP contract.

## Informal Hearing Procedures

### Notice to the Family
[24 CFR 982.555(c)]

When the CHA makes a decision that is subject to informal hearing procedures, the CHA will inform the family of its right to an informal hearing at the same time that it informs the family of the decision.

In cases where the CHA makes a decision for which an informal hearing must be offered, the notice to the family will include all of the following:

- A brief statement of the reasons for the decision including the regulatory reference;
- A statement that if the family does not agree with the decision the family may request an informal hearing of the decision; and
- A deadline for the family to request the informal hearing.

### Scheduling and Holding an Informal Hearing
[24 CFR 982.555(d)]

A request for an informal hearing must be made in writing to the CHA within 30 calendar days from the date of the CHA's decision or notice to terminate assistance. The CHA will schedule and send written notice of the informal hearing to the family and will hold the hearing within a reasonable time of the family's request. If the family misses the scheduled hearing, the family's assistance will be terminated.

Prior to the date scheduled for the hearing, the family may submit a request orally or in writing to reschedule a hearing for good cause. If the family misses the rescheduled hearing, the family's assistance will be terminated.

16-5



If the family does not appear at the scheduled time, and is unable to reschedule the hearing in advance due to the nature of the conflict, the family must contact the CHA orally or in writing within 24 hours of the scheduled hearing date, excluding weekends and holidays. The CHA will reschedule the hearing only if the family can show good cause for the failure to appear. The CHA may request documentation of the good cause prior to rescheduling the hearing. If the family misses the rescheduled hearing, the family's assistance will be terminated.

*Pre-Hearing Right to Discovery*
[24 CFR 982.555(e)-(2)]

Participants and the CHA are permitted pre-hearing discovery rights. The family must be given the opportunity to examine before the hearing any CHA documents that are directly relevant to the hearing. If the CHA does not make a document available for examination on request of the family, the CHA may not rely on that document at the hearing.

The family will be allowed to copy any documents related to the hearing. The family must request discovery of the CHA documents no later than 12:00 p.m. on the business day prior to the scheduled hearing date.

The CHA must be given an opportunity to examine at the CHA offices before the hearing any family documents that are directly relevant to the hearing. Whenever a participant requests an informal hearing, the CHA will automatically mail a letter to the participant requesting a copy of all documents that the participant intends to present or utilize at the hearing. If the family does not make the document available for examination on request of the PHA, the family may not rely on the document at the hearing. The participant must make the documents available no later than 12:00 p.m. on the business day prior to the scheduled hearing date.

*Attendance at the Informal Hearing*
CHA has designated staff to serve as hearing officers. At their own expense, the family may be represented by a lawyer or other representative at the informal hearing. The family also has the right for an interpreter at CHA's expense to attend the hearing. Hearings may be attended by the following people:

- A CHA representative(s) and any witnesses for the CHA;
- The participant and any witnesses for the participant;
- The participant's counsel or other representative; and
- An interpreter, if necessary.

*Conduct at Hearings*
[24 CFR 982.555 (e)(4)(ii)]

The hearing officer is responsible to manage the order of business and to ensure that hearings are conducted in a professional and businesslike manner. Any person demonstrating disruptive, abusive or otherwise inappropriate behavior will be excused from the hearing at the discretion of the hearing officer. If disruptive behavior is displayed by the participant, the hearing officer will end the hearing and the participant's HCV assistance will be terminated.

*Evidence*
[24 CFR 982.555(e)(5)]

The CHA and the family must be given the opportunity to present evidence and question any witnesses. In general, all evidence is admissible at an informal hearing. Evidence may be considered without regard to admissibility under the rules of evidence applicable to judicial proceedings.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



Hearsay evidence will be admissible at informal hearings; however, hearsay evidence alone cannot be used as the sole basis for the hearing officer's decision.

The CHA will use the concept of the preponderance of the evidence as the standard for making all informal hearing decisions. *Preponderance of the evidence* is defined as evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not. Preponderance of the evidence may not be determined by the number of witnesses, but by the greater weight of all evidence.

If either the CHA or the family fail to comply with the discovery requirements described above, the hearing officer may refuse to admit such evidence. Other than the failure of a party to comply with discovery, the hearing officer has the authority to overrule any objections to evidence.

Evidence of drug related/violent criminal activity:
The CHA may terminate assistance for criminal activity by a household member if the CHA determines, based on a preponderance of the evidence, that the household member has engaged in the activity, regardless of whether the household member has been arrested or convicted for such activity. While the CHA may terminate assistance based on the conduct underlying an arrest, the CHA may not base a termination decision solely on a record of arrest(s). *See* PIH Notice 2015-19. Evidence of drug-related/violent criminal activity includes, but is not limited to:

- Any conviction for drug-related/violent criminal activity within the past three years;
- Any arrests for drug-related/violent criminal activity within the past three years if substantiated by corroborating evidence;
- Any record of eviction from public or privately owned housing as a result of criminal activity within the past three years;
- Eye-witness accounts; and
- An investigation by any agent and/or employee of the CHA indicating current drug-related activity.

Evidence of alcohol abuse:
CHA will consider all credible evidence, including but not limited to, any record of arrests, convictions, or eviction of household members related to the abuse of alcohol.

*Hearing Officer's Decision*
[24 CFR 982.555(e)(6)]

The person who conducts the hearing must issue a written decision, stating briefly the reasons for the decision. Factual determinations relating to the individual circumstances of the family must be based on a preponderance of evidence presented at the hearing.

In rendering a decision, the hearing officer will consider the following matters:

- **CHA notice to the family**: The hearing officer will determine if the reasons for the CHA's decision are factually stated in the notice;
- **Discovery:** The hearing officer will determine if the CHA and the family were given the opportunity to examine any relevant documents in accordance with CHA policy;
- **CHA evidence to support the CHA decision**: The hearing officer will evaluate the facts to determine if they support the CHA's conclusion;

16-7

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



- **Validity of grounds for termination of assistance (when applicable)**: The hearing officer will determine if the termination of assistance is for one of the grounds specified in the HUD regulations and the CHA policies; and
- **Conduct at Hearings**: The hearing officer has discretion to take into account any disruptive behavior that the participant partakes in during the hearing, if applicable.

The hearing officer will issue a written decision to the family and the CHA no later than 30 calendar days after the hearing. The decision will contain the following information:

- **Hearing information;**
- **Background;**
- **Summary of the Evidence;**
- **Findings of Fact:** The hearing officer will include all findings of fact based on a preponderance of the evidence;
- **Conclusions;** and
- **Order:** The hearing report will include a statement of whether the CHA's decision is upheld or overturned.

The CHA will not provide a transcript of an audio taped hearing.

*Procedures for Rehearing or Further Hearing*

If the family misses an appointment or deadline ordered by the hearing officer, the action of the CHA will take effect and another hearing will not be granted.

In addition, within 30 calendar days after the date the hearing officer's report is mailed to the CHA and the participant, either party may request a rehearing or a further hearing. The request must demonstrate cause, supported by specific references to the hearing officer's report, why the request should be granted.

A rehearing or a further hearing may be requested for the purpose of rectifying any obvious mistake of law made during the hearing or any obvious injustice not known at the time of the hearing.

It shall be within the sole discretion of the CHA to grant or deny the request for further hearing or rehearing.

*CHA Notice of Final Decision*
[24 CFR 982.555(f)]

The CHA is not bound by the decision of the hearing officer for matters in which the CHA is not required to provide an opportunity for a hearing, or decisions that exceed the authority of the hearing officer, or decisions that conflict with or contradict HUD regulations, requirements or are otherwise contrary to federal, state or local laws.

If the CHA determines it is not bound by the hearing officer's decision in accordance with HUD regulations, the CHA must promptly notify the family of the determination and the reason for the determination. The CHA will mail a "Notice of Final Decision" including the hearing officer's report to the participant and their representative.

Grievance Procedure for Temporary Relocatees

Temporary Relocatees under the CHA Leaseholder Housing Choice and Relocation Rights Contract will have rights under the CHA Grievance Procedures for a formal hearing as spelled out in the Resident Grievance Procedure and the CHA Leaseholder Housing Choice and Relocation Rights Contract, Section 11(b). A copy of

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



the CHA Leaseholder Housing Choice and Relocation Rights Contract can be found at CHA offices or at http://www.thecha.org/.

## 16-III.C. Hearing and Appeal Provisions for Non-Citizens
[24 CFR 5.514]

Denial or termination of assistance based on immigration status is subject to special hearing and notice rules. Applicants who are denied assistance due to immigration status are entitled to an informal hearing, not an informal review.

Assistance to a family may not be delayed, denied or terminated on the basis of immigration status at any time prior to a decision under the United States Citizenship and Immigration Services (USCIS) appeal process. Assistance to a family may not be terminated or denied while the CHA hearing is pending, but assistance to an applicant may be delayed pending the completion of the informal hearing.

A decision against a family member, issued in accordance with the USCIS appeal process or the CHA informal hearing process, does not preclude the family from exercising the right that may otherwise be available to seek redress directly through judicial procedures.

### USCIS Appeal Process
[24 CFR 5.514(e)]

The CHA will notify the family in writing of the results of the USCIS secondary verification within 15 calendar days of receiving the results. If the family would like to request an appeal of the results, they must provide the CHA with a copy of the written request for appeal and proof of mailing within 15 calendar days of sending the request to the USCIS.

The USCIS will notify the family, with a copy to the CHA, of its decision. When the USCIS notifies the CHA of the decision, the CHA will notify the family of its right to request an informal hearing.

### Informal Hearing Procedures for Applicants
[24 CFR 5.514(f)]

After notification of the USCIS decision on appeal, or in lieu of an appeal to the USCIS, the family may request that the CHA provide a hearing. The request for a hearing must be made either within 30 days of receipt of the CHA notice of denial or within 30 days of receipt of the USCIS appeal decision.

Except as otherwise noted in this section, informal hearing procedures for participant families described in Section 16-III.B Informal Hearings for Participants also apply to applicant or participant families facing denial or termination of assistance based on immigration status.

## Part IV: Reporting for Children with Elevated Blood Lead Levels
[24 CFR 35.1225(e)-(f)]

The CHA has certain responsibilities relative to children with elevated blood lead levels that are receiving HCV assistance.

The CHA will provide the public health department written notice of the name and address of any child identified as having an elevated blood lead level. The CHA must attempt to obtain from the public health department the names and/or addresses of children less than six years old with an identified elevated blood lead level.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



If the CHA obtains names and addresses of elevated blood lead level children from the public health department(s), this information will be matched with the names and addresses of families receiving HCV assistance. If a match occurs, the CHA must carry out the notification, verification and hazard reduction requirements outlined in Section 8-I.E Special Requirements for Children with Elevated Blood Lead Levels.

The CHA provides an updated list of the addresses of units receiving assistance under the HCV program to the local public health department four times a year.

## Part V: Communication to Participants

Participants are considered notified of information relating to their housing assistance five days after the CHA mails information to their last known address.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 17 – Project-Based Voucher Program

## Introduction

This chapter describes the CHA policies related to the Project-Based Voucher (PBV) Program. PBV may include units that are owned (master-leased) by a third party and then sub-leased to participants.

## Part I: General Requirements

### 17-I.A. Overview

The CHA will operate the PBV program using a portion of its HCV budget authority. PBV assistance may be awarded to existing, substantially rehabilitated and newly constructed housing.

### 17-I.B. Tenant-Based vs. PBV Assistance

Except as otherwise noted in this chapter, CHA policies for the tenant-based voucher program also apply to the PBV program. For relevant policies not discussed in this chapter please refer to other sections of the Administrative Plan.

## PART II: PBV Owner Proposals

### 17-II.A. Overview

This section describes CHA's policies for owner submission and selection of PBV proposals.

### 17-II.B. Owner Proposal Selection Process

The CHA will select PBV proposals by any of the following two methods.

- <u>PBV applications</u>. The CHA may solicit applications on a competitive basis through a Request for Proposals (RFP) via the CHA's stated application process. The CHA will not limit proposals to a single site or impose restrictions that explicitly or practically preclude owner submission of proposals for PBV housing on different sites.

- <u>Proposals that were previously selected based on a competition</u>. The CHA may consider an application and select a proposal for housing assisted under a federal, state or local government housing assistance, community development or supportive services program (e.g., HOME, affordable housing funds from the City of Chicago and State of Illinois and units for which competitively awarded low income housing tax credits have been provided). Such applications are only considered if the housing was competitively selected within three years of the proposal selection date and where the earlier competitive proposal did not involve any consideration that the project would receive PBV assistance.

### Solicitation and Selection of PBV Proposals

The CHA will announce the availability of PBV and advertise its application process for existing, substantially rehabilitated and newly constructed housing by posting notice on its website at http://www.thecha.org/.

In order for a proposal to be considered, the owner must submit a complete proposal to the CHA that responds to all the requirements in the application.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



Using criteria in the application, the CHA may select proposals for supportive housing projects that have less restrictive tenant screening requirements in the approved Tenant Selection Plan than those defined in the CHA Administrative Plan. All tenant screening requirements in the Tenant Selection Plan must meet minimum HUD requirements for eligibility.

The CHA will evaluate each proposal on its merits using the factors in the RFP that will include, but are not limited to:

- The extent to which the property furthers the CHA goal of de-concentrating poverty and expanding housing and economic opportunities; and
- The extent to which the proposal complements other local activities, such as the redevelopment of a public housing site under the HOPE VI program, the HOME program, CDBG activities, other development activities in a HUD-designated Enterprise Zone, Economic Community, Renewal Community or Neighborhood Stabilization Program, or Affordable Requirements (ARO) activities.

### CHA-Owned Units

The CHA may provide PBV assistance to CHA-owned units only if HUD or a HUD-approved independent entity determines that they were appropriately selected.

In addition, the following program services will be performed by the HUD-approved independent entity:

- Determine the amount of rent for the PBV assisted units;
- Establish initial contract rents based on an appraisal conducted by a licensed, state certified appraiser; and
- Perform inspections of the PBV assisted units in accordance with CHA inspection standards.

## 17-II.C. Housing Type

The CHA may provide PBV assistance for units in existing housing. A housing unit is considered an existing unit if, at the time of CHA selection, the unit complies with CHA inspection standards.

The CHA may also provide PBV assistance to substantially rehabilitated or newly constructed housing. For these the owner must enter into an Agreement to Enter into a Housing Assistance Payments contract (AHAP).

## 17-II.B. Prohibition of Assistance for Certain Units

### Ineligible Housing Types

The CHA will not provide PBV assistance to the following types of units:

- Shared housing units;
- Units on the grounds of a penal reformatory, medical, mental, or similar public or private institution;
- Nursing homes or facilities providing continuous psychiatric, medical, nursing services, board and care, or intermediate care (except that assistance may be provided in assisted living facilities, such as supportive living facilities in Illinois);
- Units that are owned or controlled by an educational institution or its affiliate and are designated for occupancy by students;
- Manufactured homes and transitional housing;
- Units occupied by an owner and by a family ineligible for participation in the PBV program; or
- Any other subsidized housing as prohibited by HUD [24 CFR 983.54].

Units in the PBV program are not eligible for the CHA's homeownership program.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



### 17-II.D. Subsidy Layering and Environmental Reviews

#### Subsidy Layering Review

The subsidy layering review is intended to prevent excessive public assistance by combining (layering) housing assistance payment subsidy under the PBV program with other governmental housing assistance from federal, state or local agencies, including assistance such as tax concessions or tax credits.

In lieu of submitting PBV proposals to HUD for a subsidy layering review, the CHA will rely on the subsidy layering reviews conducted by the State of Illinois or the City of Chicago. By executing the Housing Assistance Payment (HAP) contract, the owner certifies that the property has not received and will not receive (before or during the term of the HAP contract) any public assistance for acquisition, development or operation of the housing other than assistance disclosed in the subsidy layering review.

#### Environmental Review

The CHA activities under the PBV program are subject to HUD environmental regulations in 24 CFR part 50 and 24 CFR part 58 and the National Environmental Policy Act of 1969 (et seq.). The CHA will not enter into an AHAP or HAP contract until it has complied with the environmental review requirements.

### 17-II.E. Cap on Number of PBV Units in Each Property

Under its MTW authority,* the CHA is able to exceed the limit of 25 percent PBV-assisted units in family properties. The CHA will cap the number of PBV units in each property on a case-by-case basis.

### 17-II.F. Site Selection Standards

#### Compliance with PBV Goals, Civil Rights Requirements, and CHA Inspection Site Standards

It is the CHA's goal to select sites for PBV housing that provide for de-concentrating poverty and expanding housing and economic opportunities. To achieve this goal the CHA will limit approval of sites for PBV housing in census tracts that have poverty concentrations of 20 percent or less.

However, the CHA may grant exceptions to the 20 percent standard where the CHA determines that the PBV assistance will complement other local redevelopment activities designed to de-concentrate poverty and expand housing and economic opportunities in census tracts with poverty concentrations greater than 20 percent, such as sites in:

- A census tract located in a HUD-designated Enterprise Zone, Economic Community, Renewal Community or Neighborhood Stabilization Program Area;
- A census tract where the concentration of assisted units will be or has decreased as a result of public housing demolition and HOPE VI redevelopment;
- A census tract that is undergoing significant revitalization as a result of State of Illinois, City of Chicago or federal dollars invested in the area;
- A census tract where new market rate units are being developed and where such market rate units will positively impact the poverty rate in the area;
- A census tract where there has been an overall decline in the poverty rate within the past five years; or
- A census tract where there are meaningful opportunities for educational and economic advancement.

---

\* For more information on the CHA's MTW agreement and activities, see the Plans, Reports and Policies page on the CHA's website.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



## Site and Neighborhood Standards for All PBV Assisted Developments

The CHA will not enter into an AHAP for substantial rehabilitation and new construction nor enter into a HAP contract for existing housing until it has determined that the site complies with the following HUD site and neighborhood standards. The site must:

- Be adequate in size, exposure and contour to accommodate the number and type of units proposed;
- Have adequate utilities and streets available to service the site;
- Be accessible to social, recreational, educational, commercial and health facilities and services as well as other municipal facilities and services equivalent to those found in neighborhoods consisting largely of unassisted similar units;
- Promote a greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons; and
- Except for housing designed for elderly persons, be located so that travel time and cost via public transportation or private automobile from the neighborhood to places of employment is not excessive.

## Additional Site and Neighborhood Standards for New Construction Developments Only

Newly constructed housing must also meet the following HUD standards:

- The site must not be located in an area of minority concentration unless the CHA determines that sufficient comparable housing opportunities exist outside areas of minority concentration for minority families in the income range to be served by the proposed property, or that the property is necessary to meet overriding housing needs that cannot be met in that housing market area;
- The site must not be located in a racially mixed area if the property will cause a significant increase in the proportion of minority to non-minority residents in the area; and
- The neighborhood must not be one that is seriously detrimental to family life or in which substandard dwellings or other undesirable conditions predominate.

# Part III: Dwelling Units

## 17-III.A. CHA Inspection Standards

The CHA inspection standards for the tenant-based program (described in Chapter 8-CHA Inspection Standards and Rent Reasonableness Determinations) generally apply to the PBV program. Under its MTW authorization,* the CHA may use the City of Chicago's Certificate of Occupancy for the initial lease-up of newly constructed and substantially rehabilitated housing of PBV and RAD2 properties. In order to reduce duplicative inspections, the CHA may also utilize the City's and/or the Illinois Housing Development Authority's inspections for those properties that are receiving assistance and oversight from City agencies.

In addition, under its MTW authorization,* the CHA procured vendor will conduct CHA inspections for all units, emergency inspections and for turnover units. In such instances, the CHA procured vendor will submit a certification that inspections were completed by the anniversary date and the CHA will conduct a comprehensive Quality Control Review (QC) and Asset Management Review (AMR) of such inspections to assure that they are performed in accordance with the inspection procedures. Owners that have maintained a two year consecutive Asset Management Review (AMR) of "Stable Status" will be allowed to receive CHA inspections biennially by the CHA procured vendor. Owners who maintain a "Watchlist" or "Trouble" AMR status will continue to receive annual CHA inspections by the procured vendor. Rental Assistance

---

* For more information on the CHA's MTW agreement and activities, see the Plans, Reports and Policies page on the CHA's website.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



Demonstration (RAD) covered properties will maintain annual inspections until the property has demonstrated a two year consecutive Asset Management Review (AMR) of "Stable Status."

## Lead-Based Paint

The lead-based paint requirements for the tenant-based voucher program do not apply to the PBV program. Instead, the Lead-Based Paint Poisoning Prevention Act (42 U.S.C. 4821-4846), the Residential Lead-based Paint Hazard Reduction Act of 1992 (42 U.S.C. 4851-4856), and implementing regulations at 24 CFR part 35, subparts A, B, H and R, apply to the PBV program.

## 17-III.B. Housing Accessibility for Persons with Disabilities

The housing must comply with program accessibility requirements of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) and implementing regulations at 24 CFR part 8. The CHA must ensure that the percentage of accessible dwelling units complies with the requirements of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), as implemented by HUD's regulations at 24 CFR 8.

## 17-III.C. Inspecting Units

### Pre-selection Inspection

In order to determine that the site meets site and neighborhood standards, the CHA will examine the proposed site for substantially rehabilitated and new construction housing before the proposal selection date.

Prior to the proposal selection date, existing housing must be inspected to determine that the property complies with CHA inspection standards. The CHA will not execute the HAP contract for existing housing until the units fully comply with CHA inspection standards.  An owner is eligible to have the CHA inspection once the unit is ready and have the  inspection valid for 90 days.

If a unit passes a pre-selection  inspection, an additional inspection is not required if the HAP contract is entered into within 12 months.

### Pre-HAP Contract Inspections

For existing housing, the CHA may accept units for placement under AHAP contract either by a passed CHA inspection or by the City's Certificate of Occupancy issued within 12 months of contract execution.

If the unit passes the pre-HAP contract inspection a subsequent inspection is not required at the time of initial occupancy of the unit.

### Turnover Inspections

The CHA may inspect the unit or, as authorized in its MTW Plan,* require the owner/agent to inspect the unit before providing assistance to a new family in a contract unit.

### Annual Inspections

At least annually the CHA will perform quality control inspections of a percentage of randomly selected contract units in each building to determine if the contract units and the premises are maintained in accordance with CHA inspection standards. Based on the inspection results, the CHA will determine if additional units need to be inspected and may inspect a larger sample or 100 percent of the contract units in a building or development.

---

\* For more information on the CHA's MTW agreement and activities, see the Plans, Reports and Policies page on the CHA's website.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



Other Inspections

The CHA will inspect contract units whenever needed to determine that the contract units comply with CHA inspection standards and that the owner is providing maintenance, utilities and other services in accordance with the HAP contract.

Inspecting CHA-Owned Units

In the case of CHA-Owned units, the inspections must be performed by an independent agency approved by HUD. The independent entity must furnish a copy of each inspection report to the CHA and to the HUD field office where the property is located. The CHA must take all necessary actions in response to inspection reports from the independent agency.

## PART IV: Substantial Rehabilitation and New Construction

### 17-IV.A. Agreement to Enter into HAP Contract

In order to offer PBV assistance in substantially rehabilitated or newly constructed units, the CHA must enter into an AHAP with the owner of the property.

By signing the AHAP the owner agrees to develop the PBV contract units to comply with CHA inspection standards and the CHA agrees that upon timely completion of such development, the CHA will enter into a HAP contract with the owner for the contract units.

Execution of AHAP

The CHA will enter into the AHAP with the owner after receiving both environmental approval and notice that subsidy layering requirements have been met.

### 17-IV.B. Conduct of Development Work

Labor Standards

If the development has nine or more units proposed for PBV assistance, the owner, the owner's contractors and subcontractors must pay Davis-Bacon wages to laborers and mechanics employed in the rehabilitation or new construction of housing.

The owner, contractors and subcontractors must also comply with the Contract Work Hours and Safety Standards Act, Department of Labor regulations in 29 CFR part 5 and other applicable federal labor relations laws and regulations.

Equal Opportunity

The owner must comply with Section 3 of the Housing and Urban Development Act of 1968 and the implementing regulations at 24 CFR part 135. The owner must also comply with federal equal employment opportunity requirements.

### 17-IV.C. Completion of Housing

The AHAP must specify deadlines for completion of the housing and for submission by the owner of evidence of completion.

The CHA will determine the need for the owner to submit additional documentation as evidence of completion. If the CHA determines the work has been completed in accordance with the AHAP and that the owner has submitted all required evidence of completion, the CHA will submit the HAP contract for execution by the owner and then execute the HAP contract. If the work has not been completed in accordance with the AHAP, the CHA will not enter into the HAP contract.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



## PART V: Housing Assistance Payments Contract (HAP)

### 17-V.A. Overview

The CHA will enter into a HAP contract with an owner for units that are covered by PBV assistance. This governs how the CHA will pay housing assistance for contract units leased and occupied by eligible families.

#### Execution of the HAP Contract

For existing housing, the HAP contract will be executed after the CHA determines that units pass CHA inspections.

For substantially rehabilitated or newly constructed housing the HAP contract will be executed after the CHA determines that the units have been completed in accordance with the AHAP. The CHA may place units under HAP contract in stages.

#### Term of HAP Contract

Under its MTW authorization,* the CHA may enter into a HAP contract for an initial term of no less than one year and no more than 30 years subject to the availability of funding.

Within one year before expiration of the HAP contract the CHA may extend the term of the contract for a maximum term which shall not exceed a total of 40 years per CHA Board authorization. In making this determination the CHA will consider if an extension is appropriate to continue providing affordable housing for low-income families. Through this activity, no contract will exceed a term totaling 40 years including the extensions.

#### Termination of HAP Contract

If the amount of rent to an owner for any contract unit is reduced below the amount at the beginning of the HAP contract term, the owner may terminate the contract by giving notice to the CHA. If a contract is terminated or expires without extension, an assisted family may elect to remain in the unit and will then be assisted under the tenant-based voucher program.

The CHA may terminate the HAP contract in accordance with the policies for tenant-based vouchers elsewhere in this Administrative Plan (see Chapter 13-Owners).

#### Housing Quality and Design Requirements

The CHA will identify the need for any special features relating to the quality, architecture and design of PBV housing on a case-by-case basis depending on the intended occupancy of the PBV property.

### 17-V.B. Amendments to the HAP Contract

#### Substitution of Contract Units

At the CHA's discretion and subject to all PBV requirements, the HAP contract may be amended to substitute a different unit with the same number of bedrooms in the same contiguous development or scattered site property as a previously covered contract unit.

#### Addition of Contract Units

The CHA may amend a HAP contract following the date the HAP contract was executed to add additional PBV units in the same property as long as the total does not exceed the approved number of units.

---

* For more information on the CHA's MTW agreement and activities, see the Plans, Reports and Policies page on the CHA's website.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



Additional units may be added to the original HAP without competition when there is a Board action to increase units at the site. Periodically CHA may have a need to increase units to facilitate tenant relocation(s), increase building stability, or for other unforeseen circumstances.

## 17-V.C. HAP Effective, Anniversary and Expiration Dates

The effective date for a PBV HAP contract is the date that initial units become eligible for HAP payment. There is a single effective and expiration date for each contract. The dates do not change even in cases where contract units are placed under the HAP contract in stages or units are added.

There is a single annual anniversary and expiration date for all units under a particular HAP contract. The anniversary and expiration dates for all units coincide with the dates for the contract units that were originally placed under contract.

## 17-V.D. Owner Responsibilities Under the HAP Contract

Owner responsibilities under the HAP contract are described in Chapter 13- Owners.

## 17-V.E. CHA Monitoring of PBV Properties

To determine compliance with the PBV HAP contract the CHA may monitor HAP, management, tenant screening, occupancy, inspections, equipment and supportive services. For supportive services, the CHA may monitor the types of services provided and tenant participation in the services and may terminate families from the program for failure to meet supportive services requirements.

# Part VI: Selection of PBV Program Participants

## 17-VI.A. Overview

This part describes policies related to eligibility and admission to the PBV program that are different from those for the tenant-based program. CHA will follow the policies outlined below in selecting participants unless otherwise directed by court orders or consent decrees.

In-Place Families

An eligible family residing in a proposed PBV contract unit on the date the proposal is selected by the CHA is considered an "in-place family." If a unit to be placed under contract is occupied by an eligible family on the date the proposal is selected, the CHA will process the family as a Special Admission. Admission of eligible in-place families is not subject to income targeting requirements. However, all other eligibility requirements apply.

## 17-VI.B. Organization of the Waiting List

For its PBV program, the CHA maintains: a CHA-managed Site-Based Waiting List for properties and units receiving benefit of the Project-Based Voucher (PBV).  Each PBV property will have its own CHA-managed, site-based waiting list or be grouped with other properties to form a combined waiting list.  CHA may group individual PBV buildings with fewer than fifty PBV units together with similar buildings on one site-based waiting list, provided that the tenant selection criteria for the buildings so grouped are substantially similar. Groups of PBV units located in a community region or groups of PBV units having other common characteristic such as a single owner, similar screening criteria or providing supportive services for specific needs, shall have an individualized site-based waiting list.

For properties participating in PBV, applicants will be selected from the CHA managed site based waiting list, state authorized lists, as well as relocatees covered under the Relocation Rights Contract whose right of return

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



or return preference to final replacement housing has not been satisfied. Exceptions are made for properties that have specific requirements such as age, geographic location, or special needs housing.

## 17-VI.C. Selection from the Waiting List

Applicants who will occupy units with PBV assistance will be selected from the CHA managed site based waiting list by order of application. The CHA may establish selection criteria or preferences for occupancy of particular PBV units.  Applicants for units benefiting from PBV must complete the CHA online application and select a PBV property or PBV property group to be included on CHA's-managed, site based waiting list.

### Units with Accessibility Features

When selecting families to occupy PBV units that have special accessibility features for persons with disabilities, the CHA will first refer to the property owner families who require such features.

### Priorities

Priority for admission to PBV developments will be given to waiting list applicants that:

- Live in a property at the time of owner proposal selection for PBV assistance (this is the highest preference for occupancy of a unit in the property);
- Live in CHA public housing units but who require a supportive housing and will not be able to sustain lease compliance and therefore run the risk of becoming homeless (for units with supportive services only); or
- Are covered under the Relocation Rights Contract and retain a right of return or return preference to final replacement housing that has not been satisfied.

Such families are not required to be on the PBV waiting list prior to admission to the program.

### Preferences

The CHA will select families according to the preferences set forth in the property's Tenant Selection Plan (TSP). If the property does not have a TSP or if the TSP is silent on selection preferences, the CHA will select families in order of preference as described for the tenant-based voucher program in Section 4-III.C-Selection Method.

The CHA will give preference to families that meet the specific requirements for occupancy, where the tenant selection plan of the PBV properties or PBV units is limited to occupancy by the homeless, seniors, families with persons with disabilities, families needing supportive services, veterans or families needing assisted living. The CHA will give preference to families that meet the specific requirements for occupancy.

CHA will give preference to families that meet HUD's definition of homelessness under the HEARTH Act for properties that include social services.   Where occupancy of the PBV property requires that the family meet HUD's definition of homelessness under the HEARTH Act and no such applicant exists on CHA's managed waiting list, applicants will be referred by the City of Chicago or Chicago Continuum of Care, through the Coordinated Entry System (CES). Additionally, if the property requires that families on the State Referral Network (SRN) be housed in the development, and none exist on CHA's managed waiting list, these applicants will be referred by the applicable agency.

Families on the HCV waiting list will be provided preference on the PBV waiting list.

### Owner Referrals

Beginning 120 days from initial occupancy of new construction and substantial rehabilitation developments, the CHA may begin referring applicants from the PBV waiting list for screening by the owner.

Effective August 1, 2024



PBV property owners can refer Applicants seeking PBV benefits directly to the CHA-managed site based wait list at any time.

## 17-VI.D. Offer of PBV Assistance

### Refusal of Offer

Upon selection of an Applicant from the CHA-managed waiting list, the CHA will refer the family to the appropriate development for screening by the owner. Should the applicant meet the PBV property Tenant Selection Plan (TSP) screening, the property will forward the applicant name to the CHA for determination of family eligibility. If the applicant declines the offer of a PBV unit, without good cause, the CHA will remove the name from the waiting list. Should the applicant not meet the PBV property TSP, CHA will allow the applicant to move their application to a different PBV site-based waiting list (or remain on the same waiting list if there are multiple properties in the waiting list group).

