**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| RySheena Moore, Cadeidga Coleman, Janishia Fleming, and Sheliah Ayanwale, on behalf of themselves and all others similarly situated, and H.O.P.E., Inc., d/b/a HOPE Fair Housing Center, | ) ) ) ) ) | Case No. 24 -cv-12912 |
| | ) | Hon. April M. Perry |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Mac Property Management, LLC, d/b/a Mac Properties, | ) ) ) | |
| Defendant. | ) ) ) | |

**Plaintiffs' Response in Opposition to Defendant Mac Properties'
Motion to Dismiss Plaintiffs' Complaint and to Strike Class Allegations**

CHICAGO LAWYERS COMMITTEE FOR CIVIL RIGHTS
Emily Coffey
MacKenzie Speer
Jacob Cantor
Aneel L. Chablani
100 N. LaSalle St., Ste. 600
Chicago, IL 60602
Telephone: (312) 630-9744
ecoffey@clccrul.org
mspeer@clccrul.org
jcantor@clccrul.org
achablani@clccrul.org

HUGHES SOCOL PIERS RESNICK & DYM, LTD.
Charles D. Wysong
Tory Tilton
70 W. Madison St., Ste. 4000
Chicago, IL 60602
Telephone: (312) 580-0100
cwysong@hsplegal.com
ttilton@hsplegal.com
*Attorneys for Plaintiffs*

TABLE OF CONTENTS

Introduction ................................................................................................................... 1

Statement of Facts ........................................................................................................ 3

Argument ....................................................................................................................... 5

   I.   Plaintiffs Plausibly Allege Differential Treatment Because of Their Vouchers. ................. 5

   II.  The Illinois General Assembly Defined Source of Income Identically to Existing Statutes to Ensure that State Law Protects Vouchers Holders. ......................................................... 7

   III. The IHRA Source of Income Protections are Constitutional. .............................................. 9

      A.  The Court Cannot Grant Defendant's Constitutional Challenge Because Defendant Did Not Notify the Illinois Attorney General in Violation of FRCP Rule 5.1 ...................... 9

      B.  No Court has Held that Federal Law Preempts State or Local Source of Income Discrimination Protections and this Court should not be the First. ............................... 9

      C.  The IHRA Does Not Facially Violate the Fourth Amendment and Defendant Did Not Bring an As-Applied Challenge, Which Would be a Fact-Based Challenge Anyway. . 13

   IV. Plaintiffs Plead a Violation of the FHA Under *Inclusive Communities* Because Defendant's Voucher Discrimination is 46x More Likely to Impact Black Renters. ............................ 18

      A.  Plaintiffs Plead a Classic FHA Disparate Impact Claim About a Specific Policy. ....... 18

      B.  Neither the FHA nor *Inclusive Communities* Require Plaintiffs to Plead Any of the Irrelevant Information that Defendant Demands. ......................................................... 20

      C.  *Knapp* was Abrogated by *Inclusive Communities*. ....................................................... 23

      D.  Plaintiffs Allege a Violation of the IHRA Regardless of *Knapp*. ................................. 26

   V.  Plaintiffs Plead Unfair Practices in Violation of the ICFA. ............................................. 27

   VI. The IHRA Does Not Preempt the ICFA Unfair Practices Claim. ..................................... 28

   VII. The Court Should Not Prematurely Strike the Class Allegations. .................................... 30

   VIII.Plaintiff HOPE Fair Housing Center has Article III Standing Under *Havens*. ................. 33

      A.  Standing Under the FHA Extends as Broadly as Permitted by Article III. ................... 34

B.  Defendant's Discriminatory Housing Practices have and will Continue to Injure HOPE's Mission and Core Activities. ........................................................................................ 34

C.  *Alliance* Did Not Overturn *Havens* and Does Not Apply to HOPE Regardless. .......... 35

Conclusion ................................................................................................................................ 39

TABLE OF AUTHORITIES

**Cases**

*216 East 29th Street Trust v. City of New York*,
  No. 24-cv-00595 (ER), 2025 WL 315380 (S.D.N.Y. Jan. 28, 2025) ..................... 13, 14, 15, 17

*Access Living of Metro. Chicago, Inc. v. City of Chicago*,
  1:18-cv-03399, 2024 WL 4346630 (N.D. Ill. Sept. 30, 2024).................................................. 37

*Access Living of Metro. Chicago, Inc. v. City of Chicago*,
  372 F. Supp. 3d 663 (N.D. Ill. 2019) ................................................................................ 6, 30

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
  659 F.3d 13 (D.C. Cir. 2011).................................................................................................... 37

*Atkins v. City of Chicago Comm'n on Hum. Rel.*,
  281 Ill. App. 3d 1066 (1st Dist. 1996) .................................................................................... 26

*Atl. Hous. Partners L.L.L.P. v. Brevard Cnty.*,
  No. 6:23-cv-2473-JSS-DCI, 2024 WL 4235770 (M.D. Fla. Sept. 19, 2024) .......................... 23

*Attorney General v. Brown*,
  400 Mass. 826 (1987) ..............................................................................................................11

*Austin Apartment Ass'n v. City of Austin*,
  89 F. Supp. 3d 886 (W.D. Tex 2015)..................................................................................11, 12

*Baker v. City of Portsmouth*,
  No. 1:14cv5l2, 2015 WL 5822659 (S.D. Ohio Oct. 1. 2015) .................................................. 15

*Bank of Am. Corp v. City of Miami*,
  581 U.S. 189 (2017) ................................................................................................................. 34

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................................... 5

*Benson v. Fannie May Confections Brands, Inc.*,
  944 F.3d 639 (7th Cir. 2019) ............................................................................................. 9, 28

*Bourbeau v. Jonathan Woodner Co.*,
  549 F. Supp. 2d 78 (D.D.C. 2008) ..........................................................................................11

*Breen v. Chao*,
  253 F. Supp. 3d 244 (D.D.C. 2017) ........................................................................................ 23

*Burbank Apartments Tenant Ass'n v. Kargman*,
  474 Mass. 107 (2016) .............................................................................................................. 25

*California Fed. Sav. & Loan Ass'n v. Guerra*,
 479 U.S. 272 (1987) ............................................................................................................ 9

*Camara v. Mun. Court of City & Cnty. of San Francisco*,
 387 U.S. 523 (1967) .......................................................................................................... 15

*CE Design Ltd. v. King Architectural Metals, Inc.*,
 637 F.3d 721 (7th Cir. 2011) ............................................................................................ 33

*Cent. Alabama Fair Hous. Ctr., Inc. v. Lowder Realty Co., Inc.*,
 236 F.3d 629 (11th Cir. 2000) .......................................................................................... 38

*City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*,
 982 F.2d 1086 (7th Cir. 1992) .......................................................................................... 37

*City of Joliet v. New West, L.P.*,
 825 F.3d 827 (7th Cir. 2016) ...................................................................................... 22, 23

*City of Los Angeles v. Patel*,
 576 U.S. 409 (2015) ................................................................................................ 13, 14, 15

*Cnty. of Cook v. Bank of Am. Corp.*,
 78 F.4th 970 (7th Cir. 2023) ............................................................................................. 38

*Comm'n on Hum. Rights and Opportunities v. Sullivan Assocs.*,
 250 Conn. 763 (1999) .................................................................................................... 11, 12

*Common Cause Indiana v. Lawson*,
 937 F.3d 944 (7th Cir. 2019) ...................................................................................... 35, 38

*Connecticut v. Teal*,
 457 U.S. 440 (1982) .......................................................................................................... 20

*Crossroads Residents Organized for Stable & Secure ResiDencieS (CROSSRDS) v.
 MSPCrossroads Apartments LLC*,
 CV 16-233 ADM/KMM, 2016 WL 3661146 (D. Minn. July 5, 2016) ................................... 25

*Crossroads Residents Organized for Stable & Secure ResiDencieS (CROSSRDS) v.
 MSPCrossroads Apartments LLC*,
 CV 16-233 ADM/HB, 2016 WL 1555697 (D. Minn. Apr. 15, 2016) .................................... 25

*Dakhlallah v. Zima*,
 42 F. Supp. 3d 901 (N.D. Ill. 2014) .................................................................................. 16

*Damasco v. Clearwire Corp.*,
 662 F.3d 891 (7th Cir. 2011) ............................................................................................ 30

*Donovan v. Dewey,*
    452 U.S. 594 (1981)..................................................................................... 17

*Durning v. Citibank, N.A.,*
    950 F.2d 1419 (9th Cir. 1991)..................................................................... 38

*Eidson v. Pierce,*
    745 F.2d 453 (7th Cir. 1984)....................................................................... 12

*Fair Hous. Ctr. of Cent. Indiana, Inc. v. M&J Mgmt. Co., LLC,*
    No. 1:22-CV-00612-TAB-JPH, 2024 WL 3859997 (S.D. Ind. Aug. 19, 2024)...... 19, 22, 38, 39

*Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC,*
    124 F.4th 990 (6th Cir. 2025)..................................................................... 37

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024)............................................................................ 2, 33, 36

*Fletcher Props., Inc. v. City of Minneapolis,*
    947 N.W.2d 1 (Minn. 2020).......................................................................... 25

*Forest Park II v. Hadley,*
    336 F.3d 724 (8th Cir. 2003)....................................................................... 12

*Franklin Tower One, L.L.C. v. N.M.,*
    157 N.J. 602 (1999) ...............................................................................11, 12

*G.G. v. Salesforce.com, Inc.,*
    76 F.4th 544 (7th Cir. 2023)......................................................................... 6

*Godinez v. Sullivan-Lackey,*
    352 Ill. App. 3d 87 (1st Dist. 2004) ....................................................... 2, 8, 26, 27

*Graoch Associates # 33, L.P. v. Louisville/Jefferson Cnty. Metro Hum. Rel. Comm'n,*
    508 F.3d 366 (6th Cir. 2007)....................................................................... 20

*Groce v. Eli Lilly & Co.,*
    193 F.3d 496 (7th Cir. 1999)....................................................................... 26

*Halpern 2012, LLC v. City of Ctr. Line,*
    404 F. Supp. 3d 1109 (E.D. Mich. 2019) ..................................................... 15

*Harris v. Kashi Sales, LLC,*
    609 F. Supp. 3d 633 (N.D. Ill. 2022) .......................................................... 16

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982)......................................................................... 2, 34, 36

v

*Hawkins v. Chicago Comm'n on Human Relations*,
  2020 IL App (1st) 191301 ................................................................................................ 26

*Hazen Paper Co. v. Biggins*,
  507 U.S. 604 (1993) ........................................................................................................ 19

*Hegwood v. City of Eau Claire*,
  676 F.3d 600 (7th Cir. 2012) ..................................................................................... 13, 16

*Herndon v. Hous. Auth. of S. Bend*,
  No. 3:15 CV 169, 2016 WL 8201134 (N.D. Ind. May 20, 2016) ................................... 25

*Hill v. Grp. Three Hous. Dev. Corp.*,
  799 F.2d 385 (8th Cir. 1986) .......................................................................................... 12

*HOPE Fair Hous. Ctr., Inc. v. City of Peoria*,
  No. 1:17-cv-01360-SLD-JEH, 2018 WL 10246029 (C.D. Ill. May 14, 2018) ...................... 35

*H.O.P.E., Inc. v. Eden Mgmt. LLC*,
  No. 13-cv-7391, 2016 WL 4011225 (N.D. Ill. July 27, 2016) ....................................... 35

*Huskey v. State Farm Fire & Cas. Co.*,
  No. 22 C 7014, 2023 WL 5848164 (N.D. Ill. Sept. 11, 2023) ................................ 18, 19, 20

*In re Hair Relaxer Mktg.Sales Practices & Prods. Liab. Litig.*,
  No. 23-CV-0818, 2024 WL 4333709 (N.D. Ill. Sept. 27, 2024) .................................. 30, 33

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*,
  920 F.3d 890 (5th Cir. 2019) .................................................................................. 21, 22, 25

*Johnson v. Levy*,
  812 F. Supp. 2d 167 (E.D.N.Y. 2011) ............................................................................... 7

*Jones v. City of Kansas City*,
  No. 4:24-cv-00649-RK, slip op. (W.D. Mo. Feb. 11, 2025) ...................................... 15, 17

*Knapp v. Eagle Prop. Mgmt. Corp.*,
  54 F.3d 1272 (7th Cir. 1995) ...................................................................................... passim

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*,
  422 F.3d 490 (7th Cir. 2005) .......................................................................................... 33

*Legal Aid Chicago v. Hunter Props.*,
  No. 23-cv-04809, 2024 WL 4346615 (N.D. Ill. Sept. 30, 2024) ............................ 35, 37, 38

