# EXHIBIT C

**SELECTED RULES**
**Applicable After Findings of No Substantial Evidence**

*A full set of rules is available from the Commission or at www.chicago.org/cchr.*

## REQUEST FOR REVIEW

**Rule 250.110. Review of Dismissals.** A complainant seeking review of the full or partial dismissal of a complaint by the Commission or a hearing officer must file and serve a request for review within 28 days of the mailing of the dismissal order. The request must be served on all other parties and the hearing officer (if any). Leave may be granted to respond or reply.

**Rule 250.130(a). Content of a Request for Review.** A request for review must state with specificity the reasons, evidence, or legal authority requiring reversal or modification of the decision in question. The request may not exceed 10 pages without leave from the Commission and must clearly state that the party is seeking reconsideration or review. Any new testimonial or documentary evidence must be provided with the request.

**Rule 250.130(b). Grounds for a Request for Review.** Grounds for reversal or modification may include relevant evidence which is newly discovered and not available at the time of the original decision; new and dispositive legal precedent not available at the time of the original decision; a material misrepresentation, misstatement, or omission which was a basis for the decision; or a material error by the Commission or hearing officer. If a complaint was dismissed for failure to cooperate, the request for review must (1) establish good cause for the complainant's noncompliance, at the time required, with the requirement which was the basis for dismissal; and (2) include any missing material which was a basis for the dismissal or show good cause for not doing so.

**Rule 250.140. Grant or Denial of Request for Review.** For dismissal orders entered by the Commission, the Commission shall rule on any request for review. For dismissal orders entered by a hearing officer, the hearing officer shall rule on any request for review. The Board of Commissioners shall rule on any request for review submitted with objections to a hearing officer's recommended ruling. If granting a reversal or modification pursuant to a request for review, the order shall describe any further proceedings in the case.

## ACCESS TO INVESTIGATIVE FILES

**Rule 220.410(a). Access to Files: General Nondisclosure and Access by Parties.** Neither the Commission nor its staff shall disclose any information obtained in the course of investigation or mediation of a case except where otherwise required by law or intergovernmental agreement, or as ordered by a hearing officer pursuant to Reg. 240.370. However, after providing the Commission with notice of at least two business days, parties or their attorneys of record may inspect files pertaining to their own cases at any time after issuance of an order concluding the investigation process or dismissing the case in its entirety.

(1)     Notwithstanding the above, the Commission shall not allow parties to inspect internal memoranda, work papers, or notes generated by Commission staff or agents in the course of an investigation, or other materials reflecting the deliberative process, mental impressions, or legal theories and recommendations of the staff or agents of the Commission.

(2)     If a party files a written motion establishing good cause or if the Commission *sua sponte* determines that good cause exists, the Commission may require parties seeking access to an investigative file to comply with a protective order limiting use of the information to Commission or related state court proceedings and prohibiting other disclosure of information from the file.

**Rule 220.410(c). Access to Files: Copying Costs.** The Commission shall furnish copies of documents available for inspection at a charge not to exceed 20 cents per page plus any delivery costs. Copies shall not

be released to the requester until the Commission has received payment in full. A party may seek waiver of these charges pursuant to Section 270.600.

**Section 270.600. Waiver of Commission Fees.** A party may by written motion request that the Commission waive its fees for copies of Commission documents. The motion shall be granted only on submission of an affidavit or other statement under oath plus any additional documentation establishing by objective evidence that the requesting party is unable to pay the charges and that the copies sought are necessary for pursuit of the party's claims or defenses in a Commission case. If the party's attorney of record was obtained through a not-for-profit legal assistance provider, the attorney's certification that the provider has determined the party to be indigent is sufficient objective evidence of inability to pay.

