```
 1                   IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   RYSHEENA MOORE, CADEIDGO COLEMAN,    ) Case No. 24cv12912
     JANISHIA FLEMING and SHELIAH        )
 4   AYANWALE, on behalf of themselves   )
     and all others similarly situated,  )
 5   and H.O.P.E., INC., d/b/a HOPE       )
     FAIR HOUSING CENTER,                 )
 6                                        )
                     Plaintiffs,          )
 7                                        )
             v.                           )
 8                                        )
     MAC PROPERTY MANAGEMENT, LLC,        )
 9   d/b/a MAC PROPERTIES,                ) Chicago, Illinois
                                          ) September 4, 2025
10                   Defendant.           ) 10:00 a.m.

11             TRANSCRIPT OF PROCEEDINGS - RULING ON MOTION
                  BEFORE THE HONORABLE APRIL M. PERRY
12
     APPEARANCES:
13
     For the Plaintiffs:   HUGHES SOCOL PIERS RESNICK & DYM
14                         BY:  MR. CHARLES D. WYSONG
                                MS. TORY TILTON
15                         70 West Madison Street, Suite 4000
                           Chicago, Illinois  60602
16
     For the Plaintiffs:   CHICAGO LAWYERS' COMMITTEE
17                         FOR CIVIL RIGHTS
                           BY:  MS. MACKENZIE F. SPEER
18                         100 North LaSalle Street, Suite 600
                           Chicago, Illinois  60602
19

20   For the Defendant:    FAEGRE DRINKER BIDDLE & REATH
                           BY:  MR. JOEL M. HAMMERMAN
21                              MS. TIFFANY C. NWOSU
                           320 South Canal Street, Suite 3300
22                         Chicago, Illinois  60606

23

24

25
```

```
1   Court Reporter:          NOREEN E. RESENDEZ, CSR, RPR, CRR
                             Official Court Reporter
2                            United States District Court
                             219 S. Dearborn Street, Suite 1725
3                            Chicago, Illinois  60604
                             (312) 582-5267
4                            Noreen_Resendez@ilnd.uscourts.gov

5

6                     *   *   *   *   *

7              PROCEEDINGS REPORTED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (Proceedings heard in open court:)

2          THE CLERK:  Calling case 24 CV 12912, Moore versus

3   Mac Property Management.

4          MR. WYSONG:  Good morning, Your Honor.  Charlie Wysong

5   for plaintiffs.

6          MS. TILTON:  Good morning, Your Honor.  Tory Tilton

7   for the plaintiffs.

8          MS. SPEER:  Good morning, Your Honor.  Mackenzie Speer

9   for plaintiffs as well.

10          MR. HAMMERMAN:  Good morning, Your Honor.  Joel

11   Hammerman on behalf of the defendant.

12          MS. NWOSN:  Tiffany Nwosn on behalf of the defendants.

13          THE COURT:  Good morning, everyone.  Thanks for being

14   here.  This is your first time up before me, right?

15          MR. WYSONG:  It is, Your Honor.

16          THE COURT:  Now comes the time for disclosure.

17          Mr. Hammerman and I worked together at the U.S.

18   Attorney's office.  His wife and I worked together at

19   GE HealthCare, so I have socialized with him from time to time.

20   I do not think that creates the type of conflict that would

21   mandate a recusal under the ethics rules, but I do want to put

22   it on the record; so if anyone disagrees with me, they are free

23   to file something.

24          MR. WYSONG:  Understood, Your Honor.  Thank you.

25          THE COURT:  Of course.  The case is up today for oral

1  ruling actually on the motion to dismiss. So while I

2  appreciate the motion to stay, I think it's going to be mooted

3  immediately. But whenever I ponder the idea of not exercising

4  supplemental jurisdiction over state law claims, I like to give

5  the parties notice and an opportunity to be heard. So I'm

6  going to review the opinion and then I'll read it later. But

7  spoiler alert, the FHA claim is going to remain, so the

8  question that I am curious about hearing from you on is which,

9  if any, of the state law claims do you feel need to stay with

10 it and why? Because I don't have to keep them and there are

11 some good reasons not to in this case.

