**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| RySheena Moore, Cadeidga Coleman, Janishia Fleming, and Sheliah Ayanwale, on behalf of themselves and all others similarly situated, and H.O.P.E., Inc., d/b/a HOPE Fair Housing Center, | ) ) ) ) | **Case No. 24-cv-12912** |
| | ) | |
| Plaintiffs, | ) | Honorable April M. Perry |
| | ) | |
| v. | ) | |
| | ) | |
| Mac Property Management, LLC, d/b/a Mac Properties, | ) ) | **JURY DEMAND** |
| | ) | |
| Defendant. | ) ) | |

**FIRST AMENDED COMPLAINT**

Plaintiffs RySheena Moore, Cadeidga Coleman, Janishia Fleming, Sheliah Ayanwale (collectively, the "Individual Plaintiffs"), and HOPE Fair Housing Center (collectively, with the Individual Plaintiffs, "Plaintiffs"), by and through their attorneys, Chicago Lawyers' Committee for Civil Rights and Hughes Socol Piers Resnick & Dym, Ltd., complain against Defendant Mac Property Management, LLC d/b/a Mac Properties as follows:

**INTRODUCTION**

1.     Plaintiffs RySheena Moore, Cadeidga Coleman, Janishia Fleming, and Sheliah Ayanwale and HOPE Fair Housing Center bring this housing discrimination complaint against Defendant Mac Properties. Mac Properties is one of the largest landlords in Chicago. It dominates the Hyde Park rental market. For years, Mac Properties unlawfully refused to rent apartments at a number of buildings to these women and other tenants who use Housing Choice Vouchers, a federal housing subsidy, to pay rent, especially at its newly-built or renovated, high-rise amenity buildings near Lake Michigan.

1

2.  Mac Properties' policies and practices of discrimination against Voucher holders violate federal, state, and local law. Voucher discrimination has been illegal for years: the Chicago Fair Housing Ordinance prohibited landlords from discriminating against prospective tenants based on their source of income (i.e. whether they have a Voucher) in 1990; Cook County did so by ordinance in 2013; and the State of Illinois amended the Illinois Human Rights Act to include this protection, effective January 1, 2023.

3.  Mac Properties' discrimination against Voucher holders is also illegal race discrimination against Black renters, because the overwhelming majority—close to 90%—of Voucher holders in Chicago are Black. Black renters are forty-six (46) times more likely than White renters to be impacted by Mac Properties' discrimination against Voucher holders.

4.  Mac Properties' discrimination undermines the purpose of the Voucher program, which is to promote housing choice and allow low-income families to afford decent housing in the private rental market, particularly in "opportunity areas" like Hyde Park. Opportunity areas have lower poverty, more consistent public safety, and greater access to well-resourced schools, stable employment, and other resources. Mac Properties denied the Individual Plaintiffs safe, stable housing in one of the few racially diverse opportunity areas in Chicago.

5.  Time and again, Mac Properties refused to rent to Voucher holders in Hyde Park, especially at buildings like newly-built or renovated high-rise buildings with amenities and near the lakefront. Mac Properties refused to give Voucher holders tours or applications, falsely claimed that apartments were unavailable (even when it advertised those apartments online and showed them to other renters), and steered Voucher holders away from desirable apartment buildings.

6.      U.S. Army Veteran Plaintiff RySheena Moore tried to use her Voucher to rent an apartment at Regents Park Apartments, a Mac Properties building near a well-resourced school for her son with a pool and other amenities to help treat her combat-related disability. When it learned of her Voucher, Mac Properties lied and told her that apartments were not available. It refused to even give her a tour or an application. Ms. Moore ended up living in a less suitable building that costs her an extra $200 per month.

7.      When Plaintiff Cadeidga Coleman tried to use her Voucher to rent at Mac Properties, the leasing agent refused to send her an application and illegally told her that she could not rent an apartment without "work income" from employment that was at least 2.5 times the monthly rent (even though the Voucher pays for most of her rent). She ended up in an inferior apartment on the other side of Chicago.

8.      Mac Properties refused to let Plaintiff Janishia Fleming tour or rent at one of its high-rise towers with amenities, and instead would only show her older buildings that were filthy and farther from the lake. This delayed her ability to use her Voucher and to secure decent housing for herself and her children.

9.      Multiple Mac Properties leasing agents, over several months, refused to rent an apartment to Plaintiff Sheliah Ayanwale at one of its newly-built properties because of her Voucher, even though it had units available within her Voucher budget.

10.      Dozens of renters have experienced and reported Mac Properties' Voucher discrimination throughout the last decade. Plaintiff HOPE Fair Housing Center ("HOPE") conducted a formal fair housing investigation, with trained testers inquiring as prospective tenants at Mac Properties buildings, to further evaluate Mac Properties' practices. Mac Properties repeatedly gave testers with Vouchers different information and treated them worse than nearly

identical prospective tenants who sought to rent without a Voucher, even when they had the same budget and sought the same apartments at the same time. HOPE's investigation confirmed Mac Properties' policy of discrimination.

11. Plaintiffs allege that Mac Properties violates the Illinois Human Rights Act, 775 ILCS 5/3-102 *et seq.*, and federal Fair Housing Act ban on practices that have a disparate impact on the basis of race, 42 U.S.C. § 3604. The Individual Plaintiffs seek to represent themselves and the class of Black Voucher holders who experienced discrimination from Mac Properties over the last two years. Plaintiffs bring this complaint to end Mac Properties' discriminatory practices and secure compensation for their experiences.

## PARTIES

### A. Plaintiffs

12. Plaintiff RySheena Moore is a Black woman and participant in the Housing Choice Voucher Program. She lives in Chicago with her 15-year-old son and has a two-bedroom Voucher. She sought to rent an apartment from Mac Properties in Chicago.

13. Plaintiff Cadeidga Coleman is a Black woman and participant in the Housing Choice Voucher Program. She lives with her 7-year-old daughter in Chicago and has a two-bedroom Voucher. She sought to rent an apartment from Mac Properties in Chicago.

14. Plaintiff Janishia Fleming is a Black woman and participant in the Housing Choice Voucher Program. She currently lives with her three children, 11, 12, and 14 years-old in Chicago, and her family has a three-bedroom Voucher. She sought to rent an apartment from Mac Properties in Chicago.

15.     Plaintiff Sheliah Ayanwale (formerly Sheliah Thomas) is a Black woman and participant in the Housing Choice Voucher Program. She lives with her 9-year-old daughter and has a two-bedroom Voucher. She sought to rent an apartment from Mac Properties in Chicago.

16.     Plaintiff H.O.P.E., Inc., d/b/a HOPE Fair Housing Center ("HOPE"), is a private, non-profit corporation. HOPE is incorporated under the laws of Illinois and its principal place of business is 202 West Willow Avenue, Suite 203, Wheaton, Illinois, 60187. HOPE's mission is to create greater housing opportunities for all. HOPE works to ensure equal opportunity for all and to eliminate housing discrimination through its activities and programs, including education and outreach, client services, public policy initiatives, training, advocacy, and investigation and referral of complaints concerning fair housing violations. HOPE has suffered concrete, particularized damages because of the injuries to its mission and activities; HOPE has diverted hundreds of hours of staff time and organizational resources, and paid out-of-pocket expenses to investigate the scope of and counteract Mac Properties' discriminatory policies and steering practices. If HOPE did not take this action, Mac Properties would—and will—continue to impair its mission and activities to promote equal housing opportunity for all.

**B.      Defendant**

17.     Defendant Mac Property Management, LLC, d/b/a Mac Properties, is a domestic limited liability company incorporated in Illinois. Mac Properties owns and manages approximately 100 residential buildings and over 5,000 apartments that are all in Hyde Park and adjacent neighborhoods on the South Side of Chicago (collectively "Hyde Park" and defined broadly herein to include Mac Properties apartments in Kenwood, Woodlawn, and adjacent areas). Over the last 15 years, it has effectively secured a monopoly on the residential rental market in and near Hyde Park, including newly-built or renovated high-rise buildings with

amenities near the lakefront. Mac Properties maintains its Chicago office at 1364 East 53rd Street, Chicago, Illinois, 60615.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this matter pursuant to the Fair Housing Act, 42 U.S.C. § 3613. This Court also has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because the matters at issue arise under the laws of the United States.

19. This Court has supplemental jurisdiction over Plaintiffs' Illinois state law claim pursuant to 42 U.S.C. § 1367(a).

20. This Court has personal jurisdiction over Defendant and venue is appropriate in the Northern District of Illinois pursuant to 28 U.S.C. § 1391 because Defendant is a resident of this district, the subject properties that Defendant owns and manages are located in this district, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## FACTUAL ALLEGATIONS

### The Housing Choice Voucher and Mobility Programs

21. The Housing Choice Voucher ("Voucher") Program enables low-income households to afford decent, safe, and sanitary housing in the private market. The Voucher program provides direct rental assistance to Voucher holders and is the largest federal housing program for low-income families. The U.S. Department of Housing and Urban Development ("HUD") provides funding for the program, and public housing authorities manage the program and funds locally. In Chicago, the Chicago Housing Authority ("CHA") manages the Voucher program and funds.