Some families may qualify for more than one unit size.  CHA will refer waiting list Applicants to a PBV property or property group in accordance with the first unit available based on the Number of Persons per Unit Standards. As an example, PBV properties or property groups with a studio apartment will receive a waiting list for single person households. Refusal to be screened for a unit or to not accept a unit offer at a particular site without good cause will result in the Applicant's name being removed from the waiting list.  Applicants must take the first unit offered, regardless of unit size, or refuse it with good cause. Refusal of a unit offer solely because an Applicant is waiting for a larger unit for which they may also qualify is not good cause for refusal.

Removal from the PBV waiting list will not affect the family's standing on CHA's Housing Choice Voucher or Public Housing waiting lists.

Any family that is removed from the PBV waiting list is eligible to reapply during any time the waiting list is open.   The date of the new application will be utilized for waiting list order.

## 17-VI.E. Owner Selection of Tenants

The PBV property owner is responsible for developing written tenant selection and screening procedures that are consistent with the purpose of improving housing opportunities for very low-income families. The owner must promptly notify the CHA in writing within 10 calendar days of rejecting an applicant, advise on the grounds of the rejection, and provide a copy of the rejection documentation. If a PBV owner rejects a family for admission to the owner's units, such rejection will not affect the family's position on the waiting list. The CHA will not screen tenants for suitability.

### Leasing

During the term of the HAP contract, the owner must lease contract units to eligible families that are selected from the CHA's waiting list. The contract unit leased to the family must match the voucher size of the family.

A family that holds a current voucher from the CHA may lease a unit in a property receiving PBV assistance. However, families wishing to move into a PBV property must relinquish their voucher to the CHA.

### Filling Vacancies

The owner must notify the CHA in writing within 10 calendar days of learning about any vacancy or expected vacancy.

The CHA will make every reasonable effort to refer families to the owner within 15 calendar days of receiving such notice.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



Reduction in HAP Contract Units Due to Vacancies

If any contract units have been vacant for 120 days, the CHA will give notice to the owner that the HAP contract will be amended to match the number of contract units occupied. The amendment to the HAP contract will be effective the first day of the month following the date of the CHA's notice.

## 17-VI.F. Screening Policies for Rental Assistance Demonstration (RAD) Properties

Households living in CHA Mod Rehab units that are converted to the RAD program under RAD's Second Component are considered new admissions to the PBV program. The preferences and screening criteria presented in this chapter apply to those families, with the following exceptions:

- For families in all Mod Rehab properties being converted to the RAD program, the CHA will use only the mandatory screening criteria required by HUD, listed in Section 3-III.B- Mandatory Denial of Assistance, at conversion. It will *not* use the additional discretionary screening criteria listed in Section 3-III.C- Other Permitted Reasons for Denial of Assistance.
- For families in Mod Rehab Single Room Occupancy (SRO) properties, the CHA will use only the mandatory screening criteria required by HUD, listed in Section 3-III.B- Mandatory Denial of Assistance, on an ongoing basis. It will *not* use the additional discretionary screening criteria listed in Section 3-III.C- Other Permitted Reasons for Denial of Assistance.
- Mod Rehab SRO properties that are converted to the RAD program will have a preference for homeless families in addition to the preferences described above. For the purposes of this preference, the CHA will use the definition used in the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act, as defined in the Federal Register (Vol. 76, No. 233).

For further policies related to the RAD program, including its First Component, see Chapter 18- Policies for Rental; Assistance Demonstration Properties.

## Part VII: Occupancy

### 17-VII.A. Overview

After an applicant has been selected from the waiting list and met CHA and owner eligibility requirements, the family will sign the lease and occupancy of the unit will begin.

Under its MTW authorization,* the CHA may choose to approve qualified owners/property managers to conduct initial eligibility determination, regular re-examinations, and interim re-examinations. In such instances the CHA will conduct a quality control review of the property manager's determinations of eligibility and re-examinations to assure that they are performed in accordance with the applicable provisions of the administrative plan.

For policies on security deposits and the requirements for the lease, including the tenancy addendum, see Chapter 9. For policies on tenants' absence from the unit, see Chapter 12-Terminations.

Initial Term and Lease Renewal

The initial lease term must be for at least one year. Upon expiration of the lease, an owner may or may not renew the lease with or without good cause. If the owner refuses to renew the lease without good cause, the

---

* For more information on the CHA's MTW agreement and activities, see the Plans, Reports and Policies page on the CHA's website.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



CHA may transfer the participant to another PBV unit or issue them a tenant-based voucher and remove the unit from the PBV HAP contract.

## Owner Termination of Tenancy

With two exceptions, the owner of a PBV unit may terminate tenancy for the same reasons an owner may do so in the tenant-based voucher program [24 CFR 982.310]. In the PBV program, terminating tenancy for good cause does not include doing so for a business or economic reason, or a desire to use the unit for personal or family use or other non-residential purpose.

## Non-Compliance with Supportive Services Requirement

If a family living in a PBV unit in supportive housing fails to complete its supportive services without good cause, that is grounds for lease termination by the owner.

## 17-VII.B. Moves and Transfers

CHA may grant moves or transfers based on the following circumstances: VAWA Emergency Transfer, Reasonable Accommodation, abatement, or overhoused/underhoused. CHA will offer the following types of continued assistance in the subsequent order, based on the availability of units:

- PBV assistance in the same building or property;
- PBV assistance in another PBV property; or
- Tenant-based voucher assistance.

PBV participants approved for a PBV unit transfer will be referred to an appropriate unit. CHA will evaluate whether the participant shall be removed from the transfer waiting list should a participant refuse a second unit offer, without good cause. Participants will be informed of the decision to remove them from the PBV transfer waiting list.

## VAWA Emergency Transfer

Per the Violence Against Women Act (VAWA), participants who are victims of domestic violence, dating violence, sexual assault, or stalking may request an emergency transfer in accordance with Housing Choice Voucher (HCV) Emergency Transfer Plan for Victims of Domestic Violence, Dating Violence, Sexual Assault, or Stalking. CHA will respond to transfer a participant who is granted an emergency transfer request, subject to availability and unit safety. PBV participants that are requesting a VAWA related transfer will receive priority for an appropriate unit.

## Reasonable Accommodation

Participants may request a unit transfer due to Reasonable Accommodation, including the need for an accessible unit. CHA will review the Reasonable Accommodation transfer request and determine eligibility.

## Abatement

Participants will be granted a unit transfer if a PBV unit is under abatement and the property owner does not cure within 60 days.

## Overhoused/Underhoused

Participants will be granted a unit transfer based on the occupancy of a wrong-size unit.

## Family Right to Move (Transfer to Tenant-Based Program)

The family may be added to the tenant-based voucher transfer waiting list after one year of PBV occupancy provided that the family has not violated any of its family or lease obligations.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



Should the tenant be selected from the PBV transfer waiting list and offered tenant based voucher assistance, the tenant is responsible for working with the existing property owner to secure permission to terminate the lease agreement.

For persons receiving PBV assistance in a studio unit who either are occupying the wrong size unit or who request to be transferred to a larger unit, will only be allowed a transfer to a larger unit if unforeseen circumstances after the initial studio occupancy occurred.

### 17-VII.C. Participation in Special Programs by PBV Residents
Participants residing in PBV units are eligible for participation in the Family Self Sufficiency (FSS) and homeownership programs. However, project-based units are not eligible for purchase with homeownership program assistance.

### 17-VII.D. Encouraging Smoke-Free Properties
CHA strongly encourages all PBV properties to establish smoke-free policies.

## Part VIII: Determining Rent to Owner

### 17-VIII.A. Overview
The amount of the initial rent to an owner of units receiving PBV assistance is established at the beginning of the HAP contract term. Although for substantially rehabilitated or newly constructed housing, the AHAP states the estimated amount of the initial rent to owner, the actual amount is established at the beginning of the HAP contract term.

During the term of the HAP contract, the rent to owner is re-determined at the owner's request, but no more than once per year, and at such time that there is at least a five percent decrease in the published fair market rent (FMR).

### 17-VIII.B. Rent Limits
The rent to owner must not exceed the lowest of the following amounts:

- An amount determined by the CHA, not to exceed 110 percent of the FMR (or the FMR exception authority, as outlined in the latest CHA MTW Plans and Reports)* for the unit bedroom size minus any utility allowance;
- The reasonable rent; and
- The rent requested by the owner.

Such rent limits also apply to tax credit units, where the unassisted market rent is used for comparability purposes.

### Use of FMRs, Exception Payment Standards and Utility Allowances
When determining the initial rent to owner the CHA must use the FMR and utility allowance schedule that were in effect at the time of execution of the HAP contract. The CHA will use 110 percent of the published FMR as a payment standard. When redetermining the rent, the most up-to-date FMR and the utility allowance schedule will be used. At its discretion, the CHA may use the amounts in effect at any time during the 30-day period prior to the beginning date of the HAP contract for initial rent and the 30-day period prior to the redetermination date for redeterminations of rent.

---

* For more information on the CHA's MTW agreement and activities, see the Plans, Reports and Policies page on the CHA's website.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



Under its MTW program,* the CHA has established payment standards that are higher than the basic range. Approval of exception payment standards is determined on a case-by-case basis.

### Redetermination of Rent

*Rent Increase*

An owner's request for a rent increase must be submitted to the CHA 60 days prior to the anniversary date of the HAP contract.

The CHA may not approve and the owner may not receive any increase of rent until and unless the owner has complied with requirements of the HAP contract, including compliance with CHA inspection standards.

*Rent Decrease*

If there is a decrease in the rent to owner, such as a change in the FMR, exception payment standard or reasonable rent amount, the rent to owner will be decreased unless the HAP contract includes a cost escalation clause or the CHA documents that the long-term viability of the development is jeopardized. The CHA will not decrease the contract rent below the initial contract rent stated in the HAP contract.

*CHA-Owned Units*

For CHA-owned units, the amount of the reasonable rent must be determined by an independent agency approved by HUD in accordance with PBV program requirements.

## 17-VIII.C. Reasonable Rent

At the time the initial rent is established and all times during the term of the HAP contract, the rent to owner for a contract unit may not exceed the reasonable rent for the unit as determined by the CHA.

## 17-VIII.D. Effect of Other Subsidy and Rent Control

In addition to the rent limits discussed in Section 17-VIII.B Rent Limits above, other restrictions may limit the amount of rent to owner in a PBV unit, such as the subsidized rent (basic rent) in federally subsidized properties specified by HUD.

### Combining Subsidy

Rent to owner may not exceed any limitation required to comply with HUD subsidy layering requirements.

### Rent Control

In addition to the rent limits set by PBV program regulations, the amount of rent to owner may also be subject to rent control or other limits under City of Chicago, State of Illinois or federal law.

## Part IX: Payments to Owner

## 17-IX.A. Housing Assistance Payments

During the term of the HAP contract, the CHA must make housing assistance payments to the owner in accordance with the terms of the HAP contract. Except for discretionary vacancy payments, the CHA will not make any housing assistance payment to the owner for any month after the family moves out of the unit.

## 17-IX.B. Rent Payments during Initial Occupancy Period

To assure the financial integrity of the PBV property at the time of initial occupancy, the CHA may, under its MTW authority,* provide pre-occupancy payments to the owner for substantially rehabilitated and newly

---

* For more information on the CHA's MTW agreement and activities, see the Plans, Reports and Policies page on the CHA's website.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



constructed units during the initial occupancy phase following the execution of the HAP contract. The CHA may make a payment of 50 percent of the contract rent for two months for any unoccupied units. In some instances, the CHA may elect to make an additional payment of 100 percent of the contract rent for one month for unoccupied units. Under no circumstances will the CHA make pre-occupancy payments for a total of more than 90 calendar days for any unit in the property.

### 17-IX.C. Vacancy

If an assisted family moves out of the unit, the owner may keep the HAP for the calendar month when the family moves out. However, the owner may not keep the payment if the CHA determines that the vacancy is the owner's fault. At the discretion of the CHA the HAP contract may provide vacancy payments to the owner for a period not exceeding two full months following the move-out month.

The CHA will decide in accordance with vacancy payment procedures if vacancy payments to the owner will be made. The HAP contract with the owner will contain any such agreement, including the amount of the vacancy payment and the period for which the owner will qualify for these payments.

### 17-IX.C. Tenant Rent to Owner

The family's share of the rent is calculated the same way for PBV units as for tenant-based vouchers. See Chapter 6.

## Part X: Regional Housing Initiative

### 17-X.A. Introduction

The Regional Housing Initiative ("RHI") is a regional collaboration between public housing authorities in the Chicago metropolitan region to promote (i) housing and economic mobility, (ii) governmental and administrative efficiencies, and (iii) interjurisdictional collaboration and coordination between local housing authorities.  RHI seeks to facilitate the development, rehabilitation, and preservation of quality rental housing in opportunity and/or revitalization areas that advance local and regional priorities throughout metropolitan Chicago.

Initially established in August 2002, CHA partners with Public Housing Authorities through an Inter-Governmental Agreement (IGA) and Supplemental Administrative Plan.

RHI provides Project Based Vouchers (PBVs) as a form of financial incentives to developers and owners of quality rental housing through a competitive application process to address the geographic mismatch between the growth in jobs and availability of affordable housing in the Chicago metropolitan region.  Participating housing authorities commit a given number of PBVs to the RHI pool. RHI may select an Administrative Agency to provide operational oversite functions.

The following PHA's are Regional Housing Initiative partners:  Chicago Housing Authority, DuPage Housing Authority, Housing Authority of Cook County, Housing Authority of Park Forest, Housing Authority of Joliet, Kendall Housing Authority, Lake County Housing Authority, McHenry County Housing Authority, Oak Park Housing Authority, and Waukegan Housing Authority.

### 17-X.B Chicago RHI Commitment

The CHA has committed project-based vouchers to RHI to create additional affordable housing opportunities throughout metropolitan Chicago.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



## Proposal Selection

The Administrative Agency will publish a Request for Proposals for RHI's competitive application process for project-based vouchers. The proposals are reviewed by a selection committee comprised of the participating Public Housing Authorities (PHAs).

The Lead PHA is designated by RHI. In most cases, this is based on the jurisdiction in which the proposed development is located. The Lead PHA is responsible for the execution of the Agreement to enter into a Housing Assistance Payments (AHAP) and Housing Assistance Payments (HAP) contract.

## Tenant Selection

When a development begins its leasing process, each housing authority may refer applicants according to established RHI applicant referral procedures and preferences.

Based on the development's RHI-approved Tenant Selection Plan, the owner/developer accepts applications and screens the families in waiting list order. Should the referred applicant meet the property's screening criteria, the application is referred back to the Lead PHA to complete the eligibility process using Lead PHA's policies and procedures.

The Lead PHA is responsible for administering the vouchers from other participating housing authorities under a Management and Operating Agreement. The Lead PHA is responsible for conducting inspections for initial, emergency and turnover unit inspections. CHA serves as the Lead PHA for any RHI-approved development located within the boundaries of the City of Chicago or where there is an executed Operating and Management Agreement designating the CHA as the Lead PHA.

For more information, please see RHI Supplement to the Admin Plan .

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Chapter 18 – Policies for Rental Assistance Demonstration Properties

## Introduction

This chapter describes the CHA policies related to Component 1 of the Rental Assistance Demonstration Project Based Voucher (RAD PBV) program.

## Part I: General Requirements

### 18-I.A Overview

The CHA will operate select properties and units under the Component 1 of the RAD PBV, a program developed by the Department of Housing and Urban Development (HUD) that seeks to preserve and protect public and affordable housing. Under RAD PBV, properties are funded through a long-term Housing Assistance Payment (HAP) contract under Section 8 of the U.S. Housing Act of 1937.

CHA's RAD properties will operate as project-based vouchers (PBV) that will be subject to HUD's regulations governing the program and by CHA's policies outlined herein.

### 18-I.B. RAD Project-Based Vouchers Vs. Traditional Project-based Voucher Assistance

Except as otherwise noted in this chapter, the CHA policies for the traditional PBV program (as outlined in Chapter 17- Project-Based Voucher Program) also apply to the RAD PBV program and its participants. All policies put forth in previous chapters of this HCV Administrative Plan apply similarly to CHA's RAD PBV program unless otherwise stated in this chapter. This chapter shall take precedent over any conflicting policies within this Administrative Plan as it relates to the RAD PBV program.

## Part II: Contract and Administrative Terms

### 18-II.A. Overview

This section describes the CHA's terms and policies for establishing RAD HAP agreements with HUD and rights to adjust assistance levels as needed.

### 18-II.B. HAP Contract Terms and Property Ownership

1. HAP Contracting

   a. Properties and units approved for RAD conversion are authorized through a HAP contract between the CHA and/or a CHA-affiliate and HUD.

   b. Properties that were previously funded by public housing operating and capital funding will be funded by HAP payments based on prevailing contract rent (for rent determinations see Part IV- Rent and Income Provisions).

2. Term of HAP Contract

   a. Initial HAP contract is 20 years.

   b. The 20-year contract term will be carried over into subsequent HAP contract renewals.

   c. Upon initial contract expiration, the HAP contract will be renewed with the same terms and conditions applicable at the initial contracting.

3. Ownership Controls

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



   a.  The CHA will maintain operational control of RAD PBV properties, as mandated by HUD regulations, through direct ownership by holding legal title to the property or through direct or indirect legal authority to order the financial, legal, or other interests of the RAD PBV property.

   b.  Legal authority may be established via contract, partnership share or agreement of an equity partnership, voting rights, majority share of general partner interests in a limited partnership, or otherwise.

4.  RAD Use Agreement

   i.  The RAD Use Agreement is a document specifying the affordability and use restrictions on the covered project.

   ii.  The agreement is superior to other liens on the property and runs concurrent with the initial HAP contract term (20 years).

## 18-II.C. Voucher Limitations

1.  Generally, RAD PBV Vouchers can account for up to 100 percent of total units within a given property.

2.  RAD PBVs awarded to the CHA will not reduce the voucher capacity. Awarded vouchers would be assigned as new vouchers to CHA outside of its current HCV allocation.

## 18-II.D. Transfers of Assistance and Temporary Assistance

1.  Transfers of Assistance

   a.  The CHA reserves the right to transfer the HAP contract, RAD Use Agreement, and all or part of rental assistance provided under RAD to another property at initial conversion or after 10 years from the effective date of the initial HAP contract.

   b.  Transfers of assistance must be approved by HUD and may be granted if the property is economically non-viable, physically obsolete, severely distressed, or uninhabitable due to unforeseen circumstances such as natural disasters, or the transfer is in the best interest of the property's residents.

   c.  Any transfer of assistance at the time of initial conversion will be included as a significant amendment to the CHA's MTW Annual Plan.

2.  RAD Rehab Assistance

   a.  Unoccupied properties that undergo rehabilitation may be eligible for RAD rehab assistance from HUD during the construction period. Payments are limited to the amount of operating fund subsidy received for the property prior to the RAD conversion. Upon construction completion, rehab assistance will be terminated and units under the HAP contract will only be eligible for payment for occupied units or for vacancy payments, as applicable.

# Part III: Applicant and WaitList Provisions

## 18-III.A. Overview

This part establishes how an applicant will be screened and how an applicant can be admitted into available units under the RAD PBV program.

## 18-III.B. Qualifying for Admission Eligibility

1.  The CHA will **only** admit applicants who are qualified[1] according to the following criteria:

   a.  Are a family, as defined in the Glossary of this policy, with the head of household age 18 or older, or

---

[1] The term "qualified" refers to applicants who are eligible and able to meet the applicant selection criteria. This term is taken from the Section 504 regulations. "Qualified Individual with Handicaps" **24 CFR § 8.3**

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



who is an emancipated minor;

b. Meet HUD requirements on citizenship or eligible immigration status; **24 CFR § 5.506**.

c. Are low-income with an annual gross income that does not exceed 80% of area median income (AMI) or the income limits established by HUD by family size;

d. Provide documentation of Social Security numbers (SSN) for all family members or sign a certification under penalties of perjury for each family member that does not have a SSN; and **24 CFR § 5.216**

    i. Eligible applicants may become residents even if they lack the SSN documentation for children under the age of 6, but must verify the SSN within 90 days.

    ii. An additional 90 day grace period will be extended, if merited due to unforeseen or uncontrollable circumstances.

2. e. Meet the admissions screening criteria in Part III of this policy.

## 18-III.C. Processing Applications for Admission

1. The CHA will accept and process applications in accordance with applicable HUD regulations, when the applicant is eligible to apply. For the purpose of placing applicants on the waitlists, the CHA will assume that the facts, as self-certified to by the applicant in his/her application, are correct. All facts provided on the application will be verified later when screening applicants for suitability.

2. As units become available, applicants at the top of each selected site based waitlist whose household composition and accessibility requirements match the features[2] of the available units will be required to attend an interview to complete their applicant file, confirm eligibility, and be screened to determine suitability.

    a. Applicants who fail to attend their scheduled interview or who do not respond to the outreach to schedule an interview will have their applications withdrawn, subject to reasonable accommodations for people with disabilities.

3. Every application file for admission to a RAD PBV property shall include: the applicant's name, SSN, date of application, application number, applicant's race and ethnicity (if disclosed), amount and source of income, family compositions so that a unit bedroom size can be assigned, eligibility determination, the date, location, identification, and circumstances of each vacancy that was offered but refused, accessibility requirements, if any and admissions preference, if any.a. The following information will be verified to determine qualification for admission to RAD PBV housing:

    i. Household composition and type (e.g. elderly, non-elderly, etc.);

    ii. Annual income;

    iii. Assets and asset income;

    iv. Deductions from income;

    v. Social Security numbers of all family members[3];

    vi. Citizenship or eligible immigration status of all family members;

    vii. CHA Work Requirement criteria;

    viii. Admissions preferences;

---

[2] For example, bedroom size or accessibility features of the unit.

[3] If a member of the applicant's family does not have eligible immigration status, the member will not need to provide a Social Security number but will be required to sign a certification for every family member who does not have a Social Security number and the resident's rent will be prorated accordingly.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



    ix.    Compliance with admissions screening criteria;

    x.    Criminal background; and

    xi.    History of payment of rent and utilities.

    b. Third-party verification is required for the information listed above. Any other form of verification requires notation in the file explaining its use.4. Emergency applicants, who are victims of federally declared disasters, will be processed on an as needed basis before applicants from the site-based waitlists.

## 18-III.D. Establishing and Maintaining the Waitlist

1. The CHA will administer waitlists as required by HUD regulations.
2. Applications will be accepted for the purpose of adding applicants to a waitlist.
   a. CHA site-based waitlists remain open and applicants may apply at any time. The CHA has the discretion to close site-based waitilists.  Notification will be provided prior to closing a waitlist.
   b. No person has a right of entitlement to be listed on a waitlist, or to any particular position on the waitlist.
3. Applicant names will be removed from a waitlist if the applicant fails to respond to attempts made by the CHA or property manager to contact or communicate with them or at the applicant's request.
4. The CHA will periodically update each waitlist by contacting all applicants in writing[4]. All applicants are responsible for maintaining the accuracy of the personal information provided on his/her application (i.e. applicant must communicate changes to address, telephone number, family composition, or income). Applicants that fail to update their information during the waitlist update will be removed from the waitlist and will not be entitled to an appeal hearing. CHA will consider failure to respond to updates based on reasonable accommodation requests.

## 18-III.E. The Preference System for Admissions

CHA will follow the policies outlined below in selecting applicants unless otherwise directed by court orders or consent decrees.

1. Preferences establish the order of applicants on the waitlist. An admissions preference does not guarantee admission. Every applicant must still meet CHA admissions screening criteria before the CHA will offer a unit.
2. Preferences will be granted to applicants on the waitlist who are otherwise qualified and who, at the time of applicant screening, are verified to meet the definitions of the preferences described in this section. The CHA may limit the number of applicants that qualify for any local preference.
3. If it is determined that an applicant does not meet the criteria for receiving a preference, the applicant will be placed back on the waitlist with no preference by the original date of application and the applicant will receive a written notice of this determination. The notice will contain a brief statement of the reasons for the determination and information about how to request a review of the decision with a designee of the CHA. Denial of a preference does not prevent the applicant from exercising any legal rights if he/she believes discrimination contributed to the CHA's decision to deny the preference.
4. It is the applicant's responsibility to notify the CHA of any change in his/her preference status. If an applicant's preference status changes while on the waitlist, the applicant's position on the waitlist will be adjusted to reflect the change. The applicant will retain their original date of application when a change is made.
5. Local Preferences Based on Income Targeting

   There is one local preference in effect based on ranges of income as required by federal law. Applicants will be grouped as follows:

---

[4] Or alternative format requested by qualified applicant with a disability.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



a. **Tier I:** Families with incomes between 0% and 30 % of AMI. This group must constitute at least 50% of all admissions in any year .[5]

b. **Tier II:** Families with incomes between 31% and 80% of AMI. The target for this group is no more than 50% of all admissions in any year.

The CHA will use the above income targeting preferences to achieve a balance of low-income to extremely low-income families to whom it leases.

6. Ranking Preferences for the Community-wide (Family) and Site-Based Family Property Waitlist

Ranking preferences are used to sort among applicants in the same manner as local preferences. The CHA has established five hierarchic ranking preferences for the Site- Based Family waitlists. The preferences are listed, in order, below:

a. **First,** Emergency Applicants who are Victims of Federally Declared Disasters;

b. **Second,** Domestic Violence Victims;

c. **Third,** Veterans, Active or Inactive Military Personnel and Immediate Family Members of both;

d. **Fourth,** Homeless, as defined by HUD under the HEARTH Act definition Number I, with documentation through the City of Chicago or Chicago's Continuum of Care-Coordinated Entry System. (see Federal Register/Vol 76, No 233); and

e. **Fifth,** Family Preservation.

Families that do not qualify for ranking preferences will be categorized as "no-preference" families.

7. Property Site Preferences for Site-Based Family Property Waitlists

An applicant may select only one CHA property or property group within the city their application for housing.  Applicants may update their CHA property preference but will not be permitted to do so while being screened for a housing opportunity by CHA property management. Applicants must select a preference to confirm position on their particular waitlist.

a. By selecting one of these property or property group preferences, the applicant may be offered a unit at any correspondingRental Assistance Demonstration unit that is covered by his/her stated preference.  This preference does not guarantee admission and every applicant must meet CHA admissions screening criteria.

b. Refusal of a unit offer within the applicant's  selected waitlist or wailist group, without good cause will result in the applicant's name being removed from the waitlist.

c. Refusal of a unit offer within the applicant's  selected waitlist or waitlist group, with good cause, will result in the applicant being returned to the waitlist.

d. CHA may consider extenuating circumstances on a case by case basis after one good cause for refusal has been provided.

8. Definition of Ranking Preferences applicable to Site-Based Family Property Waitlists:

a. <u>Emergency Applicants who are Victims of Federally Declared Disasters:</u>

Families or individuals who are displaced from their place of permanent residence due to a federally   declared disaster and apply for CHA housing.

The CHA will make unit offers to verified victims of federally declared disasters, in accordance with the extent

---

[5] The CHA has opted to select a higher percentage of extremely low-income families than that required by the federal regulations.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



and type of housing resources available at the time of the need. New emergency applicants who are victims of federally declared disasters must qualify for admission to CHA housing as listed in Part III.

The applicant must supply the documentation within 10 business days of making a request for the preference. Otherwise, the applicant will be removed from the Victims of Federally Declared Disasters preference list.

If the applicant is called for screening and the verification information is older than 12 months, then the applicant will need to provide updated information to receive this preference. Failure to provide this information will result in the applicant being returned to the family waitlist without the Victims of Federally Declared Disasters preference.

i. First priority: Individuals and families who were public housing residents or Housing Choice Voucher (HCV) participants and are victims of a federally declared disaster may receive a unit offer.

ii. Second priority: Individuals and families who were <u>not</u> Public Housing Program participants and are victims of a federally declared disaster may receive a unit offer.If emergency applicants, who are victims of federally declared disasters, arrive without any documentation, the CHA will obtain the name, SSN, and all signed release and consent forms of the head of household and all family members 18 years of age or older. The CHA will verify the family's current eligibility by using HUD's Enterprise Income Verification (EIV) system and conducting a criminal/credit check. If the data cannot be verified by HUD's EIV system and through a criminal/credit check, the CHA may accept alternate documentation that demonstrates participation in the public housing program, participation in the RAD PBV program, participation in the HCV Program, or establishes eligibility. CHA will inform all emergency applicants how to obtain a free copy of their credit check.

Applicants will have access to obtain a copy of their criminal background check and an opportunity to participate in an individualized assessment before the CHA will consider approving or denying the applicant (per compliance with the Cook County Just Housing Amendment, see II.F.12.).

<u>b. Domestic Violence Victims</u>: Applicants who can provide documentation that they have been displaced by domestic violence, sexual violence, dating violence, or stalking or need to move from their present housing because of domestic violence, sexual violence, dating violence, or stalking. The terms domestic violence, sexual violence, dating violence, and stalking are explained in detail in the Glossary.

i. Once the preference is requested, the CHA will place the applicant on the domestic violence preference waitlist based on time of request and appropriate bedroom size.

ii. The applicant must supply written documentation that he/she has been displaced or needs to move from their present housing because of domestic violence, sexual violence, dating violence, or stalking.

iii. The applicant must supply the documentation within 14 business days of making a request for the preference.

Failure to provide this information will result in the applicant being returned to the family waitlist without the domestic violence preference.

<u>c. Veterans, Active or Inactive Military Personnel and Immediate Family Members of Both</u>: An eligible applicant who can document that he/she is a veteran, or is the immediate family member[6] of a veteran (living or deceased), or is active/inactive personnel of the United States Armed Forces. Immediate family member documentation for preference must show financial support from the veteran while he/she was alive or the immediate family member is presently receiving benefits or financial support from active/inactive personnel.

---

[6] An Immediate family member is defined as a parent, legally protected relationship or child of the veteran or active/inactive personnel.



    i.    The applicant must supply the documentation at the time of the screening. Failure to provide the documentation within 10 days will result in removal of the veteran's preference.

    ii.    If the applicant is called for screening and the verification information is older than 12 months, the applicant will need to provide updated information to receive this preference. Failure to provide this information will result in the applicant being returned to the family waitlist without the preference.

d.  <u>Homeless</u>: Applicants must meet the following definition in HUD's HEARTH Act, with documentation through the City of Chicago or Chicago's Continuum of Care-Coordinated Entry System; individuals and families who lack a fixed, regular, and adequate nighttime residence and includes a subset for an individual who resided in an emergency shelter or place not meant for human habitation and who is exiting an institution where he or she temporarily resided.

e.  <u>Family Preservation</u>: Applicants who can document that their child(ren) are at risk of placement outside the household by a recognized agency, such as the Illinois Department of Children and Family Services (DCFS), or by a court because of inadequate shelter or environmental neglect, or whose child(ren) cannot be returned to the home until the family can provide for the child(ren)'s subsistence needs.

9.  Ranking Preferences for Senior Designated Housing Property Site-based Waitlists

RAD PBV properties that are designated as senior properties will utilize the Senior Designated Housing Property Site-based waitlist to fill vacant, leasable units.

The CHA has implemented the 2015 Senior Designated Housing Plan (SDHP). Under the current SDHP, all senior buildings are classified as either Traditional Senior Buildings or Reduced Age Senior Buildings. A building is classified a Reduced Age Senior Building on a quarterly basis, if the building has had an occupancy level that has fallen below 90 %for six consecutive months. A building will return to a Traditional Senior Building if the building maintains a 98 % occupancy level for one year.

<u>f. Traditional Senior Buildings</u>

At Traditional Senior Buildings applicants must be 60 years old or older to apply and 62 years old or older to be eligible for a unit offer. Ranking preferences are used to sort among applicants within the local preference income tiers. The CHA has established a ranking preference for the Traditional Senior Buildings site-based waitlist, which will raise an age eligible applicant to the top of the waitlist by date of application.

The **highest priority** ranking preference will be available to Emergency Applicants who are Victims of Federally Declared Disasters.

The following preference categories listed below offer a **second ranking priority** on the waitlist and have the same weight:

    i.    Domestic Violence Victims;
    ii.    Elder Abuse Victims;
    iii.    Veterans, Active or Inactive Military Personnel and Immediate Family Members of both.
    iv.    Homeless, as defined by HUD under the HEARTH Act Definition Number I, with documentation through the City of Chicago or Chicago's Continuum of Care-Coordinated Entry System. (see Federal Register/Vol 76, No 233).