*Loop Spine & Sports Ctr., Ltd. v. Am. Coll. of Med. Quality, Inc.*,
  No. 22 CV 04198, 2023 WL 3585835 (N.D. Ill. May 22, 2023) ..................................... 27

*Louis v. Saferent Sols., LLC*,
    685 F. Supp. 3d 19 (D. Mass. 2023) ................................................. 21

*Lucas v. Vee Pak, Inc.*,
    68 F. Supp. 3d 870 (N.D. Ill. 2014) ............................................. 32, 33

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................... 33, 36

*Maksimovic v. Tsogalis*,
    177 Ill. 2d 511 (1997) ......................................................................... 29

*Max M. v. New Trier High School Dist. No. 203*,
    859 F.2d 1297 (7th Cir. 1988) ............................................................. 9

*McCaleb v. Pizza Hut of Am., Inc.*,
    28 F. Supp. 2d 1043 (N.D. Ill. 1998) ................................................ 29

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    672 F.3d 482 (7th Cir. 2012) ......................................................... 31, 32

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) .............................................................. 31

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*,
    558 F.2d 1283 (7th Cir. 1977) ....................................................... 19, 24

*Montgomery Cnty v. Glenmont Hill Assocs. Privacy World at Glenmont Metro Centre*,
    402 Md. 250 (2007), *cert. denied* 554 U.S. 939 .............................. 11, 12

*Mother Zion Tenant Ass'n v. Donovan*,
    55 A.D.3d 333 (1st Dep't 2008) ......................................................... 12

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) .............................................................. 31

*Murdock-Alexander v. Tempsnow Emp't*,
    No. 16-CV-5182, 2016 WL 6833961 (N.D. Ill. Nov. 21, 2016) ...... 30, 32

*Murphy-Hylton v. Lieberman Mgmt. Servs.*,
    2016 IL 120394 ..................................................................................... 7

*N.A.A.C.P. v. Am. Family Mut. Ins. Co.*,
    978 F.2d 287 (7th Cir. 1992) .............................................................. 24

*Naeem v. McKesson Drug Co.*,
    444 F.3d 593 (7th Cir. 2006) .............................................................. 29

*Naperville Smart Meter Awareness v. City of Naperville*,
  900 F.3d 521 (7th Cir. 2018) ................................................................. 17

*Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Trust*,
  No. 18 CV 839, 2019 WL 5963633 (N.D. Ill. Nov. 13, 2019) ................................. 19

*Nat'l Fair Hous. All. v. Travelers Indem. Co.*,
  261 F. Supp. 3d 20 (D.D.C. 2017) ........................................................... 21

*Nesbitt v. Draper & Kramer, Inc.*,
  No. 08 C 2684, 2008 WL 4542942 (N.D. Ill. May 23, 2008) ................................... 7

*New York v. Burger*,
  482 U.S. 691 (1987) ........................................................................ 15

*Ohio v. Robinette*,
  519 U.S. 33 (1996) ......................................................................... 16

*Owner-Operator Indep. Drivers Assoc., Inc. v. United States Dep't of Transp.*,
  840 F.3d 879 (7th Cir. 2016) ............................................................... 18

*Patriotic Veterans, Inc. v. Indiana*,
  736 F.3d 1041 (7th Cir. 2013) ........................................................... 10, 11

*People v. Commons West, LLC*,
  80 Misc. 3d 447 (N.Y. Sup. Ct. 2023) ................................................... 14, 17

*People v. Commons West, LLC*,
  224 N.Y.S.3d 364 (N.Y. Sup. Ct. 2024) ................................................. 13, 17

*People v. Moore*,
  143 Ill. App. 3d 410 (1st Dist. 1986) ...................................................... 8

*Prop. Cas. Insurers Ass'n of Am. v. Todman*,
  725 F. Supp. 3d 810 (N.D. Ill. 2024) ...................................................... 19

*Raya v. Mead Johnson Nutrition Co.*,
  No. 24 C 4696, 2024 WL 4953687 (N.D. Ill. Dec. 2, 2024) ................................... 28

*Republican Nat'l Comm. v. North Carolina State Bd. of Elections*,
  120 F.4th 390 (4th Cir. 2024) .............................................................. 37

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
  903 F.3d 415 (4th Cir. 2018) ......................................................... 18, 19, 21

*Richardson v. Howard*,
  712 F.2d 319 (7th Cir. 1983) ............................................................... 5

*Ross v. Gossett,*
  33 F.4th 433 (7th Cir. 2022) .................................................................................. 31

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana,*
  786 F.3d 510 (7th Cir. 2015) .................................................................................. 39

*Salute v. Stratford Greens Garden Apts.,*
  136 F.3d 293 (2d Cir. 1998) ..............................................................................11, 24

*See v. City of Seattle,*
  387 U.S. 541 (1967) .......................................................................................... 14, 15

*Siegel v. Shell Oil Co.,*
  612 F.3d 932 (7th Cir. 2010) .................................................................................. 28

*Simer v. Rios,*
  661 F.2d 655 (7th Cir. 1981) .................................................................................. 31

*Streight v. Pritzker,*
  No. 3:21-cv-50339, 2021 WL 4306146 (N.D. Ill. Sept. 22, 2021) ........................... 17

*Suchanek v. Sturm Foods, Inc.,*
  764 F.3d 750 (7th Cir. 2014) .................................................................................. 32

*Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.,*
  17 F.4th 950 (9th Cir. 2021) .................................................................................. 22

*Swanson v. Citibank, N.A.,*
  614 F.3d 400 (7th Cir. 2010) ............................................................................... 5, 6

*Taylor v. Nat'l Investments, Ltd.,*
  CV 17-117 WES, 2022 WL 306367 (D.R.I. Feb. 2, 2022) ...................................... 25

*TBS Grp., LLC v. City of Zion,*
  No. 16-cv-5855, 2017 WL 5129008 (N.D. Ill. Nov. 6, 2017) ................................... 22

*Texas Dep't of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*
  576 U.S. 519 (2015) .......................................................................................... passim

*Thomas v. JBS Green Bay, Inc.,*
  120 F.4th 1335 (7th Cir. 2024) ............................................................................. 5, 6

*Thomas v. Union Carbide Agric. Prods. Co.,*
  473 U.S. 568 (1985) .............................................................................................. 17

*Trafficante v. Metro. Life Ins. Co.,*
  409 U.S. 205 (1972) .............................................................................................. 34

*United States v. AION Mtg.*,
 No. 23-724 (GBW), slip op. (D. Del. Mar. 18, 2025) ....................................................... 39

*United States v. Johnson*,
 47 F.4th 535 (7th Cir. 2022) ................................................................................................ 8

*United States v. Reditus Labs., LLC*,
 No. 1:22-cv-01203, 2024 WL 4351862 (C.D. Ill. Sept. 30, 2024) ......................................... 9

*Vanlaningham v. Campbell Soup Co.*,
 492 F. Supp. 3d 803 (S.D. Ill. 2020) .................................................................................. 28

*Vanzant v. Hill's Pet Nutrition, Inc.*,
 934 F.3d 730 (7th Cir. 2019) .............................................................................................. 27

*Vill. of Bellwood v. Gorey & Assocs.*,
 664 F. Supp. 320 (N.D. Ill. 1987) ......................................................................................... 6

*Vill. of Bellwood v. Dwivedi*,
 895 F.2d 1521 (7th Cir. 1990) ............................................................................................ 24

*Wetzel v. Glen St. Andrew Living Cmty., LLC*,
 901 F.3d 856 (7th Cir. 2018) .............................................................................................. 24

*Wicks v. Barron*,
 No. 12 CV 3478, 2015 WL 1598102 (N.D. Ill. Apr. 8, 2015) ............................................. 15

*Wigginton v. Bank of Am. Corp.*,
 No. 11 C 50162, 2013 WL 4854373 (N.D. Ill. Sept. 11, 2013) ............................................. 7

*Williams-Ellis v. Mario Tricoci Hair Salons & Day Spas*,
 No. 05 C 5030, 2007 WL 3232490 (N.D. Ill. Nov. 1, 2007) ............................................... 29

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*,
 536 F.3d 663 (7th Cir. 2008) .............................................................................................. 27

*Wonsey v. City of Chicago*,
 No. 16 C 9936, 2018 WL 6171795 (N.D. Ill. Nov. 26, 2018) ............................................. 16

*Wonsey v. City of Chicago*,
 940 F. 3d 394 (7th Cir. 2019) ............................................................................................. 16

*Wosinski v. Advance Cast Stone Co.*,
 377 Wis.2d 596 (2017) ........................................................................................................ 25

**Statutes**

26 U.S.C. § 42 ............................................................................................................... 17

28 U.S.C. § 2403 ............................................................................................................ 9

42 U.S.C. § 1437f ......................................................................................................... 10

42 U.S.C. § 3601 ........................................................................................................... 10

42 U.S.C. § 3602 ........................................................................................................... 34

42 U.S.C. § 3613 ........................................................................................................... 34

42 U.S.C § 3615 ............................................................................................................ 10

775 ILCS 5/1-103 ........................................................................................................... 7

775 ILCS 5/3-102 ............................................................................................. 13, 14, 26

775 ILCS 5/8–111 ........................................................................................................ 28

775 ILCS 5/10-102 .................................................................................................. 15, 29

815 ILCS 505/10a ......................................................................................................... 30

**Rules**

Fed. R. Civ. P. 5.1 .......................................................................................................... 9

Fed. R. Civ. P. 23 ............................................................................................. 31, 32, 33

Illinois Supreme Court Rule 23(e) .............................................................................. 29

**Regulations**

24 C.F.R. § 100.500 .................................................................................................. 19, 25

24 C.F.R. § 850.153 ......................................................................................................11

24 C.F.R. § 982.1 .......................................................................................................... 12

24 CFR § 982.53 ........................................................................................................... 10

**Other Authorities**

102nd Gen. Assemb., 104th Reg. Sess., at 85, 94 (IL Apr. 1, 2022).................................................. 8

Hutt, Maia, *The House is Not Your Home: Litigating Landlord Rejections of Housing Choice Vouchers Under the Fair Housing Act*, 51 COLUM. J.L. & SOC. PROBS. 391 (2018) ............... 24

Illinois Human Rights Act, Pub. Act 81-1216, § 3-102, (eff. July 1, 1980) ................................ 26

Illinois Human Rights Act, Pub. Act 102-0896, § 1-103(O-5) (eff. Jan. 1, 2023)........................ 7

S. REP. NO. 105-21, at 36 (1997) ................................................................................................. 12

*Appendix B: State, Local, and Federal Laws Barring Source-of-Income Discrimination*, POVERTY & RACE RESEARCH ACTION COUNCIL, www.prrac.org/pdf/AppendixB.pdf (last visited Feb. 26, 2025) (reporting 23 states and over 138 localities with source of income protections) ............................................................................................................................... 9

FAQ "*What are examples of a person's source of income that are protected from discrimination under the [IHRA]?*" ILLINOIS DEP'T OF HUM. RIGHTS, https://dhr.illinois.gov/filing-a-charge/faq-sourceincome.html#faq-3whatdoessourceofincomemean-faq (last visited March 18, 2025) ........................................................................................................................................... 14

**INTRODUCTION**

Plaintiffs respond in opposition to Defendant Mac Properties' Motion to Dismiss Plaintiffs' Complaint and to Strike Class Allegations, ECF No. 25, and Defendant's Corrected Memorandum in Support of that Motion, ECF No. 33 ("Mem.").

Defendant Mac Properties presses the wrong arguments, at the wrong time, with defenses that will eventually fail. This is not summary judgment. And, this is not a complicated case.

Plaintiffs' core allegation is that Defendant has a policy of discriminating against renters who use a Housing Choice Voucher ("Voucher"). Compl. ¶ 5 (ECF No. 1). Defendant's discrimination includes the refusal to show or rent units to Voucher holders at many of its desirable buildings in Hyde Park and steering them elsewhere. This happened to Plaintiff RySheena Moore, a U.S. Army Veteran, to whom Defendant lied and falsely claimed no units were available. This also happened to Plaintiff Cadeidga Coleman, to whom Defendant refused to provide a rental application without "work income." It happened to Plaintiff Janishia Fleming, who could only tour older, filthy buildings far from the lake. This happened to Plaintiff Sheliah Ayanwale, who Defendant refused to rent to at a newly-built complex, and yet scheduled her cousin (who did not have a Voucher) for a tour right away. And it happened to fair housing testers sent by Plaintiff HOPE Fair Housing. Defendant's former leasing agent has even confirmed its discriminatory policies. Compl. ¶ 90.