Case No. 23-H-38



## City of Chicago
## COMMISSION ON HUMAN RELATIONS

### INVESTIGATION SUMMARY

| Case Number 23-H-38 | Date of Determination October 2024 |
|---|---|
| Complainant Rysheena Moore | |
| Respondents Mac Property Management LLC d/b/a Mac Properties, Donell Chenault, and Salamatu Labaran [1] | |
| Type of Case __Employment  X Housing  __Public Accommodation  __Credit __Bonding | |
| CLAIM | BASIS | DETERMINATION |
| Refusal to Rent and Steering | Source of Income | No Substantial Evidence |
| Date Complaint Filed April 10, 2023 | Date of Violation February 22, 2023 |

1. **COMPLAINANT'S POSITION**

Complainant, whose income derives in part from a Housing Choice Voucher (HCV) administered by the Chicago Housing Authority (CHA), alleges that Respondents refused to rent available apartments to her and subsequently steered her to other rental properties based on her source of income.

Complainant states that on February 13, 2023, she contacted the Regents Park apartment complex, located at 5035 S. East End Ave., in Chicago, through Regents Park's website and the Zillow.com website. Complainant states that she was interested in renting any available two-bedroom apartment at Regents Park. Complainant alleges that on February 13, Respondent Mac Properties' Leasing Agent Donell Chenault responded to her communication, providing her with screening questions. Complainant states that in her reply, she disclosed her HCV income source. Complainant states that on February 14, Chenault e-mailed Complainant and asked her to schedule a tour. Complainant states that she replied to Chenault to inform him that she already had a tour scheduled for February 16.

Complainant alleges that on February 15, 2023, Chenault contacted Complainant to confirm that Complainant's rental budget was $1,700. Complainant states that she corrected

---

[1] Complainant erroneously named "Labaran Salmatu" as a Respondent in the Complaint. Respondent's correct name is Salamatu Labaran.

1

Chenault by replying that her budget was $2,000 to $2,100 per month for a two-bedroom apartment. Additionally, Complainant states that they agreed to meet on February 17, but had not agreed to a time. Complainant alleges that by February 17, Chenault had not provided her with a meeting time.

Complainant alleges that on February 20, 2023. Chenault e-mailed Complainant, said that Regents Park had no units within Complainant's budget, and directed Complainant to view other listings on the Macapartments.com website. Complainant further alleges that on February 21, she viewed the Macapartments.com listings and found two available apartments at Regents Park that met her preferences and were within her budget. Complainant states that the apartments were N 0804, listed at $2,000 per month, and N 1109, listed at $1,975 per month. Complainant alleges that she forwarded these listings to Chenault and asked if the apartments were available, but that Chenault did not respond.

Complainant alleges that on February 22, 2023, she visited Regents Park, approached the concierge, and asked for a tour of the property. Complainant states that the concierge said tours were typically scheduled ahead of time but that the concierge would check if an exception could be made for Complainant. Complainant states that the concierge led her to the office of Leasing Agent Salamatu Labaran of MAC Properties. Complainant states that she told Labaran that she was having difficulties scheduling a tour with Chenault. Complainant states that Labaran then looked Complainant up in a database, commented that Complainant was assigned to Chenault, and told Complainant to contact Chenault for further assistance. Complainant states that she reiterated to Labaran the scheduling difficulties. Complainant alleges that Labaran then called Chenault, and that Chenault said he was out of the office.

Complainant alleges that when she asked Labaran whether she could schedule a tour of the building, Labaran asked, "Do you have your moving papers?" Complainant further alleges that when she told Labaran she did not, Labaran said Complainant would not be shown apartments without moving papers, that "they [do not] hold units," and that no building in Hyde Park will show apartments without moving papers. Complainant states that she asked Labaran to direct her to someone who could further assist. Complainant states that Labaran provided the address to MAC Properties, located at 1364 E. 53rd St., in Chicago. Complainant alleges she asked Labaran whether Housing Choice Voucher holders should lie about their vouchers to avoid poor treatment, and that Labaran replied, "I [did not] say that."

Complainant states that upon arriving at MAC Properties' office, she met with a male staff person (name unknown). Complainant alleges that she told the staff person that Labaran said Complainant could not view apartments without moving papers and that the male said, "That is illegal." Complainant further alleges that Chenault, who according to Labaran was out of the office, appeared and escorted Complainant to a room. Complainant states that Chenault told her that he needed to complete a call and would meet with Complainant afterwards.