12          MR. HAMMERMAN: Your Honor, from the defense's

13 perspective we'd ask you to keep the entire case, and the

14 reason why is it's effectively -- the plaintiffs' allegations

15 are that the alleged wrongdoing arises out of one purported set

16 of operative facts. So if you're going to keep the disparate

17 impact claims, the alleged conduct is going to be the exact

18 same for the alleged source of income discrimination claims,

19 the HCFA claims, all of it. It all comes from one alleged

20 reported operative. The fact which is they claim that people

21 with Section 8 housing were discriminated against.

22          If you were to send the state claims to the state

23 courts, effectively it would require twice the discovery,

24 right? Opportunities for two depositions of every witness, the

25 same fights that may occur in the future over the scope of

discovery would be litigated in front of two separate courts.
It could lead to separate rulings.  You're not going to have
the kind of judicial efficiencies that the Supreme Court has
said.  When making this determination, you should consider -- I
know comity is an important principle here and these are state
law claims; there may be some unique issues that relate to
them.  But you also then run the risk of inconsistent rulings
between a state court and Your Honor over discovery, scope,
things of that nature that could actually run contrary to
concepts of comity.  So for the reasons of efficiency, economy,
comity, I think all of those reasons actually rule in favor of
you keeping the case entirely before Your Honor.  Obviously the
plaintiffs have filed all of their claims here.  They didn't
have to do that.  They chose to do that, so I presume that is
their position as well.  But it would be the defense's argument
that if you're going to keep the disparate impact claims, then
everything should remain here.

          MR. WYSONG:  Your Honor, plaintiffs agree.  In *Montaño*
*vs. University of Chicago*, 375 F.3d 593, it's a Seventh Circuit
case, talks about the purpose of supplemental jurisdiction,
which is discretionary, it's judicial efficiency.  I think it's
common but here exceptionally true that the facts simply
overlap.  It's hard to litigate one of these claims without
litigating all of them.  The legal theories, obviously, are
important and we believe strongly in all of them.  But in

1    addition to the issue of multiple depositions and potential

2    conflicting rulings, these are putative class actions, so what

3    classes get certified, the overlap or the lack of overlap, any

4    potential for litigating the case or resolution it is always

5    the case and I think uniquely so here, efficient to keep this

6    in one courtroom.  Certainly we will proceed with our claims

7    however the Court handles it.  It is within the Court's

8    discretion, but if the underlying purpose of supplemental

9    jurisdiction is judicial efficiency, it does make sense to have

10   this case and all of these claims in one courtroom.

11           THE COURT:  I recognize it would be wholly inefficient

12   to split them up; no doubt.  Here is what troubles me:  You

13   have very unique and fairly complex questions of state law

14   that, depending on how I interpret the statute, are going to

15   raise constitutional questions.  And unless anyone has, since

16   this matter was fully briefed, found an Illinois case that has

17   at any point described, defined, pondered source of income

18   under the IHRA -- I am aware there is one Chicago case under

19   that statute that has done so, you know, that is what bothers

20   me about a federal court, which has no real interest in

21   interpreting the IHRA and what source of income means, sticking

22   its nose into the state's business, interpreting it, and then

23   possibly promptly finding a federal constitutional problem with

24   it and striking it down.

25           MR. WYSONG:  We understand, Your Honor.  And that is

1  balanced against the real practical efficiencies of litigating

2  this case.  Certainly the Court would be within its discretion

3  on those grounds.  We would agree that there is some novelty to

4  that question; and if that's the Court's ruling, then we will

5  certainly adapt with it as we go through the legal process,

6  right, whether it's through appeal, whether it's through

7  consulting the Illinois courts at the appropriate time, whether

8  it's through -- if it's dismissed, separate litigation.  There

9  are multiple ways, of course, to litigate this case.  I don't

10  think -- I think we -- you know, we cannot deny the efficiency

11  interest here.

12      THE COURT:  Agreed.  All right.  I have read

13  everything.  I am prepared to rule but I also would like to

14  give anyone a chance to argue if things have been raised in

15  briefs that they have thought about and would like the

16  additional chance to discuss?

17      MR. MR. HAMMERMAN:  I would only say, Your Honor, if

18  you have a specific question -- I mean, you're prepared to

19  rule.  So if there are any issues that you think would be

20  helpful for us to weigh in now, then I'd be happy to do so.