22. The Voucher program helps combat economic and racial segregation in neighborhoods that lack affordable housing. 42 U.S.C. § 1437f(a). The program allows Voucher

6

holders to rent in the private housing market while paying about thirty percent of their income toward rent and utilities. The local public housing authority, such as CHA in Chicago, pays the remainder of the rent. By design, the rent will remain affordable to the Voucher holder—and the landlord is guaranteed full market rent—even if the Voucher holder's income changes during or between leases.

23.     The Voucher program is designed to provide choice and mobility. Historically, public housing concentrated low-income families, and particularly Black families, in high-poverty communities with limited access to resources. The Voucher program provides participants with the opportunity to move to other neighborhoods.

24.     Local public housing authorities also incentivize and enable Voucher holders to move to "Opportunity Areas" or "Mobility Areas," which are neighborhoods with low poverty and crime rates, by increasing the amount of rent it will approve and subsidize in those neighborhoods. In Chicago, for example, CHA may approve monthly rent up to $1,679 for a two-bedroom apartment in a "traditional" neighborhood, but may approve monthly rent up to $2,571 for a two-bedroom apartment in a Mobility Area. CHA also provides housing counseling to help Voucher holders move to Mobility Areas, offers $1,000 in moving assistance to families who move from a traditional area to a Mobility Area, and offers first-time incentive payments to landlords in Mobility Areas. CHA defines Mobility Areas in Chicago primarily based on low poverty levels (below 20%) and low crime rates.

25.     Many state and local jurisdictions have passed laws protecting Voucher holders from discrimination in the private rental market by designating "source of income" as a protected class (i.e. whether they have a Voucher to pay part of their rent). The City of Chicago added source of income protections to the Chicago Fair Housing Ordinance in 1990; Cook County

added source of income protections under the Cook County Human Rights Ordinance in 2013; and the State of Illinois added source of income protections under the Illinois Human Rights Act effective January 1, 2023. These laws promote racial and economic integration, protect affordable housing choices for Voucher holders, and counter the stigma attached to housing and other government subsidies.

26. When landlords and management companies refuse to engage with or rent to Voucher holders, they frustrate the Voucher program's purpose, restrict Voucher holders' housing choices, and violate state and local fair housing protections.

**Hyde Park and Mac Properties**

27. Hyde Park is a neighborhood on the South Side of Chicago and is one of the only Mobility Areas on Chicago's South Side.

<u>Map of Chicago Mobility Areas in Green</u>



*Source: Chicago Housing Authority (2024)*

8

28.     Hyde Park is home to the University of Chicago and its hospital system, the Museum of Science and Industry, and Kenwood and Hyde Park Academies, two high-performing Chicago Public Schools. Hyde Park is also home to some of the most scenic stretches of Chicago's waterfront, including Promontory Point and 57th Street Beach. Two of Chicago's largest outdoor public spaces, Washington Park and Jackson Park, border the neighborhood. Hyde Park's concentration of large and well-respected academic, medical, and cultural institutions and commercial corridors support an active community and annual events, like the 57th Street Art Fair and the Hyde Park Jazz Fest. Hyde Park also borders the future site of the Obama Presidential Center and Library.

29.     Hyde Park is more racially and economically integrated than the surrounding neighborhoods, which have predominately Black residents and higher poverty rates.

| | White | Hispanic or Latino | Black | Asian | Poverty Rate |
|---|---|---|---|---|---|
| Oakland | 3.9% | 4.9% | 88.8% | 0.9% | 35.8% |
| Kenwood | 21.0% | 3.0% | 66.1% | 5.7% | 24.4% |
| Hyde Park | 46.7% | 6.8% | 25.2% | 14.1% | 22.4% |
| Grand Boulevard | 4.4% | 3.3% | 88.0% | 1.0% | 27.0% |
| Washington Park | 1.8% | 2.2% | 93.9% | 0.0% | 43.5% |
| Woodlawn | 9.6% | 2.5% | 80.1% | 3.5% | 31.2% |

*Sources: Chicago Health Atlas and CMAP Summary of 2017-2021 American Community Survey Five-Year Data*

30.     Hyde Park has a competitive rental housing market with rapidly rising housing costs that increasingly displace lower-income and Black residents. Between 2000 and 2022, the overall Black population in Hyde Park dropped from 38 percent to 26 percent.

**Mac Properties Dominates Hyde Park's Rental Market**

31.     Mac Properties owns and manages buildings in Chicago, St. Louis, and Kansas City. In Chicago, Mac Properties manages properties in and around the Hyde Park neighborhood (broadly defined). It does not manage apartment buildings in any other part of Chicago.

32. Mac Properties currently owns and manages over 100 buildings, with over 5,000 apartments, in Chicago, which are all located in and around Hyde Park.

33. Hyde Park has less than 10,000 total rental units, which means that Mac Properties dominates and effectively controls this rental market.

34. Mac Properties owns and manages multi-family housing. Mac Properties began purchasing older, walk-up, courtyard, and three-flat buildings in Hyde Park in the early 2000s and has continued purchasing, constructing, or renovating high-rise, amenities buildings.

35. Mac Properties owns and manages several types of buildings:

    a. Newly-built, high-rise, amenity buildings near the lake, such as 5252 Apartments, Solstice on the Park, and City Hyde Park, which offer new, on-site fitness centers, restaurants, pools, rooftop decks, and other amenities for residents;

    b. Renovated, high-rise, amenity buildings, which are also mostly near the lake and include Regents Park Apartments, Del Prado, East Park Tower, Windermere House, Blackwood Apartments, and the Sutherland. These buildings offer renovated units, amenities like fitness centers, lounge areas, and pools, and 24-hour on-site staffing;

    c. Other buildings that tend to be older, low-rise, or three-flat buildings with fewer updates, fewer amenities, and scattered throughout the neighborhood, including some in areas on the western edge of Hyde Park farther from the lake.

10

36. Most Mac Properties buildings have units with rents that fall within the CHA Mobility Area budgets for the Voucher program, including in the newly-built or renovated high-rise buildings.

### Mac Properties' General Leasing Policies and Practices

37. Mac Properties' centralized team of leasing agents handles the rental advertising, tours, and tenant screening procedures for all its buildings in Chicago; leasing agents are not assigned to specific buildings. Mac Properties' Chicago leasing team includes around 15 leasing agents, two managers, and a director all based in Chicago.

38. Mac Properties' leasing agents respond to prospective tenant inquiries, schedule tours, provide applications, gather tenant income and other information, and otherwise manage the initial leasing process with prospective tenants for the entire Hyde Park area.

39. Mac Properties primarily advertises available units on its website and updates its website at least daily with current apartment availability and rent prices. Mac Properties' corporate office and director-level staff set prices and approve negotiated prices; the leasing agents do not have authority to set or change rent prices without approval.

40. Prospective tenants can contact Mac Properties by submitting a short form online, calling Mac Properties' central leasing number, or visiting the Mac Properties leasing office at 1364 East 53rd Street in Hyde Park. All prospective tenant inquiries are directed to and handled by the centralized Mac Properties leasing team.

41. Mac Properties immediately logs every prospective tenant inquiry into Salesforce, its customer relationship management software, and assigns a leasing agent to the inquiry. Mac Properties uses Salesforce to manage all contacts and information about prospective tenants,

11

such as their budget, whether they are a student or Voucher holder, their move-in date, and other details.

42. Mac Properties requires leasing agents to respond to every inquiry from prospective tenants, propose properties within their criteria, and schedule and conduct tours. Mac Properties requires leasing agents to be readily available to prospective tenants via email and phone.

43. Mac Properties also requires leasing agents to follow up on an initial prospective tenant inquiry at least three times and, once they establish communication, to contact a prospective tenant weekly about apartment availability and tours. Leasing agents provide rental applications to prospective tenants.

44. Mac Properties evaluates, compensates, and incentivizes leasing agents based on the number of signed leases the leasing agents obtain each month and whether they follow the communication policies for prospective tenants.

**Mac Properties' Policy and Practice of Voucher Discrimination**

45. Federal, state, and local fair housing laws require Mac Properties to treat Voucher holders equally to non-Voucher holders and to not discriminate against Voucher holders based on their source of income (i.e. the fact that they have a Voucher).

46. Despite these protections, the experience of the Individual Plaintiffs and other Voucher holders who have tried to rent from Mac Properties, statements from former Mac Properties leasing employees, and HOPE's investigation of Mac Properties' treatment of Voucher holders show that Mac Properties systematically and illegally refuses to engage in real estate transactions with Voucher holders for a number of buildings, including its newly-built or renovated high-rise amenity buildings.