<u>g. Reduced Age Senior Buildings</u>

At Reduced Age Senior Buildings applicants must be 55 years old or older to apply and 55 years old or older to be eligible for a unit offer. Ranking preferences are used to sort among applicants within the local preference income tiers. The CHA has established three hierarchic ranking preferences for the Reduced Age Senior Buildings site-based waitlists based on age eligibility in an effort to preserve the senior designation of the buildings. The hierarchal ranking preferences are listed, in order, below:

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



      i. **First** to applicants who are 62 and older
      ii. **Second** to applicants who are 60-61 years old
      iii. **Third** to applicants who are 55-59 years old

In addition to the age eligibility ranking, applicants may request a ranking preference. The **highest priority** ranking preference will be available to Emergency Applicants who are victims of Federally Declared Disasters.

The following preference categories listed below offer a **second ranking priority** on the waitlist and have the same weight:

      i. Domestic Violence Victims;
      ii. Elder Abuse Victims;
      iii. Veterans, Active or Inactive Military Personnel and Immediate Family Members of both.
      iv. Homeless, as defined by HUD under the HEARTH Act definition Number I, with documentation through the City of Chicago or Chicago's Continuum of Care-Coordinated Entry System. (see Federal Register/Vol 76, No 233).

      Any age eligible applicant that is an Emergency Applicant of a Federally Declared Disaster, and/or has a Domestic Violence, Elder Abuse Victim or Veteran, or Homeless ranking preference will be prioritized on the waitlist by date of application.

h. Senior Buildings With Accessibility Units

Additionally, all senior site-based waitlists accept applications from heads of households who are 55 years old and older who require units with accessible features. These individuals will be given a preference for an accessible unit for the senior site-based waitlist in the CHA's housing management system. Applicants who are age 55 -59 and do not require a unit with accessible features will be denied from being placed on the senior site-based waitlist. In an effort to preserve the senior designation of the buildings, the CHA follows the hierarchal ranking preferences as listed, in order, below:

      i. **First** to applicants who are 62 and older
      ii. **Second** to applicants who are 60-61 years old
      **iii. Third** to applicants who are 55-59 years old

10. Definition of Ranking Preferences applicable to Senior Designated Housing Property Site-based Waitlists[7]

    a. Emergency Applicants who are Victims of Federally Declared Disasters:

Families or individuals where the head of household are age eligible seniors who are displaced from their place of permanent residence due to a federally declared disaster and apply for CHA senior housing.The CHA will make unit offers to verified victims of federally declared disasters, in accordance with the extent and type of housing resources available at the time of the need. New emergency senior applicants who are victims of federally declared disasters must qualify for admission to CHA housing as listed in III.B.

The applicant must supply the documentation within 10 business days of making a request for the preference. Otherwise, the applicant will be removed from the Victims of Federally Declared Disasters preference list.

If the applicant is called for screening and the verification information is older than 12 months, then the applicant will need to provide updated information to receive this preference. Failure to provide this information will result in the applicant being returned to the senior waitlist without the Victims of Federally Declared Disasters preference.

---

[7] Buildings or portions of buildings designated through adherence to HUD requirements.



    i.   First priority: Individuals and families with eligible senior head of household who were public housing residents, RAD PBV, or Housing Choice Voucher (HCV) participants and are victims of a federally declared disaster may receive a unit offer.

    ii.   Second priority: Individuals and families with age eligible senior head of household who were not public housing residents, RAD PBV, or HCV participants and are victims of a federally declared disaster may receive a unit offer.

        If emergency applicants, who are victims of federally declared disasters, arrive without any documentation, the CHA will obtain the name, SSN, and all signed release and consent forms of the age eligible senior head of household and the other family member 18 years of age or older. The CHA will verify the family's current eligibility by using HUD's Enterprise Income Verification (EIV) system and conducting a criminal/credit check. If the data cannot be verified by HUD's EIV system and through a criminal/credit check, the CHA may accept alternate documentation that demonstrates participation in the public housing program, the RAD PBV program, or the HCV Program to establish eligibility. CHA will inform all emergency applicants how to obtain a free copy of their credit check.

        Applicants will have access to a copy of their criminal background check and an opportunity to participate in an individualized assessment before the CHA will consider approving or denying the applicant (per compliance with the Cook County Just Housing Amendment, see II.F.12.).

b. Domestic Violence Victims: Eligible applicants who can document that they have been displaced by domestic violence or need to move from their present housing because of domestic violence. See full definition of domestic violence in Section III.E.8.b The Preference System for Admissions.

c. Elder Abuse Victims: Eligible applicants who can document that they are victims of elder abuse. "Elder abuse" refers to any knowing, intentional, or negligent act by a caregiver or any other person that causes harm or a serious risk of harm to an elderly adult. "Abuse" refers to causing any physical, mental, or sexual injury to an eligible adult, including exploitation of such adult's financial resources. Elder abuse also includes self-neglect, which is a condition that is the result of an eligible adult's inability, due to physical or mental impairments, or both, or a diminished capacity, to perform essential self-care tasks that substantially threaten their own health, including: providing essential food, clothing, shelter, and health care; and obtaining goods and services necessary to maintain physical health, mental health, emotional well-being, and general safetd. Veterans: Active and Inactive Military Personnel and Immediate Family Members of both: An eligible applicant who can document that he/she is a veteran, or is the immediate family member[8] of a veteran (living or deceased), or is active/inactive personnel of the United States Armed Forces. Immediate family member documentation for preference must show financial support from the veteran while he/she was alive or the immediate family member is presently receiving benefits or financial support from active/inactive personnel.

e. Homeless: Applicants must meet the following definition in HUD's HEARTH Act; with documentation through the City of Chicago or Chicago's Continuum of Care-Coordinated Entry System, individuals and families who lack a fixed, regular, and adequate nighttime residence and includes a subset for an individual who resided in an emergency shelter or place not meant for human habitation and who is exiting an institution where he or she temporarily resided.

f. The CHA will not lower the age for the head of household below 55 at any senior designated housing property.

---

[8] An immediate family member is defined as a parent, legally protected relationship or child of the veteran or active/inactive personnel

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



> b. g. Elderly families who do not qualify for this ranking preference will be categorized as no-preference families.

11. Accessible Units: Qualified applicants on the waitlist that require an accessible unit will be offered an available vacant accessible unit before it is offered to an applicant who does not need the features of the unit. See Section III.R.S- Accessible Units for the order in which accessible unit offers are made.

## 18-III.F. Screening Applicants for Suitability

The CHA will determine an applicant's suitability for tenancy for the type of unit being offered at the time of screening. All applicants will be screened in accordance with HUD regulations, the Cook County Just Housing Amendment, and established management practices. Screening will include a criminal background, credit, and residential history check. The CHA will review an applicant's criminal background from as far back as reasonably necessary for certain crimes.

1. During screening, the CHA requires applicants to demonstrate their ability to comply with the essential obligations of tenancy and the provisions of the lease, which include:

   a. To pay rent, utilities, and other charges as required by the lease in a timely manner;

   b. To care for and avoid damaging the unit and common areas;

   c. To use facilities and equipment in their intended way;

   d. To create neither health nor safety hazards;

   e. To report damages and maintenance needs;

   f. To not interfere with the rights and peaceful enjoyment of others;

   g. To avoid damaging the property of others;

   h. To not engage in criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents, staff, or people in the immediate vicinity;

   i. To not engage in drug-related criminal activity; and

   j. To comply with the program requirements of HUD and the CHA.

2. The CHA will determine each applicant family's ability to comply with the essential obligations of tenancy and the provisions of the lease.

3. A qualified applicant with a disability may comply with the essential obligations of tenancy if he/she can demonstrate that assistance with caring for the unit, if needed, has been secured. The CHA will grant a reasonable accommodation to the applicant as outlined in Section I.B; **24 CFR § 8.20.**

4. An applicant who qualifies as a victim of domestic violence, sexual violence, dating violence, sexual assault or stalking may provide incomplete rental and employment histories, otherwise required as a condition of admission or assistance, when disclosure of such rental and employment history is directly related to the situation of domestic violence, sexual violence, dating violence, sexual assault or stalking or would jeopardize the safety of the applicant or the applicant's family members.

5. All applicants and household members age 18 and over (including live-in aides) will be subject to a criminal/credit background check.

   Applicants will have access to a copy of their criminal background check and an opportunity to participate in an individualized assessment before the CHA will consider approving or denying the applicant (per compliance with the Cook County Just Housing Amendment, see II.F.12.).

6. The CHA will conduct a credit check, when applicable, on the applicant head and co-head of household to determine whether the applicant has a history of non-payment of rent or utilities.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



7. The CHA will perform a credit check, when applicable, on the applicant head, co-head, and all members of the applicant household age 18 years or older to verify income information, to determine if the person owes funds to any housing authority for any program, to confirm last place of residency and to determine whether a criminal background check must be conducted in states where the applicant(s) and household members have resided. CHA will also perform a credit check, when applicable, on live-in aides for verification of everything listed above except for income information.

8. All adult applicant household members' past two years of residential history, including any lease violations, will be reviewed and verified.

9. All household members, age 18 and over, must sign all consent forms that authorize the CHA to make necessary inquiries into the applicant's behavior or background as it relates to lease compliance, including the HUD Form 9886 and the CHA Authorization and Consent Release Form. This includes obtaining arrest, conviction and eviction information to determine a pattern of behavior and the likelihood of lease compliance. Failure to sign consent forms, including HUD Form 9886 and the CHA Authorization and Consent Release Form, will result in the applicant's rejection.

Once an applicant has signed and submitted a new HUD 9886 consent form, they are not required to do so again at the next interim or regularly scheduled income examination. An applicant, participant, or family member's written revocation of consent to access financial records will result in denial or termination of assistance or admission.

The request for a person's fingerprints will be limited to those situations where there is conflicting information regarding the person's criminal history or when the law enforcement records center requires the fingerprints for positive identification (e.g. multiple individuals with the same name). Failure to meet the requirements of the background check will result in the rejection of the applicant.

10. Administrative costs incurred to complete the applicant screening process will be paid for by the CHA or property managers.

11. The CHA will comply with the provisions of the Juvenile Court Act, 705 ILCS 405/1-7 and 705 ILCS 405/1-8.

12. The CHA will comply with the provisions of the Cook County Just Housing Amendment, Ordinance No. 19-2394, to § 42-38 of the Cook County Human Rights Ordinance and Part 700 of the Cook County Human Rights Substantive Procedural Rules.Per the Cook County Just Housing Amendment to the Human Rights Ordinance (the "Just Housing Amendment"), an applicant may not be denied eligibility based on their convictions prior to the completion of an individualized assessment.

    a. Nothing in this section shall be interpreted as prohibiting the CHA from denying housing to an applicant based on their criminal conviction history when required by federal or state law.

    b. No person shall inquire about, consider, or require disclosure of criminal history before the prequalification process is complete, and the CHA has determined the applicant has satisfied all other application criteria for housing or continued occupancy and has sent notice of prequalification to the applicant.

    c. The CHA may not consider any information related to the criminal convictions that are more than three (3) years old or any covered criminal history as defined in Section 42-38(a) of the Human Rights Ordinance; the definition is also included in Section XIV.

    d. The CHA must perform an individualized assessment prior to denying an individual housing based on criminal conviction history, except in the following circumstances:

        i. A current sex offender registration requirement pursuant to the Sex Offender Registration Act (or similar law in another jurisdiction); and/or

18-11

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



    ii.  A current child sex offender residency restriction.

  e.  Any person conducting an individualized assessment is prohibited from basing any adverse housing decision, in whole or in part, upon a conviction that occurred more than (3) years from the date of the housing application.

  f.  All applicants shall receive the tenant selection criteria, a disclosure of their right to submit additional information disputing a criminal background check, and either a copy of Part 700 of the Cook County Human Rights Substantive and Procedural Rules or the website and contact information for the Commission on Human Rights (Sec. 730.11 of the Cook County Human Rights Rules).

## 18-III.G. Admissions Screening Criteria

In addition to the eligibility criteria listed in <u>Section Part III:.B- Qualifying for Admission Eligibility</u>, the CHA will use the following screening criteria in this section to determine if an applicant will be accepted or rejected for housing. If emergency applicants, who are victims of federally declared disasters, arrive without any documentation, the CHA will obtain the name and SSN of the head of household. The CHA will verify the families' current eligibility by using HUD's EIV system and conducting a criminal/credit check. If the data cannot be verified by HUD's EIV system and a criminal/credit check, the CHA may accept alternate documentation that demonstrates participation in the public housing program, participation in the RAD PBV program, participation in the HCV Programs, or establishes eligibility.

1. An applicant's past performance in meeting financial obligations, especially payment of rent, will be considered.

2. Applicants with a record of disturbance of neighbors, destruction of property, or living or housekeeping habits at prior residences which may adversely affect the health, safety, or welfare of other residents may be denied.

3. Applicants with negative findings from this housing authority, other housing authorities or housing programs will be reviewed. The burden shall be on the applicant to provide evidence to show the negative finding(s) was not the fault of the applicant.

4. Applicants who have been evicted from the CHA or any other subsidized housing program within the last three years from the date of the eviction for nonpayment of rent will have their application denied.

5. Applicants who owe funds to the CHA or any other housing authority for any program that the CHA or another housing authority operates will be denied.

6. Applicants who owe funds or judgment debts to an utility company or who cannot obtain utility connections for the specific utility required at a property will be denied.

7. An applicant family who does not meet the age eligibility requirements for senior designated housing stated in Part III.E.9, will not be offered a unit in a senior designated building.

8. Applicants must provide documentation that family members who will reside in the household between the ages of 6 and 17 are enrolled in and will attend school regularly. If regular attendance cannot be verified, the applicant must prove that the child(ren) is enrolled in school and demonstrate an improved attendance record.

9. Applicants must provide documentation that children age 13 and under will be adequately supervised when an adult is not present in the unit. (e.g. attending an after-school program while adult family member(s) is at work).

10. Applicants, co-applicants, and all members of the applicant's household age 18 to 54 are subject to the CHA Work Requirement as outlined in <u>Part V.P. -CHA Work Requirement Policy</u> Note: Applicants are not eligible for safe-harbor status. Applicants must either be compliant with the CHA Work Requirement or exempt as outlined in <u>Part V.P- CHA Work Requirement Policy</u>.

11. If an applicant is contacted for screening and is currently not meeting the work requirement, his/her spot on the list will be deferred.  It is the applicant's responsibility to notify the CHA of any change in his/her working status.  Once the applicant becomes compliant with the work requirement, he/she

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



will be placed back on the waitlist for an opportunity to screen for a unit.

12. If a member in the applicant household age 17 is not enrolled in school, the applicant must supply documentation that the child is employed for a minimum of 20 hours per week or otherwise in compliance with the CHA Work Requirement.

13. The CHA is required by Federal law (42 U.S.C. §§ 13661 and 13662) to prohibit admission to housing programs to applicants if they, or a member of their family, use a controlled substance such as cannabis at the time of their application for housing benefits.

    a.    If the applicant's background check reveals a conviction for growing cannabis, or for its manufacture, distribution, or possession, the CHA's process accommodates consideration of mitigating circumstances that are presented, including the time, nature and extent of the Applicant's conduct, its impact on others, and any factors that might indicate a reasonable probability of favorable future conduct of the applicant. The CHA's goals include promoting program integrity and an outcome where an applicant's admission into one of its programs will not interfere with the health, safety, or right to peaceful enjoyment of the premises by one's neighbors.

14. The U.S. Department of Housing and Urban Development (HUD) requires public housing authorities to deny the admission of any applicant who is engaged in the use of medical cannabis to its programs.

    a.No person who engages in drug-related criminal activity, including the possession or use of medical cannabis, shall be admitted to RAD PBV housing or any other federally assisted housing program including, but not limited to: CHA traditional family/senior public housing, Mixed-Income Mixed-Finance housing, supportive housing programs, or other project-based voucher programs.

    b.The CHA must deny admission to those applicants who are, at the time of consideration for admission, using medical cannabis. Each applicant will be informed that the use or possession of medical cannabis is considered a drug-related criminal activity and as such is grounds for denial of admission into any CHA-supported housing program.

    c.The CHA may not permit the use of medical cannabis as a reasonable accommodation.

15.The CHA is required to deny applications based on certain criminal activities or drug-related criminal activities by household members:

    a. The CHA is required to deny any applicant, for three years from the date of eviction, if any household member has been evicted from any federally-assisted housing for drug-related criminal activity. However, the CHA may admit the household if the CHA determines that:

        i. The evicted household member who engaged in drug-related criminal activity has successfully completed a supervised drug rehabilitation program approved by the CHA;

        ii. The circumstances leading to the eviction no longer exist (e.g. the household member involved in the drug-related criminal activity is imprisoned); or

        iii. The applicant household will not include the household member involved in the drug-related criminal activity.

    b. The CHA is required to deny the application of a household if the CHA determines that:

        i.   Any household member is currently engaging in illegal use of a drug.

        ii.  There is reasonable cause to believe that a household member's illegal use or pattern of illegal use of a drug may threaten the health, safety, or right to peaceful enjoyment of the premises by other residents;

        iii. Any household member has ever been convicted of drug-related criminal activity for the manufacture or production of methamphetamine on the premises of any federally-assisted housing;

        iv. Any member of the household is subject to a lifetime or any registration requirement under a state sex offender registration program, including the ten-year Illinois State Sex Offender Registration Act;

        v.  Any member of the household's abuse or pattern of abuse of alcohol may threaten the health,



safety, or right to peaceful enjoyment of the premises by other residents;[9]

c. Arrest records alone shall not be the sole reason for denying admission to housing. An arrest does not constitute evidence of criminal activity to warrant denial of admission. An arrest, however, may prompt inquiry into the conduct of an individual that upon further review and with sufficient evidence may determine an individual's lack of suitability for tenancy.

16. In addition to the federally-required rejections for criminal activity, the CHA will deny applicants if the CHA can document via police arrest and/or conviction documentation that:

a. An applicant or household member has ever been convicted of arson or child molestation;

b. An applicant or household member has ever been convicted of a crime that requires them to be registered under a state sex offender registration program including the ten-year Illinois State Sex Offender Registration Act [730 ILCS 150].

c. An applicant or household member has ever been convicted of the manufacture or production of methamphetamine on any premises.

d. An applicant or household member has a criminal history in the past three years that involves crimes of violence to persons or property as documented by police arrest and/or conviction documentation; Crimes of violence to persons or property include, but are not limited to, homicide or murder; destruction of property or vandalism; burglary; armed robbery; theft; trafficking, manufacture, use, or possession of an illegal drug or controlled substance; threats or harassment; assault with a deadly weapon; domestic violence; sexual violence, dating violence, or stalking; weapons offenses; criminal sexual assault; home invasion; kidnapping; terrorism; and manufacture, possession, transporting or receiving explosives.

e. Any applicant or household member evicted from any housing for drug-related criminal activity is barred for three years from the date of eviction.

f. Any applicant or household member has a pattern of criminal history that involves crimes of violence to person or property or drug-related criminal activity as documented by police arrests and/or conviction documentation.

g. Any applicant who engages in criminal activity of displaying, controlling, possessing, or using a firearm in a manner prohibited by law, within the last three years shall be not admitted. The CHA will deny admission to applicants who at the time of consideration for admission have a criminal background involving criminal use of weapons.

h. If an applicant based upon information during screening has any pending criminal matter, the applicant's name will be deferred from the waitlist until documentation is presented showing the outcome of the case. Once the applicant receives and notifies the CHA of the results of the case, he/ she will be placed back on the waitlist for the opportunity to screen for a unit.

17. Arrest records alone shall not be the sole reason for denying admission to housing. An arrest does not constitute evidence of criminal activity to warrant denial of admission. An arrest, however, may prompt inquiry into the conduct of an individual that upon further review and with sufficient evidence may determine an individual's lack of suitability for tenancy.

18. An applicant's intentional misrepresentation or omission of information related to eligibility, income, preference for admission, housing history, allowances, family composition, or rent will result in denial of admission. Unintentional mistakes that do not confer any advantage to the applicant will not be considered misrepresentations.

19. Applicants must be able to demonstrate the ability and willingness to comply with the terms of the lease,

---

[9] The CHA must be able to show a relationship between the applicant household member's abuse of alcohol and behavior that threatens the health, safety, or right to peaceful enjoyment of other residents.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



either alone or with assistance.[10] Availability of assistance is subject to verification by the CHA.

## 18-III.H. Screening Applicants with Mitigating Circumstances

1.  If information received through screening negatively impacts an applicant's qualification for admission, the CHA shall consider the time, nature, and extent of the applicant's conduct and any factors that might indicate a reasonable probability of favorable future conduct. Mitigating circumstances must be verifiable to be considered.

2.  The CHA will consider whether individuals who have engaged in behavior that negatively impacts their qualification for admission can document that they have been rehabilitated.

3.  During an appeal hearing or an individualized assessment, applicants are encouraged to inform the CHA of any history of domestic violence, sexual violence, dating violence, sexual assault or stalking if the applicant believes it may affect their screening.

    a.  An applicant who is a victim of domestic violence, sexual violence, dating violence, sexual assault or stalking will have a reasonable opportunity to present information regarding their status as a victim and the causal relationship between the violence and how it has impacted their ability to meet other eligibility criteria such as an acceptable credit and rental payment history, landlord references, eviction history, employment history, or criminal history.

    b. If the modified consideration is based on the work requirement, the applicant must submit documentation to show if there are any established hours the applicant can work. The number of hours the applicant is able to work shall be determined by a verified agency and this amount of hours will be the applicant's established work hours for admission to CHA. Once housed, continued lease compliance requires re-examination every 120-180 calendar days, including information about any steps that have been taken to meet the full work requirements established for the property.

## 18-III.I. Determination of Qualification for Admission

1.  Upon verification of applicant information, a final determination of qualification for admission is made.

2.  Qualified families will be notified by the CHA of the approximate date of occupancy insofar as that date can be determined; however, the date stated by the CHA is an estimate and does not guarantee that applicants will be housed by that date.

3.  Unqualified applicants will be sent a notice of denial of admission. The notice will include the basis for such determination and information on the mitigating hearing procedure if the applicant wants to request a hearing.  At the mitigating hearing, the applicant can offer information about mitigating circumstances or mistakes in facts used by the CHA to make the decision. Mitigating hearings can be conducted in person, by telephone or by document submittal based on the circumstances and discretion of the CHA. Mitigating hearings for applicants are different from the information hearings of the resident grievance process. Applicants are not entitled to use the resident grievance process contained in the ***CHA Grievance Procedure for the RAD PBV Program.***

    a. Qualified applicants with a disability, who fail to meet the screening criteria, will be offered an opportunity to show whether a reasonable accommodation will make it possible for them to be housed in accordance with the admissions screening criteria. Applicants with disabilities are encouraged to

---

[10] Applicants whose landlord, financial, criminal, and other references demonstrate that they are already willing and able to comply with lease terms in their existing housing will be considered to have met this criterion. Applicants with disabilities who demonstrate that an agency or individual will assist them with complying with the essential obligations of tenancy will be considered to have met this criterion. Applicants whose housing situations make it difficult for the CHA to determine whether or not they are able and willing to comply with lease terms (e.g. they are homeless, living with friends or relatives, or have other non-traditional housing circumstances) will have to demonstrate ability and willingness to comply with lease terms.

Effective August 1, 2024



present additional information at the initial interview; however, he/she may request an additional meeting to present such information.

4. Applicants who are victims of domestic violence, sexual violence, dating violence, sexual assault or stalking and are denied admission because they did not pass applicant screening are encouraged to present any information which directly identifies them as victims of domestic violence, sexual violence, dating violence, sexual assault or stalking. The CHA will determine if domestic violence, sexual violence, dating violence, sexual assault or stalking is a factor in the unfavorable results of screening. The CHA will not deny otherwise qualified applicants on the basis that they are or have been victims of domestic violence, sexual violence, dating violence, sexual assault or stalking.

## 18-III.J. Occupancy Guidelines: HUD Occupancy Standards

Applicants who pass screening and are qualified for housing will be placed on a waitlist and assigned a unit size based on the Occupancy Guidelines established in this section. Units shall be occupied by families of the appropriate size. Generally, two people are expected to share a bedroom.

**Number of Persons Per Unit Standard**

| Number of Bedrooms | Min Persons/Unit | Max Persons/Unit |
|---|---|---|
| Studio | 1 | 2 |
| 1BR | 1 | 2 |
| 2BR | 2 | 4 |
| 3BR | 3 | 6 |
| 4BR | 4 | 8 |
| 5BR | 5 | 10 |

1. The following principles govern the size of a unit for which a family will qualify. Units will be assigned so that:

   a. A head of household (leaseholder) <u>shall not</u> be required to share a bedroom unless the head of household is married, in a consensual relationship, or otherwise agrees to share a bedroom.

   b. If the applicant or a member of the applicant's household is pregnant, unborn children will be counted in determining unit size when the family supplies documentation of pregnancy.

   c. A single pregnant head of household may agree to share a bedroom with her child(ren) once born, but must agree to occupy the unit until the child turns age two or until the family size increases through birth, adoption, or court awarded custody of a child.

   d. The CHA will count a child who is temporarily away from the home attending school, so long as the family can document that the child will be living with the family during the summer and vacation months.

   e. The CHA will not count a child(ren) as living in the household if the parent has lost or terminated parental rights. The family must inform the CHA of a termination of parental rights within 10 calendar days of the occurrence.

   f. A live-in aide <u>shall not</u> be required to share a bedroom with the head of household. A resident's bedroom size will not be adjusted to accommodate the family members of a live-in aide; a live-in aide's family members cannot cause overcrowding in the unit. If the addition of the live-in aide will not overcrowd the current unit, the CHA will not increase the bedroom size.

   g. Children who are subject to a joint custody agreement but live with the applicant, at least 51 percent

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



of the time, will be considered members of that household. (51 percent of the time is defined as 183 days of the year, which do not have to run consecutively). Legal certification is required from families who claim joint custody or temporary guardianship.

2. Exceptions to the largest permissible unit size may be made in cases of reasonable accommodations for people with disabilities. In such cases, third-party documentation attesting to the need for additional bedroom size may be deemed necessary on a case-by-case basis. The CHA reserves the right to perform unit inspections to determine the continuing need for additional bedrooms.

3. When a family applies for housing and the waitlist is updated, some families may qualify for more than one unit size. The CHA will make a housing offer of the appropriate size unit in accordance with the first unit available and the Number of Persons per Unit Standards. Refusal of a unit offer solely because an applicant is waiting for a larger unit for which they may also qualify is not good cause for refusal.

   a. At senior designated housing properties with studio and one bedroom apartments, applicants must take the first unit offered, regardless of unit size, or refuse it with good cause. Refusal of a unit offer or refusal to be screened for a unit at a particular site without good cause will result in the applicant's name being removed from the waitlist.

   b. Applicants are responsible for updating their household composition on their online waitlist application. If a family is offered a unit and they no longer qualify for the unit size, they will be placed on the appropriate list once their household composition has been updated. The applicant will retain their preferences and date of application. The timeframe for a unit offer may differ once the family size is updated.

   c. The CHA shall change the family's list when warranted at any time while the family is on the waitlist.

   d. Units will be leased without regard to race, color, sex, age (when age eligibility is not a factor), familial status, religion, disability, national origin, ancestry, sexual orientation (including gender identity), marital status, housing status, order of protection status, military discharge status or source of income

4. Residents who are being relocated back to CHA housing as part of the Plan for Transformation per the 10/1/99 RRC and Post 10/1/99 RRC are subject to the same screening criteria process as a RAD PBV applicant.

## 18-III.K. Tenant Selection and Assignment Plan

The Tenant Selection and Assignment Plan (TSAP) is the CHA policy that determines how applicants will be placed on the waitlist and in what priority applicants will be screened and offered housing. This policy will be applied to all interested households that apply for CHA housing and for all new applicants selected from any CHA waitlist. CHA will follow the policies outlined below in selecting applicants unless otherwise directed by court orders or consent decrees.

**1. Tenant Selection and Assignment Plan (TSAP)**

   a. Emergency applicants who are victims of federally declared disasters will be offered units on an as needed basis before applicants from the waitlist. Applicants from the waitlist will be offered units after existing residents receive an offer in accordance with the ***CHA Leaseholder Housing Choice Relocation Rights Contract 10/1/99 (RRC)*** or the ***CHA Relocation Rights Contract for Families with Occupancy after 10/1/99 (Post 10/1/99 RRC)*** and the Transfer Policy in Part IV.J- Processing Transfers.

   b. Existing residents, who are required to move under the RRC, and the Post 10/1/99 RRC will be processed in accordance with the contracts. Existing residents who are required to transfer by the CHA will be processed in accordance with the Transfer Policy in Part IV.J- Processing Transfers.

   c. All unit offers will be made in writing,[11] and the CHA will not discriminate on grounds of race, color,

---

[11] Or alternative format as a result of a request for a reasonable accommodation by a qualified applicant or resident with disabilities.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



sex, age (when age eligibility is not a factor), familial status, religion, disability, national origin, ancestry, sexual orientation (including gender identity), marital status, housing status, order of protection status, military discharge status or source of income.

## 18-III.L. Administering Waitlists

1. Family RAD properties, including those within mixed-income/mixed-finance properties, will be provided names from the site-based family waitlists as applicable.

2. Senior RAD PBV properties will be provided names from the individual site-based waitlists.

3. For the transfer waitlist, resident interviews, eligibility determination, housing offers, and unit assignments will be performed by the receiving property manager. Criminal and credit background screening, transfer processing, and management of the transfer waitlist will be performed by the CHA.[12] Exceptions include emergency transfers that are expedited and completed by the property manager.

4. For the site-based wait lists of family properties (RAD PBV family or mixed-income), marketing, application intake, applicant interviews, screening for suitability, eligibility determination, housing offers, and unit assignments will be completed by the property manager. Application processing as well as waitlist management, monitoring, auditing, and maintenance will be conducted by the CHA. Property managers are required to report to the CHA on all outreach efforts to applicants and applicant ineligibility findings, as well as all unit offers, assignments, and refusals.

5. Requests for transfers from existing or pending RAD PBV properties (as noted in Part IV.J- Processing Transfers) to traditional public housing units will be initially reported to the property manager, and managed and processed by the CHA.

6. For the 50/80% AMI waitlist, marketing, initial application intake, applicant interviews, screening for suitability, eligibility determination, housing offers, and unit assignments will be conducted in writing by the property manager. Application processing and waitlist management, monitoring, auditing, and maintenance will be conducted by the CHA. Property managers are required to report to the CHA on all outreach efforts to applicants and applicant ineligibility findings, as well as all unit offers, assignments, and refusals.
   To qualify for the 50/80% waitlist, applicants must have a household income that qualifies within the 50/80% AMI framework, as published by the HUD on an annual basis. Qualification will be determined at the time of applicant screening for occupancy. Screening will include income verification. Applicants will not be offered units covered by the 50/80% AMI if they cannot meet the income requirements and will be removed from the 50/80% waitlist. The applicants will retain their original date of application on the selected public housing site-based waitlist.

7. For the 50/60 percent AMI wait lists, marketing, initial application intake, applicant interviews, screening for suitability, eligibility determination, housing offers, and unit assignments will be conducted in writing by the property manager. Application processing and wait list management, monitoring, auditing, and maintenance will be conducted by the CHA. Property managers are required to report to the CHA on all outreach efforts to applicants and applicant ineligibility findings, as well as all unit offers, assignments, and refusals.

   a. Eligible applicants who qualify under the 50/80 percent AMI waitlist, but have a household income within the Low Income Housing Tax Credit (LIHTC) limitation of 50/60 percent AMI, are eligible applicants for units created at mixed-income properties with RAD PBV units. LIHTC units have an initial eligibility for occupancy that mandates applicants must have a household income, which does not exceed 50/60 percent AMI threshold, as published by the LIHTC program administered by the Illinois Housing Development Authority (IHDA) and the City of Chicago Department of Planning and Development, pursuant to 26 USC § 42. Qualification will be determined at the time of applicant

---

[12] For CHA units in mixed-income/mixed-finance properties, determination and housing assignment will be performed by the property manager of the mixed-income/mixed-finance property.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



screening for occupancy.

    b. Applicants who cannot meet the forgoing 50/60 percent AMI criteria at the time of initial screening occupancy will not be eligible for RAD PBV units designated as 50/60 percent AMI units and will be removed from the 50/60 percent waitlist. The applicants will retain their original date of application on the applicable waitlist.

8. Application updates and waitlist withdrawals will be processed by the CHA.

9. Property managers must report all applicant ineligibility findings as well as all housing offers, unit assignments, and refusals to the CHA.

## 18-III.M. Site-based Waitlists for Family Properties

1. The CHA will maintain all family public housing site-based waitlist electronically.

2. Applicants are allowed to select one site-based family property waitlist across the family housing portfolio.

3. It is the applicant's responsibility to use the CHA site-based waitlist portal to update his/her application (e.g., contact information and family composition). Applicants may also update their property or property group preference but will not be permitted to do so while being screened for a housing opportunity by CHA property management.