Voucher discrimination blatantly violates the Illinois Human Rights Act ("IHRA") ban on "source of income" discrimination, and violates the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") as an "unfair" practice contrary to the public policy of multiple local, state, and federal entities (it is also generally unfair to lie about available units and apply rigid rules only to certain renters).

1

Plaintiff HOPE Fair Housing's claim is not novel. Defendant's housing discrimination impairs its core mission and tangibly impairs its activities, too. HOPE delayed and deferred other work, such as testing, outreach, and updating materials, to fight Defendant's discrimination. These injuries have supported standing for fair housing centers since *Havens Realty Corp. v. Coleman* ("*Havens*"), 455 U.S. 363 (1982), and still do today. *FDA v. All. for Hippocratic Med.* ("*Alliance*"), 602 U.S. 367, 380 (2024) (reaffirming *Havens*).

Plaintiffs' disparate impact race claims are not new, either. The Fair Housing Act ("FHA") authorizes a "challenge [to] practices that have a 'disproportionately adverse effect on minorities.'" *Texas Dep't of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project, Inc.* ("*Inclusive Communities*"), 576 U.S. 519, 524 (2015). Voucher discrimination is race neutral, on its face, but discriminates against Black renters, in effect, because they make up 89% of Voucher holders in Chicago, versus 2% who are White.

Defendant's legal arguments rest on rejected theories and overturned cases. No court holds that the IHRA source of income provision *fails* to protect Voucher holders. *See Godinez v. Sullivan-Lackey*, 352 Ill. App. 3d 87, 91 (1st Dist. 2004). Every court has rejected federal preemption of state and local source of income discrimination protections. And Defendant cannot find immunity in one sentence from *Knapp v. Eagle Prop. Mgmt. Corp.* ("*Knapp*")*,* 54 F.3d 1272 (7th Cir. 1995), which was overturned in *Inclusive Communities* and has not been relied on since.

At bottom, Defendant attacks Plaintiffs' well-pled allegations and well-established claims with factual excuses—that maybe it had some justification for mistreating each of the four Individual Plaintiffs, or some legitimate objection to the procedures that accompany the Voucher program that it has long chosen to participate in, for example. These theoretical defenses are not proper for a motion to dismiss. The Motion should be denied in full.

**STATEMENT OF FACTS**

Plaintiffs Moore, Coleman, Fleming, and Ayanwale ("Individual Plaintiffs") are four Black women who participate in the Voucher program. Compl. ¶¶ 12-15. Defendant repeatedly discriminated against each of them solely because they use a Voucher to support themselves and help pay for rent. Each woman found units that Defendant advertised as available, in decent buildings, and at prices they could afford with their Voucher. *Id.* ¶¶ 92-93, 105, 115, 122-23. Each of them contacted Defendant to tour or apply to these units. *Id.* ¶¶ 92, 105-06, 115-16, 124. When they each disclosed their Voucher, Defendant refused to rent to them and treated them differently than market rate renters: Defendant refused to let them tour units and refused to provide unit applications, *id.* ¶¶ 67, 72, 74, 94-99, 106-107, 109, 115, 126-129; Defendant lied to them and claimed that units were not available, *id.* ¶¶ 95, 131-132; and Defendant implemented unlawful "work income" requirements and rules that prohibit negotiating rent for Voucher holders specifically, *id.* ¶¶ 72-73, 108, 115, 128; *Id.* ¶ 90 (former Defendant employee explaining such rules). To the extent that Defendant considered renting to them, it unlawfully steered Plaintiffs toward older, smaller, "smelly," and less desirable buildings, often farther from the lake. *Id.* ¶¶ 96, 98, 106, 116-117, 131. Defendant also mistreated fair housing testers who mentioned a Voucher. *Id.* ¶ 10; *see also id.* ¶¶ 57-75 (similar allegations for over a decade). These practices are not isolated to a few renters or buildings. Defendant implements these discriminatory practices from a centralized leasing office for its Chicago/Hyde Park portfolio. *See e.g.*, *id.* ¶¶ 37-44, 47.

This discrimination against Voucher holders impacts Black renters far more than White renters. *Id.* ¶¶ 80-86. While Black renters make up about one-third of all renters in Chicago, almost everyone impacted by Defendant's discrimination is Black (89%). *Id.* ¶¶ 80-81, 83. White renters also comprise about one-third of all renters in Chicago, yet only 2% are impacted by Voucher

3

discrimination. *Id*. As a result, Black renters in Chicago are over 46 times more likely to be impacted by Defendant's discrimination than White renters. *Id*. ¶ 82 (impact on Black renters 4,600% greater than on White renters). The disparity is substantial and statistically significant. *Id*. ¶ 84.

This discrimination causes significant harm. Plaintiffs wasted time and money when Defendant steered and refused to rent to them. Plaintiffs paid extra to travel to additional unit tours, paid extra for additional unit applications, and lost wages during their extended housing search. *E.g. id*. ¶¶ 103-104, 113-114, 120-121, 201, 203. Some Plaintiffs could not find safe and decent places to live and nearly lost their Vouchers. *Id*. ¶¶ 121, 137, 203. Plaintiff Moore was stuck with a less suitable unit that increased her rent $200 per month, and without access to the good school in Hyde Park for her son. *Id*. ¶ 104. Coleman ended up on the other side of Chicago, in an older, smaller, and less valuable unit, with a far longer commute to work. *Id*. ¶ 114. Flemming lost her $1,000 moving stipend and ended up in a shelter for months. *Id*. ¶ 121. And Ayanwale called off her move to Chicago entirely. *Id*. ¶ 137.

While Defendant does participate in the Voucher program, Mem. at 21 n.16 (admitted "participation in" the Voucher program), on this Motion, the record contains no basis for whatever justification, excuse, or explanation that Defendant may try to offer for its discriminatory treatment of Voucher holders, *see* Compl. ¶ 87.

In response to complaints, Plaintiff HOPE Fair Housing investigated and confirmed Defendant's discrimination against Voucher holders through formal fair housing testing. *Id*. ¶¶ 138-148. HOPE pursued additional training, revised materials, and conducted outreach to combat Defendant's discrimination. *Id*. ¶ 146. The discrimination also directly interfered with HOPE's mission of equal housing opportunity for all. *Id*. ¶¶ 143-144. It also tangibly impaired HOPE's

4

activities and operations because HOPE invested hundreds of hours responding to Defendant's discrimination and, as a result, did not complete or delayed planned work, such as: other investigations, tenant counseling, trainings, an evaluation of appraisal practices, lending investigations, and a grantmaking program. *Id.* ¶¶ 145-148.

<div align="center">

**ARGUMENT**

</div>

## I.   Plausibly Allege Differential Treatment Because of Their Vouchers.

Defendant treated Plaintiffs differently because of their Voucher (i.e. source of income); that allegation is plausible and Rule 8 requires nothing more. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (the complaint need only "raise a right to relief above the speculative level"). Discrimination complaints are no different: "All the complaint need do is state a grievance. Details and proofs come later." *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335 (7th Cir. 2024). For an FHA claim, it is enough for a plaintiff to "identif[y] the type of discrimination that she thinks occurs (racial), by whom (Citibank …), and when (in connection with her effort in early 2009 to obtain a home-equity loan)." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010).

Each Individual Plaintiff's allegations, *standing alone*, is a plausible claim of Voucher discrimination. Compl. ¶¶ 92-137. Any one of these stories would state a claim; *four* stories of the same discrimination far exceed the "speculative level." *Twombly*, 550 U.S. at 555. Their allegations are further bolstered by formal fair housing testing, statements from former Defendant employees, and years of complaints about Defendant's Voucher discrimination. Compl. ¶¶ 10, 57, 61, 67-75, 90. *See also Richardson v. Howard*, 712 F.2d 319, 321 (7th Cir. 1983) (fair housing testing is a longstanding source of evidence to plead and prove discrimination).

Defendant's motion is detached from the pleading standard. Rule 8 requires notice pleading, not extraneous details. *See Swanson*, 614 F.3d at 404. Each Individual Plaintiff has a

<div align="center">

5

</div>

Voucher, identified units they could afford (within their Voucher "budget"), disclosed their Vouchers to Defendant, and were repeatedly denied tours, information, and applications because of their Voucher. Compl. ¶¶ 93-97, 105-110, 115-117, 122-131. "That is an entirely plausible scenario." *Swanson*, 614 F.3d at 404-05. Defendant cites no case stating that a *plausible* discrimination claim requires pleading specific prices for a specific unit or Voucher. Mem. at 11-16. Indeed, Defendant's insistence that Plaintiffs plead they were "ready and able to" rent conflicts with Rule 8 and *Swanson*, and asks Plaintiffs to plead around hypothetical defenses. *See G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 566 (7th Cir. 2023) ("a plaintiff ordinarily need not anticipate and attempt to plead around affirmative defenses") (cleaned up). Regardless, each Individual Plaintiff alleges that she saw advertised units that she could afford (within her "budget"), which must be taken as true and with all reasonable inferences made in Plaintiffs' favor.

For the same reasons, Plaintiffs are not required to plead: their budgets, whether the Chicago Housing Authority ("CHA") had approved the units, what is included in Defendant's rents, and whether Plaintiffs complied "with CHA rules." *See* Mem. at 13; *Thomas*, 120 F.4th at 1338 (what plaintiffs need to prove at summary judgment or trial "must not be treated as demands for longer and more detailed pleadings"); *Access Living of Metro. Chicago, Inc. v. City of Chicago*, 372 F. Supp. 3d 663, 671–72 (N.D. Ill. 2019) (refusing to dismiss FHA complaint for lack of allegations about each location of discrimination).

Defendant also cannot justify dismissing Plaintiffs' *entire* complaint because one of Plaintiffs' allegations occurred in *March* 2022 rather than *December* 2022. Mem. at 15 (complaining about a statement within the ICFA three-year statute of limitations.) *See also Vill. of Bellwood v. Gorey & Assocs.*, 664 F. Supp. 320, 327 (N.D. Ill. 1987) ("a continuing violation of

6

the [FHA] should be accorded different treatment than 'one discrete act of discrimination'"

(quoting *Havens*, 455 U.S. at 380)).

Defendant even fails to describe the Voucher program correctly. Defendant repeatedly

conflates the "Total Tenant Portion" ("TTP") (the roughly 30% of their income that the tenant pays

for rent) with the Voucher program's Payment Standards (the total amount of rent paid to a

landlord). *E.g.* Mem. at 12 (questioning whether an "approved TTP" was sufficient). TTP has

nothing to do with whether a Voucher holder can afford a particular unit, and *Nesbitt v. Draper &*

*Kramer, Inc.* supports Plaintiffs—not Defendant—by holding that a renter pleads discrimination

with the allegation that, "the amount of her rental voucher exceeded the amount of rent for the

apartment." No. 08 C 2684, 2008 WL 4542942, at *2 (N.D. Ill. May 23, 2008).

Finally, Defendant's reliance on *Wigginton v. Bank of Am. Corp.*, No. 11 C 50162, 2013

WL 4854373 (N.D. Ill. Sept. 11, 2013) and *Johnson v. Levy*, 812 F. Supp. 2d 167 (E.D.N.Y. 2011)

is misplaced. In both cases, the plaintiff affirmatively pled themselves out of court by alleging non-

discriminatory reasons for the challenged conduct on the face of the complaint. Plaintiffs'

Complaint contains no such fatal allegations. It pleads discrimination and should be sustained.

## II.  The Illinois General Assembly Defined Source of Income Identically to Existing Statutes to Ensure that State Law Protects Vouchers Holders.

The IHRA source of income provision protects Voucher holders from housing

discrimination because they pay rent, in part, with a Voucher. When interpreting statutes, "[a]

court's primary objective is to ascertain and give effect to the intent of the legislature." *Murphy-*

*Hylton v. Lieberman Mgmt. Servs.,* 2016 IL 120394, ¶ 25. In 2022, the Illinois General Assembly

amended the IHRA to add "source of income" as a protected status in housing transactions. Pub.

Act 102-0896, § 1-103(O-5), (eff. Jan. 1, 2023). As defined, a Voucher is income, which is any

"lawful manner by which an individual supports himself or herself and his or her dependents." 775

7

ILCS 5/1-103(O-5). The intent of the amendment is to protect Voucher holders (and others) from discrimination. The General Assembly copied the definition of "source of income" from the Chicago Fair Housing Ordinance, which has protected Voucher holders for decades. *Godinez*, 352 Ill. App. 3d at 91; *see also People v. Moore*, 143 Ill. App. 3d 410, 415 (1st Dist. 1986) (legislature is "presumed to know the law construing a statutory provision which it adopts"). Even *United States v. Johnson*, which Defendant cites, holds that "to determine the plain meaning of a ter[m], courts . . . consider the construction of similar terms in other statutes, as well as the purpose of the statute being interpreted." 47 F.4th 535, 543 (7th Cir. 2022).