2

Complainant alleges that during her meeting with Chenault, Complainant told Chenault of Labaran's behavior and Chenault provided Complainant with Labaran's full name. Complainant further alleges that during their meeting, Chenault referenced the wrong Housing Choice Voucher and Lyft income documents as the reason why Regents Park was outside of Complainant's budget. Complainant states that she corrected Chenault by saying that she did not work for Lyft and that her monthly income was $2,000. Complainant alleges that Chenault maintained that Regents Park was not within Complainant's budget and that Chenault offered to show her the "walk-ups." Complainant states that she was provided with the information of apartment buildings on Drexel Blvd., Woodlawn Ave., and Hyde Park Blvd. Complainant states that she was not interested in these properties.

## 2.    RESPONDENTS' DESCRIPTION & BACKGROUND

MAC Property Management, LLC, d/b/a MAC Properties, constructs, renovates, and operates properties for rent throughout Chicago, Illinois. MAC Properties also operates in St. Louis, MO and Kansas City, MO. It is the owner and operator of the subject property, which is known as Regents Park. Regents Park is an apartment complex located at 5035 S. East End Ave. in Chicago. It has about 1,026 units, is situated on the lakefront, and offers luxury amenities. Donnell Chenault and Salamatu Labaran are Leasing Agents for MAC Properties.

## 3.    RESPONDENTS' POSITION

Respondents acknowledge that Complainant disclosed that her income includes a Housing Choice Voucher (HCV) but they deny that they refused to rent available apartments to Complainant or that they steered her to other rental properties based on her source of income. Respondents assert that they rent to Voucher holders at the subject property.

Respondents acknowledge that on February 13, 2023, Complainant contacted Respondents through the Regents Park website and Zillow.com website. Respondents acknowledge that Chenault contacted Complainant on February 13, that Complainant underwent an initial questionnaire process, and that Complainant disclosed that she had an HCV. Respondents further acknowledge that Chenault e-mailed Complainant on February 14 to ask Complainant to schedule a tour. Respondents also acknowledge that Complainant said she already had a tour scheduled for February 16, but Respondents assert that the February 16 tour was not confirmed.

Respondents acknowledge that on February 15, 2023, Chenault inquired whether Complainant's monthly budget was $1,700, and that Complainant corrected Chenault by saying that her monthly budget was $2,000 to $2,100 per month. Respondents also acknowledge that Chenault and Complainant scheduled a tour for February 17, but that Chenault did not provide a meeting time. Additionally, Respondents acknowledge that Chenault did not contact Complainant regarding a meeting time for the February 17 tour.

3

Respondents acknowledge that on February 20, 2023, Chenault e-mailed Complainant and told her that Regents Park was not within Complainant's budget and that Chenault directed Complainant to the MAC Properties listings website. Respondents further acknowledge that Complainant forwarded Chenault the listings of Regents Park apartments N 0804, listed at $2,000 per month, and N 1109, listed at $1,975 per month, that Complainant asked whether the two apartments were available, and that Chenault did not respond to the inquiry.

Respondents acknowledge that on February 22, 2023, Complainant visited Regents Park and met with Labaran. Respondents further acknowledge that Complainant told Labaran that she was having issues with scheduling a tour with Chenault, that Labaran found Complainant on a database which showed Chenault was assisting Complainant, that Labaran told Complainant to follow-up with Chenault, and that Complainant reiterated Chenault's scheduling difficulties to Labaran. Respondents deny that Labaran said that Chenault was out of the office when Labaran called Chenault and assert that Chenault was providing a tour of a property at that time.

Respondents deny that Labaran told Complainant that she would not be shown apartments because Complainant had no moving papers or that MAC Properties "does not hold units." Respondents further deny that Labaran said buildings in Hyde Park will not show Complainant apartments without moving papers. Respondents assert that a concierge had told Complainant that Labaran might be able to give Complainant a tour of Regents Park depending on Labaran's availability. Respondents further assert that Labaran was unavailable to provide a tour to Complainant at the time and that Labaran already had a tour scheduled. Respondents acknowledge that Labaran directed Complainant to MAC Properties' office once Complainant requested further assistance. Additionally, Respondents deny that Complainant asked Labaran whether Housing Choice Voucher holders should lie to avoid poor treatment or that Labaran replied to the question.