21  Otherwise, if Your Honor is ready, I'm ready to listen.

22      THE COURT:  I asked about what I was concerned with in

23  the briefs.

24      MR. WYSONG:  Nothing further, Your Honor.  It's been

25  briefed.

1      THE COURT:  All right.  Great.  Everybody start taking

2  notes.  I apologize in advance to my court reporter.  I

3  mentioned once that these are just so much more efficient; and

4  she said, for you.

5      All right.  I'm going to start with the issue of HOPE

6  standing.  HOPE is a private non-for-profit Illinois

7  corporation, which in this case is asserting organizational

8  standing on its own behalf, not on behalf of its members or any

9  of the community that are affiliated with it.

10      For HOPE to have standing it, obviously, has to have

11  injury in fact, which is concrete and particularized that is

12  fairly traceable to the defendant's action and likely to be

13  redressed by a favorable decision on the merits.  Those are the

14  constitutional minimal requirements and the defendant argues

15  that HOPE is lacking in the first.

16      The Supreme Court has stated that at the pleading

17  stage, general factual allegations of injury resulting from the

18  defendant's conduct may suffice.  For a motion to dismiss, we

19  presume that the general allegations embrace the specific facts

20  that are necessary to support the claim.  That's in the *Lujan*

21  *vs. Defenders of Wildlife* case.

22      I am, obviously, mindful that the Supreme Court has

23  recently revisited the requirements for organizational standing

24  in the *FDA vs. Alliance for Hippocratic Medicine* case.  In that

25  case the Court held that an organization cannot spend its way

into standing by expending money or resources to advocate against defendant's actions. That said, the Court also mentioned and distinguished the allegations in the FDA case from those in an earlier case, *Havens Realty Corporation vs. Coleman*. The Court emphasized Havens was different because there was a plaintiff in that case that was not only an issue-advocacy organization but also one that operated a housing counseling service, and the defendant's discriminatory practices were impairing the plaintiff's ability to counsel and refer low-income home seekers to suitable and available rental opportunities. Specifically the Supreme Court found that if the defendant's steering of home purchasers had perceptibly impaired the organization's ability to provide counseling and referral services for low- and moderate-income home seekers, that there could be no question the organization has suffered injury in fact.

I think the case here is more similar to Havens than it is to the FDA case.

According to the complaint, which at this stage I must accept as true, HOPE, like the plaintiff in Havens, is a fair housing organization suing not just on the basis of its moral ideological or policy objectives but because of how their own practices and budget have been impaired by the defendant's actions.

HOPE has alleged that it advises housing seekers on

navigating the housing market and consults with local

governments to assess impediments to fair housing.  It alleges

that the defendant's activities have made it harder for HOPE to

provide these services requiring that HOPE divert resources to

identify and counteract the defendant's discriminatory

treatment of voucher holders.  HOPE also felt compelled to

implement an investigation of the defendant's leasing practices

after receiving complaints about the defendant, which was

another alleged drain on their resources.  Based on their

findings from that investigation, they then revised their

outreach, education, and training materials and redirected more

resources to Chicago than they had previously planned to.

Ultimately I think some of these may not amount to

cognizable injuries but at this stage, I am persuaded that HOPE

has alleged the constitutional minimum required.  That is some

of the allegations I can reasonably infer have caused HOPE's

activities to provide services to the community it serves, to

drain its resources, and have otherwise set back the

organization's actual interests separate and apart from any

social interest or ideological ones.

Ultimately, of course, HOPE will have to demonstrate

at trial, if we get to that point, that it has, in fact,

suffered that injury and that will be a different analysis once

we are at that stage with a heightened burden; but at this

point, I'm satisfied for now they have pled the basics for

1   standing.

2          Turning on to the FHA claim.  The FHA prohibits

3   businesses engaged in residential real estate transactions from

4   discriminating against any person on account of race.

5          The main Supreme Court case that I am looking at and

6   everybody else was as well, which is good, to define what this

7   means now is *Texas Department of Housing and Community Affairs*

8   *vs. Inclusive Communities Project*.  That was the first time

9   that the Supreme Court had held that a disparate impact claim

10  could be cognizable under the FHA.