12

47.     Mac Properties deploys a set of policies and practices that treat Voucher holders as less qualified and desirable renters, block Voucher holders from renting at a number of buildings across its portfolio, such as high-rise, amenities buildings, and steer Voucher holders to older, lower quality buildings with fewer amenities. Mac Properties, through its unified leasing team, applies these policies and practices across its portfolio to any Voucher holder inquiry in and around Hyde Park, Chicago:

    a.  Mac Properties directly tells Voucher holders that they cannot rent at a number of properties, including as examples its newly-built or renovated, high-rise amenity buildings;

    b.  Mac Properties refuses to send applications to, or process applications from, Voucher holders for a number of properties, including as examples its newly-built or renovated high-rise amenity buildings;

    c.  Mac Properties steers Voucher holders away from a number of properties, including as examples its newly-built or renovated high-rise amenity buildings, and toward older, lower-quality apartments with fewer amenities, even when the rent is similar;

    d.  Mac Properties lies to Voucher holders about available units and falsely states that no units are available, especially at a number of properties, including as examples its newly-built or renovated high-rise amenity buildings;

    e.  Mac Properties refuses to schedule, or cancels, tours for Voucher holders, especially for a number of properties, including as examples its newly-built or renovated high-rise amenity buildings; and

f. Mac Properties uses illegal work income policies as an excuse to refuse to rent to Voucher holders in a number of properties, including as examples its newly-built or renovated high-rise amenity buildings.

48. In doing so, Mac Properties also discriminates against Voucher holders in the leasing services associated with renting an apartment: Mac Properties refuses to follow up on certain inquiries from Voucher holders, provides different and misleading information to Voucher holders when it does follow up on inquiries, and generally provides less follow up to Voucher holders than for other renters.

49. These policies also effectively make a significant portion of Mac Properties' apartments—and a significant portion of rental housing in Hyde Park—unavailable to Voucher holders.

50. Mac Properties appears to discriminate against Voucher holders to bar low-income tenants from a number of certain buildings, such as its amenity and renovated buildings, reserving them for wealthier or more "prestigious" renters, such as University of Chicago staff and students.

51. Mac Properties also categorized the buildings in its portfolio and applied different income requirements for different categories of buildings. For example, "luxury high-rises" (such as, for example, Solstice on the Park and 5252 Apartments, among others) and "high-rises" (such as, for example, Regents Park and The Del Prado, among others) have been subjected to minimum income policies that require a potential tenant have "working income" of 3 times or 2.5 times the rent. These policies, along with other practices alleged herein, have kept Voucher holders out of Mac Properties' buildings in the Hyde Park area. Mac Properties centrally set and enacted these rules and requirements that furthered discrimination against Black renters.

14

**Mac Properties' Voucher Discrimination is Illegal and Persistent**

52.     The law requires landlords like Mac Properties to treat Voucher holders like other prospective tenants. Mac Properties does not do so.

53.     Chicago has prohibited discrimination against Voucher holders for over 30 years. In 1990, the City of Chicago prohibited source of income discrimination under the Chicago Fair Housing Ordinance. CHICAGO, ILL., MUNICIPAL CODE § 5-8-040. The Chicago Fair Housing Ordinance defines source of income as "the lawful manner by which an individual supports themselves and their dependents." *Id.* § 6-10-020.

54.     In 2013, Cook County passed a law that prohibits source of income discrimination. COOK COUNTY, ILL., CODE OF ORDINANCES § 42-38. Source of income is defined as "the lawful manner by which a person supports themselves and/or their dependents." *Id.* § 42-31.

55.     In 2022, the State of Illinois amended the Illinois Human Rights Act to expressly prohibit discrimination based on source of income. "Source of income" is defined as "the lawful manner by which an individual supports himself or herself and his or her dependents." 775 ILCS 5/1-103(O-5). No person may treat a prospective renter differently in a "real estate transaction" because of their "source of income," (i.e. whether they have a Voucher to pay part of their rent). This expansive protection includes all aspects of the renting process, including protection from misrepresentation of the availability of a unit; altering the terms, conditions, or privileges of the tenancy; refusing to receive or transmit a bona fide offer to rent; refusing to negotiate; and expressing orally or in writing an intent to commit unlawful discrimination. *See* 775 ILCS 5/3-102.

56. Likewise, and as detailed below, because Black renters in Chicago are far more likely to use a Voucher than White renters, the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and Illinois Human Rights Act, 775 ILCS 5/3-101 *et seq.*, prohibit discrimination against Voucher holders as an illegal practice that has a discriminatory, disparate impact on Black renters.

57. These laws are not new. And Mac Properties knows that.

58. Voucher holders have repeatedly complained about source of income discrimination at Mac Properties. Voucher holders filed formal administrative complaints against Mac Properties again and again, year after year, including in at least 2009, 2010, 2011, 2015, 2017, 2019, 2020, 2021, 2023, and 2024. Mac Properties also previously faced allegations of steering a Voucher holder from quality housing to an uninhabitable apartment in a 2011 court filing.

59. But Mac Properties' discrimination against Voucher holders persists. Recent examples of Mac Properties' discrimination against Voucher holders include:

60. In December 2020, Mac Properties refused to rent to a Voucher holder at four separate buildings that she asked to tour throughout Hyde Park. Instead, Mac Properties steered the Voucher holder and told her that she could only rent a small, noisy apartment in a different building because of her Voucher.

61. In May 2021, Mac Properties initially told a Voucher holder that it had two-bedroom apartments available in Hyde Park. But when Mac Properties learned that the prospective renter had a Voucher, it refused to provide any information about **any** of its apartments **anywhere** in Hyde Park and directed her to general listings across the City of Chicago.

16

62.     In March 2022, a Voucher holder toured 5252 Apartments, a new, high-rise amenity building near the lake that advertised apartments within her budget. When she mentioned her Voucher, however, Mac Properties refused to provide her with or process her application. Mac Properties told her that they have special rules that apply only to Voucher holders. Unlike for other renters, Mac Properties refused to hold apartments or negotiate rents for Voucher holders. They told her that she was not allowed to rent at 5252 Apartments.

63.     In August 2022, Mac Properties used a "work income" requirement of 2.5 times the monthly rent, meaning that Mac Properties evaluated the Voucher holder's ability to pay rent *only* based on income from employment and ignored the Voucher that would pay most of the rent and other income sources, as an excuse to deny a Voucher holder a two-bedroom apartment at Algonquin Apartments, a lakefront high-rise building. Mac Properties did so, even though CHA would have reliably paid nearly all the Voucher holder's rent.

64.     In August 2022, Mac Properties denied another Voucher holder an apartment at Algonquin Apartments, again based on a "work income" requirement. Mac Properties insisted that the Voucher holder would need "extra income" to be approved, even with good credit and a co-signer. When the Voucher holder questioned Mac Properties' income policy, Mac Properties refused to respond or rent her the apartment.

65.     In December 2022, Mac Properties refused to show or tell a Voucher holder about any of the available apartments in Regents Park Apartments ("Regents Park"), a high-rise, amenity building on the lake—even when she asked specifically about the Regents Park apartments advertised online. Instead, Mac Properties sent her four listings, none of which were at Regents Park, and told her that she could not apply to Regents Park without "work income" of at least 2.5 times the listed rent.

17

66.     In February 2023, another Voucher holder inquired about renting at Regents Park online. She mentioned her Voucher and Mac Properties delayed her request to tour Regents Park and then falsely claimed that there were no apartments available within her Voucher budget. When the Voucher holder sent Mac Properties a list of two-bedroom apartments at Regents Park within her budget, Mac Properties ignored her, refused to respond, and refused to let her tour or lease an apartment at the building. Instead, Mac Properties sent her listings in low-rise buildings without amenities. The Voucher holder tried requesting a tour in-person at Regents Park, but another leasing agent refused to give her a tour of the building or available apartments. The Voucher holder then went to the Mac Properties office to schedule a tour and was told a third time that she was not allowed to rent at Regents Park. She was encouraged to look at "the walk-ups," low-rise, and older buildings farther from the lake and with fewer amenities.

67.     About a month later, the same Voucher holder returned to Mac Properties with a new email address to start a fresh leasing inquiry with a new leasing agent. For a fourth time, Mac Properties told her that she could not rent at Regents Park or at 5252 Apartments with a Voucher. Mac Properties sent her other listings without amenities and farther from the lake. That same week, her friend contacted Mac Properties with the same budget and without a Voucher; Mac Properties promptly scheduled him for tours at Regents Park.

68.     In 2023, in response to ongoing complaints about Mac Properties' leasing office, HOPE initiated an investigation of Mac Properties' treatment of Voucher holders. In late March 2023, a HOPE fair housing tester, inquiring as a prospective tenant, called Mac Properties about one-bedroom apartments within her $2,200 per month budget. She specifically expressed interest in viewing Regents Park listings. Before she mentioned a Voucher, Mac Properties set up a tour, identified multiple available apartments, and touted all the amenities at Regents Park, including

18

the rooftop deck, pool, fitness center, two laundry rooms, and Amazon lockers. At the end of the tour, when the renter mentioned paying with a Voucher, Mac Properties told her that she could not apply to or rent three of the apartments it had previously promoted to her at Regents Park, even though the rents were within her budget.