4. Site-based family waitlist will be managed, monitored, audited, and maintained by the CHA.

5. Applicants will be electronically assigned to their selected site-based waitlist in sequence based upon:

    a. Type and size of unit needed (i.e. accessible or non-accessible unit, bedroom size);

    b. Date of application;

    c. Ranking admissions preference, if any;

    d. Income tier.

6. Refusing a unit without good cause or failing to respond to a unit offer will result in the applicant's name being removed from the waitlist.

7. Refusing a unit with good cause will result in the applicant's name being returned to the waitlist with their original placement on the wait list. Good cause is determined by the property manager. Examples of good cause include, but are not limited to:

    a. An applicant or transferring resident cannot move at the time of the offer and presents verification that acceptance of the offer of a suitable vacancy will result in undue hardship;

    b. The unit is not ready for move-in on the date projected for move-in. "Ready for move-in" means the unit has no Uniform Physical Condition Standard (UPCS) deficiencies and is clean;

    c. The family demonstrates that accepting the offer will place a family member's life, health or safety in jeopardy. The family must provide documentation of domestic violence, sexual violence, dating violence, sexual assault, stalking, or hate crimes, and/or other situations of non-random violence that put a resident's life in danger;

    d. A health professional verifies at the time of the unit offer with supporting documentation of temporary hospitalization or recovery from illness of the head of household, other household members (each as listed on final application or lease), or live-in aide necessary to the care of the head of household;

    e. The unit has lead-based paint and the family has children under the age of seven and/or a household member(s) has a medical condition(s) that could be negatively impacted by living in a unit with lead-based paint;

    f. The unit is not accessible for a disabled member of the applicant's household;

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



    g.  The unit has accessibility features not needed by the applicant household.

## 18-III.N. Site-based Waitlists for Senior Designated Housing Properties

1. The CHA received HUD approval for site-based waitlists at its senior designated housing properties.
2. Applicants are allowed to select one senior designated housing site from the entire senior designated housing portfolio.
3. Applicants are not permitted to change their site selection while they are being outreached to and screened by the property manager at the site. Applicants who reject screening or a unit offer for any reason, including because they prefer a different site, will be removed from the site- based waitlist and must reapply.
4. The site-based wait lists for senior designated housing properties will be managed, monitored, audited, and maintained by the CHA.
5. All senior housing applicants will be placed on the wait list for the site they selected. When a unit becomes available (e.g. studio apartment or a one bedroom apartment), the unit will be offered to the first eligible family. If the family fails to respond to a unit offer or declines the unit or screening for a unit without good cause, including rejection based on unit size, the applicant will be removed from the waitlist.
6. Refusing a unit or a screening for a unit with good cause will result in the applicant's name being returned to the wait list with his/her original date of application on the wait list. Good cause is determined by the property manager.
7. Refusal of a unit offer without good cause will result in the applicant being removed from the waitlist.

## 18-III.O. Transfer Waitlist (for CHA properties)

1. Residents on the transfer waitlist will receive one unit offer. However, multiple unit offers may be made in order to satisfy one or more conditions approved within a reasonable accommodation request.Refusal of or failure to respond to unit offers without good cause or failing to respond to an outreach will result in the resident being removed from the waitlist.

## 18-III.P. Making Unit Offers

1. Emergency Transfers, Transfers under the RRC or the Post 10/1/99 RRC, Mandatory Administrative Transfers, and Voluntary Administrative Transfers take precedence over new admissions from the waitlist. Family Public Housing Resident Transfers will be processed on an ongoing basis  with new admissions from waitlists.
2. For new admissions, the CHA will match the next unit available to the highest ranking applicant for a unit by bedroom size, type, and accessible features, if any. Admissions preferences are used to determine the order of selection from the waitlist. If two applicants with the same preference status need the same type and size of unit, the applicant with the earliest date of application will be offered the unit.
3. If more than one unit of the appropriate size and type is available, the first unit to be offered will be the unit that is or will be ready first for move-in. If two units are ready for move-in on the same day, the first unit to be offered will be the first unit that became vacant.
4. Once contact is made with an applicant, they must accept any unit offered within two business days of the date of the unit offer letter (or the date the alternative format of communication designated by an applicant with disabilities was provided). If an applicant refuses a unit offer, the property manager will determine whether the refusal was with or without good cause. If the applicant does not respond to the unit offer within two business days, he/she will be removed from the waitlist.
5. Pursuant to the RRC, leaseholders with a right of return will receive unit offers in accordance with the stipulations and requirements of the RRC.

## 18-III.Q. Mixed-Income Developments Unit Offers

1. Applicants that reach the top of the Community-Wide site-based waitlist will be sent to mixed-income developments for outreach and screening as units become available.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



2. The property manager will conduct the outreach and screening activity.
   Applicants who do not meet the site-specific criteria including the work requirement will be removed from the waitlist.
3. The property manager will document the outcome of outreach and screening activities in both the physical file and the housing management system.
4. The CHA will review documentation in order to approve applicants for move-in.
5. The property manager will make unit offers to applicants approved by the CHA.
6. The property manager will secure a move-in date for each applicant that accepts a unit offer and provide the CHA with the move-in dates.

## 18-III.R. Accessible Units

1. Pursuant to eligibility requirements, the CHA will offer available accessible units in the following order:
   a. First, to a current qualified resident with a disability living in the same development that requires the special features of the vacant accessible unit and occupying a unit not having those accessibility features;
   b. Second, to a current qualified resident with a disability residing in another development that requires the accessibility features of the vacant accessible unit;
   c. Third, to an eligible, qualified applicant with disabilities on the waitlist who requires the accessibility features; and
   d. Fourth, to a non-disabled eligible applicant or resident. The CHA will require the applicant or resident to execute a lease addendum that requires them to move, if there is an eligible applicant or existing resident with disabilities who requires the accessibility features of the unit.
2. The CHA shall not prohibit a qualified eligible, disabled family from accepting a non-accessible unit for which the family is eligible which may become available before an accessible unit. The CHA may modify a non-accessible unit as needed as a reasonable accommodation, unless the modification would result in an undue financial and/or an administrative burden.

## 18-III.S. Leasing Policies

All units must be occupied in accordance with a lease that complies with HUD and CHA policies. The head of household and co-head, if applicable, and the authorized representative of the CHA, prior to actual admission, shall sign this lease. All resident authorized members of the household with the right to occupy the unit shall be listed on the lease. The lease shall specify the unit to be occupied, the effective date, rent to be charged, utilities, and all other provisions as required by state and federal law, and CHA policy.Units will be leased without regard to race, color, sex, age (where age eligibility is not a factor), familial status, religion, disability, national origin, ancestry, sexual orientation (including gender identity) , marital status, housing status, order of protection status, military discharge status or source of income.

**A. Leasing Policy**

1. The leasing process for emergency applicants who are victims of federally declared disasters may be amended at any time to respond to the impact of the federally declared disaster.
2. The leased RAD PBV housing unit must be the head of household's permanent and sole domicile. All RAD PBV housing units must be occupied by families whose sole domicile is the RAD PBV housing unit.
3. The CHA will neither offer nor move a family into a unit that does not meet basic standards of habitability, including HUD occupancy standards.
4. All units must be occupied pursuant to a signed lease that complies with HUD regulations.
5. A lease is executed at the time of admission for all new residents. The lease will include the names of all authorized members bound by the lease. The lease shall be signed by the head and co-head of the household, if applicable, and by the Chief Executive Officer or designee prior to actual move-in. The head of household will receive a new copy of his/her lease.
6. Applicants/Residents shall complete a home maintenance/housekeeping orientation prior to move-in.
7. The resident shall pay a security deposit at the time of leasing. For new residents, the security deposit shall

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



be equivalent to one month's worth of income-based rent. The resident may pay the security deposit in one lump sum or spread it over three payments during the first three months of tenancy. Security deposits will never be less than the minimum rent. Pet deposits are in addition to the security deposit, and must be paid in accordance with the Pet Policy.

8. Changes in family composition, income, or familial status between the application processing interview and leasing will be processed by the CHA and/or property management. Changes after leasing will be processed by the property manager, except lease addition requests for live-in aides, residual rights requests for remaining family members, foster children, foster adults, kinship care children, and adults in legally protected relationships, which require submittal to the CHA for approval prior to moving into the unit. It is the responsibility of the applicant and/or resident to make the CHA and the property manager aware of any changes in family composition, income, or familial status within 10 calendar days of the occurrence.

9. If, at any time during the term of the lease agreement, a change in the resident family composition or income results in the need for changing or amending any provision of the lease, either:
   a. A new lease agreement will be executed; or
   b. An appropriate rider will be prepared and made a part of the existing lease.
   All copies of such riders or insertions are to be dated and signed by the head of household, and co-head, if applicable, and by the Chief Executive Officer or designee.

10. A new lease is executed when a resident transfers from one CHA unit to another, even if the transfer is within the same development, unless a reason prevents the issuance of a new lease, i.e. pending Notice of Termination, court matter, or emergency circumstance.

11. If the change in resident status or transfer results in a new lease agreement during the initial year of the RAD PBV transition, the new RAD PBV lease and associated provisions will apply.

12. The CHA will only supply one subsidy per household. When a court determines the disposition of property between the head or co-head of household in a divorce or separation under a settlement or judicial decree, the CHA will follow the court's determination of which family member continues to receive assistance. In cases where there is no court determination, the original head of household will retain use of the unit. Such provision only applies to situations involving the approved head and co-head of household.

13. Residents are not permitted to allow boarders to occupy their unit. Violation of this provision is grounds for lease termination.

14. Residents are not permitted to allow former residents who have been evicted from a federally-funded housing program for nonpayment of rent or for criminal activity to occupy their unit. Violation of this provision is grounds for lease termination.

15. Absence policy: Notice is required when all household members will be absent from the unit for over 30 consecutive days. If the entire household is absent beyond 90 consecutive days, CHA will consider the unit to be abandoned even if the family continues to pay rent and/or utilities. CHA may require the family to supply information to verify absence or residency in the assisted unit. Exceptions will be made for instances related to reasonable accommodations or the Violence Against Women Act (VAWA).

## Part IV: Resident Provisions and Rights

### 18-IV.A. Overview

This part discusses other resident rights and program requirements under the RAD PBV program, including the transfer, pet, visitor policies, property rules, and lease termination policies.

### 18-IV.B. Leasing Policies: Changes in Household Composition

1. Only persons listed on the most recent lease or added in accordance with CHA policy shall be permitted to occupy a dwelling unit and must use the dwelling unit as their sole domicile.

2. The CHA shall determine if a dwelling unit size is appropriate at any time when a household's composition changes. If the CHA determines that an addition to a household is ineligible, the person will not be added to the lease. If the addition is approved, the household will be placed on the waitlist

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



for the appropriate bedroom size, if necessary.

3. Additions to the household by natural birth[13], adoption, or court-awarded custody (excluding foster care) to a current member of the household will be processed by the property manager automatically.

4. The lease addition of a live-in aide, foster child, foster adult, or kinship care child must be requested in writing and requires authorization by the CHA before being processed by the property manager. For minors, under the age of 18, custody rights documentation or proof of kinship care is required for the addition.

5. The CHA will not approve lease addition requests for adults. Exceptions will be made for legally protected relationships or extenuating circumstances determined at the sole discretion of the CHA.

6. The CHA will approve the lease addition request if that individual passes applicant screening, including, if applicable, site-specific mixed income criteria and the unit is of the appropriate size. If a household's composition changes, a unit size determination will be made in accordance with the Occupancy Guidelines in Part III:J. to ensure that the family is appropriately housed.

7. If the household composition overcrowds the unit so that the CHA does not have a unit large enough in accordance with the Occupancy Guidelines to house the entire family, and there are adult members in the family, the head of household must decide if all or part of the household will leave the unit within 60 calendar days. The family members who leave the unit may apply to be on the waitlist if applications are being accepted. The family's failure to decrease the household size within 60 calendar days is a serious lease violation, and the family may be evicted for such lease violation.

8. Persons residing in the household without CHA approval will be considered unauthorized occupants, and the entire household will be subject to lease termination.
   Verification of an unauthorized occupancy can be established through the following:
   a. Government issued ID's or reports
   b. Utility Bills for the assisted unit
   c. Property sign-in logs and/or
   d. Other documentation or investigations

9. If a lease addition applicant is rejected because he/she did not pass screening, the rejected lease addition applicant may request a mitigating hearing. The resident may grieve the rejection in accordance with the ***CHA Grievance Procedure for the RAD PBV Program***. Only one type of hearing can occur for each request.

10. Family and/or household members who move out of the unit for any reason shall be reported by the household in writing to the property manager within 10 calendar days of the occurrence. Once reported, such member will be removed from the lease immediately. A unit size determination will be made in accordance with the Occupancy Guidelines in Section II to ensure that the family is still appropriately housed.

## 18-IV.C. Visitors

1. A guest may visit a family in an assisted unit for a total of 30 calendar days in a calendar year; however, each visit cannot exceed 14 consecutive calendar days. Residents may request a time extension to this visitor timeframe.

2. Visitors to any RAD PBV development shall be required to show a government issued or student photo identification before being allowed to enter a building.

3. Visitors may be required to sign in when entering buildings through a visitor's log prior to entry and residents may be required to escort visitors to and from their units.

4. The CHA may ban visitors who engage in any behavior that threatens the health, safety, or right to peaceful enjoyment of other residents, including criminal activity cases for three years or longer if court order approved**.** Visitors banned for such behavior, will be restricted from entering CHA properties.

---

[13]Children born to a current authorized family member of the household during tenancy.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



5. A resident will be notified in writing by the property manager when a guest of his/hers has been banned. Residents may grieve the CHA's decision to ban a visitor in accordance with the ***CHA Grievance Procedure for the RAD PBV Program.***

6. Residents will be required to sign an agreement stating they will not allow the banned visitor into their unit. Failure to sign such an agreement or violation of the signed agreement is grounds for lease termination.

7. Persons that exceed the time as a guest will be considered to reside in the assisted unit without CHA approval and will be considered an unauthorized occupant. The family will be subject to lease termination.

8. Persons residing in the household without CHA approval will be considered unauthorized occupants, and the entire household will be subject to lease termination.

9. Verification of an unauthorized occupancy can be established through the following:
    a. Government issued ID's or reports.
    b. 2-Utility Bills for the assisted unit
    c. Property sign-in logs and/or
    d. Other documentation or investigation

## 18-IV.D. Live-In Aides

1. A live-in aide is a person whose sole reason for living in the RAD PBV unit is to assist the qualified resident or family member who requires the assistance of the aide. A live-in aide resides with one or more elderly persons, near-elderly persons, or persons with disabilities, and:
    a. Is determined by a knowledgeable professional to be essential to the care and well-being of the elderly or near-elderly person or family member with a disability;
    b. Does not have an obligation for the financial support of the person(s); and
    c. Would not be living in the unit except to provide the necessary supportive services; 24 CFR § 5.403.

2. Live- in aides are household members, not family members, regardless of their familial relationship; therefore, live-in aides retain no rights to a unit upon the death, eviction, departure, or abandonment by the qualified resident with the disability who needed the live-in aide. If the qualified resident requiring the services of the live-in aide dies or leaves the unit, the live-in aide and the live-in aide's family members must vacate the unit within 30 calendar days.

3. If a family member is designated as the live-in aide of another family member, that family member will no longer have remaining rights to the unit should the head of household leave the unit. A Live-in aide who is requesting to add their family members to the lease will also have their family members status added as live-in aide household members and they will also have no remaining rights to the unit. The live-in aide and their household members cannot reclassify themselves as family members.

4. A relative that is already legally obligated to provide care to the family member requiring a live-in aide may not be classified as a live-in aide (i.e. parents cannot be the live-in aide of their child and a spouse cannot be the live-in aide to the other spouse).

5. A live-in aide's income is not counted towards the calculation of the resident's income eligibility or rent for the unit. A live-in aide's family members will not be counted toward the resident's income eligibility, rent, bedroom size, or child deductions for the resident.

6. Live-in aides are required to meet all admissions screening criteria, as well as site-specific screening criteria for mixed-income developments. A live-in aide who does not pass screening will be rejected. Live-in aides can be rejected for a number of reasons including, but not limited to:
    a. Fraud or any criminal act in relation to any federal housing program; or
    b. A record of drug-related or violent criminal activity; or
    c. Owing a debt to any public housing authority or other federally-subsidized housing program.

7. When reviewing a request to add a live-in aide, the CHA will consider:
    a. Whe ther the person who will perform the duties of the live-in aide is qualified and able to do the duties; and

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



     b.   The live-in aide's prior federally-subsidized housing history, if applicable.

8. The CHA will retain the right to review whether a relative is essential to the care of the qualified resident on a case- by-case basis.

9. The CHA will supply a bedroom for the live-in aide, if necessary. However, the CHA will not supply a larger unit in order to accommodate the live-in aide's family members.

10. Qualified residents or applicants are required to complete all applicable paperwork regarding the request for a live-in aide.

    a. The qualified resident or applicant and the live-in aide are required to complete and sign the *CHA Lease Addendum for Live-In Aides*. Failure to sign the lease addendum or violation of the terms of the lease addendum is grounds for lease termination.

    b. The qualified resident or applicant is required to complete a 'Live-In Aide Request Form' or may request assistance from family, friends, advocates, or a property manager to complete the form.

    c. The qualified resident or applicant is required to identify a 'knowledgeable professional' to certify the need for a live-in aide.

11. The qualified resident or applicant is required to complete the Certification of Need for a Live-In Aide Form.

12. If a live-in aide is rejected because he/she did not pass screening, the resident may grieve the rejection in accordance with the ***CHA Grievance Procedure for the RAD PBV Program***.

## 18-IV.E. Units Occupied by CHA Residents as Employees

1. A CHA resident may become employed by property management. A resident employee's required rent payments cannot be lowered as a part of their compensation.

2. If a CHA resident is employed by a property management company and the employment is later terminated, the resident will retain tenancy and be treated as any other resident.

## 18-IV.F. Property Rules

1. Property- specific rules vary by building. Please consult the lease addendum for a complete listing of rules applicable to the property in which you reside.

2. Smoke Free- Policy

    a.   CHA prohibits the use of all lit tobacco products in all indoor areas of public housing—including but not limited to living units, common areas, and administrative office buildings—and all outdoor areas within 25 feet of its housing and administrative office buildings; **24 CFR § 965.1 & 966**.

        i.   Lit tobacco products involve the ignition and burning of tobacco leaves and includes (but is not limited to) cigarettes, cigars, pipes, and water pipes (hookahs).

    b.   Per the Chicago Clean Indoor Air Ordinance of 2008, amended in 2014, no vaping is permitted within any CHA property common use area at any time. Vaping refers to the use of electronic nicotine delivery systems or electronic smoking devices. This e-cigarette policy prohibits the use of electronic nicotine delivery systems (also known as e-cigarettes, e-cigars, e-hookahs, and e-pipes) anywhere that tobacco smoking is prohibited.

    c.   Violation of the smoke-free policy will be considered a lease violation.

    d.   CHA's Smoke-Free Policy applies to all CHA housing. Residents of mixed-finance developments must adhere to the smoking policy referenced in their lease and/or property Tenant Selection Plan (TSP).

3. Firearms Free Policy

    a.   The CHA is a Firearms Free Property. The CHA prohibits displaying, controlling, using, or possessing any firearms, ammunition, or other weapons anywhere on or near CHA property by applicants and residents. Unless required by lawful employment and obtained in accordance with law; firearms, ammunition, or other weapons are strictly prohibited on or near CHA property. **430 ILCS 66/ et seq**.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



b.  No person conducting business, residing, or visiting on or near CHA property is allowed to carry a concealed weapon onto any location owned and operated by the CHA. Firearms, ammunition, or other weapons are prohibited at any CHA offices, sites, and facilities owned and operated by the CHA.

c.  Applicants who engage in criminal activity, including the displaying, controlling, possessing, or using a firearm in a manner prohibited by law in the last three years, shall not be admitted to RAD PBV housing. The CHA will deny admission to applicants who at the time of consideration for admission have a criminal background involving criminal use of weapons.

d.  Residents and their authorized members, guests, or persons under their control, shall not display, use, control, or possess anywhere on or near CHA property any firearms, ammunition, or other weapons in violation of federal, state, and local laws. It shall be in violation of the CHA's RAD PBV program to:

    i.   Display, intentionally or unintentionally, a weapon while on or near CHA Property, or

    ii.  Hide or conceal, intentionally or unintentionally, a weapon on one's person or belongings while on CHA Property, or

    iii. Fire or otherwise discharge, intentionally or unintentionally, the weapon while on or near CHA Property, or

    iv.  Use, intentionally or unintentionally, a weapon with a verbal or non-verbal threat to shoot, fire, explode, throw, or

    v.   Cause, intentionally or unintentionally, any injury to or on another person, or

    vi.  Cause damage to any personal or real property with the use of a weapon, or

    vii. Cause, intentionally or unintentionally, any other person to perform any of the above conduct.

e.  Any resident, resident family members, guests, or persons under the resident's control known to be involved in the display, use, possession, or control of any firearms, ammunition, or other weapons on or near CHA owned and operated property will be subject to lease termination.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



## 18-IV.G.Community Space Policy

a. CHA residential building community space shall be used for programs, activities and events for the benefit of CHA residents and must not interfere with CHA operations, or disrupt the peace and quiet of the CHA housing community or immediate vicinity. The Policy for the Use of CHA Community Space in Residential Buildings (The "Community Space Policy") prohibits specific activities in community spaces and establishes a written application process for the use of community space.

b. "Community space" is defined as all halls, lounge areas, party rooms, meeting rooms, lobbies, porches, garden areas, playgrounds, lawns and common areas in residential buildings.

c. All affiliated and non-affiliated groups, organizations or individuals desiring to use CHA community space at any time, and/or location must submit a written application for the proposed activity to the Property Manager.

d. The Community Space Policy includes the following general conditions for the use of the property:

   i. Use of CHA community space is subject to limitations on the number of persons who may attend in accordance with appropriate CHA occupancy guidelines and City of Chicago building codes, fire codes, ordinances, and safety standards.

   ii. CHA residents (defined here as Head of Household or Co-Head of Household) and affiliated and non-affiliated groups, organizations or individuals are authorized to apply to use CHA community space for organized programs, activities, and events, subject to the approval provisions of this policy.

   iii. CHA may charge use fees in connection with the use of CHA community space by affiliated and non-affiliated groups, organizations or individuals. This fee may be waived at the discretion of CHA upon a showing of financial hardship on the part of the requestor.

   iv. Use of CHA equipment is subject to the approval or the direct supervision of CHA.

   v. Sound amplification equipment may be used by groups, organizations and individuals at programs, activities and events only when prior approval has been granted by CHA.

   vi. CHA may charge fees to users requiring special facility arrangements, equipment or staffing in accordance with rates established by CHA. In such cases, deposits and/or proof of financial ability to pay such fee may be required.

   vii. No structure shall be erected on any CHA property without the express written approval of CHA.

   viii. No alcoholic beverages shall be served or consumed within CHA's community space at any time.

   ix. No publicity for any programs, activities or events may be released before the application for the proposed activity is approved in writing by CHA. No media-coverage is allowed without the express and written approval of CHA.

   x. Any admission charged or donation required as a condition of admission to an event given by any group, organization or individual shall be expended for the event. Any monies collected in excess of the expenses of the event shall not be used for an individual's personal or private use.

Effective August 1, 2024



Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan

    xi. CHA community space may not be used by any non-affiliated group, organization or individual for the conduct of profit-making activities except when a rental or lease agreement is negotiated with CHA for a fair rental value for the property or facilities used. Rental or lease agreements may be required for non-profit activities of non-affiliated groups, organizations or individuals provided that rental charges for such use may be reduced or waived in the discretion of CHA depending upon the nature and extent of the proposed use.

    xii. All rental or lease agreements involving CHA community space must be approved by CHA officials. CHA affiliated groups, organizations and individuals have no authority to enter into rental or lease agreements with other affiliated or non-affiliated corporations, groups, organizations or individuals. CHA residents and employees have no authority to enter into rental or lease agreements with affiliated or non-affiliated corporations, groups, organizations or individuals.

    xiii. Use of CHA community space by affiliated and non-affiliated groups, organizations and individuals requires adequate security for damage to the property during the period of use. Personal injury and property damage insurance coverage and any other forms of security or insurance may be required as designated by CHA. CHA may waive the requirements of security and/or insurance coverage at its discretion.

    xiv. All affiliated and non-affiliated groups, organizations and individuals agree, by making application for registration of an activity and by subsequent use after approval by CHA, to indemnify CHA and hold it harmless from any and all liabilities arising out of such group's, organization's or individual's use of the property including but not limited to, personal injury, property damage, court costs and attorneys fees.

e. An application for community space for a proposed activity may be denied when:

    i. CHA determines that the requested use would cause disruption or interference with the normal activities of the residents or the community.

    ii. CHA determines that the requested use would be contrary to federal, state or local law or regulation, or policies and regulations of CHA.

    iii. The requestor has not fully provided accurate or complete information on the application or the application contains false or misleading statements.

    iv. The resquestor has been responsible for violation of paragraphs (i.), (ii.) or (iii.) above during a previously approved program, activity or event.

    v. Approval for the use of the property has previously been given to another individual, group or organization for the date, time and location requested.

    vi. The activity creates or could create a danger or dangerous condition impacting on the health, safety and welfare of others.

    vii. The activity creates or could create a danger or dangerous condition to CHA property or maintenance problems.

    viii. The requestor's use of community space has resulted in damage to CHA property during previously registered and approved program, activity or event and has not paid for such damage.

    ix. The requestor's has outstanding and unpaid debts to CHA.

    x. Other reasons determined by the CHA.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



f. The Community Space Policy describes the following particular uses for the use of the property:

i.  Political Use

a. The use of CHA community space for speaking engagements by candidates for CHA resident office shall be subject to the registration requirements and procedures specified above.

b. The use of CHA community space to campaign for public office is strictly prohibited.

c. CHA community space may not be used to staff a campaign for public office.

ii. Religious Use

a. CHA community space may not be used for the purpose of religious worship, programs, meetings, activities or events.

iii. Literature Distribution or Sale

a. Any proposed distribution or sale of literature by an affiliated or non-affiliated group, organization or individual is subject to the express written approval of CHA.

b. Any literature which is, or which is proposed to be, distributed or sold shall comply with all applicable federal, state and local laws and regulations, and with the regulations and policies of CHA. No obscene literature or material shall be distributed on any CHA property.

c. Persons engaged in the distribution and/or sale of approved literature or material shall not obstruct or impede pedestrians or vehicles, harass other persons with physical contact or persistent demands, misrepresent the purposes or affiliations of those engaged in the distribution or sale, or misrepresent CHA's involvement in the literature distributed or sold.

d. CHA shall have the right to terminate the distribution or sale of literature by any group organization or individual which violates the provisions of this policy.

iv. Solicitation

a. Except as permitted by this provision, solicitation is prohibited in all CHA community space. "Solicitation" will not be considered to include activities or events engaged in by affiliated groups, organizations or individuals for the purpose of raising funds to meet expenses of the group, organization or individual or for charitable purposes.

b. Solicitation and fund-raising activities other than for the purpose of making a profit may be conducted on CHA properties by affiliated and non-affiliated groups, organizations and individuals with the express written approval of CHA.

c. Solicitation of dues and/or membership in an organization is permitted.

d. Request for solicitation may be denied for any reason at the discretion of CHA.

e. No funds solicited on CHA properties shall be for the benefit of any individual unless contributions are requested for the relief of an individual specified by name at the time of the request and all funds contributed are turned over to the named beneficiary for his or her use without any deductions whatsoever.

f. CHA retains the right to require any group, organization or individual to verify the use, application or disposition of funds solicited on CHA property.

g. No advertising signs, posters, or other material may be placed on any CHA property or facility by any affiliated or non-affiliated group, organization or individual without the express written approval of CHA.



h. All approved signs, posters or other material shall clearly indicate the name of the group, organization or individual and shall not misrepresent or falsely allude to an affiliation with CHA.

i. All common area use by residents must abide by the requirements of the Community Space Policy set forth above.

## 18-VI.H. Cannabis Policy

a. Federal law (42 U.S.C. §§ 13661 and 13662) requires public housing authorities to prohibit admission to housing programs to applicants if they, or a member of their family, use a controlled substance such as cannabis at the time of their application for housing benefits.

b. The laws identified above also apply to residents who currently live in subsidized housing. Although cannabis became legal under Illinois state law effective January 1, 2020, the federal laws remain unchanged and do not permit the use, possession, distribution, or growing of cannabis on federally subsidized property.

c. In situations where there are allegations that a resident has violated applicable cannabis laws, or engaged in the use, possession, distribution, or growing of cannabis, the CHA will consider relevant facts on a case-by-case basis and mitigating circumstances that are presented. These mitigating circumstances include the time, nature and extent of the conduct; the relationship of the conduct to the disability of a family member; its impact on others; the impact of a proposed action on family members; the viability of limiting a negative action to certain users rather than entire families; and any factors that might indicate a reasonable probability of favorable future conduct of the resident, including rehabilitation.

## 18-IV.I. Medical Cannabis Policy

a. Any current resident known to be involved in drug-related criminal activity, including the use and/or possession of medical cannabis, will be given the same notice and rights as for any other cause for termination under the Program.

b. The CHA may not make any distinction between the use and/or possession of medical cannabis and any other drug-related criminal activity. As the recipient of federal funding, the CHA must adhere to the laws of the federal government and may not allow for the use and/or possession of a controlled substance, including cannabis prescribed for medicinal purposes.

c. The CHA retains its discretion with respect to evicting or refraining from evicting current residents on account of their use of medical cannabis.

d. The CHA may not permit the use of medical cannabis as a reasonable accommodation.

## 18-IV.G. Lease Renewal

Upon the resident's lease expiration, all RAD PBV leases will be renewed unless good cause exists. Good cause may include grounds for lease termination, income ineligibility, or other non-compliance factors. Good cause will be determined by the CHA.

## 18-IV.H. Transfer Policy

The CHA's Transfer Policy outlines the types of transfers administered by the CHA, which transfers are mandatory and which are optional, as well as the eligibility requirements for transfers. CHA's Emergency and Mandatory transfer types have priority over new admissions from a CHA waitlist.

1. Transfers will be made without regard to race, color, sex, age (when age eligibility is not a factor), familial status, disability, national origin, ancestry, sexual orientation (including gender identity) ,



Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan

marital status, housing status, order of protection status, military discharge status or source of income. Residents may be transferred to accommodate a disability.

2. Residents who request a transfer will receive only one unit offer; however, multiple unit offers may be made to satisfy a reasonable accommodation request.

   a. For emergency and mandatory administrative transfers, refusal of a unit offer without good cause may result in lease termination, except in the case of Victim Assistance Program (VAP) Fair  or VAWA emergency transfers.

   b. For voluntary, senior housing transfers, refusal of a unit offer with or without good cause will result in the removal of the household from the transfer waitlist. 24 CFR § 1.4 (B)(2)(ii).

3. RAD PBV residents that reside in properties that were previously public housing, including traditional senior buildings; public housing units within mixed-income developments; and legacy public housing sites such as Horner, Lathrop and Ickes that have transitioned to RAD Project-Based Voucher units  will be transferred to the next available unit that satisfies their requirements if approved for a transfer. Available units may include other RAD PBV units or any public housing units pending availability. If neither RAD PBV or public housing is available for the approved transfer, a resident may be offered a tenant-based voucher to satisfy the transfer depending on availability and need.

4. RAD PBV residents that reside in new PBV properties (e.g. those projects that are not considered legacy public housing properties, including properties using RAD Transfer of Assistance) will be transferred to other available Project-Based Voucher units in accordance with Chapter 17 (17-VII.B. Moves). The CHA will offer the family the following types of continued assistance in the following order, based on the availability of units:

   a. PBV assistance in the same building or property;

   b. PBV assistance in another property; or

   c. Tenant-based voucher assistance.

5. The CHA may revise the transfer categories below to create and implement special programs and/or incentives for the benefit of public housing and/or RAD PBV residents.

6. CHA's Victim Assistance Program Transfer Plan document is CHA's effective policy for executing VAP Mandatory Administrative Transfers or VAWA Emergency Transfers.

7. Unit transfer offers include any senior or family sites including traditional family, mixed-income, and Rental Assistance Demonstration (RAD PBV) properties. CHA will follow the policies outlined below in transferring residents unless otherwise directed by court orders or consent decrees.