The legislative history also confirms that the source of income language protects Voucher holders. *See, e.g.*, 102nd Gen. Assemb., 104th Reg. Sess., at 85, 94 (IL Apr. 1, 2022) (statement of Senator Villivalam, Sponsor) ("the point of this legislation . . . is to ensure that a renter who is relying on government assistance . . . cannot solely be denied based on the fact that . . . they're receiving that government assistance" and to "mirror the source of income definition as it already exists in the City of Chicago" and other localities).

Defendant's reliance on *Knapp*, 54 F.3d at 1272 (interpreting a Wisconsin statute) and generic dictionary definitions of "income" contradict Illinois law. Mem. at 16-17. The Illinois Appellate Court has expressly rejected *Knapp* and held that "source of income" includes "Section 8 vouchers [as] part of the lawful manner for one's support." *Godinez*, 352 Ill. App. 3d at 91 (interpreting the Chicago Ordinance).

### III. **The IHRA Source of Income Protections are Constitutional.**

Like state and local source of income protections across the country that have protected Voucher holders for decades,[1] including in Illinois, the IHRA is constitutional and not preempted.

### A. **The Court Cannot Grant Defendant's Constitutional Challenge Because Defendant Did Not Notify the Illinois Attorney General in Violation of FRCP Rule 5.1.**

This Court cannot strike down the IHRA as unconstitutional because Defendant failed to comply with Rule 5.1, which requires prompt notification of a constitutional challenge to a state statute, and the right to intervene, to the Illinois Attorney General. Fed. R. Civ. P. 5.1(a); 28 U.S.C. § 2403(b). While this Court may, and should, *reject* a constitutional challenge without notice, the Court cannot hold the statute unconstitutional without compliance with Rule 5.1. Fed. R. Civ. P. 5.1(c); *see also Max M. v. New Trier High School Dist. No. 203*, 859 F.2d 1297, 1300 (7th Cir. 1988); *United States v. Reditus Labs., LLC*, No. 1:22-cv-01203, 2024 WL 4351862, at *7-8 (C.D. Ill. Sept. 30, 2024). On this basis alone, Defendant's constitutional challenges to the IHRA may be denied.

### B. **No Court has Held that Federal Law Preempts State or Local Source of Income Discrimination Protections and this Court Should Not be the First.**

As an initial matter, preemption is an affirmative defense for which Defendant bears the burden of proof and "[a]ffirmative defenses do not justify dismissal under Rule 12(b)(6)." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019) (reversing dismissal based on preemption).

Defendant's preemption argument also fails on the merits. "[P]re-emption is not to be lightly presumed." *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 281 (1987).

---

[1] Compl. ¶ 2; *Appendix B: State, Local, and Federal Laws Barring Source-of-Income Discrimination*, POVERTY & RACE RESEARCH ACTION COUNCIL ,www.prrac.org/pdf/AppendixB.pdf (last visited Feb. 26, 2025) (reporting 23 states and over 138 localities with source of income protections).

Defendant relies solely on "obstacle" conflict preemption, Mem. at 22, which requires Defendant to prove that the IHRA is an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1049 (7th Cir. 2013). State law is only preempted if it does "'major damage' to clear and substantial federal interests"; state law with "more stringent regulations" than federal law "does not constitute conflict preemption." *Id.* at 1049-50 (more stringent wage, employment discrimination, education, and gambling state laws did not constitute conflict preemption).

On its face, Defendant's preemption argument makes no sense. Defendant repeatedly conflates the FHA, 42 U.S.C. § 3601 *et seq.*, with the United States Housing Act of 1937, which includes the provisions commonly referred to as "Section 8" and the Voucher program, 42 U.S.C. § 1437f. *See* Mem. at 22-23 (referring to "the FHA" but citing to Section 8 statutory provisions and the Voucher program's legislative history). To the extent that Defendant argues the FHA preempts the IHRA, the FHA expressly does *not* preempt state laws: "Nothing in this subchapter shall be construed to invalidate or limit any law of a State or political subdivision of a State." 42 U.S.C. § 3615.

If Defendant is trying to argue that the Voucher program preempts the IHRA, that argument also fails—and has been rejected by every court to rule on it—because state and local source of income discrimination protections work in tandem with the Voucher program, not against it. The Voucher program promotes "economically mixed housing" and helps low-income families secure a "decent place to live." 42 U.S.C. § 1437f(a); *see also* Compl. ¶ 4. The IHRA advances this goal by prohibiting discrimination against Voucher holders, which increases affordable housing opportunities and decent places to live. Department of Housing and Urban Development ("HUD") regulations likewise endorse source of income protections. 24 CFR § 982.53(d) ("Nothing in part

10

982 is intended to pre-empt operation of State and local laws that prohibit discrimination against a Section 8 voucher-holder"). *Cf.* 24 C.F.R. § 850.153 (HUD preempting certain state and local laws, but not source of income protections).

Accordingly, across the country, *every* court to rule on the issue has rejected Defendant's preemption argument. They uniformly hold that the Voucher program does not preempt state and local source of income protections because voluntary landlord participation is not central to the Voucher program. *See Austin Apartment Ass'n v. City of Austin*, 89 F. Supp. 3d 886, 895 (W.D. Tex 2015) ("[t]o date, the [property owner's preemption] argument has been rejected by every court which has confronted it"); *Bourbeau v. Jonathan Woodner Co.*, 549 F. Supp. 2d 78, 88 (D.D.C. 2008) ("prohibiting discrimination . . . will 'advance rather than denigrate'" the Voucher program objective to provide decent housing to low-income families); *Franklin Tower One, L.L.C. v. N.M.*, 157 N.J. 602, 619 (1999) ( "the voluntary nature of the Section 8 program is not at the heart of the federal scheme"); *Comm'n on Hum. Rights and Opportunities v. Sullivan Assocs.,* 250 Conn. 763, 773 (1999) ("a mandatory state program for low income housing does not conflict with the purposes and objectives of 42 U.S.C. § 1437f"); *Attorney General v. Brown*, 400 Mass. 826, 829-30 (1987). The United States Supreme Court refused to disrupt these uniform holdings. *See Montgomery Cnty v. Glenmont Hill Assocs. Privacy World at Glenmont Metro Centre*, 402 Md. 250, 268-69 (2007) (preemption "unsupported by logic, any rational notion of public policy, and existing case law"), *cert. denied* 554 U.S. 939.

None of the cases that Defendant cites overcome the "presumption against preemption." *See Patriotic Veterans, Inc*, 736 F.3d at 1049. Defendant cites to dicta in *Knapp*, 54 F.3d at 1282, stating that,"[i]t seems questionable . . . to allow a state to make a voluntary federal program mandatory." *See also* Mem. at 23 (citing*, for the same point, *Salute v. Stratford Greens Garden*

*Apts.*, 136 F.3d 293 (2d Cir. 1998)). *Knapp* and *Salute* are not preemption cases and courts dismiss this *Knapp* comment as dicta. *E.g. Austin Apartment Ass'n*, 89 F. Supp. 3d at 896 (distinguishing the "dicta" in *Knapp*); *Comm'n on Hum. Rights and Opportunities,* 250 Conn. at 774; *Montgomery Cnty.*, 402 Md. at 273. Defendant also cites case law about entirely different housing programs. Mem. at 23 (citing *Hill v. Grp. Three Hous. Dev. Corp.*, 799 F.2d 385 (8th Cir. 1986); *Eidson v. Pierce*, 745 F.2d 453 (7th Cir. 1984)). Those cases are about project-based subsidies, which operate differently than Vouchers and are governed by different federal regulations. *See* 24 C.F.R. § 982.1(b)(1) (describing the difference between "project-based" and "tenant-based" assistance). These cases also hold only that landlords may select from qualified tenants, which does not conflict with the IHRA prohibition only on *discrimination* against an *otherwise qualified* tenant. Likewise, Defendant cites to irrelevant cases about a separate HUD mortgage program that has nothing to do with Vouchers. *See* Mem. at 23-24 (citing *Mother Zion Tenant Ass'n v. Donovan*, 55 A.D.3d 333 (1st Dep't 2008) (also distinguishing the case from cases involving anti-discrimination laws); *Forest Park II v. Hadley*, 336 F.3d 724 (8th Cir. 2003)).

Courts have also consistently rejected Defendant's arguments about the repeal of the "take one, take all" and "'endless lease' provisions." *See Austin Apartment Ass'n*, 89 F. Supp. 3d at 895; *Franklin Tower One, L.L.C.*, 157 N.J. at 619. Even Congress did "not anticipate that the repeal of these rules will adversely affect assisted households because protections will be continued under State, and local tenant laws." See S. REP. NO. 105-21, at 36 (1997).

Every court has recognized that source of income protection laws advance—not undermine—the purpose of the Voucher program. This Court should too.

**C. The IHRA Does Not Facially Violate the Fourth Amendment and Defendant Did Not Bring an As-Applied Challenge, Which Would be a Fact-Based Challenge Anyway.**

Defendant's "facial" challenge to the IHRA source of income discrimination protection fails because it cannot prove that the "law is unconstitutional in *all* of its applications." *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015) (emphasis added). The IHRA's statutory text says nothing about searches, and the IHRA applies broadly to numerous parties and situations, including many that have nothing to do with Vouchers. Defendant also does not bring an "as applied" challenge, because that would require a fact-intensive inquiry beyond the Complaint and would fail because Defendant has long consented to the Voucher program.

**i. The IHRA is Not Facially Unconstitutional Because it Does Not Mandate Any Searches and Applies Widely Beyond Vouchers.**

To strike down a statute as facially unconstitutional, Defendant "must establish that a 'law is unconstitutional in *all* of its applications.'" *Patel*, 576 U.S. at 418 (emphasis added). This "most exacting" standard is "the most difficult . . . to mount successfully." *Id.* at 415, 418; *see also Hegwood v. City of Eau Claire*, 676 F.3d 600, 604 (7th Cir. 2012) (rejecting a facial constitutional challenge because "the statute [was] sufficiently defined in at least one application").

Defendant's facial challenge fails for multiple reasons. First, the text of the IHRA does not implicate the Fourth Amendment because it does not mention or require any searches; it only prohibits discrimination in real estate transactions "because of . . . source of income." 775 ILCS 5/3-102. As the Southern District of New York recently reasoned, a source of income protection law that does not on its face require, or even mention, a search does not implicate the Fourth Amendment and is therefore not subject to a facial challenge. *216 East 29th Street Trust v. City of New York*, No. 24-cv-00595 (ER), 2025 WL 315380 at *8 (S.D.N.Y. Jan. 28, 2025). Notably, *216 East 29th Street Trust*, 2025 WL 315380, dismissed a property owner's facial constitutional challenge to New York City's source of income protections even after *People v. Commons West,*

*LLC*, 224 N.Y.S.3d 364 (N.Y. Sup. Ct. 2024) ("*Commons West II*") and *People v. Commons West, LLC*, 80 Misc. 3d 447 (N.Y. Sup. Ct. 2023) ("*Commons West I*"), on which Defendant heavily relies (and which are on appeal).

Second, Defendant cannot demonstrate that the IHRA is unconstitutional in *all* applications. *Patel*, 576 U.S. at 415; *216 East 29th Street Trust*, 2025 WL 315380. The IHRA prohibits discrimination in a wide range of scenarios that have nothing to do with whether a landlord participates in the Voucher program. A few examples: (a) it prohibits discrimination on other income, like veterans' benefits, child support, retirement income, and Social Security Disability Income;[2] (b) it prohibits steering to inadequate housing, discriminatory terms, and differences in negotiating and leasing practices for Voucher holders, *see* 775 ILCS 5/3-102(B) and 3-102(D); Compl. ¶¶ 47(c), 90, 117-118, 165, 188 (alleging Defendant engaged in these practices); and (c) it prohibits a landlord, who already voluntarily participates in the Voucher program, from discriminating against, or refusing, additional Voucher tenants. The IHRA applies to many scenarios that have nothing to do with whether a landlord participates in the Voucher program and thus does not facially implicate the Fourth Amendment.