Respondents acknowledge that Complainant visited MAC Properties' office, but assert that the male staff person with whom she interacted from the start was, in fact, Chenault. Respondents acknowledge that Complainant told Chenault that Labaran said she would not provide Complainant a tour because Complainant did not have her moving papers, but deny that Chenault replied, "That is illegal." Respondents assert again that Labaran did not make any statements regarding moving papers to Complainant and that Labaran's schedule restricted her from providing a tour to Complainant. Additionally, Respondents acknowledge that Chenault escorted Complainant into an office and that Chenault said he would return after completing a call.

Respondents acknowledge that Chenault provided Complainant with Labaran's information, and that Complainant spoke of Labaran's behavior, but Respondents deny that Labaran mistreated Complainant. Respondents acknowledge that while discussing Complainant's application for Regents Park, Chenault mistakenly referenced income information that did not pertain to Complainant. Respondents acknowledge that Chenault still said that Complainant did not qualify for Regents Park based on Complainant's reported monthly income

4

amount. Respondents acknowledge that Chenault then offered to show Complainant apartment buildings on Drexel Blvd., Woodlawn Ave., and Hyde Park Blvd.

Respondents assert that Chenault expressed to Complainant that Regents Park did not have apartments within her budget and directed her to apartments managed by Respondents within the same area. Respondents further assert that MAC Properties implements non-discriminatory policies, and that the application has verbiage of these policies. Respondents also assert that MAC Properties continued to reach out to Complainant on several occasions in efforts to help Complainant obtain an apartment through Leasing Agent Kenyetta McLaurin. Additionally, Respondents state that on March 29, 2023, McLaurin explained to Complainant Respondents' process of submitting CHA rent requests and that McLaurin attempted to schedule tours with Complainant on April 12 and April 20. Respondents state that Complainant eventually told McLaurin, "Thank you for reaching out. I am no longer moving."

### 4. COMPLAINANT'S REBUTTAL

Complainant maintains her allegations. Complainant states that she is a disabled United States Army veteran with post-traumatic stress disorder (PTSD) and receives a disability retirement pension. Complainant states that the combined amount of her Housing Choice Voucher (HCV) and disability retirement pension is about $4,500 to $4,700 per month. Complainant states that she did not disclose this total amount to Respondents. Complainant states that she only disclosed her pension income amount, which is about $2,000 per month. Complainant states that she was able to afford rent at Regents Park and that a friend with a HCV was renting an apartment at Regents Park.

Complainant alleges that during her meeting with Labaran, Labaran's demeanor changed to "uninviting and nasty" upon learning that Complainant was an HCV holder. Complainant further alleges that Labaran said "Oh, you have a Voucher," in a condescending manner.

Complainant states that after interacting with Chenault and Labaran, her housing search led her to an available apartment at 5252 S. Cornell, in Chicago. Complainant states that she inquired about the available apartment, and that MAC Properties' agent, McLaurin, responded to her inquiry. Complainant states that she was not aware that 5252 S. Cornell was also affiliated with MAC Properties until McLaurin contacted her. Complainant alleges that the exact same thing happened with McLaurin as with Chenault. Complainant states that at that point, she stopped looking for apartments.

Complainant states that in an attempt to "test" Respondents, Complainant had her long-time friend Curtis Pettigrew, who does not have an HCV, request a tour of Regents Park. Complainant states that Labaran provided a tour of Regents Park to Pettigrew, that Complainant accompanied Pettigrew on the tour, and that Labaran did not recognize Complainant. Complainant states that Labaran treated Pettigrew "wonderfully" and that Labaran followed up with Pettigrew to apply for an apartment. Complainant states that she was never given the

opportunity to apply for an available apartment at Regents Park.