11         Specifically in Inclusive Communities the Supreme

12  Court stated that in order to plead a disparate impact claim, a

13  plaintiff must allege facts sufficient to support causal

14  connection between the challenged policy and the disparate

15  impact upon members of a protected class.  Here I think the

16  plaintiffs have done that.  They've alleged that defendants

17  facially neutral policy of not renting certain apartments in

18  Hyde Park to Section 8 voucher holders excluded a

19  disproportionately black population from those properties.  As

20  support for that claim, plaintiffs have alleged that 89 percent

21  of Section 8 voucher holders are black and only 2 percent are

22  white and that among Chicago renters generally only 33 percent

23  are black and 34 percent are white.  Thus the plaintiff has

24  alleged facts from which I can infer that the no-voucher policy

25  disproportionately impacted black renters.

1    With respect to the defendant's arguments, first the

2  defendant has argued that the plaintiffs were required to plead

3  specifics about their budgets or other facts about the rental

4  units they were pursuing.  But the complaint only need include

5  a short and plain statement of the claim, and I think that they

6  have done so from the facts that are alleged.

7    This includes facts like the results of the HOPE

8  investigation, the named plaintiffs' experiences with the

9  defendant, and that University of Chicago students were not

10  expected to meet the same income requirements that the

11  defendant allegedly used when denying some of the plaintiffs

12  rentals.

13    The second argument I think is a much more difficult

14  one.  And that has to do with the Inclusive Communities Project

15  and the causality requirement that is maybe in there, hard to

16  say frankly.  There is language that is certainly helpful to

17  the defendants.  Specifically the defendants have argued that

18  the plaintiffs need to allege that the defendant's policy was

19  responsible for any statistical disparity in either renters,

20  Section 8 holders, who is to know, could be all of those within

21  the Hyde Park market, within all of Chicago or was somehow

22  responsible for the disparate nature of voucher holders being

23  black versus white.

24    I am not persuaded ultimately by that argument.  The

25  Seventh Circuit has made clear that disparate impact plaintiffs

1  are permitted to rely on a variety of statistical methods and

2  comparisons to support their claims and at the pleading stage

3  basic allegations of this sort will suffice.  The nature of the

4  facts of each case, I think, have to drive the type of

5  statistics that are relevant.  So if we look at Inclusive

6  Communities, the plaintiff was alleging that the Texas Housing

7  Authority caused segregated housing patterns based upon some of

8  the things that they were doing.  So when the Supreme Court

9  noted that to prove its case, the plaintiffs in Inclusive

10 Communities actually needed to show that it was the defendant's

11 actions that caused those disparities, I think that makes

12 sense.  I don't think that language should be read as broadly

13 as defendants are reading it to say that in every case that

14 will be required.  And one of the reasons that I am reaching

15 that conclusion, at least at this point, is that Inclusive

16 Communities provided a very specific example of possible

17 disparate impact claims, specifically a landlord who would not

18 rent to an individual with a drug conviction.  And when they

19 did that, they noted that the FHA had actually excluded that

20 type of claim specifically when it was drafted.

21        Now, if we were to read Inclusive Communities to stand

22 for the proposition that whenever the plaintiff uses a

23 statistic in their complaint, they also have to prove that it

24 is the defendant who is responsible for that statistic, that

25 example would have made no sense because, obviously, when a

landlord denies tenancy to someone with a drug conviction, you

would never claim that they are, in fact, responsible for the

fact that a disproportionate number of people with drug

convictions are people of color.

So I think given those two things together, it can't

be read as broadly as the defendants are reading it here.

Although, I recognize that some courts have tried to do so.

The other thing that I would note about Inclusive

Communities, there were two different questions presented for

the certificate petition. The first was, are disparate impact

claims cognizable under the FHA? The second one is, if they

are, what are the standards and burdens of proof that should

apply? The Supreme Court granted cert only on to the first.

They did not grant cert on to the second, which, obviously, all

of their language is binding on me. That said, the fact that

they did not grant cert on that specific question, have

argument on that question, or set briefing on that question, I

would tend to take from that they were not trying to answer the

question as broadly as some of the other courts have found.