69.     In April 2023, another HOPE fair housing tester visited Mac Properties' leasing office and asked about using a Voucher to rent a one-bedroom apartment for around $2,200 per month. Mac Properties sent her an email with a list of apartments at older buildings with fewer amenities, and never followed up with her again.

70.     The next day, a different HOPE fair housing tester contacted Mac Properties' leasing office and asked about one-bedroom apartments for around $2,200 per month, but did not mention a Voucher. Mac Properties sent the tester a list of available units at Regents Park and other buildings, and repeatedly followed up, by email and phone, for over a month.

71.     In April 2023, a Voucher holder contacted Mac Properties to confirm whether the apartments listed online, and within her budget, were still available at 5252 Apartments. After Mac Properties confirmed that the apartments were available, she told the leasing agent that she would call back when she received her Voucher moving paperwork. Yet, a few days later, when she asked for an application for those same apartments, Mac Properties refused to send her the application, to let her apply, or to lease her any apartments at the building. A few days later, the Voucher holder called Mac Properties and spoke with a different leasing agent. This leasing agent again told her that she could not lease an apartment at 5252 Apartments with her Voucher and denied her an application. The Voucher holder contacted Mac Properties a third time—this time with a new email address and no mention of a Voucher. She finally secured an application and completed it, but Mac Properties refused to process it or rent her the apartment when they

19

learned that she had a Voucher. Mac Properties directed her to other buildings and did not rent her the apartment at 5252 Apartments, even though it remained available and within her Voucher budget.

72. In July 2023, a Voucher holder contacted Mac Properties about an apartment at Regents Park. Mac Properties told her that she could not rent a Regents Park apartment even though there were apartments available within her budget. Mac Properties sent the Voucher holder to low-rise properties with fewer amenities and farther from the lake. When the Voucher holder contacted Mac Properties again that same week—with a different email address and no mention of a Voucher—Mac Properties promptly scheduled her for a tour at Regents Park. The Voucher holder was ultimately prohibited from touring, or renting at, Regents Park once the new leasing agent looked up her name in Mac Properties' system and learned of her Voucher.

73. In October 2023, another HOPE fair housing tester toured three apartments at Regents Park. After the tour, the potential renter mentioned, for the first time, that she had a Voucher. As soon as she mentioned the Voucher, Mac Properties discouraged her from applying to the two-bedroom apartment they had toured, and told the potential renter about the credit check, conditional approval fee for credit flags, and the one-time administrative fee. After that, Mac Properties never sent follow-up information about the apartments, as promised, and never contacted the potential renter again.

74. During that same week in October 2023, a different HOPE fair housing tester contacted Mac Properties about renting an apartment at Regents Park with a similar budget and without a Voucher. Mac Properties promptly sent the person five potential apartments at Regents Park, scheduled and completed the tour within days, and followed up repeatedly to see if the non-Voucher holder would rent at Regents Park.

75.     In March 2024, another HOPE fair housing tester contacted Mac Properties to rent a one-bedroom apartment at Regents Park with a Voucher. Mac Properties said they would send an email with apartment options for the tester to look over. Mac Properties never sent her any information about available apartments at Regents Park, as promised, even though it continued to publicly advertise available apartments at Regents Park within her budget.

76.     During that same week in March 2024, a different HOPE fair housing tester contacted Mac Properties about renting a one-bedroom apartment at Regents Park with a similar budget and without a Voucher. Mac Properties sent her eight specific listings for one-bedroom apartments with monthly rent below the Voucher budget, including at Regents Park and nearby Mac Properties buildings. Mac Properties repeatedly followed up with and solicited her about renting at Regents Park.

77.     These examples are not exhaustive. Despite repeated warnings and challenges to its practices, Mac Properties continues to discriminate against and treat Voucher holders differently than other prospective tenants. For Voucher holders, Mac Properties' discriminatory policies and practices deny tours and applications at a range of specific buildings across the Hyde Park area portfolio, steer them to a set of older, lower quality buildings with fewer amenities, and overall offer inadequate leasing services to Voucher holders seeking to rent in the Hyde Park area. Mac Properties sends a clear message: Voucher holders are not encouraged or welcomed at Mac Properties, especially at a number of buildings, such as its newly-built or renovated high-rise amenity buildings. Mac Properties' discrimination violates local, state, and federal law, and denies Voucher holders equal access to affordable, quality housing in the Hyde Park area, one of the few racially diverse Mobility Areas in Chicago.

**Mac Properties' Voucher Discrimination Disparately Impacts
and Harms Black Renters**

78.     Mac Properties systematically refuses to engage in real estate transactions with Voucher holders who seek to rent at a number of buildings in the Hyde Park area, such as newly-built or renovated high-rise amenity buildings, which illegally restricts Voucher holders' access to quality rental housing in Hyde Park.

79.     Mac Properties' refusal to transact with Voucher holders has a significant disparate impact on Black renters. In Chicago, discrimination against Voucher holders is effectively discrimination against Black families.

80.     Of all Chicago households, 28.0% are Black and 38.4% are White.

81.     Among renters in Chicago, 33.3% are Black and 34.7% are White.

82.     Among Voucher holders in Chicago, 89% are Black and 2% are White.

83.     The disproportionate representation of Black households among Voucher holders is practically and statistically significant. Black renters are forty-six times (46.47x) more likely than White renters to be impacted by Mac Properties' discrimination against Voucher holders. Put differently, the proportion of Black renters impacted by Mac Properties' discrimination is 4,600% larger than the proportion of White renters impacted.

84.     The racial disparity in Mac Properties' discrimination is substantial and significant. CHA publishes data on the race of each Voucher holder. The data shows who is impacted. With so few White Voucher holders, Mac Properties' discrimination has virtually no impact on White renters. Almost everyone impacted (89%) is a Black renter.

85.     Even if CHA's Voucher data is treated as a sample of the relevant renters, if Mac Properties' discriminatory policies and practices were race-neutral, the chance of observing a

22

racial gap this large would be less than one in one billion. The racial disparity is statistically significant at far below the .0000001 level (p-value).

86.     Mac Properties' discrimination against Voucher holders is discrimination against Black renters. Plaintiffs Moore, Coleman, Ayanwale, and Fleming—all Black women—experienced it first-hand.

87.     Mac Properties' discrimination against Voucher holders has a significant and substantial disparate impact on Black families and renters. The effect of Mac Properties' discrimination is to deny a group of Black renters access to Mac Properties apartments, especially at a number of buildings that include its newly-built or renovated high-rise amenity buildings and, by extension, quality housing in one of the few racially diverse Mobility Areas in Chicago and on the South Side.

88.     There is no legal justification for Mac Properties' policy and practice of discriminating against Voucher holders in Chicago. The policies and practices are independently unlawful. The Chicago Human Rights Ordinance has specifically prohibited source of income discrimination since 1990; the Cook County Human Rights Ordinance banned source of income discrimination in 2013; and the Illinois Human Rights Act prohibited source of income discrimination as of January 1, 2023.

89.     Under these laws, the Chicago Commission on Human Relations, Cook County Commission on Human Rights, and Illinois Department of Human Rights all instruct housing providers not to discriminate against Voucher holders.[1] Landlords must fairly account for a

---

[1] *See* COOK CO. DEP'T OF HUM. RTS. AND ETHICS, Source of Income Protections Under Cook County Human Rights Ordinance (Feb. 3, 2022), https://www.cookcountyil.gov/sites/g/files/ywwepo161/files/Documents/2022-02/SourceofIncomeProtections_UpdatedMemo2022.pdf; CITY OF CHICAGO COMM'N ON HUM. REL., Section 8 Voucher Holders and Source of Income Discrimination, https://www.chicago.gov/content/dam/city/depts/cchr/AdjSupportingInfo/AdjFORMS/Section8Vouchers

housing subsidy, such as a Voucher, when evaluating a tenant's ability to pay rent and not require Voucher holders to also document income based on a multiple of the Housing Authority's monthly portion.

90.     There is no legitimate business justification for Mac Properties' discrimination against Voucher holders. Rent payments from the Voucher program are far more secure than payments from any tenant, as CHA receives Voucher funds from the federal government and pays its portion of the rent directly to the landlord each month. If the tenant's income decreases, CHA increases the amount of rent it pays.

91.     Further, Mac Properties often waives income requirements and other rules for rental applications for non-Voucher renters, including University of Chicago students. According to a former employee, Mac Properties can—and does—negotiate the advertised or requested rent for market renters, but not for Voucher holders. Mac Properties also strictly applies its minimum "work income" policy to Voucher holders, but exempts University of Chicago students from that same policy (even without a co-signer).

92.     To the extent that Mac Properties asserts a business interest in rules that discriminate against Voucher holders, like "work income" requirements, any such interests can be addressed by less discriminatory alternatives, like considering and crediting the housing subsidy in an ability-to-pay evaluation.