## 18-IV.I. Transfer Categories

Transfers will be assigned to the appropriate categories on the transfer waitlist. The CHA has the discretion to make transfers based on the Authority's needs; therefore, residents may be offered a transfer out of transfer category sequence order and/or out of date order. The transfer categories are as follows:

1. <u>Emergency Transfers:</u> A mandatory transfer upon determination by the property manager, the CHA, or determined in a legal proceeding that unit or building conditions or VAWA pose an immediate threat to resident life, health, or safety.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



    a.   Prior written notice to the resident is not required for an emergency transfer;

    b.   Emergency conditions that occur due to abuse or neglect to a unit by the resident will be grounds for emergency transfers; however, the responsible resident will be charged for the damages caused to the unit and/or may have their lease terminated;[14] and

    c.   Refusal to accept an emergency transfer is grounds for lease termination and eviction.
       **.i.** Refusal of a unit in the case of VAP or VAWA related transfers is not grounds for termination or eviction.

    d.   CHA has discretion whether to return the resident to the original unit once the emergency is resolved.

2.   <u>Transfers under the RRC or Post 10/1/99 RRC</u>, which include:

    a.   Transfers out of housing to be demolished, rehabilitated, or revitalized;

    b.   Transfers back into housing that has been rehabilitated or revitalized;

    c.   CHA-initiated split family transfers for relocating families; or

    d.   One time transfers out of mixed-income/mixed-finance housing into a CHA unit where the resident meets the site-specific requirements. This section is not applicable to residents receiving a Voluntary Incentive Transfer to a mixed-income/mixed-finance community.

       i.   Households that accepted final replacement housing in mixed-income/mixed-finance housing must meet additional site-specific requirements established in the redevelopment agreement or Tenant Selection Plan (TSP) for the property

3.   <u>Mandatory Administrative Transfers</u>: Some examples include, but are not limited to:

    a.   A transfer to move residents with disabilities to accessible units or units with features that accommodate their disabilities. **24 CFR § 8.27(a)(1)**.

    b.   A transfer requested by a resident and approved by the CHA to resolve problems of a life-threatening nature that are not related to unit or building conditions, and not covered under VAWA (see Emergency Transfers) where documented situations of non-random violence that put a resident's life in danger have occurred. These transfers are dealt with expeditiously and without consideration of lease compliance until the family is transferred.

    c.   A transfer to move residents not requiring the accessibility features of their current unit so that the unit may be occupied by a qualified applicant or resident with a disability requiring the accessibility features of the unit. **24 CFR § 8.27(b)**.

    d.   A transfer to move residents with disabilities who, through third-party certification, have a verified need for a reasonable accommodation in the form of a transfer. Property Managers that have transfer requests of this nature must notify the CHA. A recommendation to approve the transfer request must be issued by the Property Asset Management (PAM) Department before the transfer is conducted. Examples of such transfers may include, but are not limited to:

       i.   Transfers to a unit which provides an extra bedroom for a live-in aide, large medical equipment, a separate room for a family member needing extra space for a verified medical need (e.g., a child who may have loud, disruptive/violent outbursts), etc.;

       ii.   Transfers to a unit located on the first floor of a development;

       iii.   Transfers to a unit without mobility barriers, such as stairs, carpeting, etc.; and

       iv.   Transfers to units with sensory equipment.

    e.   Transfers to permit unit modernization other than those covered by the RRC or the Post 10/1/99

---

[14] A resident may challenge any charges for damages in accordance with the ***CHA Grievance Procedure for the RAD PBV Program***.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



RRC[15].

f.  Transfers initiated by the CHA for families who are over housed (living in a bedroom size too large) in accordance with the Part III.J - Occupancy Guidelines and transfers initiated by the CHA for families who are overcrowded (living in a bedroom size too small) in accordance with the Occupancy Guidelines[16].

    i.  When a head of a household, originally housed in a bedroom by themself, gives birth or adopts a child, the family will not be considered overcrowded for this transfer type until the child is two years old.

    ii.  Families who have received transfers to replacement housing under the RRC or Post RRC 10/1/99 RRC are subject to additional moves required to comply with over-housed, under-housed, and other mandatory or emergency transfers.

g.  Transfers for non-elderly residents after the death or departure of the elderly family's head of household, co-head, or spouse. This transfer is mandatory for residents who were not in residency at senior designated housing on the date of the FY2005 designation. Non-elderly family members that were in residency at senior designated housing on the date of the FY2005 designation[17] have a right to remain in the unit as a remaining family member.

h.  Mandatory transfers for non-elderly remaining family members living in senior designated housing who add a non-elderly person to the household. These transfers are only applicable to non-elderly remaining family members who were residing in senior designated housing on the date of the FY2005 designation, and remained in the unit after the death or departure of the elderly family's head of household, co-head, or spouse.

i.  Transfers based on extenuating circumstances.

j.  Transfers of participants in the Choose to Own homeownership program who have completed the requirements for homeownership and have purchased a home. These households will be transferred to the Housing Choice Voucher program to use their subsidy toward their mortgage. These transfers do not apply to households who do not meet the income requirements to receive a Housing Choice Voucher.

k.  After one year of residency within a RAD PBV property, beginning 365 days after the date of RAD transaction closing (the effective date of the HAP contract) residents may request a tenant-based voucher. **Residents must be lease compliant and in good standing with CHA in accordance with** Section 18-V.K.- Residents in Good Standing **in order to be approved for the voucher transfer list**. If no vouchers are available at the time of the request, eligible households who complete a transfer request will be placed on a tenant-based voucher transfer wait list and will be processed in order of priority detailed herein. Once a family is screened for applicability and suitability for the HCV program, they will be will be removed from the transfer list and may be afforded the opportunity to re-apply in the event the transfer is not completed due to ineligibility or other reasons.

    Similar to the policy for other PBV properties, households within RAD PBV properties requesting the tenant-based voucher have priority for issuance and will be offered a voucher based on the number of turnover vouchers available. CHA will cap the number of turnover vouchers available for these transfers to no more than 75 % of the total number of turnover vouchers in any single year as allowed by HUD regulations.

---

[15] For example, rehabilitation that takes place after the completion of the Plan for Transformation.

[16] The date of the FY2005 designation is March 14, 2005.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



2. <u>Transfers between Programs</u>:
  a. Transfers of public housing residents prior to RAD conversion. For residents seeking to remain in public housing in lieu of becoming participants in the Project-Based Voucher program, CHA will offer the opportunity to move to other CHA-owned public housing properties, if available. Transfer requests may begin approximately 180 days before the prospective effective date of the HAP contract and end on the effective date of the HAP contract. Residents will be responsible for costs associated with this transfer.
  b. Transfers between those properties listed as Senior Designated Properties in the FY2010 Senior Designated Housing Plan and subsequent versions, regardless of its designation as a Public Housing property or a RAD PBV property.
  c. The CHA shall have the authority to authorize transfers between housing programs when processing mandatory administrative and emergency transfers.

    i. The CHA will first attempt to transfer a resident within their current program (e.g. Public housing to Public Housing). If the CHA cannot accommodate such a transfer within the same program, the CHA may authorize a transfer outside of the resident's current program.
    ii. The CHA may authorize the mandatory administrative or emergency transfer of a resident to and from any of the following housing programs:
      a. Public Housing,
      b. RAD PBV, and
      c. PBRA.

  d. Residents are required to end participation in their current program and be processed as a new admission in the program to which they are transferring.
3. <u>Voluntary Administrative Transfers</u>:
  a. Senior designated Housing transfers are available to lease-compliant residents of senior buildings impacted by the FY2005 Senior Designated Housing Plan (SDHP) who wish to transfer from the senior designated housing property to a family property and who were in residency on the date of the FY2005 SDHP designation.
  b. Transfers available to elderly lease-compliant residents of family properties who wish to transfer to a senior designated housing property and who were in residency on the date of designation.

## 8-IV.J. Processing Transfers

1. The CHA maintains the transfer waitlist by category and processes these transfers for all properties.
2. Residents may request transfers from property managers with the necessary documentation to substantiate the need for the transfer. Property managers must submit a transfer request package to the CHA, justify the transfer and obtain final approval from the CHA before moving a family into a new unit.
3. In the case of split family transfers, property managers must submit the transfer request package to the CHA Office of the General Counsel for legal determination of split eligibility and rights under the RRC and/or Post 10/1/99 RRC, prior to submittal to the CHA Occupancy Department.
4. The CHA will run a credit check, when applicable, and a criminal check in all cases and credit check, on all adult household members age 18 and over. Applicants will have access to CHA will provide applicants with a copy of their criminal background check and an opportunity to participate in an individualized assessment before the CHA will consider approving or denying the applicant (per compliance with the Cook County Just Housing Amendment, see II.F.12.).The CHA will approve the resident's eligibility to transfer based on the documentation provided in the transfer request package and the results of the criminal and credit background check. CHA will provide information to all residents regarding how to obtain a free copy of their credit report. If the request is denied based on the criminal background information, the CHA will provide a copy of the criminal background

18-34

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



information used.

5. The CHA must approve all mandatory administrative transfers for reasonable accommodations.

6. Within each transfer category, applications will be listed by the date the transfer request package is received by the CHA.

7. With the exception of emergency transfers, a property manager cannot transfer a family until the CHA approves the transfer and informs the property manager that the family has reached the top of the transfer waitlist.

8. The CHA shall take into consideration issues of personal safety when transferring families to/from buildings. The family must provide documentation of domestic violence, sexual violence, dating violence, stalking, or hate crimes, and/or other situations of non-random violence that put a resident's life in danger when contesting transferring to/from a building or area of the city.

9. Transfers may be initiated by the CHA (e.g. moving a resident who does not need the features of an accessible unit to a non-accessible unit).

10. Unit offers for residents on the transfer waitlist:

    a. Residents who request a transfer will receive only one unit offer;
       i. For mandatory transfers, refusal of a unit offer without good cause will result in lease termination.
       ii. For voluntary transfers, refusal of a unit offer with or without good cause will result in the removal of the household from the transfer wait list. 24 CFR § 1.4 (B)(2)(ii).

**b.** Failing to respond to an outreach will result in the resident's name being removed from the waitlist.11. Residents will be notified of transfers as follows:

    a. For emergency transfers, there is no notice requirement.
    b. For RRC transfers and Post 10/1/99 RRC transfers, the property manager will provide notice as required under the RRC and the Post 10/1/99 RRC.
    c. Property managers may provide less than the 30 calendar days' notice for mandatory administrative transfers in which the resident is in danger from domestic violence, sexual violence, dating violence, stalking, or hate crimes, and/or other situations of non-random violence or some medical condition that is not life-threatening but may be exacerbated by their current unit or location.
    d. For all other transfers, the property manager will provide at least 30 calendar days' notice.

## 18-IV.K. Residents in Good Standing

1. For voluntary administrative, senior housing transfers (including RAD PBV to HCV transfers), residents are required to be in good standing.

2. The receiving property manager will screen the resident and household prior to move in. If the criminal and credit check run by the CHA is over 120 days old, the property manager must re-run both checks as part of the screening process. During screening, the receiving property manager will determine if the resident is in good standing and in compliance with the ***CHA Residential Lease Agreement for the RAD PBV Program***.

3. The CHA will make exceptions to these good standing requirements in the case of extenuating circumstances.[18]

4. The CHA will provide transfers for victims of domestic violence, sexual violence, dating violence, sexual assault stalking, or hate crimes, and/or other situations of non-random violence even if a resident is not in good standing; however, a new lease will not be executed until the resident resolves all issues related to non-compliance which are not related to the need for the victim assistance transfer.

---

[18] E.g. One person not in good standing who is living alone in a three bedroom unit and does not want to move to a smaller unit in accordance with the Occupancy Guidelines.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



5. Mandatory transfers do not stop the lease termination process.

## 18-IV.L. Cost of Transfers

1. The CHA will pay the costs associated with moving and transfer of utilities for most transfer types, except transfers where a resident elects to move with a tenant-based voucher or to other public housing due to RAD conversion activity. Additionally, the CHA will not pay the costs associated with moving and transfer of utilities for senior housing transfers.

2. Residents are solely responsible for all costs associated with resident-initiated transfers.

3. Transfers in connection with the RRC and Post 10/1/99 RRC will include moving expenses as defined under the RRC and Post 10/1/99 RRC.

## 18-IV.M. Security Deposits

1. If a resident transfers from one CHA unit to another unit within the same development (intra-development), a new lease will be executed for the dwelling into which the family moves and the security deposit will be moved over to the new unit.

2. If the resident transfers from one CHA development to a different development (inter-development) a new lease will be executed for the dwelling unit into which the family moves and the CHA will refund the resident's security deposit minus any damages assessed.

3. The resident will be responsible for paying a security deposit for the new dwelling unit equal to the original security deposit amount at the previous unit. If a security deposit was not collected on the previous unit a new security deposit equal to the minimum rent will be collected.

## 18-IV.N. Split Family Transfers Split family transfers will be processed in accordance with the policy outlined in this section below:

a. *Overcrowded families not covered by the RRC or Post 10/1/99 RRC:* If a family is overcrowded and the CHA does not have a unit large enough to house the entire household in accordance with the Occupancy Guidelines, and there are adult members in the household, the head of household must decide if all or part of the household will leave RAD PBV housing within 60 calendar days. The family members who leave the unit may apply to CHA's waitlists. The head of household's failure to decrease the household size within 60 calendar days is a serious lease violation, and the family is subject to lease termination and eviction.

b. Types of Split Family Transfers for Relocating Families:
   This section applies to families covered by the RRC or Post 10/1/99 RRC whose right of return or preference for return has not been satisfied.

   i. CHA-initiated split family transfers for relocating families: The CHA may make a onetime split family transfer when it is evident that the CHA is unable to house the entire family in one unit and must offer two units. The original and splitting family retain their right of return under the RRC or preference for return under the Post 10/1/99 RRC. The splitting family is given the option of a public housing unit or an HCV.

   ii. Resident-requested split family transfers for relocating families: Families in the process of being relocated under the RRC or the Post 10/1/99 RRC may request a split family transfer. This type of request is granted at the discretion of the CHA. If granted, the CHA will offer the splitting family an HCV rather than a CHA housing unit. The splitting family does not retain any right of return under the RRC or preference for return under the Post 10/1/99 RRC that they may have possessed prior to the split. The original family retains its right of return.

   iii. Splitting families of a 10/1/99 household who are approved for a split with a right of return will not be offered CHA replacement housing until the CHA has offered units to residents in Priorities One through Eight, pursuant to the RRC. Post 10/1/99 splitting families who are approved for a split with a preference for return will not receive an offer of replacement housing until the CHA has offered units to residents in Priority One through Eleven of the RRC.



c. The presence of an additional adult family member, with or without children, does not automatically qualify a family for a split family transfer.

d. For all types of splits, the head of the splitting family must be a member of the original family's household for at least three consecutive years before the split family transfer can be initiated.

e. The head of household and all members, age 18 years and over, of the splitting family must pass applicant screening.

f. Split families with a right of return will be transferred, whenever possible, within the same development.
If that is not possible, an attempt will be made to transfer them within the same neighborhood or geographic region of the city, in which they reside.

g. The original family must be lease compliant in order to qualify for a split family transfer. If the original family violates the lease after the family requested a split and the family member requesting to split was not involved in the lease violation and meets all other requirements to split, the split will continue to be processed.

h. The CHA will only supply one subsidy per household. Split family transfers will not be allowed to separate co-heads of household or spouses. If a court determines the disposition of property between the head and co-head of household in a divorce or separation under a settlement or judicial decree, the CHA will follow the court's determination of which family member continues to receive assistance. In cases where there is no court determination, the original head of household will retain use of the unit.

## 18-IV.O. Temporary Relocation and Right to Return to a RAD PBV property

1. Unless not lease compliant, residents are not required to move permanently under the RAD PBV program.

2. In the event of construction or rehabilitation activity at RAD PBV properties that require residents to be temporarily relocated, residents will have the right to return to a RAD-assisted unit once construction is complete. The right to return will remain in the event of a transfer of RAD assistance. The CHA will comply with all RAD PBV relocation provisions as applicable.

3. The CHA may offer residents an opportunity to permanently relocate before or during construction. If a resident accepts the CHA's offer to move permanently, the resident waives their right to return to a RAD-assisted unit after construction is completed.

## Part V: Rent and Income Provisions

## 18-V.A. Re-examinations of Income and Family Circumstances

1. After initial occupancy, the CHA must re-examine a family's eligibility for continued occupancy. Residents must provide documentation of family composition, income, and assets. At the time of re-examination, income, employment, allowances, Social Security numbers, and any additional data deemed necessary will be verified. Verified information will be analyzed and a determination made with respect to the eligibility of the household for continued occupancy; the eligibility of an individual as a remaining family member; the appropriate unit size for the family; and the amount of rent the family should pay.

2. Residents occupying CHA housing at the time of the initial RAD transition will not be subject to rescreening solely due to the conversion. Conditions existing at the time of the RAD transition will be grandfathered until the next regularly scheduled re-examination.

3. If a family's TTP has risen to a level that is equal or greater than the gross rent for a given RAD PBV unit and remains there for 180 consecutive calendar days, the family's assistance terminates automatically. Upon termination, the tenant rent paid will be the lesser of 1) the family's TTP or 2) any applicable maximum rent under LIHTC regulations. It is the family's responsibility to report any

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



changes in circumstances that would cause the assistance to rise above zero before the expiration of the 180 day period.

For pre-conversion families residing in properties that were previously public housing, including traditional senior buildings; public housing units within mixed-income developments; and legacy public housing sites such as Horner, Lathrop and that have transitioned to Project-Based Voucher units under RAD, assistance is recoverable and will be restored when the family's TTP falls below the gross rent. This exception is granted once; afterwards, normal PBV regulations shall apply.

## 18-V.B. Eligibility for Continued Occupancy

1. Residents must meet the following criteria to be eligible for continued occupancy:

    a. Qualify as a family as defined in the Glossary of Terms of this policy;

    b. Maintain full compliance with the resident obligations and responsibilities as described in the ***CHA Residential Lease Agreement for the RAD PBV Program***.

    c. Have Social Security numbers for each family member or have signed certifications under penalties of perjury for any family member who indicates they do not have a Social Security number; 24 **CFR § 5.216**. Leaseholders who are 62 years of age or older, and had not previously disclosed a valid SSN as of January 31, 2010 are exempt. This exemption continues even if the individual moves to a new assisted unit.

    d. Meet HUD standards for citizenship or eligible immigration status or are paying a pro-rated rent; **24 CFR § 5.500**.

    e. Maintain compliance with or provide documentation of exemption from the CHA Work Requirement (Section V.P) or Community Service Requirements/Economic Independence Programs, (Section IV.J.); and

    f. Not be Over Income Limit

    g. Continue to otherwise meet eligibility requirements for the housing program and any site-specific eligibility requirements.

2. All adult household members, including live-in aides, must pass a criminal background check. If any adult member of the household fails to pass the criminal background check during re-examination, the CHA may begin lease termination against the entire household. The CHA shall provide the resident with a copy of the background information used to make the determination to terminate the lease.

3. All children, in the household between the ages of 6 and 17, are required to attend school on a regular basis, in accordance with local school board policies and state law. Residents shall provide the CHA with releases and authority so that the CHA can inquire into the attendance of any school aged child between the ages of 6 and 17.

4. Residents may be required to prove through documentation that children age 13 and under participate in daycare, after school programs, or are otherwise adequately supervised when school is not in session.

5. A resident must continue to demonstrate suitability based on satisfactory behavior as a renter including but not limited to: housekeeping performance; good payment records for rent; other charges and utilities; satisfactory record of lease compliance; and an acceptable criminal background record as a law-abiding member of society. Residents found to be ineligible during re-examination will be subject to lease termination.

Effective August 1, 2024



6. If any adult member of the household fails to pass the criminal background check during re-examination, the CHA may begin lease termination against the entire household. Residents will have access to a copy of their criminal background check and an opportunity to participate in an individualized assessment before the CHA will consider lease termination (per compliance with the Cook County Just Housing Amendment, see II.F.12.).

## 18-V.C. Re-Examinations

The CHA will ensure that the regular re-examination for each family is completed as follows:

| Frequency | Population |
|---|---|
| Annual (every year) | Families participating in the Homeownership Program or receiving zero income |
| Biennial (every two years) | Families with an income-based & Families participating in the LevelUp (CHA's FSS program) |
| Triennial (every three years) | Families where all members are either elderly and/or disabled (with fixed incomes) |

1. During the regularly scheduled reexamination, CHA will offer residents the opportunity to decide whether to pay income-based rent or the flat rent applicable to the dwelling unit they will occupy.
   a. The CHA will re-examine the family composition and income of all resident families.
   b. Families paying income-based rent or participating in the LevelUp Program shall have their incomes re-examined every two years.
2. The re-examination process shall begin 120 days prior to the expiration of the lease. In the case of a resident transfer, the anniversary date (lease date) for the resident becomes the first day of the month after the transfer.
   a. Re-examination must be completed before the expiration of the lease. The resident may be terminated for failure to comply with re-examination notices. If the resident comes in for re-examination once termination has started, the termination process will continue until the re-examination is complete.
3. The resident shall sign a personal declaration form to certify the validity and completeness of the documents provided during the re-examination process. All members, age 18 and over, of the resident household must sign all consent forms that authorize the CHA to make necessary inquiries into the resident and household members' behavior or background as it relates to lease compliance. This includes obtaining arrest and eviction information to determine a pattern of behavior and the likelihood of lease compliance. Failure to sign all consent forms, including HUD Form 9886 and the CHA Authorization and Consent Release Form, will result in the resident's lease termination.
4. All information in a resident file must be verified. As part of the verification process, all adult members of the resident's household must: (1) sign all consent/release forms, including HUD Form 9886; (2) complete all relevant paperwork; and (3) return all documentation required to complete the verification process. Verifications are considered in a hierarchy:
   a. UIV/EIV (for income-related matters);
   b. Third-party written verification (tenant provided documentation);
   c. Third-party verification form;
   d. Third-party oral verification; and
   e. Resident Self-Certification.
5. The CHA or property manager shall document the steps taken to obtain information through the verification process before proceeding to next level of the hierarchy.
6. When it is not possible to estimate family income accurately at re-examination, a temporary determination will be made.
7. Streamlined income determinations may be conducted for any member of a household with a fixed

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



source of income. If a resident has both fixed- and non-fixed sources of income, the non-fixed income will remain subject to third-party verification.

    a. Fixed-income includes income from:

        i. Social Security payments, to include Supplemental Security Income (SSI) and Supplemental Security Disability Insurance (SSDI);

        ii. Federal, state, local, and private pension plans; and

        iii. Other periodic payments received from annuities, insurance policies, retirement funds, disability or death benefits, and other similar types of periodic payments.

    b. The streamlined income determination will be made by applying a verified a cost of living adjustment (COLA) or current rate of interest to the previously verified or adjusted income amount.

8. Zero Income Family Certification: Unless the family has income that is excluded for rent computation, families reporting zero income will have their circumstances examined every 180 calendar days until they have a stable income. A monetary or non-monetary contribution from persons not residing in the dwelling unit for any purpose other than the payment or reimbursement of medical expenses shall be considered income. **24 CFR § 5.609**.

9. If the CHA is in the process of terminating the lease of a resident when the resident is scheduled for re-examination, the re-examination will be completed, but a new lease will not be executed.

    a. If the CHA prevails in the lease termination action, a new lease will not be executed and the resident will be evicted.

    b. If the resident prevails in the lease termination action, a new lease will be executed.

10. If any adult member of the household fails to pass the background check during re-examination, the CHA will begin lease termination. If the resident prevails in the lease termination action and there has been no recent criminal activity, a new lease will be executed.

11. At any time a resident may request an interim re-examination, and the CHA shall provide one. An interim re-examination shall be conducted whenever there is a change in family composition .

12. CHA may not rent a dwelling unit to families, or assist families with, net family assets exceeding $100,000 annually (adjusted for inflation) or an ownership interest in property that is suitable for occupancy. This restriction does not apply to victims of domestic violence, individuals using housing assistance for homeownership opportunities, families offering properties for sale or families whose properties do not meet the disability-related needs for all members of the family.

## 18-V.D. Action Following Re-examination

1. Failure to complete re-examination is a serious lease violation and grounds for lease termination.

2. If a change in the unit size is required, the resident will be placed on a transfer waitlist in accordance with the transfer criteria described in this policy and moved to an appropriate unit when one becomes available. Failure by a resident to comply with a mandatory administrative transfer is cause for lease termination.

3. If there is any change in rent, the lease will be amended during the interim re-examination or a new lease will be executed during the annual re-examination, and a Notice of Rent Adjustment will be issued prior to the effective date of the rent adjustment. The Notice of Rent Adjustment will include the current rent, the new rent, the date when the new rent takes effect, the reason for the rent adjustment, and information regarding the resident's right to request an informal hearing if he/she disagrees with the new rent.

4. Residents transitioning from flat rent to income-based rent that experience a monthly increase in rent of more than 10 percent or $25 (whichever is greater) solely due to the RAD transition will have rent increases phased in over a five year period. Rent adjustments under the five-year phase-in schedule will apply to the Total Tenant Payment (TTP) at a rate of 20 percent per year, and will occur at annual or interim re-examinations.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



## 18-V.E. Unit Maintenance and Inspections

1. Residents are responsible for maintaining their unit in a safe, decent and habitable condition. Housekeeping, cleaning, and/or maintenance of resident's assigned areas (e.g. yards, porches, etc.) are also the responsibility of the resident and their household.

2. Property management will conduct inspections to ensure that residents are maintaining their units and assigned areas in safe and sanitary conditions. Residents will not be held responsible for normal wear and tear.

3. Annual inspections will be conducted for all units. The Uniform Physical Condition Standards (UPCS) and protocols will be used for CHA-owned properites and the HQS (or any other new inspection standards) standards and protocols will be used for third party owned properties. Residents will be notified at least 48 hours in advance. The CHA shall inspect the condition of the dwelling unit, the equipment within, and any areas assigned to the resident for upkeep. The CHA will use all inspections to assess the resident's compliance with housekeeping standards and overall care of the dwelling unit and equipment in accordance with the Lease. The CHA will provide the resident with a written statement regarding dwelling unit conditions, and the CHA shall request work orders for all items found to be in disrepair.

4. If the CHA detects any housekeeping problems, the CHA will notify the resident in writing of the housekeeping violations, identify the measures and time period necessary to cure the unsatisfactory conditions, and conduct an interim inspection.

   a. The CHA reserves the right to document all inspections and observed deficiencies.

   b. Any resident found to be in violation of CHA or property management housekeeping standards will be required to complete the home maintenance/housekeeping orientation again.

   c. In addition to repeating the home maintenance/housekeeping orientation, residents will be fined in accordance with the charge sheet for repairs and maintenance.

   d. Residents, including those with live-in aides, are responsible for housekeeping and/or maintenance upkeep. If such a resident is non-compliant, the CHA reserves the right to proceed with a through c above if unsatisfactory conditions are not cured.

5. The CHA will give the resident 30 calendar days to cure housekeeping violations. The CHA will conduct an interim inspection at the end of the 30-day cure period as a follow up to any housekeeping violations found during the annual inspection and to measure corrections to any identified unsatisfactory conditions and progress toward resolution of the problem. If the housekeeping violation has not been resolved at the end of the 30 calendar days or the established cure time period, the CHA may proceed with lease termination.

6. Property management may conduct additional, more frequent housekeeping inspections of residents with histories of poor housekeeping. Residents will receive at least 48 hours' notice that such inspection will take place.

7. Property management may conduct inspections of units where an extra bedroom has been granted to reasonably accommodate a resident or family member's verifiable disability. Management will inspect to see that the extra rooms are being utilized in accordance with the documented reason for the accommodation (e.g. a live-in aide, large hospital bed, breathing apparatus, mobility aides, etc. are housed within the room). If the extra bedroom is not being used in accordance with the documented reason for the accommodation, the resident may be subjected to lease termination.

## 18-V.F. Effective Date of Rent Adjustments

1. Timely Reporting (Within 10 calendar days of the occurrence):

   a. Decreases in rent - First day of the month after the decrease in income is first reported to the

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



property manager. Income decreases reported or verified after the tenant accounting cut-off date will be effective the first of the second month with a credit retroactive to the first month.

b.   Increases in rent not due to misrepresentation or omission: the CHA is not required to process increases in rent related to increases in income until the next regularly scheduled re-examination. Increases in income are not subject to reporting requirement within 10 calendar days of the occurrence, unless the resident previously underwent a interim reexamination where rent was decreased during the same certification period.
If the family has reported a change in family income or composition in a timely manner according to policy, they will be given 30 days advanced notice of any rent increases, and such rent increases will be effective the first day of the month beginning after the end of that 30 day period.

2.   Late Reporting (After 10 calendar days of the occurrence):

a.   Decreases in rent - The household is not entitled to a rent credit for any prior monthly rent before the decrease in income is reported to the property manager.

b.   Increases in rent : increases in income are only required to be reported at time of next regularly scheduled re-examination. Increases in income are not subject to reporting requirement within 10 calendar days of the occurrence. The household will receive a charge for the prior months that were affected by the increase and not timely reported at last regularly scheduled re-examination. The rent increase should be manually calculated starting from the first day of the second month following the re-examination date at which the increase in income should have been reported. All prior charges are posted manually on the tenant ledger.

3.   A misrepresentation or omission may be grounds for lease termination and eviction.

## 18-V.G. Remaining Family Members

1.   If the head of household dies or leaves the unit without housing subsidy assistance (e.g. institutionalization, forming a new household in unsubsidized housing and given their RRC or Post 10/1/99 RRC rights to the remaining family members, etc.), continued occupancy by remaining family members may be permitted only if:
    a.   The family reports the death or departure of the head of household within 30 calendar days of the occurrence;
    b.   The family member requesting to become the new head of household is age 18 years or older, has lived in the unit as an authorized family member on the Lease for a minimum of three consecutive years (36 months), has not had any unauthorized extended absences. There are no rent and/or criminal activity violations and passes applicant screening; and
    c.   The new CHA-approved head of household signs a new lease.
2.   The new head of household will be held responsible for rent arrearages, unless the arrearage occurred before the new head of household turned age 18.
3.   At CHA's sole discretion, in senior designated housing only, exceptions may be made in instances where there is an elderly remaining family member who has not resided in the unit for at least three consecutive years (36 months).
4.   Household members (live-in aides, live-in aides' family members, foster children, and foster adults) do not have rights as remaining family members to become the head of household. If no authorized remaining family members are eligible to assume the head of household role, the household members must vacate the unit within 30 calendar days. Live–in aides do not have any continued occupancy rights if the person who they cared for died or left the unit, even if the live-in aide was a family member prior to becoming a live-in aide. If a Live-in aide or foster adult is allowed to bring additional household members with them to the unit (i.e. spouse, partner, children), such persons similarly do not have

18-42



rights as remaining family members to become head of household or obtain any public housing and/or RAD PBV program benefits.

5. Remaining family members, who are non-elderly and were residing in senior designated housing properties on the date of the FY2005 designation, may continue to remain in their unit if the elderly family's head of household, co-head of household, or spouse passes away. If he/she wishes to add a non-elderly person to the household or upon request, the CHA will transfer the non-elderly remaining family member to a family property.

6. When a head of household leaves a household with children or adults with a disability who cannot assume the role of the head of household, and there is no remaining family member to assume the head of household role, the lease will be terminated. Subject to program eligibility and voucher availability, the CHA may offer either a HCV, a public housing or RAD PBV unit to a permanent legal custodial guardian.

   a. The permanent legal custodial guardian will be required to document that he/she has been awarded permanent legal custodial guardianship.

   b. The permanent legal custodial guardian may be held responsible for rent arrearages incurred by the former head of household and/or co-head of household on a case by case determination.

## 18-V.H. Community Service and Economic Independence Requirement

1. The CHA works to assist residents in moving toward economic independence. In support of this goal, the CHA requires that all residents and adult authorized members of the household who are not exempt from the CHA Work Requirement perform eight hours per month of community service or participate eight hours a month in an economic independence program. The requirement can also be met by a combination of eight hours of community service and participation in an economic independence program. This requirement is known as the Community Service and Economic Independence Requirement.

2. Residents and adult authorized members of the household up to 54 years of age who are in compliance with the CHA Work Requirement, are in compliance with the Community Service and Economic Independence Requirement. Residents and adult authorized members of the household deemed eligible for Safe Harbor within the CHA Work Requirement (Section VIII) must satisfy the Community Service/Economic Independence Policy.

   a. Residents and adult authorized members of the household 55 to 61 years of age who are exempt from CHA's work requirement are NOT exempt from the Community Service and Economic Independence Requirement.