The breadth of the IHRA and the fact that Defendant already participates in the Voucher program highlight that any constitutional challenge to the IHRA would be "as-applied" to Defendant on specific facts. Defendant tries to frame its attack as a facial challenge to avoid having to navigate its undeniable "participation in the [Voucher program]." Mem. at 21 n.6. But a "case-by-case," as-applied analysis requires examining facts beyond the pleadings that cannot be resolved on a motion to dismiss. *See See v. City of Seattle*, 387 U.S. 541, 545-46 (1967)

---

[2] FAQ "*What are examples of a person's source of income that are protected from discrimination under the [IHRA]?*", ILLINOIS DEP'T OF HUM. RIGHTS, https://dhr.illinois.gov/filing-a-charge/faq-sourceincome.html #faq-3whatdoessourceofincomemean-faq (last visited March 18, 2025).

(constitutional challenges to commercial inspections must be "resolved . . . on a case-by-case basis under the general Fourth Amendment standard of reasonableness"). Among other facts, this includes Defendant's history with the Voucher program; the scope, nature, and process for any inspections; and Defendant's alleged privacy interest as a commercial business. *See Wicks v. Barron*, No. 12 CV 3478, 2015 WL 1598102, at *2 (N.D. Ill. Apr. 8, 2015) ("Because a landlord has turned over possession and use of an apartment to his tenants, he does not have a protected reasonable expectation of privacy in a rented apartment."); *New York v. Burger*, 482 U.S. 691, 700 (1987) (diminished privacy in commercial property).

None of these facts are in the Complaint, nor can Defendant prematurely force some of them into the record by citing HUD regulations and CHA forms. Mem. at 19 n.15. The New York court rejected this very argument. *216 East 29th Street Trust*, 2025 WL 315380, at *8. Indeed, Defendant even cites to wrong portions of the CHA Administrative Plan. Mem. at 19 n.15 (citing to "Ex. A § 17-V.A.", which applies to project-based subsidies and not tenant-based Vouchers). These are fact issues that cannot be resolved on the pleadings.

Fact questions about consent also distinguish this Motion from Defendant's cases, which involve coercion by mandatory penalties or criminal prosecution. *Compare* Mem. at 18-21 (relying on *Patel*, 576 U.S. 409 (arrest and criminal charges); *Camara v. Mun. Court of City & Cnty. of San Francisco*, 387 U.S. 523 (1967) (criminal prosecution of tenant); *City of Seattle*, 387 U.S. 541 (criminal prosecution for refusing inspector); *Baker v. City of Portsmouth*, No. 1:14cv512, 2015 WL 5822659 (S.D. Ohio Oct. 1. 2015) (criminal charges and a $250 daily fine); *Jones v. City of Kansas City*, No. 4:24-cv-00649-RK, slip op. at 2 (W.D. Mo. Feb. 11, 2025) (mandatory $1,000 penalty); *Halpern 2012, LLC v. City of Ctr. Line*, 404 F. Supp. 3d 1109 (E.D. Mich. 2019) (criminal and financial penalties)), *with* 775 ILCS 5/10-102 (no mandatory fine or criminal enforcement).

Indeed, Defendant does not even have standing to raise a facial challenge, which is premised on the idea that the IHRA *might* cause a landlord to participate in the Voucher program who otherwise would not. Whether that is ever true, Defendant already participates in the Voucher program (in a discriminatory way), Mem. at 21, and is *not* that landlord. *See Hegwood*, 676 F.3d at 603 (the court will not examine "hypothetical facts"). The IHRA is not facially unconstitutional.

ii. **An As-Applied Challenge Would Also Fail Because there are Too Many Factual Issues that Cannot be Resolved on the Pleadings.**

Any as-applied challenge here also fails. First, Defendant has waived this argument. It mentions an as-applied challenge to the IHRA in only a single passing comment in a footnote. Mem. at 22 n. 16; *see Harris v. Kashi Sales, LLC*, 609 F. Supp. 3d 633, 642 (N.D. Ill. 2022) (denying motion to dismiss argument because "[i]n the Seventh Circuit, arguments raised only 'by a passing reference in a footnote' are deemed waived"). Regardless, an as-applied challenge is premature on a motion to dismiss without a factual record. *Hegwood*, 676 F.3d at 603 (the Court must "examine the facts of the case before us exclusively"). Defendant likely avoids an as-applied challenge because key facts are absent from the record and, ultimately, these facts will undermine its Fourth Amendment argument.

Most critically, there is no factual record of the extent to which Defendant participates in the Voucher program and whether it actually opposed any Voucher inspections. "The Fourth Amendment [is] not applicable where a party consents to a search." *Wonsey v. City of Chicago*, No. 16 C 9936, 2018 WL 6171795, at *3 (N.D. Ill. Nov. 26, 2018); *Wonsey v. City of Chicago*, 940 F. 3d 394 (7th Cir. 2019) (same). Whether consent to a search is voluntary, "is a question of fact to be determined from all the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 40 (1996); *Dakhlallah v. Zima*, 42 F. Supp. 3d 901 (N.D. Ill. 2014) (same). Defendant's allegation of purported coercion, *see* Mem. at 19, is yet another fact issue. And Defendant has admitted that it consents to the

Voucher program. *See* Mem. at 21 n.16. This further distinguishes *Commons West I*, *Commons West II*, and *Jones*, No. 4:24-cv-00649-RK, in which the landlords categorically refused to participate in the Voucher program.

The record also lacks information about whether CHA has inspected Defendant's property; the extent, circumstances, or scope of a search; any privacy interest implicated; any notice or other procedures; and whether Defendant participates in other housing programs that independently bar discrimination against Voucher holders. *E.g.* 26 U.S.C. § 42(h)(6)(B)(iv).

Finally, Defendant's Fourth Amendment argument is premature and hypothetical. The ripeness doctrine prevents courts, "from entangling themselves in abstract disagreements" by adjudicating disputes too early. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985). *See also 216 East 29th Street Trust*, 2025 WL 315380, at *9-11.

### iii.  Any Alleged Searches are Reasonable Under the Specific Circumstances.

Any searches that may be related to the Voucher program would be reasonable under the specific circumstances and certain exceptions. When a search is "not performed as part of a criminal investigation," the court begins with assessing "whether they are reasonable." *Naperville Smart Meter Awareness v. City of Naperville*, 900 F.3d 521, 528 (7th Cir. 2018). This requires balancing the "intrusion on the individual's Fourth Amendment interests against [the government's] promotion of [its] legitimate . . . interests." *Id.* at 529 (upholding information collection as, "unrelated to law enforcement, . . . minimally invasive, and . . . little risk of corollary criminal consequences"). *See also Donovan v. Dewey,* 452 U.S. 594, 598–99 (1981) (limited privacy for inspections of commercial property). For example, courts uphold government searches "beyond the normal need for law enforcement" as reasonable in special needs circumstances, *see, e.g. Streight v. Pritzker*, No. 3:21-cv-50339, 2021 WL 4306146 (N.D. Ill. Sept. 22, 2021), and in

pervasively regulated industries, *see, e.g.*, *Owner-Operator Indep. Drivers Assoc., Inc. v. United States Dep't of Transp.*, 840 F.3d 879 (7th Cir. 2016). The reasonableness assessment ultimately requires fact-specific inquiries related to whatever privacy interest Defendant alleges in its business; consent; and the notice, purpose, scope, and circumstances of any search, including whether pre-compliance review is available—none of which is in the record.

**IV.   Plaintiffs Plead a Violation of the FHA Under *Inclusive Communities* Because Defendant's Voucher Discrimination is 46x More Likely to Impact Black Renters.**

In 2015, the Supreme Court held that plaintiffs can bring a disparate impact claim under the FHA to "challenge[] practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." *Inclusive Communities*, 576 U.S. at 524, 540-41. *Inclusive Communities*—not *Knapp* or any other standard—governs FHA disparate impact claims and requires them to be evaluated through the familiar three-step burden shifting framework. *Id.* at 524, 541; *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 (4th Cir. 2018) ("an FHA disparate-impact claim should be analyzed under a three-step, burden-shifting framework."). At the pleading stage, Plaintiffs only need to allege the first step, that "defendant's policy or policies caus[es a racial] disparity." *Id.* at 425. Nothing more is required by *Inclusive Communities*, the FHA, or Rule 8. *Huskey v. State Farm Fire & Cas. Co.*, No. 22 C 7014, 2023 WL 5848164, at *8 (N.D. Ill. Sept. 11, 2023) ("*Inclusive Communities* did not displace" Rule 8). The Motion should be denied.

**A.   Plaintiffs Plead a Classic FHA Disparate Impact Claim About a Specific Policy.**

Plaintiffs plead each element of a disparate impact claim: they (1) point to a "policy or policies," (2) with "a causal connection," to (3) a "statistical disparity." *Inclusive Communities*, 576 U.S. at 521, 543. First, Plaintiffs point to Defendant's policy and practice of "systematically refus[ing] to engage in real estate transactions with Voucher holders who seek to rent at specific

18

buildings." Compl. ¶¶ 77, 185, 188. Defendant implements this policy through its centralized leasing office and throughout its Chicago/Hyde Park portfolio, not just in two buildings, as Defendant argues. *Id.* ¶¶ 37, 46-48, 90; Mem. at 26 n.21. "Plaintiffs need not pin down the policy with greater precision at this stage." *Huskey*, 2023 WL 5848164, at *8 (naming policy as "algorithmic decision-making tools to automate claims-processing" is sufficient).

Second, Plaintiffs allege a "disproportionately adverse effect on minorities." *Inclusive Communities*, 576 U.S. at 524 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). The Voucher discrimination policy is "facially neutral . . . but [it] in fact fall[s] more harshly on one group than another," *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993), and "it actually or predictably results in a disparate impact on a group of persons," 24 C.F.R. § 100.500(a).[3] Plaintiffs allege exactly this impact. Compl. ¶¶ 80-82. "Almost everyone impacted (89%) is a Black renter," who are over 46 times more likely to be impacted than White renters in Chicago. *Id*. ¶¶ 82-83.

Third, Plaintiffs plead causation: *Defendant* adopted the policy that causes the disparate impact. Disparate impact claims can involve racially discriminatory effects from either (1) "a "decision [that] has a greater adverse impact on one racial group than on another," or (2) a "decision . . . [that] perpetuates segregation" in a community. *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977). The difference matters for pleading causation. Causation is "easy" in a case like this one about the "disparate effect" of a landlord's policy. *See Reyes*, 903 F.3d at 428 (causation is "self-evident" with statistics about who the policy impacts); *Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Trust*, No. 18 CV 839, 2019 WL 5963633,

---

[3] While the language varies slightly, *Inclusive Communities* and the HUD regulation require the same analysis. *See Prop. Cas. Insurers Ass'n of Am. v. Todman*, 725 F. Supp. 3d 810, 844 (N.D. Ill. 2024) ("*Inclusive Communities* did not disturb the [HUD] Rule's basic three-step burden-shifting approach."); *Fair Hous. Ctr. of Cent. Indiana, Inc. v. M&J Mgmt. Co., LLC*, No. 1:22-CV-00612-TAB-JPH, 2024 WL 3859997, at *5 (S.D. Ind. Aug. 19, 2024).

at *17 (N.D. Ill. Nov. 13, 2019) ("Plaintiffs [do not] attempt to hold Defendants liable for a racial imbalance"); Compl. ¶ 78.

**B. Neither the FHA nor *Inclusive Communities* Require Plaintiffs to Plead Any of the Irrelevant Information that Defendant Demands.**

Plaintiffs are not required to allege any of the additional details that Defendant identifies, particularly since Defendant repeatedly confuses this challenge to a specific policy with a segregation claim based on demographic patterns that Plaintiffs do not allege. Mem. at 26-28.

<u>First</u>, Plaintiffs are not required to allege (or prove) "the racial make-up of Regents or 5252." Mem. at 28. Those demographics are irrelevant because disparate impact claims are never subject to a "'bottom-line' theory of defense." *Connecticut v. Teal*, 457 U.S. 440, 442 (1982). It is no defense that Defendant leases to *other* Black renters (if it does); the anti-Voucher policy is still illegal because *that policy* has a disparate impact. *Id.* at 441 (employer can not "discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group."); *Graoch Associates # 33, L.P. v. Louisville/Jefferson Cnty. Metro Hum. Rel. Comm'n*, 508 F.3d 366, 369 (6th Cir. 2007) (same under the FHA).