5.     **DESCRIPTION OF RELEVANT DOCUMENTS** *This may not include every document obtained, but includes any evidentiary documents (other than Complaints, Verified Responses, and Position Statements) on which the Commission bases its determination.*

     a.     **Title or Description:** <u>E-mail Message between Complainant and Chenault, dated February 14 to February 21, 2023</u>
**Source:** <u>Complainant</u>
**Relevant Content:** The exchange shows that Complainant and Chenault attempted to coordinate a tour of Regents Park. On February 15, Chenault asks Complainant if her budget is about $1,700 for a two-bedroom. Complainant replies, "2000/2100."

On February 20, Chenault says, "We may have to explore other buildings. I don't have a [two-bedroom] for the price at Regents Park. Have you reviewed our website www.macapartments.com?"

On February 21, Complainant replies, "Yes, I did. I keep seeing units going for that price or similar. Other buildings are fine as well." Complainant then provides Chenault with screenshots of the listings for unit N 1109, listed for $1,975, and unit N 0804, listed for $2,000. Complainant asks whether the two units were available, but the exchange shows no further correspondence.

     b.     **Title or Description:** <u>CHA Rent Burden Worksheet, dated March 8, 2023</u>
**Source:** <u>Complainant</u>
**Relevant Content:** The document states that Complainant's voucher number is # CHA-T0206041. The voucher further states that the voucher is for a two-bedroom and that Complainant can expect to pay between $416 to $554. Under the "Suggested Budget" portion of the document, it states that rent and utilities should be between $1,497 and $2,485 within mobility areas. It also states that rent and utilities should be between $1,497 and $1,635 for non-mobility areas.

     c.     **Title or Description:** <u>E-mail Messages between Complainant and McLaurin, dated March 29 and March 30, 2023</u>
**Source:** <u>Respondents</u>
**Relevant Content:** The exchange shows that McLaurin provided Complainant with links to available properties. McLaurin states that the links meet Complainant's criteria. There are six links which consist of units located at "Algonquin Apartments", "The Blackwood", "Paramour", "The Del Prado", and 5222-38 S. Drexel Ave. Complainant replies by asking if Regents Park or a property known as "Twin Towers" had availability.

d.  **Title or Description:** <u>E-mail Message from McLaurin to Complainant, dated April 4, 2023</u>
**Source:** <u>Complainant</u>
**Relevant Content:** In the exchange, McLaurin states that Respondents do not own a property known as the "Twin Towers." McLaurin then says, "I listed some options in my previous email that are within your voucher amount." McLaurin also explains MAC Properties' process of submitting rental requests to the CHA and that it is based on a unit's rental price plus the utility fee of the building. McLaurin provides an example with Regents Park apartment number N 0504. The rent for this apartment is $2,184, the utility fee is $210, and so MAC Properties would send a rental request to the CHA in the amount of $2,394. McLaurin further explains that the CHA will approve this sum if it is less than the voucher amount.

e.  **Title or Description:** <u>E-mail Message from Labaran to Pettigrew, dated March 28 and April 12, 2023</u>
**Source:** <u>Complainant</u>
**Relevant Content:** In the messages, Labaran provides Pettigrew with a list of available apartments at Regents Park. Labaran states that she has also provided application links for the two apartments that they viewed on April 5, 2023, at Regents Park.

f.  **Title or Description:** <u>E-mail Messages between Complainant and McLaurin, dated April 20 and April 24, 2023</u>
**Source:** <u>Respondents</u>
**Relevant Content:** In the exchange, McLaurin attempts to schedule an appointment with Complainant for the "Algonquin Apartments" or any other property. On April 24, Complainant says that she is no longer moving.

g.  **Title or Description:** <u>Affidavits of Donell Chenault, Salamatu Labaran and Kenyetta McLaurin, dated June 15, 2023</u>
**Source:** <u>Respondents</u>
**Relevant Content:** In his affidavit, Chenault states that on February 20, 2023, he advised Complainant that Regents Park did not have units within Complainant's budget. Chenault further states that he sent her available alternative units in the area. Chenault also states that he never told Complainant that Labaran had done anything illegal.

In her affidavit, Labaran states that on February 22, 2023, she met Complainant. Labaran further states that she told Complainant that she already had a tour scheduled for a different applicant. Labaran also states that moving papers were never discussed during the meeting.