Now, this is a bit of a morass. Circuits have gone

all sorts of different ways on the issue as to what exactly the

prime facia case has to be, and the Seventh Circuit has not

come out at all. So I am not dealing with a ton of authority

at this point that is binding other than Inclusive Communities,

but that is where I land based upon the things I've already

1  said.

2      So similar to Inclusive Communities, the plaintiffs

3  have alleged that the black renters were disproportionately

4  impacted by the defendant's policy of refusing to rent to

5  voucher holders at certain of their Hyde Park apartment

6  buildings.  Accepting that as true, as I must at this stage of

7  proceedings, the no-vouchers policy would presumably have a

8  disparate impact on black renters when compared to white

9  renters.  In other words, almost all of the prospective renters

10  who were impacted are black despite them only making up a third

11  of the rental population in Chicago.  That alone is not going

12  to get the plaintiffs past summary judgment.  But we are not at

13  summary judgement.  Just like in an employment discrimination

14  case where the plaintiff does not have to meet all of the

15  elements of the McDonnell Douglas test, I don't think a housing

16  discrimination plaintiff needs to at this stage either in order

17  to state a plausible claim.

18      The defendants have also argued that the Seventh

19  Circuit does not allow FHA disparate impact claims based on

20  allegedly discriminatory treatment of voucher holders.  In

21  support of this argument they cite *Knapp vs. Eagle Property*

22  *Management Corporation*.  Two things about Knapp, first it

23  preceded Inclusive Communities by at least 10 years and it was

24  issued at a time that disparate impact claims were cognizable

25  only sometimes, depending on a wide range of factors.  It has

not been cited by the Seventh Circuit and as far as I can tell,

by any Northern District of Illinois Court since Inclusive

Communities.  And so I think it is questionable as to the

extent it is good law at all; but to the extent it is, the

second point I will note is that that was a trial evidentiary

issue decided on an abuse-of-discretion standard, not at all

based on pleading standards or on the motion to dismiss

standard.

So this is a tricky one.  The Seventh Circuit has not

weighed in yet, maybe they will, maybe they won't before you

all get to summary judgment; but at least at this point I am

persuaded that for a motion to dismiss without any factual

record, we shouldn't be reaching these issues at this depth.

So for those reasons the FHA claim will survive dismissal.

Let me turn to the state claims.  The defendant has

moved to dismiss the plaintiffs' IHRA claim for race

discrimination, which is Count II for basically the same

reasons as the FHA claim, correctly noting that the standards

are basically the same.  For the same reasons that I find the

FHA claim survives, I also find that Count II survives.

I do think it makes sense to address those two claims

together because those are so very similar, but I think that is

unfortunately for you all and efficiency generally where my

consideration of the state law claims is going to end.  The

supplemental jurisdiction statute provides that district courts

1  can decline to exercise supplemental jurisdiction over a claim

2  under that particular subsection if it raises novel or complex

3  issues of state law or if the claim substantially predominates

4  over the claim over which the district court has original

5  jurisdiction.

6  In this case I am most persuaded that all of your

7  remaining state law claims raise very complex and novel issues

8  of state law.  So starting with Count III, you've alleged --

9  the plaintiffs have alleged that the defendant violated the

10  IHRA provision prohibiting source of income discrimination.

11  Specifically, that section provides it's illegal to refuse to

12  engage in a real estate transaction or to discriminate in

13  making available a real estate transaction to someone on the

14  basis of that person's source of income.  The only definition

15  we have for source of income, in the statute at least, is the

16  lawful manner by which an individual supports himself or

17  herself and his or her dependents.

18  The parties have done a great job of arguing all the

19  different ways that could be interpreted to include Section 8,

20  to not include Section 8 using many different sources; but I

21  have not been able to find and you have not pointed me to any

22  Illinois court case that actually defines source of income.

23  Obviously, there is Godinez, which we talked about a little bit

24  earlier, which discusses Chicago municipal code source of

25  income and defines that particular source of income term

1   obviously, relying on that code's text and that code's policy

2   objectives and the historical practices of the City of Chicago

3   Commission on Human Relations.  I don't expect the analysis

4   would be terribly different, but I do expect that the Illinois

5   court is going to want to and should do it in the first

6   instance.