---

SourceofIncomeDisc.pdf; ILLINOIS DEPT' OF HUMAN RIGHTS, Source of Income Discrimination Frequently Asked Questions, https://dhr.illinois.gov/filing-a-charge/faq-sourceincome.html (last visited Dec. 13, 2024).

**Mac Properties Discriminated Against the Individual Plaintiffs**

*RySheena Moore*

93.     Plaintiff RySheena Moore contacted Mac Properties around February 13, 2023 about renting a two-bedroom apartment at Regents Park in Chicago. Ms. Moore lives with her son, who is currently 15 years old.

94.     Ms. Moore looked at available apartments on Mac Properties' website and determined that she could afford them with her Voucher and military service-related retirement pension. She was particularly interested in Regents Park because the rent was lower, it offered amenities, including a pool, and was closer to the lake. Ms. Moore is a United States Army veteran with a disability; being close to the lake and having an on-site pool would help treat her disability. She also prioritized searching for housing in a safe neighborhood with good schools for her son, and she was excited about the possibility of her son attending Kenwood Academy.

95.     She contacted Mac Properties online. When a Mac Properties leasing agent responded to Ms. Moore, she confirmed that she was looking for an apartment with rent up to or around $2,100 and mentioned her Voucher. They agreed to meet on February 17, 2023 to tour an apartment at Regents Park, but the leasing agent never provided Ms. Moore with a meeting time.

96.     The Mac Properties leasing agent did not contact Ms. Moore again until February 20, 2023, when he falsely stated that Regents Park did not have any apartments available within her budget. Ms. Moore sent the leasing agent screenshots of two Regents Park apartment listings that were within her Voucher budget: Apartment N0804 (listed for $2,000) and Apartment N1109 (listed for $1,975). The Mac Properties leasing agent never responded. Mac Properties lied to her about Regents Park and falsely represented that no apartments were available when, in fact, multiple apartments were available.

97. In a separate email, the leasing agent suggested that she tour apartments in other parts of the neighborhood and farther from the lake, instead of Regents Park. The leasing agent refused to rent to Ms. Moore at Regents Park and steered her toward buildings without amenities and farther from the lake.

98. Ms. Moore went to Regents Park in-person on February 22, 2023. Ms. Moore spoke with a second Mac Properties leasing agent, who asked whether Ms. Moore had her Voucher "moving papers." The second Mac Properties leasing agent falsely and illegally told her that, "We don't schedule tours with Housing Choice Voucher holders if they do not have their moving papers in hand." Ms. Moore requested a tour and explained to the second leasing agent that she did not yet have her moving papers because her current lease did not end until May 31, 2023. The Mac Properties leasing agent refused to show Ms. Moore the building or available apartments and refused to rent to Ms. Moore.

99. Frustrated with this mistreatment, Ms. Moore went to Mac Properties' main leasing office for assistance. There, the Mac Properties leasing agent again refused to show or rent her an apartment at Regents Park and did not suggest or offer any other high-rise buildings near the lake or buildings similar to Regents Park, even though Mac Properties owns several similar high-rises with many amenities and updates. Instead, the leasing agent only offered to show her the "walk-ups" and sent Ms. Moore listings for older, low-rise apartment buildings farther from the lake and that lacked amenities.

100. In March 2023, Ms. Moore contacted Mac Properties again about advertised apartments that were within her Voucher budget, and yet again, Mac Properties refused to rent her an apartment at Regents Park, even though it publicly advertised available apartments within her budget.

101.    In April 2023, Ms. Moore asked a friend, who did not have a Voucher, to inquire about scheduling a tour at Regents Park. A Mac Properties leasing agent promptly scheduled him for a tour at Regents Park and repeatedly followed up with him about renting the apartment.

102.    When Mac Properties refused to engage in real estate transactions with Ms. Moore because of her Voucher, she was frustrated and discouraged. Time and again, Ms. Moore was denied the opportunity to even tour or apply to apartments at Regents Park like any other potential renter, simply because she had a Voucher. Multiple Mac Properties leasing agents refused to rent to her. Even when Ms. Moore went to Hyde Park in person, both to Regents Park and the central leasing office, Mac Properties falsely told her that she could not rent at Regents Park because of her Voucher. This mistreatment caused her even more frustration, embarrassment, and stress.

103.    This discrimination was particularly distressing for Ms. Moore because she faced rising rent in her apartment and risked losing that apartment entirely. She is an Army veteran with a disability. She was on a deadline to find a new apartment at the end of her lease, and to find a home and neighborhood with a well-resourced school for her son. Mac Properties made her feel discouraged about her options and opportunities and distrustful and anxious about seeking to rent from other landlords, especially at buildings with amenities.

104.    Mac Properties' discrimination also cost Ms. Moore economically. She spent time and money traveling to Hyde Park in attempts to tour Regents Park apartments, only to be unlawfully refused by Mac Properties leasing agents.

105.    Despite her efforts to rent from Mac Properties, in the end, Ms. Moore had to stay in her prior apartment and pay a more-than-$200-per-month rent increase. Her current apartment is more costly and lacks critical features: an on-site pool and proximity to the lake, both of which

would help treat her disability. Further, because Mac Properties refused to rent to her, she continues to experience anxiety as her lease expiration date approaches and worries about the limited options if she has to search for a new apartment.

### *Cadeidga Coleman*

106.    Plaintiff Cadeidga Coleman contacted Mac Properties around December 19, 2022 about renting a two-bedroom apartment at Regents Park. Ms. Coleman saw available two-bedroom apartments advertised at Regents Park that were within her Voucher budget. Ms. Coleman was moving from Minnesota back to Chicago with her then five-year-old daughter and needed to lease an apartment by mid-February 2023, or she risked losing her Voucher.

107.    Initially, a Mac Properties leasing agent contacted Ms. Coleman to assist with her request to rent at Regents Park. When Ms. Coleman disclosed that she had a Voucher, the Mac Properties leasing agent refused to show or rent her any of the available Regents Park apartments, even though Ms. Coleman had also disclosed her budget was more than the advertised rent. Instead, the leasing agent suggested four other apartments to Ms. Coleman—none were at Regents Park, in a high-rise or amenity building, or near the lake.

108.    The leasing agent told Ms. Coleman that she would send her an application and preapproval form, but after Ms. Coleman disclosed her Voucher, the leasing agent refused to send the paperwork necessary for her to rent *any* apartment from Mac Properties, including Regents Park or any of the many other similarly renovated or amenity high-rise buildings that Mac Properties has nearby in the Hyde Park area.

109.    When Ms. Coleman called the leasing agent again for an application, the leasing agent again refused. She told Ms. Coleman that Mac Properties required her to have "work income" of 2.5 times the full monthly rent, in addition to her Voucher.

28

110.     Ms. Coleman contacted Mac Properties again around January 7, 2023, hoping to speak with a different leasing agent. Mac Properties never responded to this inquiry.

111.     In January 2023, Ms. Coleman called her original leasing agent again, who again refused to rent to Ms. Colemen because Mac Properties required "work income" and would not rent an apartment to a Voucher holder even if CHA paid the entire rent.

112.     Ms. Coleman felt defeated and resigned. She had found a building in Hyde Park that met her needs and was within her budget, but Mac Properties denied her the opportunity to live there simply because of her Voucher. She repeatedly advocated for herself, calling and reaching out to Mac Properties again and again, hoping a different leasing agent would provide a different answer—but Mac Properties refused to let her rent at Regents Park every time. Mac Properties' mistreatment caused Ms. Coleman to feel discouraged about her housing search and options. She started looking for lower quality apartments without amenities because Mac Properties made her feel like that was all she could hope for in Chicago with her Voucher.

113.     Until Mac Properties' discrimination, Ms. Coleman had been particularly excited about moving back to Chicago from Minnesota with her daughter. She was staying with her sister while she was searching for housing and hoped she would find something quickly, since that was her experience using a Voucher in Minnesota. Mac Properties' refusal to rent to her shifted that excitement to stress and worry. It delayed her housing search, her chance to use her Voucher, and her move to Chicago.

114.     Mac Properties' discrimination directly impacted Ms. Coleman financially. She was forced to spend over $900 on additional application and move-in fees.

115.     Faced with the Voucher deadline, Ms. Coleman ultimately moved into a garden apartment in an older building in the West Ridge Neighborhood. The building has no amenities

29

or access to the lakefront, and the apartment is smaller, lower quality, and less valuable than the apartments at Regents Park. At the time, Ms. Coleman was working at the McCormick Center and the West Ridge apartment was also miles north of her job and Regents Park, leaving her facing a much longer commute to work every day. And yet, Ms. Coleman's total contract rent for this inferior apartment is as much as it would have been for the nicer apartment at Regents Park.

### Janishia Fleming

116.     In July 2023, Plaintiff Janishia Fleming contacted Mac Properties and tried to rent an apartment at Regents Park. At the time she received a Voucher, after nearly a decade on the waitlist, Ms. Fleming and her children were homeless and searching for an apartment. Mac Properties had initially "pre-approved" her application after a credit screening, but then told her that she could not tour or rent at Regents Park, even though the rent prices were within her budget. The leasing agent alleged that Ms. Fleming could only rent apartments with rent at least $300 per month under her Voucher budget and that there were hidden utility and maintenance fees at Regents Park. Mac Properties refused to process her full application for Regents Park.