3. At least eight hours of activity must be performed each month. An individual should not skip a month and then double up the following month, unless special circumstances warrant special consideration.

4. A total of 96 hours per year is required by each non-exempt resident and adult authorized member of the resident's household.

5. Compliance with community service activities is monitored on an annual basis. If a resident fails to comply with their responsibilities, the property manager will begin lease termination.

6. Types of Service

   a. Community Service includes, but is not limited to, volunteer work:

      i. At a local institution such as a school, community center, hospital, nursing home, homeless shelter, foodbank hospice, etc.;

      ii. With a non-profit organization, such as the Boy Scouts, Girl Scouts, Boys or Girls Club, Big Brothers or Big Sisters etc.;

      iii. With a community arts program involving performing arts, fine arts, visual arts, etc.;

      iv. With any program funded under the Older Americans Act;

      v. With service programs sponsored by churches, which do not involve religious education, recruitment or the practice of religion;

      vi. At a CHA property to help with children or senior programs;

18-43



       vii.  Through the Local Advisory Council (LAC) to help residents, serving as an officer in a LAC, or serving on the Central Advisory Council (CAC) or Resident Advisory Board; and

      viii.  Care for the children of other residents, so that they may fulfill their CHA Work Requirement or Community Service Requirement.

  b.  Political activities are excluded from community service.

  c.  Volunteer work activity does not involve payment to the participant and must not take the place of work performed by paid employees.

  d.  Economic Independence activities are programs and classes that work toward economic and social independence. Such activities include, but are not limited to:

      i.  Job readiness, job training, or skills training programs;

      ii.  Higher education (junior college or college), vocational education, or GED classes;

      iii.  Verifiable job search activities or apprenticeship programs;

      iv.  Substance abuse or mental health counseling;

      v.  English proficiency or literacy (reading) classes;

      vi.  Parenting classes or budgeting and credit counseling; and

      vii.  Activities required by the Department of Public Assistance as part of welfare reform.

  e.  The economic independence hours will count toward the eight hour per month requirement, and will only count hours when a non-exempt adult is actually attending class or engaged in job training. The required hours will not include time in transit.

7.  Community service and economic independence activities can be performed within or outside the neighborhood.

8.  A resident or adult authorized member of the household is exempt from the Community Service and Economic Independence Requirement when such member:

  a.  Is 62 years of age or older;

  b.  Is blind or disabled as defined under 216(i)(1) or 1614 of the Social Security Act (42 USC 416(i)(1)) and certifies that he/she is unable to comply with the requirement;

  c.  Is verified to be the fulltime caretaker of a disabled person as defined above;

  d.  Is retired (retirement is not age based) and receives a pension;

  e.  Is enrolled as a full-time student at a secondary school, accredited college, university, apprenticeship program, or trade school;

  f.  Is engaged in work activities;

  g.  Meets the requirements for being exempted from engaging in a work activity under the State Program funded under part A of title IV of the Social Security Act (42 USC 01 et seq.) or under any other welfare program of the State of Illinois, including a State-administered welfare-to-work program; or

  h.  Is a member of a family receiving assistance, benefits or services under a State program funded under part A of title IV of the Social Security Act (42 USC 601 et seq.) or under any other welfare program of the State of Illinois, including a State-administered welfare-to-work program, and has not been found by the State or other administering entity to be in noncompliance with such a program.

9.  Family Obligations

  a.  At lease execution or re-examination after the effective date of this policy, all residents and adult authorized members of the household, age 18 and over, must:

      i.  Provide documentation that they are exempt from the Community Service and Economic Independence Requirement if they qualify for an exemption; and

      ii.  Sign a certification that they have received and read this policy and understand that if they are not exempt, failure to comply with the Community Service and Economic Independence Requirement is grounds for non-renewal of the lease.

  b.  Non-exempt residents, who are exempted from paying the minimum rent, must present a completed documentation form, provided by the CHA, of activities performed over the previous

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



90 days to the property manager during their quarterly re-examination.

c. At each re-examination, non-exempt residents and adult authorized members of the household must present a completed documentation form of activities performed over the previous 12 months. The forms will include places for signatures of supervisors, instructors, or counselors certifying to the number of hours contributed each month.

d. Change in exempt status:

   i. If, during the 12 month period, a non-exempt resident or adult authorized member of the household becomes exempt, it is their responsibility to report this to the property manager and provide documentation of the qualifying exemption.

   ii. If, during the 12 month period, an exempt resident or adult authorized member of the household becomes non-exempt, it is their responsibility to report this to the property manager.

10. Non-Compliance of a Non-Exempt Family Member

a. If during re-examination, the property manager determines a non-exempt resident or adult authorized member's failure to either report or complete the required Community Service and Economic Independence Requirement, the property manager shall send a Notice of Lease Violation to the head of household that describes the non-compliance and indicates that the CHA will not renew the lease at the end of the 12-month lease term, unless the head of household and any other non-compliant adult enter into a written agreement (Lease Addendum Agreement) at their re-examination with the CHA to cure the non-compliance issue or the family provides written assurance satisfactory to the CHA that the non-compliant adult is no longer residing in the unit. The notice shall also provide that the resident may grieve the determination of non-compliance pursuant to the ***CHA Grievance Procedure for the RAD PBV Program*** or exercise any judicial remedy to timely address the non-renewal of the lease.

b. If, at the re-examination, the resident remains non-lease compliant due to violation of the requirements:

   i. The property manager will notify the resident that he/she has been deemed non-compliant due to the failure to comply with Section 22 of the Lease.

   ii. The property manager shall issue the resident the Non-Lease Compliant Notice and request that the head of household sign the Lease Addendum Agreement stating that the resident agrees to make up the missing hours.

   iii. In conjunction with the issuance of the Non-Lease Compliant Notice and the Lease Addendum Agreement, the property manager reserves the right to serve a Notice of Intent to Not Renew the Lease.

   iv. If the resident refuses to sign the Lease Addendum Agreement, he/she will not be allowed to sign any of the paperwork included in the lease renewal packet, and the property manager shall serve a Notice of Intent to Not Renew the Lease. If the adult authorized member fails to either report or complete the required Community Service and Economic Independence Requirement, the head of household will be notified and both parties shall be required to sign the Lease Addendum Agreement stating that the adult authorized member will make up the missing hours. If the adult authorized member refuses to sign or make up the hours, the family will be deemed non-lease compliant unless the family provides written assurance satisfactory to the CHA and the non-compliant adult is no longer residing in the unit.

c. Pursuant to the written Lease Addendum Agreement, the non-exempt adult will be granted one year to make up any lost hours while simultaneously completing their current requirements of 96 hours a year.

d. If the property manager verifies that the lost hours were not made up, the property manager will serve the head of household with a Notice to Vacate the Property within 30 days and initiate the eviction process.

11. The head of household may use the ***CHA Grievance Procedure for the RAD PBV Program*** to contest the determination whether or not to grant an exemption and/or the decision to initiate the lease

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



termination.

## 18-V.I. Other Resident Opportunities

1. LevelUp (CHA's FSS program) Program

    a. Eligible families may participate in the LevelUp program, which enables families to increase their earned income and reduce their dependency on welfare assistance and rental subsidies. See CHA's Family Self-Sufficiency Action Plan.

2. Choose to Own Homeownership Program

    a. Eligible families may participate in the Choose to Own homeownership program, which assists a family residing in a home purchased and owned by one or more members of the family. See section V.B.3. on voluntary transfers and CHA's Housing Choice Voucher Administration Plan, Chapter 15, part VI.

## 18-V.J. Over Income Residents

1. To be eligible for continued occupancy in the Public Housing Program, family's total income may not exceed 120% of the Area Median Income.

    a. When a family's income is over 120% of the AMI ("over income") for 24 consecutive months, households will have their lease terminated with the Public Housing Program.

    b. The CHA will provide the Over-income Family three written noticed during their 24-month grace period.

    i. First written notice will be delivered within 30 days of the annual or interim reexamination that a household's income exceeding 120% of AMI is initially determined.

    ii. Second written notice will be delivered within 30 days of the subsequent, required interim reexamination twelve months after the initial determination if family income remains above 120% of AMI.

    iii. Third and final written noticed that states the households lease will be terminated by CHA within six months will be delivered within 30 days of the third annual reexamination, if Over-income Family remains above 120% of AMI 24 consecutive months after initial determination.

2. If the family's income falls below the over income limit at any time during the allotted grace period, the tracking period will end. If at any time the family's income exceeds the over income limit in the future, they are entitled to a new grace period.

3. Households participating in LevelUp (CHA's FSS program) are not exempt from over-income policies.

4. CHA will update the 120% AMI limit annually within 60 days of HUD publishing Income Limits for a given year.

## 18-V.K. Interim Adjustments for Rent & Family Composition

1. If there are any changes in a family's income or household composition between regularly scheduled re-examinations, an interim re-examination may be conducted. At any time, a resident may request an interim re-examination, and the CHA will grant it. If the last regular re-examination was effective more than 90 days prior to the change in family circumstances, all family information and income must be re-verified. An interim re-examination does not affect the date of a resident's regularly scheduled re-examination.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



## 18-V.L. Adjusting Rent between Regularly Scheduled Re-examinations (Interim Increase / Reduction in Rent)

1. Annual Re-Examinations

   a. Residents are required to report <u>all changes in family composition or decreases</u> <u>in income</u> to the property manager within 10 calendar days of the occurrence.

   b. Failure to report changes in income within 10 calendar days may result in a retroactive rent increase, but not a retroactive credit or rent reduction.

   c. Residents are not required to report interim increases in earned income unless they previously had rent decrease due to a decrease in income during the same certification period. Increases in income are only required to be reported at time of next regularly scheduled re- examination.

2. Biennial & Triennial Re-Examinations

   a. Residents are required to report decreases in income to the property manager within 10 calendar days of the occurrence in order to qualify for a reduction in rent.

   b. Failure to report a decrease in income within the 10 calendar days will not result in a retroactive decrease in rent.

3. When the CHA makes a rent calculation error at admission or at re-examination, and it causes the household's rent to be too low, any increase in rent will not go into effect retroactively. The increase in rent will go into effect the first day of the second month after the CHA error is discovered and proper notice of the rent increase has been given to the household. If the CHA's rent calculation error resulted in an overpayment by the resident, the resident has the choice between a refund for overpayment or a credit to their account.

4. If the error in rent calculation is caused by the information reported by the resident at admission or any re-examination, resulting in an overpayment by the resident, the resident's rent will decrease effective the month after reporting. Less than a 30 day written notice, if necessary, is allowable to correct the error. The resident will not receive a retroactive credit.

5. The CHA will process interim changes in rent in accordance with the following chart[19]

| __INCOME CHANGE__ | __CHA ACTION__ |
|---|---|
| (a) Decrease in income for any reason, <u>except</u> for a decrease that lasts less than 30 calendar days or is subject to Imputed Welfare Income rules[20]. | The CHA will process an interim rent reduction in rent if the income decrease lasts more than 30 calendar days. |
| (b)  Increase of more than 10% in adjusted income | An interim reexamination will be processed, however, increases to earned income will not be considered. If the family has previously received an interim reduction within the same annual or biennial reexamination cycle and their earned income increases by more than 10 percent. |
| (c) Increase in earned income of a current household member. | The CHA will process a rent increase at time of next regularly scheduled re-examination. |

---

[19] This chart may not be all inclusive of all interim changes. The CHA reserves the right to process other interim changes as needed.

[20] Decreases in welfare income resulting from welfare fraud or from cuts for failure to comply with economic independence requirements are not eligible for rent reductions. **24 CFR § 5.615**

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



| (d) Increase in unearned income (e.g., COLA adjustment for Social Security). | The CHA will process a rent increase at time of next regularly scheduled re-examination. |
|---|---|
| (e) Increase in income because a person with income (from any source) joins the household. | The CHA will process an interim rent increase. |
| (f) Resident misrepresented or failed to report facts upon which rent is based; therefore, resident is paying less rent than they should have been paying. | The CHA will apply any increase in rent retroactive to the first day of the second month, following the month in which the misrepresentation or omission occurred. Misrepresentation or omissions are also grounds for lease termination. |
| (g) Resident paying income-based rent experiences a verified change in circumstances that qualifies them for a reduction in income- based rent even if their income has not decreased (i.e., increase in permissible deductions and expenses). | The CHA will process an interim rent reduction. An increase in a resident's deduction(s) will cause a reduction to their adjusted income. |
| (h) Families w howho have elected to pay flat rent experience a financial hardship. | The CHA will process an interim rent reduction and adjust the family's rent to income-based rent. |
| (i) Increase in monetary or non-monetary income after resident claimed zero income. | The CHA will process a rent increase at time of next reported income increase or next regularly scheduled re-examination, whichever occurs first. |

6. The property manager must document and verify the circumstances applicable to rent adjustments.

7. The CHA will process interim decreases in rent as follows:

   a. An interim adjustment will be processed when a resident reports a decrease in income that is expected to last more than 30 calendar days.

   b. An interim adjustment will not be processed when a decrease in income is reported, and the CHA verifies that the decrease will last less than 30 calendar days or is a change of less than ten percent of the original income.

8. Residents that report no source of income are required to complete an income re-examination every 90 days, in accordance with Part IV.E.-Re-Examinations Reporting is required until income increases or it is time for the next regularly scheduled re-examination, whichever occurs first.

9. If an interim is requested within 30 days of the beginning of the re-examination process, the interim must be completed in accordance with Part IV.L.-Interim Adjustments for Rent & Family Composition, and the information gathered can also be used to complete the re-examination process. The property manager does not need to re-verify the information gained from this interim.

10. If a resident experiences a decrease in income from public assistance because his/her grant is reduced for one of the following reasons, the resident's rent will not be reduced:

   a. The resident committed welfare fraud;

   b. The resident failed to comply with economic independence requirements; or

   c. The resident chose not to engage in economic independence requirements.

11. If a resident formally challenges the welfare department's reduction of a grant, an interim reduction in rent will be processed until a final determination is made by the welfare department.

   a. If the welfare department upholds their original ruling about the grant reduction, the resident will owe a retroactive rent for the period of the granted interim rent reduction.

   b. If the welfare department overturns the grant reduction, no retroactive balance is owed.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



### 18-V.M. Effective Date of Rent Adjustments

1. Residents will be notified in writing of any rent adjustment, including the effective date of the adjustment, in accordance with Part V.H- Effective Date of Rent Adjustments.

### 18-V.N. Interim Changes in Household Composition

1. All changes in family composition must be reported within 10 calendar days of the occurrence. These changes would include:
   a. A family or household member included on the lease leaves the unit; or
   b. Natural birth, adoption, or court-awarded custody of a child (excluding foster care arrangements) to a current family member.
2. Head of households who do not notify the CHA of additions or who permit persons to join the household without prior authorization are in violation of their lease and are subject to lease termination.
3. The addition of a live-in aide, foster child, foster adult, or kinship care child between re-examinations must be requested in writing and requires authorization from the CHA and the property manager before the individual may move into the unit.
4. Additional income that the live-in aide, foster child, foster adult, or kinship care child may contribute to the household will not be included in the family's rent calculation.
5. Interim changes in household composition must be made pursuant to Part V.L-Interim Adjustments for Rent & Family Composition.

### 18-V.O. CHA Work Requirement Policy

1. Every applicant at the time of screening, resident and adult authorized family member of a RAD PBV unit, age 18 up to age 54, is required to be engaged, a minimum of 20 hours a week, on a regular basis, unless the resident or adult authorized family member of the household is exempt or approved for Safe Harbor. Any member of the applicant or resident's household, who is 17 years of age and not attending school full-time, will be subject to the CHA Work Requirement. Applicants from CHA waitlists are not eligible for Safe Harbor.
2. Applicants in screening, residents, and adult authorized family members of the household may meet the work requirement through any combination of employment, attendance at an accredited school, educational institution, training program, job readiness, GED or literacy program, internship, or work experience opportunity.
   a. If an applicant/resident is considered a part-time student at an accredited school, he/she must either work or volunteer the remaining 50 percent of the required hours (10 hours).
3. Volunteer or community service opportunities are also allowable provided that the volunteer or community service can be verified and constitutes no more than 50 percent of the required hours for the first three years of compliance.
4. Residents and adult authorized family members of the household up to 54 years of age, who are in compliance with the CHA Work Requirement, are in compliance with HUD's Community Service and Economic Independence Requirement (Part IV:J.- Community Service & Economic Independence Requirement).
   a. Residents and adult authorized members of the household 55 to 61 years of age who are exempt from CHA's work requirement are NOT exempt from the Community Service and Economic Independence Requirement.
5. Any non-exempt resident or adult authorized family member of a public housing unit, who fails to meet the CHA Work Requirement and is not approved for Safe Harbor, may subject the entire household to lease termination and eviction.
6. School Enrollment and the CHA Work Requirement
   a. All school age authorized members of the household, who are under 18 years of age and who

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



have not completed their secondary education, are encouraged to finish their enrollment in high school and obtain their high school diploma. Any authorized member of the resident's household, who is 17 years of age and not attending school full-time, will be subject to the CHA Work Requirement unless otherwise exempt.

7. CHA Work Requirement Exemptions
   a. Applicants in screening, residents, and/or adult authorized family members of the resident's household may be eligible for an exemption from the CHA Work Requirement. An exemption will be provided for residents and/or adult authorized members of the household who are:
      i. 55 years of age or older;
      ii. Blind or disabled as defined under 216(i)(1) or 1614 of the <u>Social Security Act</u> (42 USC 416(i)(1));
      iii. The primary caretaker of a blind person or person with a disability as defined in number C.2 above;
      iv. Retired and receiving a retirement annuity or pension;
      v. Single parent serving as the primary, full-time caretaker for children age 12 months and under; or
      vi. Receiving TANF and have an active Responsibility and Services Plan (RSP).
      vii. Victims of federally declared disasters (180 calendar day temporary exemption)

8. CHA Work Requirement Verification at Scheduled Re-examination
   a. During the re-examination, the property manager will determine whether each resident and adult authorized family member of the resident's household, age 17 up to age 54, is in compliance with the CHA Work Requirement through a combination of employment, school attendance, or performance of volunteer or community service.
   b. All information in the resident file must be verified and documented in accordance with <u>Part IV:E-Re-examinations</u>. Any and all relevant documents will be placed in the resident file.
   c. If a resident and/or adult authorized family member of the resident's household is not in compliance, the property manager will give the resident the opportunity to request Safe Harbor.

9. Safe Harbor Clause
   a. Residents and/or adult authorized family members of the resident's household may be eligible for Safe Harbor. When residents and/or adult authorized family members of the resident's household are unable to comply with the work requirement, they may request Safe Harbor consideration. Applicants in screening are not eligible for Safe Harbor.
   b. Residents and/or adult authorized family members of the resident's household may be eligible for Safe Harbor when they are (this list is not exhaustive):
      i. Waiting for approval or an appeal of an application for SSI/SSDI;
      ii. Experiencing a temporary medical condition or are the caregiver for someone with a temporary medical condition;
      iii. Examples of temporary medical conditions include, but are not limited to: a broken bone or infectious mononucleosis, or verifiable physician-ordered bed rest for pregnant women.
      iv. Separated from employment (within the last 60 calendar days);
      v. Participating in an active DCFS plan to reunify their family (parents with children under age five) where participation is time consuming;
      vi. Either the victim or the caregiver for a victim of violence, including but not limited to domestic violence, sexual violence, dating violence, and stalking;
      vii. Attempted but failed to find adequate child care to allow the residents and/or adult authorized member to work; and
      viii. Attempted but failed to find employment.
   c. The resident and adult authorized family members of the resident's household, who are approved by the CHA for Safe Harbor, will be required to undergo an interim Safe Harbor re-examination every 180 calendar days from the date that the Safe Harbor request is approved. If the Safe Harbor

18-50

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



request occurs during the re-examination, the Safe Harbor request date will be the lease effective date.

    i.   The resident and/or adult authorized family member of the resident's household will be required to work with the assigned contracted service provider to create an action plan and Safe Harbor request which will include a description of the steps being taken to move toward becoming compliant. The signed application/action plan will then be submitted to the property management company for approval.

    ii.   Safe Harbor status must be approved every 180 calendar days through an interim Safe Harbor re-examination with property management. Failure to appear for the interim Safe Harbor re-examination is a material lease violation subject to termination.

    iii.   The contracted service provider will be required to sign off on the Safe Harbor form to indicate that the resident's status is Compliant, Non-Compliant, Exempt, or recommendation for an additional Safe Harbor with a new action plan.

    iv.   Recommendations for additional Safe Harbor will be approved.

    v.   Non-Compliant and Non-engaged residents will be subject to lease termination.

d. If the resident or adult authorized family member of the resident's household is denied Safe Harbor, the resident has the right to grieve the CHA's decision through the grievance process outlined in the ***CHA Grievance Procedure for the RAD PBV Program***. In certain situations, the resident may be offered (subject to availability), the opportunity to transition to a supportive housing program in lieu of lease termination.

e. Residents and/or adult authorized family members of the resident's household approved for Safe Harbor status must meet the Community Service/Economic Independence Policy requirement of eight hours per month, unless they qualify for an exemption from the HUD's Community Service/Economic Independence requirement.

    i.   Compliance with HUD's Community Service/Economic Independence requirement will be tracked every 180 calendar days at the Safe Harbor interim re-examination.


## 18-V.P. Utilities

All RAD PBV units have utility connections for water, gas, heat, and electricity. The payment of utilities is made by the resident or by the CHA, depending on the building in which a unit is located.

1. The following requirements apply to residents living in developments with resident-paid utilities:

   a. Residents must obtain and maintain utility connections throughout tenancy. Residents must pay their utility bills to ensure that utilities remain connected. The utility bill must be in the name of a consenting adult authorized member of the household. Failure to maintain the utility connection is a serious violation of the lease, subject to lease termination.

   b. If a resident or applicant is unable to get utilities connected, the resident or applicant will not be permitted to move into a unit with resident-paid utilities.

   c. When a resident applies for utility service, the resident must sign a third-party notification agreement so that the CHA is notified if the resident fails to pay the utility bill or if utility service will be disconnected.

   d. Residents must bring in utility account information to the Property Manager when there is a change in their utility account numbers or other billing information.

   e. Units where residents pay some or all utilities directly to the utility provider receive a monthly utility allowance, as a rent credit towards his/her monthly rent amount, that reflects a reasonable amount of utilities for the specific size and type of unit occupied. A reimbursement of a portion of the utility allowance may be paid by the CHA directly to the utility provider if the Total Tenant Payment is lower than the utility allowance and a credit is due. The CHA shall provide the resident with a letter indicating the amount of the reimbursement provided to the



Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan

utility provider on their behalf.

f. The monthly utility allowance is deducted from the resident's Total Tenant Payment to compute the Tenant Rent the resident pays the CHA.

   i. If the resident's Total Tenant Payment is higher than the unit's designated utility allowance, then the resident's rent amount will be the difference remaining after the utility allowance is subtracted.

   ii. If the resident's Total Tenant Payment is lower than the unit's designated utility allowance, then the resident may receive a reimbursement of a portion of the utility allowance after subtraction of the minimum rent amount.

2. The resident utility bills will be reflected as follows:
   a. If the resident's actual utility bill is less than the utility reimbursement, the resident will receive the savings in the form of a credit on the utility provider's billing statement.
   b. If the resident's bill is greater than the utility reimbursement, the resident must pay the excess amount directly to the utility provider.

3. Lease Part 2 of the CHA Residential Lease Agreement for the RAD PBV Program will state the utility allowance amount for the unit and the utility reimbursement to be received by the resident, if applicable.

## 18-V.Q. Reasonable Accommodations

As a reasonable accommodation, the CHA will grant qualified residents with disabilities a higher utility allowance or not charge for the use of certain appliances when there is a verified need for the special equipment due to the resident's disability. The CHA must approve the reasonable accommodation request prior to providing the higher utility allowance. Examples of special equipment include, but are not limited to: breathing machines, battery charging for electric scooters, or dialysis equipment.

## 18-V.R. Flat Rents

1. Flat rents are eliminated in the RAD PBV Program. Residents can only pay income-based rent in the RAD PBV program.

2. If a flat rent resident's rent increases by more than the greater of 10 percent or $25 as a result of the RAD conversion, rent increases will be phased in over five years. The following schedule will apply:
   a. Year One: Any re-examination (interim or annual) performed prior to the second annual re-examination after conversion – 20 percent of the difference between most recently paid TTP and the standard TTP
   b. Year Two: Year Two annual re-examination and any interim re-examination prior to Year Three annual re-examination – 40 percent of the difference between most recently paid TTP and the standard TTP
   c. Year Three: Year Three annual re-examination and any interim re-examination prior to Year Four annual re-examination – 60 percent of the difference between most recently paid TTP and the standard TTP
   d. Year Four: Year Four annual re-examination and any interim re-examination prior to Year Five annual re-examination – 80 percent of the difference between most recently paid TTP and the standard TTP.
   e. Year Five annual re-examination and all subsequent re-examinations – Full standard TTP

3. The incremental increase resulting from transitions from flat rent to income-based rent as noted above is applicable to residents that were Public Housing leaseholders at the time of initial RAD conversion. This step-up rent process is not applicable to new move-ins or applicants.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



18-V.S. Determining Income and Rent Income verification is conducted by the CHA during admissions, interim re-examination, and scheduled re-examinations. The CHA uses all available resources to obtain an accurate representation of a resident's annual income. Residents are required to work with the CHA in providing the most up-to-date and accurate income information. This information will allow the CHA to present the most accurate rent information.

1. All sources of income must be reported to the CHA. The CHA will then make the final determination of what is included and excluded in the computation of annual income. The CHA adopts the definition of annual income provided by HUD, which is stated below. The definition is subject to any changes made by HUD.Annual Income is the anticipated total income from all sources, including net or imputed income derived from assets, received by the family head and spouse (even if temporarily absent) and by each additional family member, including all net or imputed income from assets, plus unearned income by or on behalf of each dependent under 18 years, for the 12-month period following the effective date of initial determination or interim re- examination of income, exclusive of income that is temporary, non-recurring, or sporadic as defined below, or is specifically excluded from income by other federal statute. However, when calculating family income at regular re-examination, CHA will review income for the previous 12-months, taking into account any redetermination from an interim reexamination during that period, except for those eligible for a streamlined income verification. Moreover, CHA will make adjustments to reflect current income if there was a change during that period. When Annualcalculating Annual income includes but is not limited to:The full amount, before any payroll deductions, of wages and salaries, overtime pay, commissions, fees, tips and bonuses, and other compensation for personal services.

2. The net income from operation of a business or profession, including any withdrawal of cash or assets from the operation of the business. Expenditures for business expansion or amortization of capital indebtedness shall not be used as deductions in determining the net income from a business. An allowance for the straight line depreciation of assets used in a business or profession may be deducted as provided in Internal Revenue Service regulations. Withdrawals of cash or assets will not be considered income when used to reimburse the family for cash or assets invested in the business.

3. Interest, dividends, and other net income of any kind from real or personal property. Expenditures for amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for the straight line depreciation of real or personal property is permitted. Withdrawals of cash or assets will not be considered income when used to reimburse the family for cash or assets invested in the property.

   a. 4. If the family has net family assets in excess of $50,000, annual income shall include include the greater of thethe actual income derived from all net family assets. If it is not possible to calculate an actual return on any or all assets over $50,000, then imputed income from assets will be determined based on the current passbook savings rate as determined by HUD. (adjusted annually by CPI-W).CHA will accept a family's declaration of the amount of assets of less than $50,000, and the amount of income expected to be received from those assets. The CHA's application and reexamination documentation, which should be signed by all adult family members, can serve as the declaration. Where the family has net family assets equal to or less than $50,000, CHA will not request supporting documentation (e.g., bank statements) from the family to confirm the assets or the amount of income expected to be received from those assets. Where the family has net family assets more than $50,000, CHA will obtain supporting documentation (e.g., bank statements) from the family to confirm the assets. Any assets will continue to be reported on HUD Form 50058. (PIH 2013-03).

   b. Excluded assets include but are not limited to: Necessary items of personal property, non-necessary items of personal property valued under $50,000, retirement accounts recognized by

18-53



Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan

the IRS, real property the family does not have effective legal authority to sell, amounts recovered in any civil action or settlement based on for an incident resulting in disability, the value of certain education or disability support savings accounts, interest in Indian trust land, equity in property where the family receives assistance under 24 CFR 982, the value of a family's LevelUp (CHA's FSS program) accounts, federal tax refunds or refundable tax credits for a period of 12 months after receipt by the family, or a trust that is not revocable by or under the control of any family member, will not be considered a net family asset; 25 CFR 5.603(b).

5. The full amount of <u>periodic</u> payments received from Social Security, annuities, insurance policies, pensions, disability or death benefits, and other similar types of periodic receipts. (See B.14. below for treatment of delayed or deferred periodic payment of Social Security or Supplemental Security Income (SSI) benefits.)

6. Payments in lieu of earnings, such as unemployment and disability compensation, worker's compensation, and severance pay. (However, see B.3. below concerning treatment of lump-sum additions as family assets.)

7. All welfare assistance payments, such as TANF and General Assistance, received by or on behalf of any family member.

8. Periodic and determinable allowances, such as alimony and child support payments, and regular cash and non-cash contributions or gifts received from agencies or persons not residing in the dwelling made to or on behalf of family members.

9. All regular pay, special pay, and allowances of a family member in the Armed Forces. (See B. 7. below concerning pay for exposure to hostile fire.) .

10. CHA may not rent a dwelling unit to, or assist families with, net family assets exceeding $100,000 annually (adjusted for inflation) or have an ownership interest in real property that is suitable for occupancy. This restriction does not apply to victims of domestic violence, property jointly owned with someone else, individuals using housing assistance for homeownership opportunities, families offering properties for sale or families whose properties do not meet the disability-related needs for all members of the family.

CHA will not verify full excluded income nor report it on the 50058.

Annual income does not include the following:

1. Any imputed return on an asset when net family assets total $50,000 or less (which amount HUD will adjust annually in accordance with the Consumer Price Index for Urban Wage Earners and Clerical Workers) and no actual income from the net family assets can be determined.

2. The following types of trust distributions:

   a. For an irrevocable trust or a revocable trust outside the control of the family or household excluded from the definition of net family assets under § 5.603(b):

      i. Distributions of the principal or corpus of the trust; and

      ii. Distributions of income from the trust when the distributions are used to pay the costs of health and medical care expenses for a minor.

   b. For a revocable trust under the control of the family or household, any distributions from the trust; except that any actual income earned by the trust, regardless of whether it is distributed, shall be considered income to the family at the time it is received by the trust.

3. Earned income of children under the 18 years of age.

4. Payments received for the care of foster children or foster adults, or State or Tribal kinship or guardianship care payments.

5. Insurance payments and settlements for personal or property losses, including but not limited to payments through health insurance, motor vehicle insurance, and workers' compensation.

6. Amounts received by the family that are specifically for, or in reimbursement of, the cost of health and medical care expenses for any family member.

7. Any amounts recovered in any civil action or settlement based on a claim of malpractice, negligence, or other breach of duty owed to a family member arising out of law, that resulted in a member of the

18-54

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



family becoming disabled.

8. Income of a live-in aide, foster child, or foster adult as defined in §§ 5.403 and 5.603, respectively.

9. Student financial assistance that satisfies the following criteria:

   a. Any assistance that section 479B of the Higher Education Act of 1965, as amended (20 U.S.C. 1087uu), requires be excluded from a family's income; and;

   b. Student financial assistance for tuition, books, and supplies (including supplies and equipment to support students with learning disabilities or other disabilities), room and board, and other fees required and charged to a student by an institution of higher education (as defined under Section 102 of the Higher Education Act of 1965 (20 U.S.C. 1002)) and, for a student who is not the head of household or spouse, the reasonable and actual costs of housing while attending the institution of higher education and not residing in an assisted unit.

10. Income and distributions from any Coverdell education savings account under section 530 of the Internal Revenue Code of 1986 or any qualified tuition program under section 529 of such Code; and income earned by government contributions to, and distributions from, ''baby bond'' accounts created, authorized, or funded by Federal, State, or local government.