<u>Second,</u> Plaintiffs are not required to plead demographic data about *Hyde Park* renters and Voucher holders—rather than the *Chicago* data they plead. *See* Mem. at 27-28. "Plaintiffs' burden at the pleading stage is to allege a plausible—rather than airtight—statistical disparity." *Huskey*, 2023 WL 5848164, at *2, *8 (impact claim stated where Black policyholders were just 9% to 39% more likely to face barriers to an insurance claim). As in *Huskey,* the "plausibility of the statistical disparity" is further bolstered by Plaintiffs' "experience and that of her similarly situated" non-Voucher testers and friends. *Id.* at *8; *e.g.* Compl. ¶¶ 10, 68-69, 72-75, 117, 132 (paired testers; Plaintiff Ayanwale's cousin, who did not have a Voucher, treated better; Plaintiff Fleming treated better without a Voucher).

20

The Complaint pleads statistical disparities just like those sufficient to support a disparate impact claim since *Inclusive Communities*. *E.g. Nat'l Fair Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 33–34 (D.D.C. 2017) ("the different composition of the affected population (voucher recipients) as **compared to the District's population** as a whole, members of a protected class are **more likely** to be harmed by Travelers' policy than are other individuals") (emphasis added); *Reyes*, 903 F.3d at 428 ("Latinos constitute 64.6%" of undocumented persons and "are ten times more likely than non-Latinos to be adversely affected"); *Louis v. Saferent Sols.*, *LLC*, 685 F. Supp. 3d 19, 37-39 (D. Mass. 2023) (national credit disparities by race plus individual plaintiff stories "sufficient at the pleading stage to raise an inference of disparate impact").

<u>Third</u>, Plaintiffs do not have to plead (or prove) that Defendant *caused* Black renters to disproportionately *use Vouchers*. *See* Mem. at 27 ("Complaint does not allege Mac's conduct contributed to the racial imbalance in Chicago's [Voucher program] beneficiaries"). Defendant misuses the *Inclusive Communities* discussion of "robust causa[tion]" to allege that it is not liable for a "disparity they did not create." *Inclusive Communities*, 576 U.S. at 542; *see* Mem. at 28. But this language means only that a landlord cannot be held liable for mere "statistical imbalances in the composition of their" tenants or neighborhood. *Reyes*, 903 F.3d at 419 (quoting *Wards Cove*, 490 U.S. 624, 657 (1989)). For example, it would be insufficient to plead that a particular apartment building (or neighborhood) has less than average minority tenants, *unless* the Plaintiff can link that demographic outcome to a *landlord*'s policy or practice. *Inclusive Communities*, 576 U.S. at 526.

It makes no sense to apply this *Inclusive Communities* mere statistical imbalance language to a *specific policy*—that Defendant adopted—that disproportionately harms Black renters. Defendant's position "turns disparate-impact liability on its head." *Inclusive Cmtys. Project, Inc.*

21

*v. Lincoln Prop. Co.* ("*Lincoln Properties*"), 920 F.3d 890, 922 (5th Cir. 2019) (Davis, J. dissenting). It would be "akin to requiring plaintiffs . . . to show that their employer's policy caused Black persons not to have a high school education." *Id.* (discussing *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)). Although the Fifth Circuit majority in *Lincoln Properties* misapplied this line from *Communities*, "there is no indication the Seventh Circuit would follow the Fifth Circuit's [majority] reasoning in a case of an identifiable exclusionary policy." *M&J Mgmt. Co., LLC*, 2024 WL 3859997, at *6.

Here "[c]ausality is palpable since it is undisputed that Defendants adopted the . . . policy in question." *Id.* "When a defendant makes a deliberate choice to subject only a subset of its customers or constituents to a certain policy," causation is "not a difficult inquiry.'" *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 963-64 (9th Cir. 2021) (a "disproportionate percentage" of impacted public housing residents were minority compared to "the District's customer base").

Defendant's reliance on snippets of dicta in other cases also fails. *See* Mem. at 28-29. *TBS Grp., LLC v. City of Zion,* is a landlord complaint about inspection fees that was dismissed because the unexplained "demographic statistics cited by TBS do not plausibly suggest a disparate impact." No. 16-cv-5855, 2017 WL 5129008, at *10 (N.D. Ill. Nov. 6, 2017). Likewise, *City of Joliet v. New West, L.P.*, affirmed dismissal of a landlord claim not because of lack of impact, but because closing an apartment building was "a specific decision, not part of a policy" that could be challenged in a disparate impact claim. 825 F.3d 827, 830 (7th Cir. 2016).

Fourth, Plaintiffs do not need to plead (or prove) that Defendant caused a "statistical incongruence in Hyde Park or Chicago," or that Defendant barred or "restricted" Black renters from "(i) [finding homes] to rent in Hyde Park or (ii) find[ing] homes in Chicago." Mem. at 26

22

n.20, 27-28. While the Complaint alleges the practical importance of Defendant's exclusionary policies, *e.g.* Comp. ¶ 4, Plaintiffs' claim is not a segregation claim, or a claim brought by a landlord, and so proof of exclusion from an entire City or neighborhood is not an element. None of Defendant's cases establish such a requirement. Mem. at 27 (citing *City of Joliet,* 825 F.3d at 830 (challenged action not a policy); *Breen v. Chao*, 253 F. Supp. 3d 244, 265 (D.D.C. 2017) (employment reduction in force is not a "policy" subject to an ADEA disparate impact claim). In fact, the Florida case cited by Defendant recognizes that a plaintiff must plead that, "the application of a facially neutral policy 'had a harsher impact' on a protected group of individuals, such as a racial minority." *Atl. Hous. Partners L.L.L.P. v. Brevard Cnty*., No. 6:23-cv-2473-JSS-DCI, 2024 WL 4235770 at *7 (M.D. Fla. Sept. 19, 2024) (dismissing landlord complaint that did "not provide any statistical evidence" or identify a "minority group").

## C. *Knapp* was Abrogated by *Inclusive Communities*.

Defendant also cannot secure dismissal with citation to *Knapp*, because the Supreme Court overturned that case in *Inclusive Communities*. *See* Mem. at 23-24. In 1995, the Seventh Circuit considered a disparate impact FHA claim against a landlord for categorically refusing to accept Vouchers in Wisconsin. *Knapp*, 54 F.3d at 1275. The court affirmed dismissal of the complaint with a remark that, as a policy matter, it would "**assume** that their non-participation constitutes a legitimate reason for their refusal to accept section 8 tenants," which "does not **seem** objectionable" because participation was **voluntary** under the Housing Act. *Id.* at 1279-80 (emphasis added). Defendant wrongly argues that this line immunizes landlords from all disparate impact claims related to Vouchers. Mem. at 23-24.

This Court is bound to follow *Inclusive Communities,* and not the conflicting, and erroneous, policy exception for a "voluntary" action from *Knapp* thirty years ago. *Inclusive Communities* holds that disparate impact claims are analyzed through the three-step burden-

shifting framework. 576 U.S. at 524, 541. *Knapp* conflicts with the *Inclusive Communities* standard because it suggests ruling on the landlord's justification (avoiding Vouchers) on a motion to dismiss, rather than requiring the landlord to justify its actions at the second stage of burden-shifting. *Id.; see generally* Hutt, Maia, *The House is Not Your Home: Litigating Landlord Rejections of Housing Choice Vouchers Under the Fair Housing Act*, 51 COLUM. J.L. & SOC. PROBS. 391, 413 (2018) (*Knapp* "skips the second and third steps").

*Inclusive Communities* also abrogates the three Seventh Circuit cases upon which *Knapp* relied. 54 F.3d at 1280 (stating "disparate impact analysis is not appropriate in certain contexts"). First, *Metro. Hous. Dev. Corp.* implemented the uncontroversial idea that a statistical gap does not create *"per se"* disparate impact liability through a four-factor balancing test. 558 F.2d at 1290. This has been replaced by the *Inclusive Communities* three-step burden shifting test. Second, *Knapp* cites dicta about how a court might consider a disparate impact challenge to insurance rates, in a case actually holding that plaintiffs can bring an FHA disparate treatment claim. *N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 291 (7th Cir. 1992) (mentioning disparate impact "not to resolve the question but to [only] make clear that we have not done so by indirection"). Last, *Knapp* relied on *Vill. of Bellwood v. Dwivedi,* which doubted that FHA disparate impact claims could be analogized to Title VII. 895 F.2d 1521, 1533-34 (7th Cir. 1990) (reversing a specific jury instruction). *Inclusive Communities* rejects this analysis, too, specifically adopting "an analysis that is analogous to Title VII." 576 U.S. at 521; *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 863 (7th Cir. 2018) (under the FHA, courts "look to analogous anti-discrimination statutes for guidance" including "Title VII"). None of this analysis survives *Inclusive Communities*. For the same reasons, *Inclusive Communities* overturns *Salute*, 136 F.3d at 302

24

(following the majority in *Knapp* over the blistering dissent of Judge Calabresi for the "novel *per se* defense" that ignored the "literal application of a statute").

*Inclusive Communities* also highlights that Congress enumerated statutory exceptions to disparate impact liability in the FHA—none of which apply to the Voucher program. 576 U.S. at 537 (identifying exceptions for appraisers, controlled substance convictions, and maximum occupancy limits). "Congress has had the opportunity to exempt landlords from disparate-impact liability under the FHA for discriminating against potential tenants based on their status as voucher holders, but Congress has not done so." *Lincoln Properties*, 920 F.3d at 924 (Davis, J. dissenting). The HUD regulations contain no exception, either. 24 C.F.R. § 100.500.

Not one case has relied on the *Knapp* policy exception since *Inclusive Communities*. Multiple cases reject *Knapp. See Burbank Apartments Tenant Ass'n v. Kargman*, 474 Mass. 107, 126 n.27 (2016) (*Knapp* is contrary to "the legislative policies behind the fair housing regime"); *Crossroads Residents Organized for Stable & Secure ResiDencieS (CROSSRDS) v. MSP Crossroads Apartments LLC*, CV 16-233 ADM/KMM, 2016 WL 3661146, at *10 & n.6 (D. Minn. July 5, 2016) (rejecting the "blanket exemptions" argument). A handful of other cases cite *Knapp* on unrelated points.[4] Even *Lincoln Properties*, which Defendant highlights, Mem. at 25 n.19, only

---

[4] *See Taylor v. Nat'l Investments, Ltd.*, CV 17-117 WES, 2022 WL 306367, at *8 (D.R.I. Feb. 2, 2022) (departing from *Knapp* to hold no private right action under Section 1437f of the Housing Act); *Herndon v. Hous. Auth. of S. Bend*, No. 3:15 CV 169, 2016 WL 8201134, at *4 (N.D. Ind. May 20, 2016) *revs'd on appeal* 670 Fed. Appx. 417 (7th Cir. 2016) (dicta citing *Knapp* to explain disparate impact claims); *Wosinski v. Advance Cast Stone Co.*, 377 Wis.2d 596, 672 (citing the insurance coverage ruling from *Knapp*); *Crossroads Residents Organized for Stable & Secure ResiDencieS (CROSSRDS) v. MSP Crossroads Apartments LLC*, CV 16-233 ADM/HB, 2016 WL 1555697, at *5 (D. Minn. Apr. 15, 2016) (denying a preliminary injunction as a close call and noting the *Knapp* conflict with other circuits to be evaluated later); *Fletcher Props., Inc. v. City of Minneapolis*, 947 N.W.2d 1, 7 (Minn. 2020) (upholding the City of Minneapolis source of income ordinance over constitutional challenges, and citing *Knapp* only for the general principle that "under federal law, participation in Section 8 is voluntary").

cites *Knapp* for the general proposition that "the voucher program is voluntary." 920 F.3d at 900. No court relies on *Knapp* because it is not the law after *Inclusive Communities*.

To the extent the Court applies *Knapp*—and it should not—the facts here are distinguishable and preclude dismissal. In *Knapp,* participation in the Voucher program was held to be "voluntary," even under state law, while Illinois law protects Voucher holders from discrimination. Compl. ¶ 2; *Godinez*, 352 Ill. App. 3d at 91. Further, the landlord in *Knapp* categorically refused to participate in the Voucher program, while Defendant has participated for years, albeit in a discriminatory way. *See* Mem. at 21 n.16

Notably, the FHA claim is the sole basis for federal jurisdiction here. Compl. ¶ 18. If the Court dismisses it, then the Court can dismiss the state law claims without prejudice and without reaching those disputes. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[T]he usual practice is to dismiss without prejudice state supplemental claims.").