In her affidavit, McLaurin states that on March 29, 2023, she e-mailed Complainant to schedule a tour. McLaurin further states that she advised Complainant of pricing and how MAC Properties sends rent requests to the CHA. McLaurin states that Complainant replied to an attempt to schedule Complainant for a tour by saying that she was no longer moving.

7

    h.      **Title or Description:** <u>Signed CHA Leases with Accompanying Housing Assistance Payments (HAP) Contracts, received August 11, 2023</u>
**Source:** <u>Respondents</u>
**Relevant Content:** The documents indicate that there are at least twenty Housing Choice Voucher recipients renting apartments at Regents Park.

    i.      **Title or Description:** <u>CHA Rent Determinations, dated July 17, 2024</u>
**Source:** <u>CCHR</u>
**Relevant Content:** The rent determination from the CHA indicates that the listed rental amounts for 5035 S. East End Ave., apartments N 1109 listed at $1,975 per month, N 0804 listed at $2,000 per month, and N 0504 listed at $2,184 per month, would not have been approved by the CHA. The CHA would have approved $1,712.60.

## 6.    DETERMINATION

       Complainant alleges that Respondents refused to rent available apartments to her and steered her to other properties because her source of income includes a Housing Choice Voucher (HCV). Respondents deny the allegations and assert that they rent to HCV holders at the subject property.

       The Chicago Fair Housing Ordinance (CFHO) explicitly states that a property owner or manager may not refuse to rent to a housing applicant based on their legal source of income; and the Commission has long held that a CHA Housing Choice Voucher is a legal source of income. A respondent must allow an applicant to apply for the housing, at which time the applicant is able to initiate the application process with the CHA to have the housing unit inspected and possibly approved for occupancy. Complainant alleges that Respondents refused to rent available apartments to her based on her income source when she was refused tours of the Regents Park apartment complex, when Labaran said that Complainant would not be shown apartments without moving papers, and when Complainant was never given the opportunity to apply for an apartment at Regents Park.

       In this matter, Complainant cannot establish a *prima facie* case of housing discrimination. To establish a *prima facie* case, Complainant must establish that she is a member of a protected class that is known to Respondents; that she is qualified to rent the housing in question; that Respondents subjected her to an adverse action; and that others outside of her protected class were treated more favorably in similar circumstances. Here, the investigation revealed that Complainant was not qualified to rent the subject apartments in that the CHA would not have approved the rent amounts for which the subject units were listed. The CHA indicated that it would only approve up to $1,712.60 for the subject units, but they were listed for $1,975 and $2,000 per month, above the CHA approval amount. As such, Complainant was not qualified to rent the units. Additionally, during an investigation interview, Complainant stated that she did not disclose all her income to Respondents. Complainant states that she only disclosed her pension amount and that it amounted to about $2,000 per month. The evidence shows that

Chenault and McLaurin both informed Complainant that apartments at Regents Park were outside of Complainant's stated budget. The evidence also shows that McLaurin explained Respondents' CHA rental amount request process to Complainant, presumably as an attempt to demonstrate how some units were outside of Complainant's claimed budget. Finally, the investigation revealed that Respondents rent apartments to 20 HCV holders; however, Respondents are cautioned that the CHA may approve the listed market rate rent for other applicants, depending on their circumstances, or that HUD could update the payment standard. Respondents should ensure that the application of their minimum income requirement is consistent with the CFHO.

The CFHO states that a property owner, property manager or leasing agent may not steer an applicant to housing based on source of income. Steering is defined as encouraging, discouraging, or assigning housing rentals to a particular section of a community, development, or building based on a person's membership within a protected class. Complainant alleges that Respondents steered her when Respondents attempted to show her other apartments that Complainant had no interest in, based on her income source. The evidence shows that Respondents attempted to show those rentals to Complainant because they were within her purported budget. The investigation also did not reveal, and no objective evidence has been presented which shows that Respondents practice the steering of tenants with HCVs into specific sections of the properties they own and operate.

Accordingly, the Commission finds no substantial evidence of housing discrimination based on source of income.