7           So for the interest of comity and respect for the

8   state courts, I believe this is more appropriately reached in

9   the first instance by the Illinois state courts.  And in

10  reaching that conclusion, I am persuaded in no small part by

11  the fact that you are Illinois defendants and Illinois

12  plaintiffs dealing with an Illinois statute and Illinois has a

13  very strong interest in being the first one to discuss and

14  define what type of discrimination protections its citizens

15  have.

16          Additionally, we have the constitutional question if

17  you do win, plaintiffs, on your source of income definition.

18  In some way protecting Section 8 housing voucher recipients,

19  you have walked yourself straight into a potential

20  constitutional problem and it is not a frivolous one the

21  defendants have raised.  I am not expressing any opinion on how

22  that constitutional argument would play out.  I will note that

23  at least one state court, as you all know in New York, has held

24  a similar statute facially unconstitutional under the Fourth

25  Amendment because that particular statute, as does this one,

1  would require any of the defendants or housing landlords to

2  make themselves available for search of their records as part

3  of participation in that program.

4       Obviously, this isn't a formal abstention ruling.

5  This isn't a Pullman case but that said I am persuaded by the

6  Supreme Court's language in Pullman that federal courts should

7  abstain from questions where difficult and unsettled cases of

8  state law must be resolved before a substantial federal

9  constitutional question could be decided, which I think is

10  present here.

11       So for that reason I am declining supplemental

12  jurisdiction over Count I.  I think Count I and Count IV best

13  go together because of the preemption arguments that have been

14  raised.  Specifically that if you do survive in Count I,

15  perhaps you have preemption problems on either the federal or

16  state level with Count IV, so for that reason I am also going

17  to decline the supplemental jurisdiction as to Count IV.

18       Lastly, I want to talk about class allegations.  But

19  before I read out what I have written on that, let me ask the

20  plaintiff.  Based upon the ruling so far, do you think you want

21  to amend your class allegations to more closely fit the

22  remaining claims?

23       MR. WYSONG:  We may, Your Honor.  Certainly class

24  allegations and class definitions can be amended at any time

25  through judgment, right, when you move for it and later.  We

1  think the allegations in the complaint are valid and we can

2  certainly ask for leave to amend if there is a concern with the

3  class as its framed.

4      THE COURT:  I mean, don't you have to allege race at

5  this point?

6      MR. WYSONG:  You would, Your Honor, for these claims

7  with race.  I, obviously, will have to talk to my colleagues

8  about that.  I don't know that that requires the Court to

9  strike these class allegations.  We can say the class is

10  sufficiently viable at this time, and when we move for class to

11  certify, we can move for a class that would match the claims.

12  If the Court prefers, we can amend the class allegations to

13  match what remains in this case.  We can handle it either way.

14  Logistically, Your Honor, we agree; we'll need to revisit the

15  class allegations.

16      THE COURT:  Okay.  Let me --

17      MR. WYSONG:  Can I add, Your Honor?

18      THE COURT:  Of course.

19      MR. WYSONG:  I do think the procedure matters because

20  if the claims survive, the next thing we're going to talk about

21  is discovery.  And so if the Court thinks there's some

22  infirmity with the class in general, I think that would be

23  reasonable.  If the only need is to address the scope of the

24  definition, I think it could be appropriate to strike just the

25  definition and allow us to replead that.  So I would ask

1   that -- if there is some clarity there, if the Court has

2   already considered the issues. Because we don't think for an

3   injunctive case like this there's any actual fundamental

4   problem with the class. So if we need a definition, we would

5   ask that it be dismissed without prejudice to specifically fix

6   the definition; and if the Court has concerns about any class,

7   then we would like to know that so we can address it.

8           THE COURT: I don't have concerns about any class.

9           MR. WYSONG: Okay.

10           THE COURT: And since we're going to get into this,

11   let me at least make a couple findings that will help guide

12   you, but I do think you need to replead.