117.     Ms. Fleming was worried about finding housing by her Voucher deadline, so she agreed to tour the buildings that Mac Properties would allow her to see and rent. Instead of Regents Park or any other high-rise amenity, newly-built, or renovated building, or any other building near the lake, the Mac Properties leasing agent showed her older, low-rise buildings. The buildings Ms. Fleming toured were "filthy" and "smelly" and in peripheral areas of Hyde Park farther from the lake.

118.     In August 2023, Ms. Fleming again tried to rent at Regents Park through a different leasing agent. She contacted Mac Properties with another email address and, at first, did not disclose that she had a Voucher. Since she did not disclose her Voucher, the Mac Leasing

30

agent immediately offered to show her available apartments at Regents Park. When the leasing agent entered Ms. Fleming's name to book the tour, she learned about Ms. Fleming's Voucher and denied her a tour. Discouraged, Ms. Fleming asked Mac Properties to assign her a new leasing agent. Mac Properties assigned her a new leasing agent, but that agent also refused to show her Regents Park and suggested that she apply to a low-rise walk-up in the periphery of Hyde Park. Again, the new agent did not offer any of Mac Properties' high-rise buildings near the lake, including buildings that had been renovated or that have amenities.

119. Ms. Fleming was exhausted. She had done everything she could to try to rent safe, stable housing from Mac Properties, but she was refused every time because of her Voucher. That Mac Properties repeatedly steered her towards "filthy" and "smelly" buildings in its portfolio, rather than the lakefront amenities building she sought, was offensive and upsetting. Mac Properties only treated her respectfully, and seriously considered her inquiries at Regents Park, when it did not know that she had a Voucher. Ms. Fleming was distressed, frustrated, and discouraged by Mac Properties' mistreatment.

120. Ms. Fleming waited for nearly a decade to be called from the CHA waitlist and to secure a Voucher. She experienced immense relief and hope for more financial stability when she finally got a Voucher. Mac Properties' discrimination immediately diminished that excitement and hope and delayed, for months, her and her children's ability to secure safe, stable housing.

121. Mac Properties' discrimination directly impacted Ms. Fleming financially. She spent time and money traveling to tour additional apartments in Chicago and Hyde Park. She missed work and had to submit additional apartment applications, each with fees ranging from around $20-$75.

31

122. When Mac Properties refused to rent to her, Ms. Fleming could not find anywhere suitable to rent within the Voucher's requirements and ended up in a temporary shelter in the Chicago suburbs for months. The shelter required her to be present with her children, which prevented her from working and earning additional income. Because Mac Properties refused to rent to her, Ms. Fleming also lost out on a $1,000 CHA Mobility Program stipend and months of Voucher benefits that were not available while she continued to search for a suitable apartment with a landlord who would rent to her. At long last, Ms. Fleming and her family finally moved into an apartment in March 2024. Ms. Fleming has tried to forget about the instability and worry she associates with this time, but she continues to experience stress and agitation when she thinks about how Mac Properties treated her.

### *Sheliah Ayanwale*

123. Plaintiff Sheliah Ayanwale lives in Texas with her 9-year-old daughter. For the last few years, she has wanted to move to Chicago to be closer to her family. Her daughter has been bullied in school as one of the few Black children and Ms. Ayanwale wants to live in a more racially diverse neighborhood and school district. In Spring 2023, she started the formal process to "port", or transfer, her Voucher from Texas to Chicago.

124. When she started searching for housing in Chicago, Ms. Ayanwale specifically focused on Hyde Park because it was a racially diverse Mobility Area close to the lake and her family. She looked for new buildings with video tours so that she could be more confident in signing a lease without an in-person viewing. Ms. Ayanwale was excited to find a few apartments at 5252 Apartments that advertised rental prices within her Voucher budget.

125. Ms. Ayanwale contacted a Mac Properties leasing agent around April 2023 to confirm the monthly rent at 5252 Apartments. The leasing agent confirmed that the monthly rent

for a studio was $2,505 and $2,700 for a one-bedroom. Ms. Ayanwale shared that she was a Voucher holder.

126. Shortly after this conversation, Ms. Ayanwale confirmed that CHA's monthly Mobility Area Voucher budget was about $2,700 for an apartment with up to two bedrooms. Meanwhile, Ms. Ayanwale continued to check the online listed rent at 5252 Apartments and was relieved that the advertised rent stayed the same.

127. Ms. Ayanwale called Mac Properties to apply for a one-bedroom or studio apartment at 5252 Apartments. A second Mac Properties leasing agent evaded Ms. Ayanwale's request for an application, discouraged her from applying to the building with a Voucher, and eventually outright refused to provide Ms. Ayanwale with an application.

128. Ms. Ayanwale called the first leasing agent again about renting an apartment at 5252 Apartments. She left a voicemail, but no one at Mac Properties returned her call.

129. Ms. Ayanwale called Mac Properties again a few days later and spoke with a third leasing agent. This leasing agent also evaded her requests to apply to 5252 Apartments and lied to Ms. Ayanwale about the rental requirements. She told Ms. Ayanwale that she could only rent an apartment at least $100 per month below her Voucher budget maximum of $2,700, but then would not let Ms. Ayanwale apply for a studio, even though it was $2,505 per month—or $200 below her Voucher budget.

130. Eventually, the Mac Properties leasing agent relented and told Ms. Ayanwale that she would email an application to her. That was a lie, too. She never sent the application.

131. A few days later, Ms. Ayanwale was still waiting for an application. Ms. Ayanwale called Mac Properties again, asked for an application to 5252 Apartments, and did not

mention her Voucher. With no mention of a Voucher, the fourth leasing agent she spoke to sent her an application that afternoon. Ms. Ayanwale completed the application that same day.

132. A few days later, this fourth leasing agent called Ms. Ayanwale and asked if she had a Voucher. When Ms. Ayanwale confirmed that she did, yet another Mac Properties leasing agent refused to rent her an apartment at 5252 Apartments—this time with the claim that no apartments were available. Instead, the leasing agent suggested older buildings to Ms. Ayanwale. Ms. Ayanwale was not interested in being offered fewer amenities at similar prices. She was also growing frustrated by and distrustful of Mac Properties.

133. Exhausted by all the excuses, Ms. Ayanwale had her cousin call to inquire about studio apartments at 5252 Apartments. When the cousin called, Mac Properties confirmed that there were indeed apartments available at 5252 Apartments in Ms. Ayanwale's price range. Mac Properties had lied to Ms. Ayanwale again.

134. Mac Properties never responded to Ms. Ayanwale's pending application to rent at 5252 Apartments.

135. Ms. Ayanwale was distraught. *Four* different Mac Properties leasing agents had lied to her, refused to provide her with an application, or refused to return her calls—all because she was a Voucher holder. Ms. Ayanwale had repeatedly confirmed that the apartments she sought were within her budget, but Mac Properties only allowed her to apply when it believed she did not have a Voucher. One leasing agent even went so far as to tell Ms. Ayanwale that no apartments were available at 5252 Apartments—a blatant lie that was confirmed when Mac Properties told her non-Voucher holder cousin that there were in fact apartments available at 5252 Apartments.

136. Ms. Ayanwale was distressed, frustrated, and discouraged by Mac Properties' mistreatment. Ms. Ayanwale was eager to move her and her daughter to Hyde Park, to be near her family and in a racially diverse neighborhood close to the lake. Mac Properties owns most of the rental units in Hyde Park, and its discrimination thwarted her goal of returning to Chicago in safe, stable housing that fit her family's needs and were within budget.

137. Mac Properties' discrimination directly impacted Ms. Ayanwale financially. She spent time and money traveling to Chicago to tour additional apartments when Mac Properties thwarted her attempts to secure a lease without a visit. She applied to multiple other apartments, each with application and administrative fees between $50 and $200. The only apartments she could find were in poor condition and in neighborhoods that she felt were not safe.

138. With no viable option, Ms. Ayanwale canceled her Voucher transfer to Chicago. Ms. Ayanwale was extremely upset and depressed that she was forced to remain in Texas, and it took so long to port her voucher back to Texas that Ms. Ayanwale was left homeless for months while she waited for the transfer. During this time, she stayed in shelters and hotels, occasionally paying out-of-pocket for a hotel when she could afford it. Ms. Ayanwale remains in Texas to this day, eager to return to Chicago. Her experience with Mac Properties continues to make her question whether it is possible to move back to Chicago with her Voucher. She fears experiencing homelessness again if she tries. She also continues to experience embarrassment and shame about her experience with Mac Properties and her subsequent period of homelessness.

**Injury to Plaintiff HOPE**

139. Mac Properties' unlawful policies and practices have inflicted, and continue to inflict, concrete, particularized, and substantial injuries on Plaintiff HOPE Fair Housing Center.