11. The special pay to a family member serving in the Armed Forces who is exposed to hostile fire.

12. Amounts received under employment training programs as follows:

   a. Amounts received by a person with a disability that are disregarded for a limited time for purposes of Supplemental Security Income eligibility and benefits because they are set aside for use under a Plan to Attain Self-Sufficiency (PASS);

   b. Amounts received by a participant in other publicly assisted programs which are specifically for or in reimbursement of out-of-pocket expenses incurred (e.g., special equipment, clothing, transportation, child care, etc.) and which are made solely to allow participation in a specific program;

   c. Amounts received under a resident service stipend not to exceed $200 per month. A resident service stipend is a modest amount received by a resident for performing a service for the PHA or owner, on a part-time basis, that enhances the quality of life in the development.

   d. Incremental earnings and benefits resulting to any family member from participation in training programs funded by HUD or in qualifying Federal, State, Tribal, or local employment training programs (including training programs not affiliated with a local government) and training of a family member as resident management staff.

13. Reparation payments paid by a foreign government pursuant to claims filed under the laws of that government by persons who were persecuted during the Nazi era.

14. Earned income of dependent fulltime students in excess of the amount of the deduction for a dependent in § 5.611.

15. Adoption assistance payments for a child in excess of the amount of the deduction for a dependent in § 5.611.

16. Deferred periodic amounts from Supplemental Security Income and Social Security benefits that are received in a lump sum amount or in prospective monthly amounts, or any deferred Department of Veterans Affairs disability benefits that are received in a lump sum amount or in prospective monthly amounts.

17. Payments related to aid and attendance under 38 U.S.C. 1521 to veterans in need of regular aid and attendance.

18. Amounts received by the family in the form of refunds or rebates under State or local law for property taxes paid on the dwelling unit.

19. Payments made by or authorized by a State Medicaid agency (including through a managed care entity) or other State or Federal agency to a family to enable a family member who has a disability to reside in the family's assisted unit. Authorized payments may include payments to a member of the assisted family through the State Medicaid agency (including through a managed care entity) or other State or Federal agency for caregiving services the family member provides to enable a family



member who has a disability to reside in the family's assisted unit.

20. Loan proceeds (the net amount disbursed by a lender to or on behalf of a borrower, under the terms of a loan agreement) received by the family or a third party (e.g., proceeds received by the family from a private loan to enable attendance at an educational institution or to finance the purchase of a car).

21. Payments received by Tribal members as a result of claims relating to the mismanagement of assets held in trust by the United States, to the extent such payments are also excluded from gross income under the Internal Revenue Code or other Federal law.

22. Amounts that HUD is required by Federal statute to exclude from consideration as income for purposes of determining eligibility or benefits under a category of assistance programs.

23. Replacement housing ''gap'' payments made in accordance with 49 CFR part 24 that offset increased out of pocket costs of displaced persons that move from one federally subsidized housing unit to another Federally subsidized housing unit. Such replacement housing ''gap'' payments are not excluded from annual income if the increased cost of rent and utilities is subsequently reduced or eliminated, and the displaced person retains or continues to receive the replacement housing ''gap'' payments.

24. Nonrecurring income, which is income that will not be repeated in the coming year based on information provided by the family. Income received as an independent contractor, day laborer, or seasonal worker is not excluded from income under this paragraph, even if the source, date, or amount of the income varies. Nonrecurring income includes:

    a. Payments from the U.S. Census Bureau for employment (relating to decennial census or the American Community Survey) lasting no longer than 180 days and not culminating in permanent employment.

    b. Direct Federal or State payment intended for economic stimulus or recovery.

    c. Amounts directly received by the family as a result of State refundable tax credits or State tax refunds at the time they are received.

    d. Amounts directly received by the family as a result of Federal refundable tax credits and Federal tax refunds at the time they are received.

    e. Gifts for holidays, birthdays, or other significant life events or milestones (e.g., wedding gifts, baby showers, anniversaries).

    f. Non-monetary, in-kind donations, such as food, clothing, or toiletries, received from a food bank or similar organization.

    g. Lump-sum additions to net family assets, including but not limited lottery or other contest winnings.

25. Civil rights settlements or judgments, including settlements or judgments for back pay.

26. Income received from any account under a retirement plan recognized as such by the Internal Revenue Service, including individual retirement arrangements (IRAs), employer retirement plans, and retirement plans for self-employed individuals; except that any distribution of periodic payments from such accounts shall be income at the time they are received by the family.

27. Income earned on amounts placed in a family's Family Self Sufficiency Account.

28. Gross income a family member receives through self-employment or operation of a business; except that the following shall be considered income to a family member:

    a. Net income from the operation of a business or profession. Expenditures for business expansion or amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for depreciation of assets used in a business or profession may be deducted, based on straight line depreciation, as provided in Internal Revenue Service regulations; and

    b. Any withdrawal of cash or assets from the operation of a business or profession will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested in the operation by the family.

**Adjusted Income** Income-based rent is calculated using adjusted income. Adjusted income is annual

18-56

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



income minus the following deductions and exemptions:

a. **For All Families:**

1. Child Care Expenses: A deduction of amounts anticipated to be paid by the family for the care of children under 13 years of age for the period for which annual income is computed, but only when such care is necessary to enable a family member to be gainfully employed, to seek employment, or to further their education. Amounts deducted must be unreimbursed expenses and shall not exceed:

   a. The amount of income earned by the family member released to work; or
   b. An amount determined to be reasonable by the CHA when the expense is incurred to permit education or to seek employment.

   A family whose eligibility for the child care expense deduction is ending may request a financial hardship exemption to continue the deduction if demonstrate that they are unable to pay their rent because of loss of this deduction, and the child care expense is still necessary even though the family member is no longer employed or furthering education.

2. Dependent Deduction: An exemption of $480 annually, adjusted annually for inflation and rounded to the next lowest multiple of $25, for each member of the family residing in the household (other than the head of household or spouse, live- in aide, foster adult, or foster child), who is age 18 or under, is age 18 or over and disabled, or is a full-time student. If parents share joint custody of a child and both parents live in CHA housing, the dependent deduction will be applied in accordance with a court-ordered determination or mutual written agreement on how to split the deduction.

3. Work-related Disability Expenses: A deduction of unreimbursed amounts paid for attendant care or auxiliary apparatus expenses for family members with disabilities where such expenses are necessary to permit any family member, including the disabled member, to be employed. In no event may the amount of the deduction exceed the employment income earned by the family member(s) freed to work.

   Equipment and auxiliary apparatus may include, but are not limited to: wheelchairs, lifts, reading devices for the visually impaired, and equipment added to cars and vans to permit their use by the disabled family member. The annualized cost differential between a car and the cost of a van required by the family member with disabilities is also included.

   a. For non-elderly families and elderly or disabled families without medical expenses, the deduction equals the cost of all unreimbursed expenses for work-related disability expenses minus ten percent of annual income, provided the amount calculated does not exceed the employment income earned.
   b. For elderly or disabled families with medical expenses, the deduction equals the cost of all unreimbursed expenses for work-related disability expenses minus ten percent of annual income (provided the amount calculated does not exceed the employment income earned) plus medical expenses as defined below.

**For Elderly and Disabled Families Only:**

These deductions will only apply when the elderly or disabled individual is the head of household, co-head or spouse.

4. Medical Expense Deduction: A deduction of unreimbursed medical expenses, including insurance premiums, anticipated for the period for which annual income is computed.

   Medical expenses include, but are not limited to: services of physicians and other health care professionals, services of health care facilities, health insurance premiums (including the cost of Medicare), prescription and non-prescription medicines, transportation to and from treatment, dental expenses, eyeglasses, hearing aids and batteries, attendant care (unrelated to employment of family members), and payments on accumulated medical bills. The expenses claimed must be verifiable  to

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



be considered by the CHA for the purpose of determining a deduction from income.

   a.   For elderly or disabled families without work-related disability expenses, the amount of the deduction shall equal total medical expenses exceeding ten percent of annual income.

   b.   For elderly or disabled families with both work-related disability expenses and medical expenses, the amount of the deduction is calculated as described in B.8 above.
General Financial Hardship Exemption: This exemption is for families who can demonstrate a financial hardship due to an increase in their qualified expenses or because of a change that would not otherwise trigger an interim reexamination. The family may receive a deduction of all eligible expenses exceeding 5% of their annual income. The exemption ends when the circumstances that made the family eligible for the exemption no longer apply or after 90 days, whichever comes earlier.

5. Elderly/Disabled Household Exemption: An exemption of $525 per household, adjusted annually for inflation and rounding to the next lowest multiple of $25.. See the   Glossary  for definitions of elderly and disabled family.

6. Optional Deductions/Exemptions: The CHA may amend this policy and grant further deductions. Any such deduction would be noted here. HUD does not increase operating subsidy to offset additional deductions.

7. Computing Income-based Rent 24 CFR § 5.628.

   a.   The RAD PBV Program only allows Residents to pay income-based rent.

   b.   The first step in computing income-based rent is to determine each family's Total Tenant Payment (TTP). TTP is the higher of 30 percent of adjusted monthly income or 10 percent of gross monthly income.

   c.   Minimum TTP: The minimum TTP shall be $75 per month. Whenever the TTP calculation results in an amount less than $75, the CHA will impose a TTP of $75.

   d.   If the family is occupying a unit that has resident-paid utilities, a utility allowance is subtracted from the TTP.

   e.   If the result of this computation is a positive number, then the amount is Tenant Rent.

   f.   If the TTP less the utility allowance is a negative number, the result is a utility reimbursement, which may be paid directly to the utility provider by the CHA pursuant to Part IV.Q- Utilities.

   g.   In developments where the CHA is responsible for providing the utility, Tenant Rent equals TTP. 24 CFR § 5.634.

   h.   If the CHA is responsible for providing all utilities and the Minimum TTP is applicable.

8. Minimum Rent Hardship Suspension/Exemption 24 CFR § 5.630.

a. A minimum rent hardship exemption shall be granted to residents who can document that due to a financial hardship they are unable to pay the minimum rent. Examples of financial hardship for which a family would qualify for an exemption of minimum rent include, but are not limited to:

   i.   The family has lost eligibility for or is applying for an eligibility determination for a federal, state or local assistance program;

   ii.   The family would be evicted as a result of being unable to pay the minimum rent;

   iii.   The income of the family has decreased because of changed circumstances, including loss of employment; or

   iv.   A death occurred in the family.

b. If a family paying minimum rent requests a hardship exemption, the CHA must suspend the minimum rent, effective the following month. The CHA may not evict the family for non-payment of the minimum rent for 90 calendar days following the request for the hardship exemption.

c. The suspension of minimum rent continues until the CHA determines whether or not the



hardship is short-term (lasting less than 90 calendar days) or long term (lasting 90 calendar days or more).

d. If the CHA determines that a qualifying financial hardship is temporary, the CHA will not impose the minimum rent during the 90-day period beginning the month following the date of the family's request for hardship exemption. At the end of the 90-day suspension period, the CHA will reinstate the minimum rent from the beginning of the suspension. The family will be offered a reasonable repayment agreement, on terms and conditions established by the CHA for the amount of back rent owed by the family.

e. If the CHA determines that the qualifying financial hardship is long-term, the family will be exempt from minimum rent until the hardship ceases. The resident will not be required to repay the suspended minimum rent.

f. Exemption from minimum rent does not mean the family does not have to pay rent. The family is required to pay the greater of 30 percent of adjusted monthly income or 10 percent of gross monthly income when that amount is less than the minimum rent.

9. **Repayment Plans**

a. The resident and the CHA may enter and agree to one rent repayment plan in any consecutive 12 month period. The repayment plan may not result in the TTP being more than 40 percent of the adjusted monthly income.

b. The resident may be required to make a minimum deposit of 50 percent of the past due debt in order to sign a repayment plan and be lease compliant.

## 18-V.T. Resident Organizations

CHA recognizes duly elected resident organizations in accordance with CHA's Moving to Work (MTW) agreement and practices related to elections, use of CHA's premises, funding levels, and stipends as specified in the funding agreement executed by the CHA with the Central Advisory Council. As noted in Part IV.J., residents' participation in such organizations would qualify as community service activity.

## 18-V.U. Pet and Assistance Animal Policy

**Policy Statement**

1. Under Section 31 of Title I of the United States Housing Act of 1937, residents of federal public housing may own and keep common household pets in accordance with applicable regulations. The following policy sets forth requirements related to residents who wish to keep common household pets such as dogs and cats in their RAD PBV units.

2. All residents who desire to keep a pet or assistance animal must obtain prior approval by the CHA before the pet/animal enters the unit.

3. This policy applies to residents who live in units acquired through the CHA's Property Investment Initiative.

4. A qualified applicant or resident with a disability may request a reasonable accommodation to this policy at any time.

**Assistance Animals for Residents with Disabilities**

1. The CHA and property managers will make reasonable accommodations for qualified persons with disabilities who are in need of an assistance animal. Such a reasonable accommodation will be granted pursuant to Chapter 2- Fair Housing & Equal Opportunity. Assistance animals are animals that assist, support, or provide service to persons with disabilities, and include Service Animals and Support Animals. The functions performed by the assistance animal include, but are not limited to, the following:

    a. Guiding individuals who are blind or have a visual impairment;

    b. Alerting individuals who are deaf or hard of hearing to sounds;

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



c. Seeking and retrieving items;

d. Alerting persons to impending seizures or items that cause allergic reactions; or

e. Providing emotional support to persons with disabilities who have a disability-related need for such support.

2. The CHA requires verification of the need for an assistance animal from a knowledgeable professional and will confirm such verification. Once this verification is obtained and confirmed, the person with a disability will be exempt from the pet application fee and pet deposit. An assistance animal is not considered a pet and, thus, may not be subject to the size and weight limitations of this policy. All other parts of this policy shall be applicable.

    a. Property Management will approve the need for a service animal without CHA approval if the following two conditions are met:

        i. The service animal is a dog; and

        ii. It is readily apparent that the dog is trained to do work or perform tasks for the benefit of the resident with a disability. It is "readily apparent" when the dog is observed: a. guiding an individual who is blind or has low vision; b. pulling a wheelchair; or c. providing assistance with stability or balance to an individual with an observable mobility disability.

3. Qualified residents with disabilities who have an assistance animal are required to comply with all other parts of this policy, including but not limited to, documentation that their animals are healthy and have received all legally -required inoculations. In addition, persons with disabilities must be able to care for their animals, keep them and their units in a safe and healthy condition, and be responsible for any damage, beyond reasonable wear and tear caused by their assistance animal. Owners of assistance animals must meet these requirements on their own or as part of a reasonable accommodation, with assistance from some source other than the CHA.

4. A reasonable accommodation request for an exemption to any part of this Pet Policy may be made at any time. Such request will be evaluated and requires supporting documentation from a knowledgeable professional. Approved assistance animals are still subject to all applicable provisions of policy.

**Ownership of Pets/Assistance Animals**

1. Pet ownership by CHA residents is subject to reasonable requirements and limitations as described in this policy. CHA approval is required for pet or assistance animal ownership on CHA property. It is the resident's responsibility to read and comply with this policy. Owners will be responsible and liable for all bodily harm to other residents or individuals caused by their pet/animal. Destruction of property belonging to the CHA or others caused by the Owner's pet/animal owner's animal will be the financial obligation of the pet owner. Failure to make required restitution or repeated or serious violations of this policy are cause for lease termination.

2. Ownership of pets is restricted in the following ways:

    a. By type or breed of animal;

    b. By the number and combination of pets sought; and

    c. By size, weight, or other factors particular to the type of pet (e.g., fish or birds).

    d. Breed and weight restrictions do not apply to animals that assist, support or provide service to persons with disabilities.

3. Common household pets are defined as domesticated animals, such as a dog, cat, bird, rodent, rabbit, fish, or turtle, which are traditionally kept in the home for pleasure and not for commercial purposes.

4. Dog and Cat Ownership: Breeds of canines (full or partial) used for attack or defense purposes including, but not limited to, Rottweilers, Pit Bull Terriers, Chows, and Doberman Pinschers, are not eligible for ownership on CHA property and will not be allowed under any circumstances. Overly

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



aggressive cats, with a known or suspected propensity, tendency, or disposition to unprovoked attacks, will also be excluded. Breed restrictions do not apply to animals that assist, support or provide service to persons with disabilities; 24 CFR § 960.705.

5. Birds and Fish Ownership: The number of birds in a unit shall not exceed two and no aquarium shall exceed 20 gallons in size. Certain types of birds, including but not limited to hawks, eagles, condors, and pigeons, are not allowed under any circumstances.

6. Hamster, Guinea Pig or Gerbil Ownership: A maximum combination of two hamsters, guinea pigs, or gerbils may be kept.

7. **Animals Not Permitted:** Any poisonous or life-threatening reptiles and exotic or dangerous animals (e.g., snakes, iguanas, pigs, wild animals such as wolves and big cats, etc.) are not considered common household pets.  They will not be allowed on CHA property under any circumstances.

**Rules for Ownership**

1. Residents must register their pets or assistance animals with property management and receive approval before the pet/assistance animal is brought onto the premises.  Failure to do so is a material violation of the lease. Residents will not be allowed to apply for pet approval retroactively.  Therefore, the pet/animal cannot be on the premises until the property manager gives approval. At the time of registration, the resident must submit the following completed documents: Pet Application Form, Alternative Care of Pet Statement, proof of inoculation, and an identification tag.

   a. For cats and dogs, the resident must provide proof of having current rabies inoculations and verification that the pet/animal is spayed/neutered or a letter from a veterinarian giving a medical reason why the procedure cannot be performed.

   b. For dogs, the resident must provide proof of having a current City of Chicago Dog License, as well as provide verification of the dog's breed.

2. Residents must pay a non-refundable pet application fee of $50.00 for pets at  the time  the  pet application is submitted.  (e.g., a $50.00 pet application fee for each of the following: a dog, a cat, an aquarium larger than 1 gallon and up to 20 gallons, or a pair of caged birds, gerbils, hamsters, or guinea pigs.)

3. Residents with disabilities who present verified documentation of their need for an assistance animal shall not be subject to a pet application fee or the pet deposit.  The other information listed in Section D(1) above must be provided.

4. When the completed pet application is received, the property manager will review it.  For new residents, the application will be approved or rejected by the time of leasing.  For current residents, the property manager will approve or reject the completed application within 15 calendar days from the day the application was received.  Incomplete applications, which are missing any required documents, will be denied.  Residents will be required to re-submit the request.  For current residents, pet applications will not be processed or approved if the household is not lease compliant.

5. If the property management approves the pet application, the resident can bring the pet on to the premises and must pay a refundable pet deposit.   The pet deposit shall be kept together with the resident's security deposit in the same interest-bearing account.   The CHA will credit the resident's account on an annual basis in accordance with state and local law.   The property manager must provide the resident a receipt for the pet deposit, separate from the security deposit receipt, and keep a copy of it in the resident's file; 24 CFR § 960.707 (d).

   a. Birds/Fish/Gerbils/Hamsters/Guinea Pigs/Turtles: A resident shall pay a refundable pet deposit of $50.00 for an aquarium larger than 1 gallon and up to 20 gallons for fish or turtles and/or $50.00 pet deposit for one or a pair of birds, gerbils, hamsters, or guinea pigs.   This deposit must be paid at the time the lease is signed or pet approval is granted.

   b. Cats/Dogs: A resident shall pay a refundable pet deposit of $100.00 for a dog or for a cat.   The resident shall have the following options to pay the pet deposit:

      i. The entire $100.00 paid at the time the lease is signed or pet approval is granted; or

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



    ii.  $50.00 paid at the time the lease is signed or pet approval is granted and the remaining $50.00 paid in two installments of $25.00.  Each installment of $25.00 is due the first of the month for the two months immediately following the signing of the lease or the pet approval.

    c.  Pet deposits will be refunded to the resident within 45 calendar days after the resident has moved from the property or the resident no longer has ownership of the pet.  Property management will have the right to use the pet deposit to pay reasonable expenses attributable to damage caused by the pet. Such expenses can include, but are not limited to, fumigation of the unit and cost of repairs and replacement to the unit. Property management will notify the resident in writing of any deductions taken from the pet deposit within 30 calendar days.

6.  One cat or one dog may be kept in any one unit.  Cats are limited to 15 pounds (at adult weight).  Dogs are limited to 35 pounds and 24 inches in height from the floor to the top of their head (at adult weight and height).  An approved assistance animal is not subject to these size and weight limitations.  Cats and dogs must wear a current rabies tag and an identification tag specifying the resident's name, address, and telephone number at all times. On case by case bBased on disability related need CHA may, on a case by case basis, determine a resident is allowed more than one emotional support or service animal.

7.  One pair of birds and/or up to a 20-gallon aquarium of fish may be kept in any one unit.  A reasonable amount of fish or other animals (such as turtles) appropriately kept in an aquarium will be permitted in a maximum 20-gallon aquarium.

8.  An animal cage that can house a maximum combination of two hamsters, guinea pigs, or gerbils may be kept.

9.  In compliance with City Ordinance S7-12-160 "Rabies Inoculation of Animals," every dog and cat must wear a valid rabies tag.   All pets and assistance animals must also wear a tag bearing the owner's name, address, and telephone number.

10.  All dogs and cats over six months of age must be spayed/neutered unless a letter is received from a licensed veterinarian giving a medical reason why such is detrimental to the health of the pet or assistance animal.

11.  An owner must be capable of taking care of the pet or animal without assistance or with assistance from a source other than the CHA.   An owner is required to maintain a current Alternative Care of Pet Statement, which is a notarized statement from a person who will assume immediate responsibility for the pet in case the owner dies, becomes incapacitated, or is otherwise incapable of caring for the pet or assistance animal.   The Alternative Care of Pet Statement contains the alternative caregiver's name, address, and telephone number.

12.  At the time of the regularly scheduled re-examination, the resident must update the Alternative Care of Pet Statement and registration, which includes providing proof of up-to-date inoculations, identification tag, and for cats and dogs, verification that the pet or assistance animal has been spayed/neutered, or a letter from a veterinarian giving a medical reason why the procedure was not performed.

13.  Residents must physically control or confine their pets and assistance animals when CHA and property management employees, agents of the CHA or property management, or others must enter the unit to conduct business, provide services, or enforce lease terms.

14.  Pets and assistance animals shall be quartered in the resident's unit.  Residents shall not alter their unit, patio, or other area on CHA property to create an enclosure or a caged area for a pet or assistance animal.

15.  No dog houses will be allowed on the premises.

16.  Dishes or containers for food and water must be located within the owner's unit.   Owners may not deposit food or table scraps for pets or animals on their porches, yards, or balconies.

17.  Residents may not feed or provide water to stray wild animals.

18.  Every owner will be responsible for proper disposal of fecal waste of their pet or assistance animal in a manner that will not damage or deface the unit or premises. In accordance with City Ordinance S7-

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



12- 420 "Removal of Animal Excrement," the excrement of any animal curbed on CHA property must be removed and disposed of immediately. Failure of the owner to remove and dispose of waste may result in a $20.00 charge per occurrence from property management. Continued violation of this ordinance by the resident will be cause for lease termination.

19. In accordance with Section 8(f) of the RAD PBV Lease Agreement, owners are required to make sure their pets or assistance animals do not make noise that interferes with their neighbors' peaceful enjoyment of their units or disrupts the peace of the development/site.

20. Owners will be responsible for any damage caused by their pet or assistance animals including the cost of professional carpet cleaning and exterminating for fleas or other pet-borne pests.

21. Pets are not permitted in common areas (e.g., solariums, craft rooms, social rooms, laundry rooms, maintenance space, playgrounds, TV lounges, etc.). Lobby areas are available to pets for ingress and egress only. Assistance animals for persons with disabilities are exempt from this restriction.

22. While pets and assistance animals are outside of the unit and in building common areas (e.g., elevators, hallways, lobby, etc.), they must be controlled by being either kept on a leash, carried in the resident's arms, or in an appropriate animal cab. While outside the unit, dogs must be kept tightly reigned on a leash no longer than six feet in length.

23. If a pet or assistance animal bites or attacks a resident, CHA employee, anyone visiting on the premises, or any animal on the premises, the owner must surrender the animal to an animal control center within 24 hours, in accordance with City Ordinance S7-12-090 "Owner's Responsibility Where an Animal Has Bitten another Animal or Person." Upon knowledge of the incident, the property manager should also contact an animal control center.

    A pet or assistance animal that bites or attacks a resident, CHA employee, anyone visiting on the premises, or any animal on the premises shall be subject to the mandates set forth in City Ordinance S7-12-050 regarding Dangerous Animals. The animal control center to which the animal was surrendered will determine if the animal is dangerous.

    The owner must give permission to the animal control center to which the animal was surrendered to supply property management with a copy of the determination.

24. Visitors (non-residents) on CHA property are not allowed to bring animals onto the premises, except for assistance animals. The head of household being visited is liable for any and all damages caused by their visitor's assistance animal.

25. It is a material violation of the lease for a resident to neglect, abuse, or abandon their animal(s). The CHA will take the necessary steps to protect the safety of the animal(s) pursuant to this policy.

26. It is a material violation of the lease to breed any animals in the unit.


**Pet Rule Violation**

1. Violation of this Policy twice within a 12-month period is considered a material violation of the lease and appropriate lease enforcement actions up to and including eviction shall be taken. If a violation of Item 9 or Item 11 of this section constitutes a second violation within 12 months, but such violation is cured; the number of violations will be reduced to one.

2. A single violation of Item 23 of this section is cause for lease termination. If the animal control center to which the pet that bit or attacked a resident, CHA employee, anyone visiting on the premises, or any animal on the premises was surrendered determines that the animal is a dangerous animal, the owner shall be required to remove the animal immediately to avoid lease termination.

3. Notice of Pet Rule Violation

When the property manager determines that an owner has violated one or more of these rules governing the owning or keeping of pets or assistance animals (excluding Item 23), based on objective facts and supported by written statements, then the CHA will serve a notice of the pet rule violation on the owner.

   a. The notice of pet rule violation must:

      i.    Contain a brief statement of the factual basis for the determination and the pet rule or rules

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



        alleged to be violated;

    ii.    State that the owner has 10 calendar days from the effective date of service of the notice to correct the violation (including, in appropriate circumstances, removal of the pet or assistance animal) or to make a written request for a meeting to discuss the violation. The effective date of service is the day that the notice is delivered or mailed, or in the case of service by posting, on the day that the notice was initially posted;

    iii.   State that the owner is entitled to be accompanied by another person of their choice at a requested meeting; and

    iv.   State that the owner's failure to correct the violation, to request a meeting, or to appear at a requested meeting may result in termination of the owner's Lease; 24 CFR § 5.356 (a).

  b.   The notice of violation of Item 23 of Section XIII.D. will be cause for an emergency notice of removal. This notice will require the immediate removal of the animal.

**Pet Rule Violation Meeting**

1. If within 10 calendar days from service of notice violation, the owner requests a meeting to discuss an alleged pet rule violation, the CHA shall establish a mutually agreeable time and place for the meeting to be held. The meeting must be held within 15 calendar days from the effective date the notice of pet rule violation was served (unless the CHA agrees to a later date).

2. The CHA and the owner shall discuss any alleged pet rule violation and attempt to cure the violation and reach an understanding.

3. As a result of the meeting, the CHA may give the owner additional time to correct the violation; 24 CFR § 5.356 (b)(1).

4. Any decision or agreements made as a result of the meeting will be placed in writing and signed by both parties. One copy is given to the owner, and one copy is placed in the resident's file.

5. Residents have the right to grieve decisions made through the <u>CHA Grievance Procedure for RAD Program</u>.

**Notice of Pet Removal**

1. If the owner and the CHA are unable to resolve the pet rule violation at the meeting or if the CHA determines that the pet owner failed to cure the pet rule violation within the additional time provided for this purpose under Section E.3.a.ii above (or at the meeting, if appropriate), the CHA will send the resident a notice requiring the pet owner to remove the pet. This notice must:

    a.   Contain a brief statement of the factual basis for the determination and the pet rule or rules that have been violated;

    b.   State that the owner must remove the pet or assistance animal within 10 calendar days of the effective date of service of notice (or the pet rule violation meeting, if the notice is served at the meeting); and

    c.   State the failure to remove the pet or assistance animal may result in the termination of the pet owner's tenancy; 24 CFR § 5.356 (b)(2).

**Termination of Pet Owner's Lease**

1. The CHA will not terminate an owner's tenancy based on a pet rule violation unless:

    a.   The owner failed to remove the pet/assistance animal or correct the pet rule violation within the applicable time period specified above (including any additional time permitted by the CHA); and

    b.   The pet rule violation is sufficient to terminate the owner's tenancy under the terms of the Lease and applicable regulations; 24 CFR § 5.356 (c).

2. Provisions of resident's Lease related to lease termination will apply in all cases.

**Protection of the Pet**

1. If the health or safety of a pet or assistance animal is threatened by the death or incapacity of the owner, or by other factors that render the owner unable to care for the pet, the CHA may contact the responsible party(ies)

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



listed in the registration form or the Alternate Care of Pet Statement and ask that they assume responsibility for the pet.

2. If the CHA finds evidence of neglect, abuse, or abandonment of the animal, the CHA may contact the responsible party(ies) listed in the registration form or the Alternative Care of Pet Statement and ask that they assume responsibility for the pet.

3. If the CHA is unable to contact the responsible party(ies) despite reasonable efforts or if the responsible party(ies) are unwilling or unable to care for the pet, the CHA may contact the appropriate state or local Animal Control Authority, Humane Society, or designated agent of the CHA and request the removal of the pet or assistance animal.

4. If none of the above actions are effective, the CHA may enter the owner's unit, remove the pet, and place the pet or assistance animal in a facility that will provide care and shelter until the owner or a representative of the owner is able to assume responsibility for the pet or assistance animal, but for no longer than 30 calendar days. The cost of the animal care facility provided under this section shall be paid by the owner; 24 CFR § 5.363.

**Nuisance or Threat to Health or Safety**

Nothing in this policy prohibits the CHA or the appropriate City of Chicago authority from requiring the removal of any pet or assistance animal from the property if the animal's conduct or condition constitutes a nuisance or a threat to the health or safety of other occupants of the property or members of the community where the property is located, pursuant to provisions of state or local law; 24 CFR § 5.327.


18-V.V. Lease Termination The CHA requires that all resident households abide by their resident obligations and lease agreement in order to remain in good standing for RAD PBV housing.

1. Lease Termination Policy
   a. The CHA, owner or the head of household may terminate tenancy at any time in accordance with all applicable federal, state and local laws, and the terms of the ***CHA Residential Lease Agreement for the RAD PBV Program*** (Lease) and **CHA Residential Mixed-Income Lease Agreement Addendum**, as applicable.
   b. A qualified resident with a disability may request a reasonable accommodation up until the time that he/she voluntarily vacates or is forcibly evicted from the dwelling unit.
   c. The CHA/owner shall provide the head of household written notice of the termination in accordance with the following schedule:
      i. Within 14 days, in the case of nonpayment of rent
      ii. As reasonable but not to exceed 30 days, if the health, safety or welfare of other residents, CHA staff, property management, or the like is threatened
      iii. 30 days in all other applicable cases
2. Resident-initiated Lease Termination (Including Senior Housing Transfers for Good Cause and Family Public Housing Resident Transfers)

   a. The head of household may terminate their lease by providing 15 calendar days written notice, or by an appropriate alternative format in the case of a person with a disability, to the CHA or the property manager. If there is a co-head of household, they must also sign the written notice in order to terminate the lease. If the head of household is a qualified person with a disability, they may terminate the lease by an alternate form of communication.

   b. There is an exemption to providing 15 calendar days written notice when the head of household is a victim of domestic violence, sexual violence, dating violence, or stalking. When the head of household, and/or their household members are victims of domestic violence, sexual violence, dating violence, sexual assault or stalking, and must leave the unit due to their status as a victim of domestic violence, sexual violence, dating violence or stalking, the victim or another household member shall inform property management within 72 hours but no longer than 30 days from the

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



date of departure, after alternative housing or shelter is found.