**D. Plaintiffs Allege a Violation of the IHRA Regardless of *Knapp*.**

Plaintiffs' IHRA claim for race discrimination is viable separate and apart from the FHA. Compl. ¶¶ 170-181. While Illinois courts sometimes look to federal law when state authority is not available, Illinois law protects Voucher holders and does not follow *Knapp*. *E.g. Atkins v. City of Chicago Comm'n on Hum. Rel.*, 281 Ill. App. 3d 1066, 1073 (1st Dist. 1996) (relying on federal law when there was "no Illinois reported case law"). The fair housing protections of the IHRA were adopted years before *Knapp*. Pub. Act 81-1216, § 3-102, (eff. July 1, 1980). No text in the IHRA supports an exception. *See supra* Section IV.C. While *Knapp* rests on the premise that participation in the Voucher program was voluntary (including under Wisconsin law), Illinois prohibits discrimination against Vouchers holders based on their source of income. 775 ILCS 5/3-102; *See Hawkins v. Chicago Comm'n on Hum. Rel.*, 2020 IL App (1st) 191301, ¶ 26 (reversing dismissal of a disparate impact claim *by voucher holders* against Mac Properties because "business

26

necessity is a[n] [affirmative] defense that Mac must plead and prove"). And Illinois courts explicitly reject *Knapp*. *See Godinez*, 352 Ill. App. 3d at 93. There is no reason to think that the Illinois General Assembly or courts intend to bar a disparate impact claim or would be reluctant to protect Voucher holders. The IHRA race discrimination claim should not be dismissed.

## V.   <u>Plaintiffs Plead Unfair Practices in Violation of the ICFA.</u>

Plaintiffs allege that Defendant engaged in unfair practices with enough information to show that the ICFA claim is more than "speculative" and satisfies Rule 8. *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008) (unfairness claims pled to the Rule 8 standard, not Rule 9(b)). "Illinois courts consider three factors [for whether a practice is unfair]: whether [a practice] 'offends public policy'; is 'immoral, unethical, oppressive, or unscrupulous'; **or** 'causes substantial injury to consumers.'" *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 739 (7th Cir. 2019) (emphasis added). Defendant misstates the law by alleging that Plaintiffs must plead all three factors. *See* Mem. at 31-32 (changing the "or" to "and"). Plaintiffs satisfy at least the first factor by alleging that Defendant's practices offend public policy, which alone states an ICFA claim. *E.g.* Compl. ¶¶ 52-54, 87-88, 195, 197-199.

Plaintiffs also satisfy the second and third factors by alleging that Defendant's practices are unfair, entirely aside from violating public policy. Defendant lied to Vouchers holders about unit availability and refused to assist Voucher holders with leasing. *E.g. id.* ¶¶ 94-99, 106-107, 131, 200 (refusing application, refusing tours, refusing to show up for tours). These practices, which target low-income renters, essentially barred Plaintiffs from units and buildings in Hyde Park. *See id.* ¶ 200. Defendant's mistreatment of Plaintiffs even implicates the "unequal bargaining power" identified in one of Defendant's cases. *See Loop Spine & Sports Ctr., Ltd. v. Am. Coll. of Med. Quality, Inc.*, No. 22 CV 04198, 2023 WL 3585835, at *3 (N.D. Ill. May 22, 2023).

27

The impact of Defendant's policies on Voucher holders is tangible and substantial. Plaintiffs suffered wasted time and expenses and were ultimately stuck with "lower quality and less economically valuable rental apartments" than if Defendant had rented to them. *E.g.* Compl. ¶¶ 103 (travel expenses), 104 (increased rent), 113 ("additional" $900), 114 (less valuable unit), 120 (missed work and "additional" application fees), 121, 201, 203. The Complaint pleads substantial injury, and actual damages, too. *See Raya v. Mead Johnson Nutrition Co.*, No. 24 C 4696, 2024 WL 4953687, at *8 (N.D. Ill. Dec. 2, 2024) (refusing to dismiss unfair practices claim even though the "complaint does not contain any explicit allegations about public policy, morality, or ethics"). This case cannot be compared to the *de minimis* injuries that stem from a single-page unsolicited fax, as Defendant argues. *See* Mem. at 32 (relying on *Loop Spine & Sports Ctr., Ltd.*, 2023 WL 3585835, at *3).

The other two cases that Defendant relies on are actually about causation and do not immunize Defendant from Plaintiffs' ICFA claims. Mem. at 31-32. *See Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (affirming summary judgment on causation where plaintiff alleged that Shell gas prices were too high, but then continued to go to the Shell); *Vanlaningham v. Campbell Soup Co.*, 492 F. Supp. 3d 803, 809 (S.D. Ill. 2020) (only dismissing claims about statements on website that plaintiffs did not see, which could not have caused any harm).

Plaintiffs sufficiently plead specific harms and Defendant's factual allegations otherwise have no place in a motion to dismiss. *See* Compl. ¶¶ 121, 137, 203.

## VI.    **The IHRA Does Not Preempt the ICFA Unfair Practices Claim.**

The IHRA does not bar Plaintiffs' ICFA claim. *See* Mem. at 30-32; *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639 (7th Cir. 2019) (preemption an affirmative defense). First, the IHRA's preemption provision does not bar statutory claims. On its face, the provision does not apply to claims "otherwise provided by law." 775 ILCS 5/8–111(D). The preemption analysis

addresses whether a "common law tort" is barred. *Maksimovic v. Tsogalis*, 177 Ill. 2d 511, 516-17 (1997) (explaining "a common law action" can be barred if there is no "independent basis" for the claim). *See McCaleb v. Pizza Hut of Am., Inc.*, 28 F. Supp. 2d 1043, 1049 (N.D. Ill. 1998) (holding no preemption because the "independent legal basis for the claim [] is the Hate Crimes Act itself"); *Cf. Williams-Ellis v. Mario Tricoci Hair Salons & Day Spas*, No. 05 C 5030, 2007 WL 3232490, at *7 (N.D. Ill. Nov. 1, 2007) (holding common law fraud claims not preempted, without even questioning if the ICFA claim was preempted). Defendant points to no case that holds this provision of the IHRA preempts a statutory claim.[5]

Second, the logic of preemption does not apply to housing claims. The IHRA preemption provision protects the "[Illinois Human Rights] Commission [which is] vested with exclusive jurisdiction" over certain claims "to promote the efficient and uniform processing of state civil rights claims." *Maksimovic*, 177 Ill. 2d at 518. For a housing claim, there is nothing to protect. The Illinois General Assembly does not require housing claims to even be *submitted* to the Department of Human Rights or Commission; they can be filed directly in court. 775 ILCS 5/10-102 (authorizing direct court litigation for "Article 3" housing cases). Preemption for housing claims would conflict with the provision that authorizes such plaintiffs to go directly to court.

Third, the IHRA does not bar Plaintiffs' ICFA claim, specifically, because there is an "independent basis for the action apart from the Act." *Maksimovic*, 177 Ill. 2d at 517. The test is not "factual overlap," but rather whether the separate claim is "independent of legal duties furnished by the IHRA." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006). Plaintiffs' ICFA claim is premised on a variety of sources of "public policy" and thus not dependent on the IHRA or legal duties it creates. *See, e.g.*, Compl. ¶ 195. Defendant's selective

---

[5] Defendant violates Illinois Supreme Court Rule 23(e) when it attempts to rely on an unpublished Illinois state court decision from before 2021. Mem. 31 n.23 (citing *dicta* from a case actually about *res judicata*).

29

quotation demonstrates that Defendant needs to *rewrite* the Complaint to even make this argument. Mem. at 30 (mis-citing Compl. ¶ 195). Plaintiffs' actual allegation: that the practices "offend public policy because they violate the City of Chicago ordinances, Cook County ordinances, Illinois State law, and federal law, as detailed above." Compl. ¶ 198; *see also*; Compl. ¶¶ 2, 25, 52-54, 87-88. In addition, Defendant engages in unfair marketing and lease practices entirely separate from Voucher discrimination. *See supra*, Section V. Further, Plaintiffs' ICFA claim covers unfair conduct from 2021 to January 2023, before the IHRA source of income provision went into effect. The ICFA claim is not preempted because it could be pled without reference to the IHRA.

## VII.    **The Court Should Not Prematurely Strike the Class Allegations.**

"Generally, courts deny motions to strike class allegations before certification briefing." *In re Hair Relaxer Mktg. Sales Practices & Prods. Liab. Litig.* ("*In re Hair Relaxer*"), No. 23-CV-0818, 2024 WL 4333709, at *1 (N.D. Ill. Sept. 27, 2024). Courts strike class allegations only in the rare case where a class is so legally flawed that it could never be certified, even with modification, *and* only if there are no facts or discovery relevant to class certification. *Murdock-Alexander v. Tempsnow Emp't*, No. 16-CV-5182, 2016 WL 6833961, at *3 (N.D. Ill. Nov. 21, 2016). Indeed, "a court may abuse its discretion by not allowing for appropriate discovery before deciding whether to certify a class." *Damasco v. Clearwire Corp.,* 950 f. 891, 897 (7th Cir. 2011). Defendant does not meet this standard.

First, the class definition is not temporally "overbroad on its face" because the claims here extend beyond when the IHRA source of income protections became effective in January 2023. *See* Mem. at 33. The proposed class period of 2021 through the present tracks the three-year statute of limitations for ICFA claim. 815 ILCS 505/10a(e); *see, e.g.* Mem. at 34 n.25. Indeed, with discovery, the statute of limitations may even be longer. *See Access Living of Metro. Chicago, Inc.*,

372 F. Supp. 3d at 671–72 (explaining that a "continuing violation" can extend FHA claims and that "dismissal" on statute limitations "is appropriate only where the Plaintiff" has pled herself out of court). More generally, whether the proposed class period captures *some* class members who did not "suffe[r] the harms," *see* Mem. at 33, is "irrelevant" even "on class certification." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012) ("a class will often include persons who have not been injured"). The claims are not limited, as a matter of law, to January 1, 2023.

Second, Plaintiffs define the class definition by objective conduct—i.e. the act of seeking to rent from Defendant—not by impermissible "subjective criteria." Mem. at 35. "Plaintiffs can generally avoid the subjectivity problem by defining the class in terms of conduct (an objective fact) rather than a state of mind." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir. 2015). The class is defined by objective action—"Voucher holders who **sought** to rent" from Defendant, Compl. ¶ 149– not the subjective feeling of being "discouraged" from applying to a government program, as in the case Defendant cites. Mem. at 35 (citing *Simer. v. Rios*, 661 F.2d 655 (7th Cir. 1981) (denying certification because the class was "unmanageable," not because of subjectivity)). And though it is not required, class members will be identifiable in Defendant's own records. *See* Compl. ¶ 41 (Defendant "logs every prospective tenant inquiry into Salesforce."). Regardless, the argument is not a basis to strike the class allegations because the court can address any nuance in the class definition at class certification. *Messner*, 669 F.3d at 825 (explaining that class definition issues should be fixed, not preclude certification).

Third, Plaintiffs identify numerous common questions that more than satisfy Rule 23(a). *See* Mem. at 34. A common question is one that, "will resolve an issue that is central to the validity of each one of the claims." *Ross v. Gossett*, 33 F.4th 433, 437 (7th Cir. 2022); *McReynolds v.*

31

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 490 (7th Cir. 2012) (reversing denial of certification under Rule 23(c)(4) and (b)(2) to allow litigation of a common question of whether two practices had a disparate racial impact). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 755–56 (7th Cir. 2014) (reversing denial of certification because even one question could support a class). Plaintiffs allege that Defendant controls the leasing of its Hyde Park properties through a unified team of leasing agents and "a set of portfolio-wide policies and practices." Compl. ¶¶ 37-40, 47. The implementation of these policies and practices, and whether they are lawful, are common questions with common answers. *Id.* ¶ 152; *Lucas v. Vee Pak, Inc.*, 68 F. Supp. 3d 870, 881 (N.D. Ill. 2014) (common question of whether employer had a discriminatory policy of steering Black workers "as a general rule" satisfied commonality); *McReynolds*, 672 F.3d at 490 (even at class certification, "[t]he only issue . . . is whether the plaintiffs' claim of disparate impact is most efficiently determined on a class-wide basis rather than in 700 individual lawsuits").

Defendant also raises factual disputes about Plaintiffs' common questions that cannot be resolved on the pleadings. Mem. at 34 (disputing questions (b) and (h)). For one, this argument is flatly contrary to Plaintiffs' allegations, which must be taken as true. *See, e.g.,* Compl. ¶¶ 37-50. Two, Defendant's factual disagreements also confirm the necessity of discovery here, and for that reason, too, the motion is inappropriate. *See Murdock-Alexander*, 2016 WL 6833961, at *3 (denying a motion to strike as premature because "discovery is often appropriate, even necessary").