13           I think that the defendant's arguments don't plausibly

14   raise an issue with the common question of law or fact being

15   present in some regard. I do think that class treatment could

16   resolve several questions of common law or fact. I also think

17   perhaps they're not drafted as well as they could be, which

18   isn't dispositive obviously. We are not at the class

19   certification stage. But just for an example of what I think

20   would be relevant, a jury will have to decide whether it was

21   the defendant's policy to refuse to rent to voucher holders at

22   certain properties. Those things are going to be, I think,

23   common to the entire class. Similarly, whether or not a claim

24   of discrimination based on Section 8 voucher holders and their

25   status is going to get you a disparate impact claim when we get

1  to summary judgment, those are going to be common to all of the

2  class members.  Whether or not the defendant had a nonarbitrary

3  reason or a valid business reason for turning away voucher

4  holders, that's going to be the same for everyone.  So I think

5  there are common questions of law or facts that exist.  So I

6  wouldn't strike on that basis.

7       The idea that your class definition is based on a

8  subjective element, I mean, I'm allowed to redefine it.  I

9  think we can get to a way that it is perhaps better worded.

10  The idea is that it has to be objective, right?  It has to

11  be -- they have to have taken some identifiable step.  They

12  can't just in their heart of hearts have at some point wished

13  to rent.  So I would ask you to take kind of another go at that

14  type of the language.

15       The geographical scope, I think, is perhaps something

16  that you also need to refine a bit here.  At least with respect

17  to your surviving allegations in the complaint, you are very

18  limited to Hyde Park and specific Hyde Park properties, even

19  within that; so I think the class definition probably needs to

20  be limited on that basis as well.  And as we already discussed,

21  with respect to the racial element, right now it's not present

22  at all and it needs to be since the only two surviving claims

23  focus on that.

24       So I don't know that it really matters whether I

25  strike it and then you try again or whether you agree to just

1 try again, but I will hand everyone -- or I will hand

2 defendants a win here since they have not had one yet and say

3 they are struck.  Why don't you go ahead and replead.  Tell me

4 how long you need to consult and amend?

5     MR. WYSONG:  Twenty-one days, Your Honor.

6     THE COURT:  Okay.  All right.  So you're going to want

7 to answer?

8     MR. HAMMERMAN:  Or otherwise plead.

9     THE COURT:  Or otherwise plead.  How long do you need

10 to ponder your options?

11     MR. HAMMERMAN:  The only thing that gives me some

12 pause, Your Honor, is in 21 days we're looking at the -- I'm

13 basically heading into a trial for much of October.

14     THE COURT:  Okay.

15     MR. HAMMERMAN:  So I'm happy to give them more time to

16 replead, but I would hate to have to file a brief or an answer

17 while I'm on trial if that's possible.

18     THE COURT:  How long is the trial?

19     MR. HAMMERMAN:  Two weeks.

20     THE COURT:  Okay.

21     MR. HAMMERMAN:  And it's the back half of October.  So

22 basically the last two weeks of October.

23     THE COURT:  By late November would you have it?

24     MR. HAMMERMAN:  Yes.

25     THE COURT:  What's 21 days, Jim?

1          THE CLERK:  The 25th.

2          THE COURT:  So, okay, if they replead by the 25th,

3     answer or otherwise plead by 10/25?

4          MR. HAMMERMAN:  October 25th?  So that's during my

5     trial.

6          THE COURT:  All right.  How about -- do you have an

7     objection to it being late November?

8          MR. WYSONG:  Well, Your Honor, if it's late November,

9     we would ask for the 28 days, which I think Mr. Hammerman

10    agrees with.  The other issue is following this ruling and the

11    comment about mootness, we expect to be moving along with

12    discovery.  So if we are going to be stuck in re-briefing a

13    motion to stay, then we certainly object to taking this long.

14    But presuming we are moving forward with those conversations,

15    the pleading doesn't -- we don't have a problem with late

16    November.

17         THE COURT:  I do plan to refer you to the magistrate

18    for discovery.  How that discovery gets cabined for the first

19    60 days is going to be up to the magistrate.  It seems to me

20    that the things you are going to be arguing about you can

21    perhaps create a discovery plan that sorts out immediate issues

22    immediately and then holds the broader issues.  But you tell me

23    if I'm wrong.