35

140. HOPE's mission is to create greater housing opportunities for all. HOPE works to ensure equal opportunity for all and to eliminate housing discrimination through its activities and programs, including education and outreach, client services, public policy initiatives, training, advocacy, and investigation and referral of complaints concerning fair housing violations. HOPE services 40 of 102 counties in Illinois.

141. HOPE increases awareness of fair housing protections and obligations through outreach and education. HOPE staff host an annual fair housing conference, design and implement advertising campaigns and materials, build relationships with industry and community groups to evaluate and address training needs, and plan and offer training opportunities for housing seekers, housing providers, and others. For example, after the State of Illinois added source of income protections to the Illinois Human Rights Act, HOPE staff focused on outreach and education efforts in areas of the state that previously did not have source of income protections.

142. HOPE also advises housing seekers, housing providers, and others across the State of Illinois on fair housing and other matters. HOPE staff receive inquiries from individuals affected by discriminatory housing practices, landlord-tenant issues, and other housing concerns. HOPE staff evaluate the concern and provide advice and referrals. As resources permit and where appropriate, HOPE may investigate reports of discrimination further and assist the impacted persons to resolve the issue through coaching on self-advocacy or contacting the housing provider to mediate the issue. Because of limited resources and capacity, HOPE staff also create and distribute informational materials and resources, including "self-advocacy" letters for housing seekers, related to common discrimination questions and issues, such as discriminatory tenant screening policies and bias in home appraisals.

36

143. HOPE also provides services, training, and consultation to local governments assessing impediments to fair housing. HOPE staff design and implement market audits and investigations to evaluate the scope and impact of fair housing concerns in a local market.

144. Mac Properties' policy and practice of discriminating against Voucher holders based on their source of income, and causing a discriminatory impact on Black households, directly interferes with HOPE's mission to ensure equal housing opportunities for all.

145. Mac Properties' policy and practice of discriminating against and steering Voucher holders also directly interferes with HOPE's programs and services, as detailed above, including counseling Voucher holders on their fair housing rights, educating the public about fair housing rights and requirements, educating and working with industry groups on fair housing compliance, and providing assistance to other individuals and families looking for housing or affected by discriminatory housing practices.

146. In order to protect its mission and activities and prevent continued harm, HOPE was compelled to use its small staff, and limited budget and resources, to identify and counteract Mac Properties' discriminatory treatment of Voucher holders. In response to complaints about Mac Properties' refusals to show units to and steer Voucher holders, HOPE designed and implemented a fair housing investigation of Mac Properties' leasing practices, including spending time and resources evaluating complaints from Voucher holders, requesting and reviewing public records and other documents, and training additional fair housing testers to assist with this specific investigation. HOPE staff planned, coordinated, and evaluated fair housing tests in 2023 and 2024, which diverted staff time from other investigations, programs, and activities. HOPE's diversion of resources was necessary to respond to and evaluate the scope of Mac Properties' policy and practice of steering Voucher holders.

37

147. HOPE also conducted additional outreach, education, and training activities to counteract Mac Properties' discriminatory policies and practices. Based on its investigative findings of Mac Properties, HOPE staff revised outreach, education, and training materials and conducted additional source of income trainings in Chicago, whereas it had previously planned to focus trainings in other areas of Illinois that lacked source of income protections prior to January 1, 2023, when the statewide protection went into effect.

148. HOPE delayed other programs, activities, and priorities to divert resources to investigate Mac Properties' treatment of Voucher holders and counteract Mac Properties' discrimination. For example, HOPE staff delayed analyzing and publishing the results of a large-scale appraisal practices audit in its service area; training necessary for a planned shift toward more lending and sales investigations; developing and launching a home ownership grantmaking program; and training staff on homeownership counseling to expand programs and services. HOPE also had to shift staff time away from grants and decline to reapply to a grant that funds outreach and education work in Illinois counties that do not have a full-service fair housing agency.

149. HOPE has suffered concrete, particularized damages because of the injuries to its mission and activities. HOPE has diverted hundreds of hours of staff time and organizational resources, and paid out-of-pocket expenses to investigate the scope of and counteract Mac Properties' discriminatory policies and steering practices. If HOPE did not take this action, Mac Properties would—and will—continue to impair its mission and activities to promote equal housing opportunity for all.

## CLASS ALLEGATIONS

150. The Individual Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of:

Voucher holders who are Black and who contacted Mac Properties about renting a Hyde Park area apartment in a building that was subject to Mac Properties' restrictive policies regarding Voucher holders, on or after December 17, 2022.

151. A class action in this case is proper pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(c)(4).

152. The class is so numerous that joinder of all members is impracticable. According to HUD data, more than 3,000 Voucher holders in Chicago successfully move each year, and even more search for housing. Hyde Park is a highly sought after neighborhood in a Mobility Area with affordable rents and a diverse, resourced community. With about 5,000 Mac Properties apartments in and around Hyde Park, on information and belief the class exceeds 40 persons.

153. There are questions of fact and law common to the class that predominate over questions affecting individual class members. These common questions of fact and law include:

    a. Whether Mac Properties refuses to engage in real estate transactions with Voucher holders to keep Voucher holders out of a number of buildings or apartment, and if so, which buildings or apartment and how Mac Properties did so;

    b. Whether Mac Properties systematically refuses to engage in real estate transactions with Voucher holders by steering Voucher holders to older, lower quality buildings with fewer amenities;

    c. Whether Mac Properties refuses to engage in real estate transactions with Voucher holders by lying about apartment availability;

    d. Whether Mac Properties refuses to engage in real estate transactions with Voucher holders by refusing to show or provide tours of available apartments;

39

e. Whether Mac Properties refuses to engage in real estate transactions with Voucher holders through application of its minimum income policy, where and how those policies operated, and whether those policies violate State and Federal law;

f. Whether Mac Properties refuses to engage in real estate transactions with Voucher holders through a hidden fees policy, where and how those policies operated, and whether those policies violate State and Federal law;

g. Whether Mac Properties refuses to engage in real estate transactions with Voucher holders by refusing to negotiate the monthly rent for Voucher holders;

h. Whether Mac Properties' policies and practices for Voucher holders have a disparate impact on Black renters;

i. Whether Mac Properties' policies and practices for Voucher holders are not justified by business necessity;

j. Whether Mac Properties' policies and practices for Voucher holders violate the Fair Housing Act;

k. Whether Mac Properties knew and was warned that its policies and practices that refuse to engage in real estate transactions with Voucher holders, including income requirements, violated the law and Mac Properties chose to implement and enforce them anyway; and

l. Whether Mac Properties' brazen violation of local, state, and federal law was so malicious, oppressive, or reckless as to warrant punitive damages, and if so, in what amount.

154. The Individual Plaintiffs, as proposed class representatives, will fairly and adequately represent and protect the interests of the class. The claims of each Individual Plaintiff are typical of the claims of class members. They are all Voucher holders who are Black and contacted Mac Properties about renting its apartments in the Hyde Park area.

155. Plaintiffs are represented by attorneys who are qualified, experienced, and capable of conducting the litigation and adequately representing the interests of all class members.

156.    Mac Properties' illegal policies and practices toward Voucher holders apply to the class generally. Injunctive relief stopping these illegal policies and practices would apply to, and benefit, the class as whole.

157.    A class action is an appropriate method for achieving the fair and efficient adjudication of this controversy.

158.    Common questions of law and fact predominate over any individualized questions such that it is a fair and efficient method to adjudicate this dispute as a class, at least for injunctive relief, declaratory relief, and common questions with respect to particular issues.

159.    Common questions of law and fact predominate such that the class-wide resolution of those issues would materially advance the resolution of this litigation.

160.    The identities of all members of the class can be readily determined from records possessed and maintained by Mac Properties.

161.    Plaintiffs know of no conflicts of interest between class members.

### CAUSES OF ACTION

**COUNT I**
**Violation of the Illinois Human Rights Act**
**Race Discrimination (Disparate Impact)**
**775 ILCS 5/3-102 *et seq.***
**(All Plaintiffs and on Behalf of Those Similarly Situated)**

162.    Plaintiffs restate and reallege the foregoing paragraphs as if fully stated and alleged herein.

163.    Defendant Mac Properties is subject to the provisions of the IHRA as an "owner or any other person." 775 ILCS 5/3-102.

164.    The IHRA prohibits the following conduct because of a person's race, *id.* 1-103(Q):

41

a. "Refuse to engage in a real estate transaction with a person," *id.* 3-102(A);

b. "[D]iscriminate in making available such a [Real Estate] transaction," *id.;*

c. "Alter the terms, conditions or privileges of a real estate transaction," *id.* 3-102(B);

d. "Alter the terms, conditions or privileges of . . . services in connection" with a real estate transaction, *id.*;

e. "Refuse to negotiate a real estate transaction," *id.* 3-102(D); and

f. "Represent to a person that real property is not available for inspection, sale, rental, or lease when in fact it is so available, or to fail to bring a property listing to the person's attention, or to refuse to permit the person to inspect real property," *id.* 3-102(E).