3. CHA-initiated Lease Termination

a. The CHA or the property manager will terminate a lease for serious or repeated violations of the material provisions of the lease and related addenda.

b. The CHA or the property manager may not terminate the tenancy of a head of household on the basis of an incident or incidents of actual or threatened domestic violence, sexual violence, dating violence, sexual assault or stalking that occurs against the head of household or authorized members of the head of household's family that constitute serious or repeated violations of the material provisions of the lease.

c. Criminal activity directly relating to domestic violence, sexual violence, dating violence, sexual assault or stalking engaged in by a member of a resident's household or any guest or other person under the control, shall not be cause for termination of assistance or tenancy, or occupancy rights if the leaseholder or other of the leaseholder's household is the victim or threatened victim of that domestic violence, sexual violence, dating violence, sexual assault or stalking and, as a result, could not control or prevent the criminal activity.

d. The property manager shall give written notice of proposed lease termination as required by the Lease and applicable regulations. The Notice of Lease Termination will be provided in English, d. Spanish, or other language as needed[21], or in the alternative format requested by a qualified resident with a disability.

e. In the Notice of Lease Termination, the CHA must inform a resident of the reason for the lease termination and of his/her right to grieve the lease termination as provided in the ***CHA Grievance Procedure for the RAD PBV Program***.

i. Upon the head of household's request, the resident shall have the opportunity prior to a grievance hearing to examine his/her file; to copy all documents, records, and regulations relevant to the grievance, at their own expense; and to take notes.

ii. Requests for copies of documents, records, and regulations shall be submitted in writing by the resident or by the resident's representative to the property manager and the CHA.

iii. The property manager and the CHA are required to provide the documents to the resident within five calendar days from the date of the request.

iv. If the resident or the resident's representative requests copies within five calendar days of the hearing, copies of documents shall be made available no later than one hour before the hearing is scheduled to begin.

v. The resident or the resident's representative shall be responsible for payment at the time the resident receives the copies from the property manager or the CHA. Costs for copies shall not exceed 10 cents per page.

vi. Any document requested by the resident or his/her representative, within the appropriate timeframe, that is in the possession of the CHA or the property manager and that is not made available after the resident's request, may not be presented by the CHA or property manager at a grievance hearing.

vii. The CHA, its representatives, and/or Property Management shall have the opportunity before the hearing to request copies of all documents, records, and regulations relevant to the grievance that are in the possession of the resident. The head of household, upon request, shall

---

[21] Where a significant number or proportion of the population eligible to be served or likely to be directly affected by a federally assisted program (e.g. public housing) requires service or information in a language other than English in order to be effectively informed of or to participate in the program, the CHA shall take reasonable steps, considering the scope of the program and the size and concentration of such population, to provide information in appropriate languages to such persons.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



allow the CHA and/or Property Management to make copies of all documents the head of household plans to present at the hearing.

viii. Any document requested by the CHA, it's representatives, and/or Property Management, within the appropriate timeframe, that is in the possession of the resident and that is not made available after the CHA, it's representatives, and/or Property Management's request, may not be presented by the resident at a grievance hearing.

**Fair Notice Ordinance**

4. The CHA is in compliance with the City of Chicago 2020 Fair Notice Ordinance. In an instance of CHA-initiated termination of a periodic tenancy or non-renewal of a fixed-term rental agreement, CHA must provide the following notices to residents:

a. 30 days' notice to terminate a resident's lease if they have lived in their unit less than six months.

b. 60 days' notice to terminate a resident's lease if they have lived in their unit for more than six months but less than three years.

c. 120 days' notice to terminate a resident's lease if they have lived in their unit more than three years.

The Fair Notice Ordinance does not apply if the eviction process has begun due to nonpayment of rent or another violation of the lease.

**5. Eviction Actions**

a. The CHA may only evict a resident from the unit by bringing a court action.

b. Only the Cook County Sheriff's Office or another legally-authorized department are authorized to execute an eviction.

c. If the resident does not prevail in an eviction action, the resident will be liable for all court costs, excluding attorney fees. If the resident prevails in an eviction action, he/she is not liable for court costs.

d. The CHA is not required to prove that the resident knew or should have known that a family member, household member, guest, or other person under the resident's control was engaged in the action that violated the lease.

e. When deciding whether or not to evict for criminal activity, the CHA may consider all the circumstances of the case, including the seriousness of the offense, the impact of the offense on other residents and the surrounding community, the extent of participation by family and household members, and the effects that the eviction would have on family and household members not involved in the proscribed activity.

f. In appropriate cases, the CHA may permit continued occupancy by Remaining Family Members (see 18-IV.I) and may impose a condition that the family members who engaged in the proscribed activity will neither reside in nor visit the dwelling unit again.

g. The CHA may require a resident who has engaged in the illegal use of drugs to present evidence of successful completion of a treatment program as a condition to visit and/or reside in the dwelling unit.

h. The CHA may place the Remaining Family Members on probation for an appropriate period of time.

**6. Record Keeping Requirements**

The CHA shall maintain a written or electronic record of every lease termination and/or eviction. Copies of all issued termination notices shall become a permanent part of the resident's tenant file.

Effective August 1, 2024

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



# Glossary

Acronyms Used in Subsidized Housing

| | |
|---|---|
| **ADA** | Americans with Disabilities Act of 1990 |
| **AHAP** | Agreement to Enter into a Housing Assistance Payment Contract |
| **AMI** | Area Median Income |
| **CDBG** | Community Development Block Grant (Program) |
| **CHA** | Chicago Housing Authority |
| **CFR** | Code of Federal Regulations |
| **DCFS** | Department of Children and Family Services |
| **EID** | Earned Income Disallowance |
| **EIV** | Enterprise Income Verification |
| **FHA** | Federal Housing Administration |
| **FMR** | Fair Market Rent |
| **FSS** | Family Self-Sufficiency (Program) |
| **HOME** | Home Investment Partnership Program |
| **HAP** | Housing Assistance Payment |
| **HCV** | Housing Choice Voucher |
| **HQS** | Housing Quality Standards |
| **HUD** | Department of Housing and Urban Development |
| **IHDA** | Illinois Housing Development Authority |
| **ITT** | Intent to Terminate |
| **LIHTC** | Low-Income Housing Tax Credits |
| **MTW** | Moving to Work Demonstration |
| **PBV** | Project-Based Voucher |
| **PHA** | Public Housing Authority |
| **PIH** | (HUD Office of) Public and Indian Housing |
| **RAD** | Rental Assistance Demonstration |
| **RRC** | Relocation Rights Contract |
| **RHI** | Regional Housing Initiative |
| **RTA** | Request for Tenancy Approval |
| **SDHP** | Senior Designated Housing Plan |
| **SEMAP** | Section 8 Management Assessment Program |

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan

| **SRO** | Single Room Occupancy |
| **SSDI** | Social Security Disability Insurance |
| **SSI** | Supplemental Security Income |
| **SSN** | Social Security Number |
| **TANF** | Temporary assistance for needy families |
| **TSP** | Tenant Selection Plan |
| **TTP** | Total Tenant Payment |
| **UIV** | Up-front Income Verification |
| **USCIS** | United States Citizenship and Immigration Services |
| **VAWA** | Violence Against Women Reauthorization Act of 2013 |
| **VASH** | Veterans Affairs Supportive Housing |

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



## Glossary of Terms

***Abatement of HAP contract.*** The process used by the CHA for withholding housing assistance payments from an owner. Abatement is used to enforce the CHA's rights and remedies against an owner under the HAP contract, such as the recovery of overpayments to the owner, or other housing assistance payments for a dwelling unit not maintained in accordance with CHA inspection standards. The CHA does not reimburse an owner for housing assistance payments that were abated for the period that the unit did not meet CHA inspection standards.

***Abusive or violent behavior.*** Behavior that includes verbal as well as physical abuse or violence. It also includes the use of racial epithets, or other language written or oral, that is customarily used to intimidate.

***Adjusted income.*** Annual income minus allowable HUD deductions.

***Americans with Disability Act (ADA).*** A federal law that prohibits discrimination against people with disabilities in employment, transportation, public accommodation, communications and governmental activities.

***Administrative fee.*** A fee paid by HUD to the CHA for administration of the program. See 24 CFR 982.152.

***Administrative fee reserve*** (formerly "operating reserve"). An account established by the CHA from excess administrative fee income. The administrative fee reserve must be used for housing purposes. See 24 CFR 982.155.

***Admission.*** The point when a family becomes a participant in the program. The date used for this purpose is the effective date of the first HAP contract for a family (first day of initial lease term) in a tenant-based program.

***Agreement to Enter into a Housing Assistance Payment Contract (AHAP).*** The document signed by the CHA and a potential PBV owner prior to entering into a HAP contract. The document assures that CHA will enter into a HAP contract as long as the owner complies with CHA inspection standards.

***Annual income.*** The anticipated total income of an eligible family from all sources for the 12-month period following the date of determination of income, computed in accordance with HUD regulations.

***Applicant (applicant family).*** A family that has applied for admission to a program but is not yet a participant.

***Area Median Income (AMI).*** Income amounts estimated and published by HUD for a geographical area and adjusted for different family sizes. HUD uses AMI to calculate income limits for eligibility in a variety of housing programs, including HCV. For the CHA, the applicable geographical area is the Chicago Metropolitan Statistical Area of Chicago-Joliet-Naperville.

***Budget authority.*** An amount authorized and appropriated by Congress for payment to PHAs under the HCV program. For each funding increment, the budget authority is the maximum amount that may be paid by HUD to the CHA over the Annual Contributions Contract (ACC) term of the funding increment.

***Childcare expenses.*** The amount anticipated to be paid by the family for the care of children under 13 years of age during the period for which annual income is computed. Deductions from annual income are only given where such care is necessary to enable a family member to actively seek employment, be gainfully employed, or to further his or her education and only to the extent such amounts are not reimbursed. The amount deducted shall reflect reasonable charges for childcare. In the case of childcare necessary to permit employment, the amount deducted shall not exceed the amount of employment income that is included in annual income.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



***Choose to Own (CTO).*** A program administered by the CHA that gives participants the option to own a home within the city of Chicago. See Homeownership Program.

***Co-head.*** An individual in the household who is equally responsible for the lease with the head of household. A family may have a co-head or spouse but not both. A co-head never qualifies as a dependent and must have legal capacity to enter into a lease.

***Code of Federal Regulations (CFR).*** Published federal rules that define and implement laws; commonly referred to as "the regulations."

***Community Development Block Grant Program (CDBG).*** A HUD program that provides communities with resources to address a wide range of unique community development needs. The CDBG program provides annual grants on a formula basis to 1209 general units of local government and states.

***Congregate housing.*** Housing for elderly persons or persons with disabilities that meets CHA inspection standards for congregate housing. A special housing type: see 24 CFR 982.606 to 982.609.

***Continuously assisted.*** An applicant is continuously assisted under the 1937 Act if the family is already receiving assistance under any 1937 Housing Act program when the family is admitted to the voucher program.

***Cooperative*** (term includes mutual housing). Housing owned by a nonprofit corporation or association, and where a member of the corporation or association has the right to reside in a particular apartment and participate in management of the housing. A special housing type: see 24 CFR 982.619.

***Dating violence.*** Violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim. The existence of such a relationship shall be determined based on a consideration of the following factors:

- The length of the relationship;
- The type of relationship; and
- The frequency of interaction between the persons involved in the relationship.

***Department of Child Family Services (DCFS).*** The state government agency responsible for child protective services.

***Demonstration programs.*** Programs for a limited number of participants that allow CHA to provide subsidized housing for a special population of people in need. See the CHA's Demonstration Program and Special Initiatives Overview.

***Department of Housing and Urban Development (HUD).*** The federal agency that administers programs that provide housing and community development assistance. The department also works to ensure fair and equal housing for all.

***Dependent.*** A member of the family (except foster children and foster adults) other than the head, spouse, co-head or live in aide who is under 18 years of age, or is a person with a disability, or is a full-time student.

***Disability assistance expenses.*** Reasonable expenses anticipated for a disabled family member for attendant care or an auxiliary apparatus that is necessary to enable a family member (including the disabled member) to be employed during the period for which annual income is computed. Participants will only be able to deduct these expenses from their income if they are not paid to a member of the family nor reimbursed by an outside source.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



**Disabled family.** A family whose head, spouse, co-head or sole member is a person with disabilities; or two or more persons with disabilities living together; or one or more persons with disabilities living with one or more live-in aides.

**Disabled person.** The CHA utilizes two different definitions of disability: there is a HUD definition that is used for income rent calculations and eligibility determinations as well as a broader Americans with Disabilities Act (ADA)/Fair Housing Act (FHA) definition that is used for reasonable accommodation purposes. See section 2-II.A.

**Domestic partners.** Individuals who are over the age of 18 who intend to live in the same residence and are responsible for each other's common welfare. They cannot be legally married to another person or be related by blood closer than would bar marriage in the State of Illinois. In addition, a city, county, or state agency or other unit of government must recognize them as domestic partners. If they are not recognized by a government agency then they must identify each other as their primary beneficiary in their will and have at least two joint financial arrangements. Examples of such are the following:

- Joint ownership of a motor vehicle;
- A joint credit account;
- A joint checking account; or
- A lease for a residence identifying both domestic partners as tenants.

**Domestic violence.** Felony or misdemeanor crimes of violence committed by:

- A current or former spouse of the victim;
- A person with whom the victim shares a child in common;
- A person who is cohabitating with or has cohabitated with the victim as a spouse;
- A person similarly situated to a spouse of the victim under domestic or family violence laws; or
- Any other person against whom an adult or youth victim is protected from that person's acts under domestic or family violence laws.

**Domestic Violence Victims.** Eligible applicants who can document that they have been displaced by domestic violence or need to move from their present housing because of domestic violence. See full definition of domestic violence in the Glossary.

**Domicile.** The legal residence of the household head or spouse as determined in accordance with state and local laws.

**Drug-related criminal activity.** As defined in 24 CFR 5.100. This includes the distribution, possession, sale or use of medical marijuana.

**Drug-trafficking.** The illegal manufacture, sale or distribution, or the possession with intent to manufacture, sell or distribute, of a controlled substance as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802).

**Earned Income Disallowance (EID).** A program that allows tenants who have been out of work to accept a job without having their rent increase right away. EID encourages self-sufficiency rewarding residents who go to work to increase their earnings.

**Elder Abuse Victims.** Eligible applicants who can document that they are victims of elder abuse. "Elder abuse" refers to any knowing, intentional, or negligent act by a caregiver or any other person that causes harm or a serious risk of harm to an elderly adult. "Abuse" refers to causing any physical, mental, or sexual injury to an eligible adult, including exploitation of such adult's financial resources.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



Elder abuse also includes self-neglect, which is a condition that is the result of an eligible adult's inability, due to physical or mental impairments, or both, or a diminished capacity, to perform essential self-care tasks that substantially threaten his or her own health, including: providing essential food, clothing, shelter, and health care; and obtaining goods and services necessary to maintain physical health, mental health, emotional well-being, and general safety.

***Elderly family.*** A family whose head, spouse or sole member is a person who is at least 62 years of age; or two or more persons who are at least 62 years of age living together; or one or more persons who are at least 62 years of age living with one or more live-in aides.

***Elderly person.*** An individual who is at least 62 years of age.

***Eligible family.*** A family that is income eligible and meets the other requirements to participate in the HCV program.

***Enterprise Income Verification (EIV).*** The online system that provides new hire, wage, unemployment compensation and Social Security benefit information through a data matching process for households covered by a HUD-Form 50058 and individuals who have disclosed a valid Social Security Number.

***Elevated Blood Lead Levels.*** A confirmed concentration of lead in whole blood of a child under the age six equal to or greater than the concentration in the most recent guidance published by the U.S. Department of Health and Human Services (HHS) on recommending that an environmental intervention be conducted.

***Eviction.*** The removal of a tenant from a rental property by the landlord.

***Exception payment standard.*** A payment standard that is outside of the HUD-established FMR range.

***Excluded income.*** Income that is not counted in determining the family's share of rent.

***Fair Housing Act (FHA).*** Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988.

***Fair Market Rent (FMR).*** The rent, including the cost of utilities, as established by HUD for units of varying sizes that must be paid in the housing market area to rent privately owned, existing, decent, safe and sanitary rental housing of modest (non-luxury) nature with suitable amenities.

***Family.*** Includes, but is not limited to, the following, regardless of actual or perceived sexual orientation, gender identity or marital status:

- A family with a child or children;
- Two or more elderly or disabled persons living together;
- One or more elderly or disabled persons living with one or more live-in aides;
- A single person, who may be an elderly person, a displaced person, a disabled person or any other single person; or
- Two or more individuals who are not related by blood, marriage, adoption or other operation of law but who either can demonstrate that they have lived together previously or certify that each individual's income and other resources will be available to meet the needs of the family.

***Family obligations.*** The rules and regulations that program participants must abide by to remain on the Housing Choice Voucher program.

***Family rent to owner.*** See Family share.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



**Family Self-Sufficiency (FSS) Program**. The program established by the CHA in accordance with 24 fami part 984 to promote self-sufficiency of assisted families, including the coordination of supportive services (42 U.S.C. 1437u). See the CHA's Family Self-Sufficiency Action Plan.

**Family share.** The portion of rent and utilities paid by the family. See 24 CFR 982.515(a).

**Family Unification Program (FUP).** The program under which Housing Choice Vouchers are provided to two different populations:
- Families for whom the lack of adequate housing is a primary factor in:
  - The imminent placement of the family's child or children in out-of-home care; or
  - The delay in the discharge of the child or children to the family from out-of-home care. There is no time limitation on FUP family vouchers.
- Youth at least 18 years old and not more than 21 years old who left foster care at age 16 or older and who lack adequate housing. FUP vouchers used by youth are limited by statute to 18 months of housing assistance.

**Foster Youth To Indepedence Initiative (FYI).** The program under which Housing Choice Vouchers are provided to youth at least 18 years and not more than 24 years of age (have not reahed 25th birthday) who left foster care, or will leave foster care within 90 days, and are homeless or are at risk of becoming homeless at age 16 or older. As required by stature, these may only be used to provide housing assistane for the youth for a maximum of 36 months.

**Family unit size.** The appropriate number of bedrooms for a family as determined by the CHA under CHA subsidy standards.

**Federal Housing Administration (FHA).** The federal agency that provides mortgage insurance on loans made by FHA-approved lenders throughout the United States and its territories.

**Fixed-income.** The term "fixed-income" includes income from:
- Social Security payments to include Supplemental Security Income (SSI) and Supplemental Security Disability Insurance (SSDI);
- Federal, state, local and private pension plans; and
- Other periodic payments received from annuities, insurance policies, retirement funds, disability or death benefits, and other similar types of periodic receipts that are of substantially the same amounts from year to year**.**

**Gross rent.** The sum of the rent to owner plus any utility allowance.

**Group home.** A dwelling unit that is licensed by a state as a group home for the exclusive residential use of two to 12 persons who are elderly or persons with disabilities (including any live-in aide). A special housing type: see 24 CFR 982.610 to 982.614.

**Guest.** A person temporarily staying in the unit with the consent of the head of household or other adult member See 24 CFR 5.100..

**HAP contract.** A written contract between the CHA and an owner for the purpose of providing housing assistance payments to the owner on behalf of an eligible family.

**Hardship exemption.** An exemption of a policy given to a participant due to the policy causing a financial hardship. See section 6-II.B for the hardship exemption for the minimum rent policy.

**Hearsay evidence.** Evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



**Head of household.** The adult member of the family who is the head of the household for purposes of determining income eligibility and rent.

**Homeless, homeless individual or homeless person.** CHA follows the definition of homeless and homeless person found at 24 CFR 91.5.

**Homeownership Program.** A Program to assist a family residing in a home purchased and owned by one or more members of the family.

**Household.** Includes all family members residing in the unit and additional people who, with the CHA's permission, live in an assisted unit, such as live-in aides, foster children and foster adults.

**Housing Assistance Payment (HAP).** The monthly assistance payment by the CHA, which includes a payment to the owner for rent under the family's lease and any additional payment to the family if the total assistance payment exceeds the rent to owner.

**Housing Quality Standards (HQS).** The HUD minimum quality standards a unit must meet prior to an owner receiving any payment from the CHA.

**Income.** Monetary payments received by each member of the household from various sources, as determined in accordance with criteria established by HUD.

**In-place family.** An eligible family residing in a proposed PBV contract unit on the date the proposal is selected.

**Informal hearing.** The process where participants have the ability to challenge a decision that has had a negative impact on them.

**Informal review.** The process where applicants have the ability to challenge a decision that has had a negative impact on them.

**Initial PHA.** In portability, the term refers to:
- The PHA that originally selected a family that later decides to move out of the jurisdiction of the selecting PHA;
- The PHA that was administering assistance for a family and the family later decides to move out of the jurisdiction of the administering PHA; or
- The PHA that absorbed a family that later decides to move out of the jurisdiction of the absorbing PHA.

**Initial payment standard.** The payment standard at the beginning of the HAP contract term.

**Initial rent to owner.** The rent to owner at the beginning of the HAP contract term.

**Intent to Terminate (ITT).** The initial document that the CHA sends to the family and their landlord to begin the termination process.

**Jurisdiction.** The area in which the CHA has authority under state and local law to administer the program.

**Lease.** A written agreement between an owner or property manager and a tenant for the leasing of a dwelling unit to the tenant. The lease establishes the conditions for occupancy of the dwelling unit by a family with housing assistance payments under a HAP contract between the owner and the CHA.

**Leaseholder Housing Choice and Relocation Rights Contract (RRC).** The contract that sets forth the rights and responsibilities of the Chicago Housing Authority and the CHA public housing leaseholder (who were lease compliant on 10/1/1999) in the event that CHA relocates them from their CHA public housing unit either temporarily or permanently for any reason beyond their control when in

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



conjunction with redevelopment, demolition, consolidation, rehabilitation, court order or required conversion to tenant-based assistance.

***Live-in aide.*** A person who resides with one or more elderly persons near-elderly persons or persons with disabilities, and who:

- Is determined to be essential to the care and well-being of the persons;
- Not obligated for the support of the persons; and
- Would not be living in the unit except to provide the necessary supportive services.

***Local preference.*** A preference or criteria used by a PHA to select applicants who reside in the PHA's jurisdiction.

***Low income family.*** A family whose income does not exceed 80% of the median income for the area as determined by HUD, with adjustments for smaller or larger families.

***Low Income Housing Tax Credits (LIHTC).*** A dollar for dollar reduction in tax liability provided by the federal government to the owner of a qualified low-income housing development for the acquisition, rehabilitation or construction of low-income rental housing units.

***Manufactured home.*** A manufactured structure that is built on a permanent chassis, is designed for use as a principal place of residence and meets the CHA inspection standards. A special housing type: see 24 CFR 982.620 and §982.621.

***Medical expenses***. The amount of unreimbursed payments made by the household for medical or dental related costs that are anticipated during the period for which annual income is computed and not covered by insurance. For elderly and disabled families these expenses are deducted from household income and used to calculate adjusted income (deductions given only if they exceed 3% of annual income).

***Minimum rent.*** Participants must pay a minimum rent of $75. See Section 6-II for policies on minimum rent.

***Minor***. A member of a household other than the head or spouse who is under 18 years of age.

***Mixed family.*** A family whose members include those with citizenship or eligible immigration status and those without citizenship or eligible immigration status.

***Mixed financing.*** A financing structure that allows HUD to mix public, private and non-profit funds to develop and operate housing developments.

***Mixed-income.*** A housing development comprised of housing with various levels of affordability, including market-rate and affordable housing within the same property.

***Moderate Rehabilitation.*** A program that provides project-based rental assistance for low-income families. The program was repealed in 1991 and no new projects are authorized for development.

***Monthly gross income***. The family's total monthly income.

***Moving to Work (MTW) Program.*** A demonstration program authorized by law that allows public housing agencies to design and test ways to promote self-sufficiency among assisted families, achieve programmatic efficiency and reduce costs, and increase housing choice for low-income households.

***Moving to Work (MTW) Demonstration Agreement.*** A statement signed by the CHA and HUD granting the CHA authority to waive selected statutory and regulatory requirements to allow the flexibility in achieving the stated objectives of the MTW program.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



**Noncitizen.** A person who is neither a citizen nor national of the United States.

**Owner.** Any person or entity with the legal right to lease or sublease a unit to a participant in the HCV program. This includes a principal or other interested party such as a designated agent of the owner.

**Participant (participant family).** A family that has been admitted to the CHA program and is currently receiving assistance. The family becomes a participant on the effective date of the first HAP contract executed by the CHA for the family (first day of initial lease term).

**Payment standard.** An amount established by CHA that represents the maximum monthly assistance payment for a family assisted in the voucher program (before deducting the total tenant payment by the family). Payment standards are based on HUD published FMRs.

**Persons with disabilities.** A person who has a disability as defined in 42 U.S.C. 423 or a developmental disability as defined in 42 U.S.C. 6001. Includes a person who is determined, under HUD regulations, to have a physical or mental impairment that is expected to be of long-continued and indefinite duration, substantially impedes the ability to live independently and is of such a nature that the ability to live independently could be improved by more suitable housing conditions. For purposes of reasonable accommodations and program accessibility persons with disabilities are defined as "individuals with handicaps" as defined in 24 CFR 8.3. The definition does not exclude persons who have AIDS or conditions arising from AIDS, but does not include a person whose disability is based solely on drug or alcohol dependence (for low-income housing eligibility purposes).

**Portability.** Renting a dwelling unit with a housing choice voucher outside the jurisdiction of the initial PHA.

**Preference.** Specific criteria used to give priority to applicants off the waiting list who meet designated criteria. See Section 4-II.C for a list of the CHA's preferences.

**Preponderance of the evidence.** Evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not.

**Project Based Voucher (PBV).** A component of a public housing agency's housing choice voucher program that commits project-based vouchers to privately developed and owned housing units. A PHA can attach up to 20 percent of its voucher assistance to specific housing units if the owner agrees to either rehabilitate or construct the units or to set aside a portion of the units in an existing development. See Chapter 17.

**Public assistance.** Any welfare or other payments to families or individuals based on need, which are made under programs funded, separately or jointly, by federal, state or local governments.

**Public and Indian Housing (PIH).** The HUD program office that oversees public housing and the housing choice voucher programs.

**Public Housing Authority (PHA).** Any state, county, municipality or other governmental entity or public body, or agency that is authorized to engage or assist in the development or operation of low-income housing under the 1937 Act.

**Reasonable accommodation.** A modification or change the CHA can make to its policies or procedures that will assist an otherwise qualified applicant or participant with a disability to take full advantage of and use CHA programs, including those that are operated by other agencies in CHA-owned public space.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



**Reasonable rent.** A rent to owner that is not more than rent charged for comparable units in the private unassisted market and other market rate units on the premises.

**Receiving PHA.** In portability: A PHA that receives a family selected for participation in the tenant-based program of another PHA. The receiving PHA issues a voucher and provides program assistance to the family.

**Reexamination**. The process of securing documentation of total family income used to determine the total rent, HAP and tenant amount for the next 12 months if there are no additional changes reported.

**Regional Housing Initiative (RHI).** A partnership of PHAs in the region that provides financial incentives to developers and owners of rental housing to address local issues.

**Rent reasonableness**. The process to ensure that the CHA pays a fair rent for each unit rented under the HCV program.

**Rent to owner.** The total monthly rent payable to the owner under the lease for the unit (also known as contract rent). Rent to owner covers payment for any housing services, maintenance and utilities that the owner is required to provide.

**Rental Assistance Demonstration (RAD).** A HUD demonstration program that, among other components, allows public housing and Moderate Rehabilitation properties to convert to long-term Section 8 rental assistance contracts.

**Repayment agreement.** A formal document signed by a tenant and provided to the CHA in which a tenant acknowledges a debt in a specific amount and agrees to repay the amount due at specific time periods.

**Request for Tenancy Approval (RTA).** The document that needs to be completed by the participant or applicant and owner to begin the lease up process.

**Section 8 Management Assessment Program.** A HUD assessment tool that measures the performance of public housing agencies that administer the Housing Choice Voucher program.

**Senior Designated Housing Plan (SDHP).** The CHA's plan to specifically address the housing needs of senior citizens.

**Shared housing.** A unit occupied by two or more families. The unit consists of both common space for shared use by the occupants of the unit and separate private space for each assisted family. A special housing type: see 24 CFR 982.615 to 982.618.

**Single Room Occupancy (SRO) housing.** A unit that contains no sanitary or food preparation facilities or contains one or the other but not both. A special housing type: see 24 CFR 982.602 to 982.605.

**Social Security Insurance (SSI).** A federally run benefits program that provides aid to low income people who are 65 or older, blind, or disabled.

**Social Security Disability Insurance (SSDI).** A federally run benefits program that provides aid to people who are unable to achieve gainful employment due to a permanent disabling condition.

**Special admission.** Admission of an applicant that is not on the CHA waiting list or without considering the applicant's waiting list position.

**Special housing types.** See subpart M of part 982. Subpart M states the special regulatory requirements for: SRO housing, congregate housing, group homes, shared housing, cooperatives (including mutual housing).

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



***Special purpose vouchers.*** Vouchers that are different from regular housing choice vouchers in that funding has been specifically provided by Congress in separate appropriations and are reserved for special populations (e.g. VASH or FUP).

***Stalking.***
- To follow, pursue, or repeatedly commit acts with the intent to kill, injure, harass, or intimidate;
- To place under surveillance with the intent to kill, injure, harass, or intimidate another person; or
- To repeatedly commit acts to place a person in reasonable fear of the death of, or serious bodily injury to, or to cause substantial emotional harm to:
  - That person;
  - A member of the immediate family of that person; or
  - The spouse or intimate partner of that person.

***Subsidy standards.*** Standards established by the CHA to determine the appropriate number of bedrooms and amount of subsidy for families of different sizes and compositions.

***Supportive housing.*** Affordable housing blended with on-site supportive services, including case management, that helps people live more stable, productive lives. Supportive housing benefits individuals and families facing complex challenges, including those who are homeless or at risk of becoming homeless, and those facing serious, persistent challenges to a successful life such as alcohol abuse, substance use, mental illness or HIV/AIDS. Populations served may also include persons with developmental disabilities or the frail elderly.

***Targeted funding.*** Funding that the CHA receives that is allocated for a specified category. The CHA can only use this funding to assist families that meet the particular criteria.

***Tenancy.*** The possession of property as a tenant.

***Tenancy addendum.*** The lease language required by HUD in the lease between the tenant and the owner.

***Tenant based voucher.*** A HUD funded subsidy program assisting low and very low-income families obtain housing on the private market.

***Tenant Selection Plan (TSP).*** A plan drafted by the owner of a PBV building documenting criteria for selecting perspective tenants.

***Term of lease.*** The amount of time a tenant and owner agree in writing to live in a dwelling unit.

***Termination of assistance.*** The removal of a participant from a CHA program. See Chapter 12.

***Temporary Assistance for Needy Families (TANF).*** A program designed to help needy families achieve self-sufficiency. States receive block grants to design and operate programs to accomplish one of the purposes of the TANF program.

***Total Tenant Payment (TTP).*** The total amount the tenant is required to pay toward rent and utilities.

***Unauthorized occupant:*** A person residing in the assisted unit without the consent or approval of CHA.

***United States Citizenship and Immigration Services (USCIS).*** The federal government agency that oversees lawful immigration to the United States.

***Upfront Income Verification (UIV).*** Verification of income, before or during a family reexamination, through an independent source that systematically and uniformly maintains income information in computerized form.

Chicago Housing Authority
Housing Choice Voucher Program Administrative Plan



***Utility allowance.*** The estimated cost that a participant will pay in utilities which is included in their total tenant portion.

***Utility reimbursement.*** The portion of the housing assistance payment which exceeds the amount of rent to owner due to the utility allowance being greater than the total tenant payment. This amount is paid directly to the tenant.

***Veterans Affairs Supportive Housing (VASH).*** A housing program that combines HCV rental assistance for homeless veterans with case management and clinical services provided by the Department of Veterans Affairs.

***Veterans, Active and Inactive Military Personnel and Immediate Family Members of both***: An eligible applicant who can document that he/she is a veteran, or is the immediate family member of a veteran (living or deceased), or is active/inactive personnel of the United States Armed Forces. Immediate family member documentation for preference must show financial support from the veteran while he/she was alive or the immediate family member is presently receiving benefits or financial support from active/inactive personnel.

***Violence Against Women Act (VAWA).*** A federal law that protects victims (both men and women) of domestic violence, dating violence, sexual assault or stalking who apply for or live in private housing with a voucher. The law covers the head of household and household members.

***Very low income family.*** A family whose annual income does not exceed 50% of the median income for the area, as determined by HUD, with adjustments for smaller and larger families.

***Violent criminal activity.*** Any illegal criminal activity that has as one of its elements the use, attempted use or threatened use of physical force against the person or property of another.

***Voucher.*** A document issued by the CHA to a family selected for admission to the HCV program. This document describes the program and the procedures for CHA approval of a unit selected by the family. The voucher also states obligations of the family under the program.

***Voucher term.*** The amount of time a participant or applicant has to search for housing with their housing choice voucher**.**

***Welfare assistance***. Income assistance from federal or state welfare programs, including assistance provided under TANF and general assistance. This does not include assistance directed solely to meeting housing expenses, nor programs that provide health care, childcare or other services for working families. For the FSS program ([24 CFR 984.103(b)](https://www.example.com)), "welfare assistance" includes only cash maintenance payments from federal or state programs designed to meet a family's ongoing basic needs, but does not include food stamps, emergency rental and utilities assistance, SSI, SSDI or Social Security.