Fourth, the named Plaintiffs' claims are typical, and the Court would have no basis to conclude otherwise without a factual record. *See* Mem. at 35 (arguing Plaintiffs interacted with some but not all of the Defendant buildings). "[T]ypicality under Rule 23(a)(3) should be

32

determined with reference to the company's actions." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 725 (7th Cir. 2011). Claims are typical when they "arise from the same practices, events, or course of conduct by Defendants. Each named Plaintiff is pursuing a common remedy . . . arising out of common conduct . . . Nothing further is required." *In re Hair Relaxer*, 2024 WL 4333709, at *4–5. Indeed, Plaintiffs even allege that they interacted with many other buildings. *E.g.* Compl. ¶¶ 57-76, 98, 116-118, 131 (examples of discrimination across a range of buildings). Regardless, Defendant makes a factual argument that cannot be resolved on a motion to strike. *Lucas*, 68 F. Supp. 3d at 884 (holding that the allegations satisfy Rule 8 and thus plaintiffs "are therefore entitled to discovery before the defendants can attempt to bar the door to class certification.").

"Defendants have a steep burden on a motion to strike to show that the pleadings make clear that the suit cannot satisfy Rule 23." *In re Hair Relaxer*, 2024 WL 4333709, at *4 (cleaned up). Defendant has not met the burden and its motion to strike should be denied.

**VIII. Plaintiff HOPE Fair Housing Center has Article III Standing Under *Havens*.**

Plaintiff HOPE has sufficiently alleged that Defendant's discrimination against Voucher holders impaired its mission and core activities, which establishes an injury-in-fact and Article III standing under *Havens*. The long-standing Supreme Court and Seventh Circuit precedent on organizational standing under the FHA was affirmed, not overturned, in *Alliance*, 602 U.S. at 380. "At the pleading stage," HOPE only needs "general factual allegations of injury resulting from the defendant's conduct.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 498 (7th Cir. 2005) ("A motion to dismiss for lack of standing should not be granted unless there are no set of facts consistent with the complaint's allegations that could establish standing."). The motion to dismiss Plaintiff HOPE on standing should be denied.

33

**A. Standing Under the FHA Extends as Broadly as Permitted by Article III.**

Congress passed the FHA as part of the Civil Rights Act of 1968 to authorize any "aggrieved person" to bring a housing discrimination lawsuit. 42 U.S.C. § 3613(a). The statute defines "aggrieved person" as "any person who" either "claims to have been injured by a discriminatory housing practice" or believes that such an injury "is about to occur." *Id.* at § 3602(i). Under the FHA, standing is "as broad [] as is permitted by Article III." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209-211 (1972) (cleaned up). *See also Bank of Am. Corp v. City of Miami*, 581 U.S. 189, 198 (2017) (again reaffirming *Havens* and the broadest standing under the FHA).

**B. Defendant's Discriminatory Housing Practices have and will Continue to Injure HOPE's Mission and Core Activities.**

In *Havens*, the Supreme Court recognized and set the standard for organizational standing under the FHA. 455 U.S. 363 (1982). In *Havens*, a fair housing center, HOME, received a complaint about a real estate corporation's discriminatory treatment of Black housing seekers and, in response, designed and implemented a testing investigation. *Id.* at 366-69. The Court recognized that HOME had standing to sue for an FHA violation because injury to an organization can include impairment to its mission, activities, or access to information:

> If, as broadly alleged, [Havens'] steering practices have perceptibly impaired HOME's ability to provide housing counseling and referral services for low- and moderate-income home-seekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.

*Id.* at 379; *id.* at 379 n.20 (recognizing injury to mission as a distinct basis for standing). For decades, the Supreme Court and Seventh Circuit have consistently applied the core of *Havens*: that an organization has standing to challenge discrimination where the conduct perceptibly impairs its mission or activities. *See, e.g., Bank of Am. Corp.*, 581 U.S. at 198 ("the Act allows suits by . . . a village alleging that it lost tax revenue and had the racial balance of its community undermined by

34

racial-steering practices; and a nonprofit organization that spent money to combat housing discrimination."); *Common Cause Indiana v. Lawson*, 937 F.3d 944, 952-53 (7th Cir. 2019) (collecting cases) (standing based on concrete, specific adverse consequences to mission from state law change). Accordingly, courts have long recognized that HOPE specifically has standing to enforce the FHA. *See*, *e.g.*, *HOPE Fair Hous. Ctr., Inc. v. City of Peoria*, No. 1:17-cv-01360-SLD-JEH, 2018 WL 10246029, at *3-5, *7-8, *10-11 (C.D. Ill. May 14, 2018); *H.O.P.E., Inc. v. Eden Mgmt. LLC*, No. 13-cv-7391, 2016 WL 4011225, *13-15 (N.D. Ill. July 27, 2016).

Here, HOPE pleads the same perceptible impairments to its mission and activities as in *Havens,* its progeny, and past cases recognizing HOPE's standing. HOPE is a non-profit organization whose mission is to create greater housing opportunities for all. Compl. ¶ 139. It effectuates that mission through the same set of core fair housing services that HOME provided in *Havens*, including: education and outreach; counseling and referral services for housing seekers; investigations of complaints; private grant-making to households needing financial assistance to afford housing; and other services that promote equal housing access. *Id.* ¶¶ 139-142, 147. Also, just as in *Havens*, after receiving complaints about Defendant's treatment of Voucher holders, HOPE spent time and resources investigating the scope and impact of Defendant's fair housing violations; HOPE responded with additional outreach, education, and training activities; and, in order to do so, delayed planned work on other core programs, activities, and priorities. *Id.* ¶¶ 145-47. These facts allege the injury recognized in *Havens,* and Defendant has not contested standing on causation or redressability. HOPE pleads Article III standing.

### C. *Alliance* Did Not Overturn *Havens* and Does Not Apply to HOPE Regardless.

Despite straightforward allegations of injury to HOPE that parallel *Havens*, Defendant repeatedly cites to two cases to argue against standing, neither of which justifies dismissal. Mem. at 36-40 (relying almost exclusively on *Alliance* and *Legal Aid Chicago v. Hunter Props.* ("*Hunter*

35

*Properties*"), No. 23-cv-04809, 2024 WL 4346615 (N.D. Ill. Sept. 30, 2024) *vacated* Nov. 4. 2024 (Dkt. 52).

*Alliance* affirmed *Havens*—it did not replace it—which even Defendant tacitly acknowledges. Mem. at 36-37. *Alliance* held that a professional association of doctors opposed to abortion care did not have sufficient injury to challenge the Federal Drug Administration decision to ease the rules for mifepristone for medication abortions. 602 U.S. at 396-97. *Alliance* confirmed that a professional association could not sue based on an ideological opposition to the regulation alone or "manufacture its own standing" by spending money to oppose a regulation with no impact on its core mission or activities. *Id.* at 394. The Court contrasted the professional association's political expenditures (no standing), with the impact of discrimination on a fair housing agency's mission and activities (standing under *Havens*). *Id.* at 395 (reaffirming organizational standing under *Havens* where a defendant's "actions directly affected and interfered with HOME's core business activities"). Indeed, *Alliance* is a continuation of the well-established rule that parties not directly impacted by a *government action* rarely have standing to challenge them. *See*, *Lujan*, 504 U.S. at 561-62 ("When, however . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed"); *Alliance*, 602 U.S. at 384-85 (collecting cases).

Defendant cannot recast HOPE as akin to the ideological professional association trying to spend its way into standing in *Alliance,* when HOPE is on all fours with *Havens* and exactly like the fair housing agency that both *Havens* and *Alliance* agree have standing. 455 U.S. at 379; 602 U.S. at 395. HOPE does not have a mere ideological opposition to discrimination, it is a fair housing center whose very mission and activities were "perceptibly impaired" by Defendant's discrimination. Compl. ¶¶ 138-148. The more time it had to spend on Defendant's discrimination,

the less resources it had available for other activities. *Id.* Even after *Alliance*, courts continue to recognize this difference and uphold standing for organizations to sue based on perceptible impairments to their mission and core activities. *See, e.g.*, *Republican Nat'l Comm. v. North Carolina State Bd. of Elections*, 120 F.4th 390, 396 (4th Cir. 2024) (Republican parties properly pled injuries to mission and activities, voter support and registration directly impacted by state law); *Access Living of Metro. Chicago, Inc. v. City of Chicago*, 1:18-cv-03399, 2024 WL 4346630 (N.D. Ill. Sept. 30, 2024) (housing agency has standing where city policies made core activity of helping clients find housing more difficult and reduced effectiveness of the organization's services). Except for the vacated opinion in *Hunter Properties*, these courts take *Alliance* to, at most, clarify that an organization's pleading of diversion of resources must be tied to the organization's mission and core activities. Even *Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, which Defendant cites, reaffirmed *Havens* for a fair housing organization. 124 F.4th 990, 992–93 (6th Cir. 2025) ("If, for example, a defendant's actions interfered with the counseling and referral services that a housing organization provided, that conduct could suffice to establish standing.").

Likewise, HOPE is not manufacturing standing. Among other concrete impacts on its operations, HOPE spent time and money investigating Defendant's discriminatory practices, including through fair housing testing. Defendant cannot characterize these investigative resources as mere litigation expenses or "self-inflicted" budgetary choices. Mem. at 40 (citing *Hunter Properties* and *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011)). The Seventh Circuit has rejected both arguments. Investigation costs can support standing, as distinct from litigation expenses (such as legal fees or time spent responding to discovery). *See, e.g.*, *City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086,

1095 (7th Cir. 1992) standing where "the investigation into Matchmaker's activities . . . deflected its time and money from counseling to legal efforts directed against discrimination"); *M&J Mgmt. Co., LLC.*, 2024 WL 3859997 at *3 ("The Seventh Circuit has characterized diversion of resources as equivalent to the opportunity costs of pursuing the investigation of the defendant's practices.").

The Seventh Circuit also rejects the characterization of this injury as "self-inflicted." *See Common Cause Indiana*, 937 F.3d at 956 ("What matters is whether the organizations' activities were undertaken because of the challenged law, not whether 'they are voluntarily incurred or not.'"). The expense for HOPE to investigate discriminatory practices is one of multiple markers of perceptible impairment of HOPE's mission and core activities. *See also, e.g., Cent. Alabama Fair Hous. Ctr., Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629, 642 (11th Cir. 2000) ("The *Havens* court regarded the identification and combating of discrimination as a 'concrete and demonstrable' injury, . . . Because testing helps to identify discrimination, the injuries attributable to the discrimination identified by the testing give an organization standing.").

Last, Defendant also cannot rely on *Hunter Properties* because the now-vacated (and unpublished) opinion has no precedential authority. *See Cnty. of Cook v. Bank of Am. Corp.*, 78 F.4th 970, 972 (7th Cir. 2023) ("the Supreme Court vacated that decision as moot. . ., which strips it of any value as precedent") (cleaned up); *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) ("a decision that has been vacated has no precedential authority whatsoever"). Even if considered, the judge in *Hunter Properties* distinguished the eviction defense work of a general legal aid agency from the core activities of a fair housing organization and adopted a novel test for organizational standing. *Hunter Properties*, 2024 WL 4346615, at *13-14. Here, there is no distinction between HOPE's core activities and those pled in *Havens*. The Court should apply *Alliance* and *Havens* directly and has no need—or justification—to make up new tests for standing.

38

*See M&J Mgmt. Co., LLC.*, 2024 WL 3859997 (fair housing agency has standing because activities were impaired by opportunity cost losses and non-economic injury to mission); *United States v. AION Mtg.*, No. 23-742 (GBW), slip op. at 11-12 (D. Del. Mar. 18, 2025) ("the injury in fact standard from Havens still applies," fair housing agencies have standing under *Havens* to challenge discriminatory policy they investigated). HOPE has standing and Defendant's motion should be denied.

<div align="center">

### CONCLUSION

</div>

For the reasons stated herein, Defendant's Motion should be denied in full. If any aspect of motion is granted, it should be without prejudice and with leave to replead. *Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015).


Dated: March 20, 2025

<div style="margin-left: 40%">

Respectfully submitted:

By: */s/ Charles D. Wysong*
*One of the Attorneys for Plaintiffs*

</div>


CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS

Emily Coffey
MacKenzie Speer
Jacob Cantor
Aneel L. Chablani
100 N. LaSalle St., Ste. 600
Chicago, IL 60602
Telephone: (312) 630-9744
ecoffey@clccrul.org
mspeer@clccrul.org
jcantor@clccrul.org
achablani@clccrul.org

*Attorneys for Plaintiffs*

HUGHES SOCOL PIERS RESNICK & DYM, LTD.

Charles D. Wysong
Tory Tilton
70 W. Madison St., Ste. 4000
Chicago, IL 60602
Telephone: (312) 580-0100
cwysong@hsplegal.com
ttilton@hsplegal.com