24         MR. HAMMERMAN:  I mean, to some degree I would love to

25    see what the complaint looks like before opining about how

1  discovery is going to proceed, Your Honor.

2         THE COURT:  The only thing that has been struck is the

3  class part of it.

4         MR. WYSONG:  It's going to be a narrow class

5  definition.  It's going to have two claims.  That is what it is

6  going to be.

7         MR. HAMMERMAN:  I would like to see it, Your Honor,

8  before I opine about how we would want to proceed with

9  discovery.

10        THE COURT:  I mean, all I've struck is the class

11 allegations.  So at this moment the complaint stands with Count

12 III and -- II and III.

13        MR. HAMMERMAN:  I think though, Your Honor, to be

14 direct, the class allegations really matter here.  If I hear

15 Your Honor correctly, you're right.  This complaint alleges

16 that there was purported discrimination with respect to two

17 buildings in Hyde Park, two buildings; and yet the original

18 class allegations sought a class that was for anyone who was a

19 Section 8 voucher holder who sought to rent property in the

20 city of Chicago over four years, so ...

21        THE COURT:  Got it.

22        MR. HAMMERMAN:  So understanding how they seek to

23 restructure their class to now meet the allegations that remain

24 before Your Honor actually are going to be important with

25 respect to potential agreements or disagreements in how we

1  should proceed with discovery.

2      THE COURT:  Is there any reason you can't start with

3  the two buildings?

4      MR. WYSONG:  Yes, Your Honor.  We disagree with the

5  scope there and we are way into the details of discovery.  My

6  concern is I don't want to be told we have to wait until

7  December for a 26(f) conference because we couldn't even get a

8  26(f) conference yet.  So understanding we are going to have to

9  have a 26(f) conference, we are going to have to serve

10 discovery.  By the time we serve the discovery, the amended

11 complaint will be there; and if there are disputes about

12 sequencing discovery or the scope of discovery, that's

13 something the magistrate can handle or the parties can talk

14 about in the first instance.  No doubt we will continue to have

15 disagreements over the scope of discovery.  Our primary concern

16 is if the complaint is standing, we don't want to be told to

17 wait until December to even have a 26(f) conference or serve

18 discovery.

19     THE COURT:  Well, here.  The complaint is standing at

20 least as to those two counts.  There are, at this moment, no

21 class allegations.  So when I send you to the magistrate, you

22 can tell the magistrate that and plan your discovery

23 accordingly.  And if they amend quicker, then you'll have a

24 better sense before the magistrate what exactly you're looking

25 at and if they don't, you can wait until, I guess, late

1 November to sort through it.  But at least that will get the

2 ball rolling.

3        So what is your earliest date, Mr. Hammerman, to

4 answer or otherwise plead?

5        MR. HAMMERMAN:  I would say mid November would be

6 fine, Your Honor.  If possible -- actually, let me pull up my

7 calendar.  The third week would probably be best.

8        MR. WYSONG:  No objection, Your Honor.

9        THE CLERK:  The 19th?

10        THE COURT:  The 19th?

11        MR. HAMMERMAN:  Sure.  That's great, Your Honor.

12        THE COURT:  And how long did you want to amend because

13 it sounds like it doesn't matter on his side?

14        MR. WYSONG:  Let's just say the 28th if we can do

15 it -- excuse me.  I lost which month I was in here, sorry.

16        If we can just say October 2nd and maybe we'll do it

17 sooner so we can move along these discovery discussions.

18        THE COURT:  All right.  October 2nd to file the

19 amended complaint.  November 19th to answer or otherwise plead.

20 The motion to stay will be denied.

21        Anything else that we should talk about today?

22        MR. WYSONG:  No, Your Honor.

23        MR. HAMMERMAN:  No, Your Honor.

24        THE COURT:  All right.  Thank you all.

25    (Concluded at 10:35 a.m.)

1                              *   *   *   *   *

2       I certify that the foregoing is a correct transcript from the

3   record of proceedings in the above-entitled matter.

4   */s/Noreen E. Resendez*              09/10/2025
    Noreen E. Resendez                   Date
5   Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25