165. Under the IHRA, discrimination "because of" race includes both claims of disparate treatment and disparate impact. *See, e.g.*, *McQueen v. City of Chicago*, 09 C 2048, 2014 WL 1715439, at *4 (N.D. Ill. Apr. 30, 2014).

166. Through its conduct and policies described above, Mac Properties refused to engage in real estate transactions, refused to negotiate a real estate transaction, represented that real property is not available for rent or inspection, refused to permit a person to inspect real property, and discriminated in the terms, conditions, privileges, and services related to real estate transactions because of a prospective renter's Voucher.

167. Mac Properties' systematic refusal to engage in real estate transactions with Voucher holders has a significant disparate impact on Black renters, as detailed above. In Chicago, 89% of Voucher holders are Black, while just 33% of renters are Black. Black renters are forty-six times (46.47x) more likely than White renters to be impacted by Mac Properties' discrimination against Voucher holders.

168. Mac Properties' policies and practices toward Voucher holders denies a group of renters—overwhelmingly Black—effective and equal access to the Hyde Park rental market, and

42

especially a number of buildings, including as examples its newly-built or renovated high-rise amenity buildings.

169. Mac Properties' policies and practices toward Voucher holders are not justified by any substantial, legitimate, or non-discriminatory interest; they are unlawful, immoral, oppressive, and serve no purpose. Mac Properties' policies and practices include illusory rules applied only to Voucher holders, like the refusal to negotiate rent (only with Voucher holders) and imposition of illogical "work income" requirements (which Mac Properties will simply waive for University of Chicago students). Even if Mac Properties alleges a non-discriminatory basis for these policies and practices, there are less discriminatory alternatives available.

170. Mac Properties' violation of the IHRA denied, and continues to deny, the Individual Plaintiffs and other Black Voucher holders full and equal access to residential housing in Chicago, and, in particular, access to a number of buildings in Hyde Park, including as examples its newly-built or renovated high-rise amenity buildings.

171. Mac Properties' violation of the IHRA caused the Individual Plaintiffs and other Black Voucher holders to suffer pecuniary losses, inconvenience, humiliation, mental anguish, frustration, distress, and inconvenience.

172. Mac Properties' violation of the IHRA also caused, and continues to cause, harm to HOPE's mission to fight housing discrimination and prevented HOPE from carrying out other programs and services it provides, including education and outreach, client services, training, advocacy, and investigation and audits of other fair housing issues. HOPE's limited resources and staff have been diverted from providing these services to efforts directed to investigate, address, and counteract Mac Properties' discriminatory conduct. HOPE has diverted hundreds of hours of staff time and organizational resources, and paid out-of-pocket expenses to investigate

the scope of and counteract Mac Properties' discriminatory policies and steering practices. If HOPE did not take this action, Mac Properties would—and will—continue to impair its mission and activities to promote equal housing opportunity for all.

173. Plaintiffs and other Black Voucher holders are therefore entitled to relief under the IHRA. 775 ILCS 5/10-102.

**COUNT II**
**Violation of the Fair Housing Act**
**Race Discrimination (Disparate Impact)**
**42 U.S.C. § 3604**
**(All Plaintiffs and on Behalf of Those Similarly Situated)**

174. Plaintiffs restate and reallege the foregoing paragraphs as if fully stated and alleged herein.

175. The Fair Housing Act ("FHA") prohibits the following conduct because of a person's race:

  a. "To refuse to sell or rent" a dwelling, 42 U.S.C. § 3604(a);

  b. "[T]o refuse to negotiate for the sale or rental of" a dwelling, *id.*;

  c. To "otherwise make unavailable or deny" a dwelling, *id.*;

  d. "To discriminate . . . in the terms, conditions, or privileges of sale or rental of a dwelling," *id.* § 3604(b);

  e. "To discriminate . . . in the provision of services or facilities in connection" with the rental of a dwelling, *id.*; and

  f. "To represent . . . that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available," *id.* § 3604(d).

176. Both intentionally discriminatory conduct and practices that have a disparate impact because of a person's race violate the FHA. *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015).

44

177.     Through its conduct and policies described above, Mac Properties refused to engage in real estate transactions, refused to negotiate a real estate transaction, represented that real property is not available for rent or inspection, refused to permit a person to inspect real property, and discriminated in the terms, conditions, privileges, and services related to real estate transactions because of a prospective renter's Voucher.

178.     Mac Properties' systematic refusal to engage in real estate transactions with Voucher holders has the direct result of causing a significant disparate impact on Black renters, as detailed above. In Chicago, 89% of Voucher holders are Black, while just 33% of renters are Black. Black renters are forty-six times (46.47x) more likely than White renters to be impacted by Mac Properties' discrimination against Voucher holders.

179.     Mac Properties' policies and practices toward Voucher holders denies a group of renters—overwhelmingly Black—effective and equal access to the rental market in Hyde Park, and especially a number of buildings, including as examples its newly-built or renovated amenity high-rise buildings.

180.     Mac Properties' policies and practices toward Voucher holders are not justified by any substantial, legitimate, or non-discriminatory interest; they are unlawful, immoral, oppressive, and serve no purpose. They include illusory rules applied only to Voucher holders, like the refusal to negotiate rent (only with Voucher holders) and imposition of illogical "work income" requirements (which Mac Properties will simply waive for students). Even if Mac Properties alleges a non-discriminatory basis for these policies and practices, there are less discriminatory alternatives available.

181.     Mac Properties' violation of the FHA denied, and continues to deny, the Individual Plaintiffs and other Black Voucher holders full and equal access to residential housing

45

in Chicago, and, in particular, access to a number of buildings in Hyde Park, including as examples its newly-built or renovated high-rise amenity buildings.

182. Mac Properties' violation of the FHA caused the Individual Plaintiffs and other Black Voucher holders to suffer pecuniary losses, inconvenience, humiliation, mental anguish, frustration, distress, and inconvenience.

183. Mac Properties' violation of the FHA also caused, and continues to cause, harm to HOPE's mission to fight housing discrimination and prevented HOPE from carrying out other programs and services it provides, including education and outreach, client services, training, advocacy, and investigation and audits of other fair housing issues. HOPE's limited resources and staff have been diverted from providing these services to efforts directed to investigate, address, and counteract Mac Properties' discriminatory conduct. HOPE has diverted hundreds of hours of staff time and organizational resources, and paid out-of-pocket expenses to investigate the scope of and counteract Mac Properties' discriminatory policies and steering practices. If HOPE did not take this action, Mac Properties would—and will—continue to impair its mission and activities to promote equal housing opportunity for all.

184. Plaintiffs and other Black Voucher holders are therefore entitled to relief under the FHA. 42 U.S.C. § 3613.

## DEMAND FOR JURY TRIAL

185. Plaintiffs demand a trial by jury on all issues for which a jury trial is allowed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

a. Certify a class of Black Voucher holders for injunctive relief pursuant to Federal Rule of Civil Procedure 23(b)(2);

b. Certify a class of Black Voucher holders for the resolution of common particular issues pursuant to Federal Rule of Civil Procedure 23(c)(4);

46

c. Appoint the Individual Plaintiffs as representatives of the class of Black Voucher holders;

d. Appoint the undersigned counsel to represent the class of Black Voucher holders;

e. Declare that Mac Properties violated the IHRA and FHA;

f. Enjoin Mac Properties from engaging in the foregoing illegal conduct now and in the future;

g. Order Mac Properties to revise its policies and procedures to comply with the IHRA and FHA;

h. Appoint a court monitor to oversee Mac Properties' compliance with injunctive relief and its treatment of Black Voucher holders;

i. Award damages to compensate the Individual Plaintiffs and class of Black Voucher holders pursuant to the IHRA and FHA through a claims process, or damages proceedings, by court, special master, or otherwise as appropriate;

j. Award compensatory damages to HOPE pursuant to the IHRA and FHA;

k. Award punitive damages against Mac Properties pursuant to the IHRA and FHA;

l. In the alternative, award nominal damages pursuant to the IHRA and FHA;

m. Award pre- and post-judgment interest;

n. Award reasonable attorney's fees, expert fees, and the costs and expenses of litigation; and

o. All other and further relief this Court deems just and equitable.

Dated: October 1, 2025

Respectfully submitted,

By: */s/ Charles D. Wysong*
One of Plaintiffs' Attorneys

CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS
Emily Coffey
MacKenzie Speer
Jacob Cantor
Aneel L. Chablani
100 N. LaSalle St., Ste. 600
Chicago, IL 60602

47

Telephone: (312) 630-9744
ecoffey@clccrul.org
mspeer@clccrul.org
jcantor@clccrul.org
achablani@clccrul.org

HUGHES SOCOL PIERS RESNICK & DYM, LTD.
Charles D. Wysong
Tory Tilton
70 W. Madison St., Ste. 4000
Chicago, IL 60602
Telephone: (312) 580-0100
cwysong@hsplegal.com
ttilton@hsplegal.com

*Attorneys for Plaintiffs*

48